1  HARVEY SISKIND LLP
   LAWRENCE J. SISKIND (SBN 85628)
2  Email:  siskind@harveysiskind.com
   SETH I. APPEL (SBN 233421)
3  Email:  sappel@harveysiskind.com
   Four Embarcadero Center, 39th Floor
4  San Francisco, CA  94111
   Telephone:  (415) 354-0100
5  Facsimile:  (415) 391-7124
6
7  Attorneys for Respondent and Cross-Petitioner
   MASTER CHIPS, BVBA
8
9              IN THE UNITED STATES DISTRICT COURT
10          FOR THE NORTHERN DISTRICT OF CALIFORNIA
11                    SAN JOSE DIVISION
12
13  MAXIM INTEGRATED PRODUCTS, INC.,          Case No. C 08 00721 JW
14                    Petitioner,             MEMORANDUM IN OPPOSITION TO
                                              PETITION TO VACATE, AND IN
15      v.                                    SUPPORT OF PETITION TO
                                              CONFIRM, ARBITRATION AWARD
16  MASTER CHIPS, BVBA,
17                    Respondent.             Date:    June 2, 2008
                                              Time:    9:00 am
18
19                                            The Honorable James Ware
                                              Courtroom 8, 4th Floor
20  MASTER CHIPS, BVBA,
21                    Cross-Petitioner,
22
23      v.
24  MAXIM INTEGRATED PRODUCTS, INC.,
25                    Cross-Respondent.
26
27
28

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ........................................................... iii

INTRODUCTION ......................................................................... 1

STATEMENT OF FACTS ............................................................... 2

STANDARD OF REVIEW .............................................................. 7

    I.    The Power of Federal Judges to Vacate International
        Arbitration Awards is Extremely Narrow ......................... 7

    II.   The Grounds for Vacating International Arbitration
        Awards are Limited to Those Contained in Article V
        of the Convention ....................................................... 9

ARGUMENT ............................................................................... 10

    I.    The Arbitrator Did Not Act Improperly by Neglecting
        to Postpone Hearings. ................................................. 10

        A.   Maxim was Not Prejudiced by the Arbitrator's
           Decision Not to Postpone the November 2006
           and May 2007 Hearings ......................................... 10

              1.   Maxim knew the amount of Master Chips's
                   damages, and the likelihood that it would
                   ultimately seek that amount, throughout the
                   arbitration ....................................................... 10

              2.   Maxim's conduct at the November 2006 and
                   May 2007 hearings was unaffected by the
                   amount of Master Chips's damages claim .......... 13

              3.   Master Chips was forced to temporarily
                   reduce the amount of its damages claim
                   because Maxim violated the Rules ..................... 14

        B.   Allowing Master Chips to Increase its Damages
           Claim was Consistent with the Rules. ....................... 15

        C.   The Cases Cited by Maxim are Distinguishable. ......... 15

i

## **TABLE OF CONTENTS (cont.)**

Page

II.   The Arbitrator Did Not Act Improperly by Allowing
      Master Chips's Expert to Testify In French. ..................................... 17

      A.   Maxim Agreed to Have Master Chips's Expert
           Testify in French. ................................................................ 17

      B.   Maxim Suffered No Prejudice from this Eminently
           Practical Arrangement ........................................................ 18

           1.   Maxim's Counsel Had No Difficulty Understanding
                Master Chips's Expert. ................................................ 18

           2.   Maxim's Counsel Understands French .......................... 18

      C.   The Cases Cited by Maxim are Distinguishable. ..................... 19

III.  The Arbitrator Did Not Act Improperly in his Treatment
      of the November 2006 Stipulation. ................................................ 20

      A.   Maxim Flouted its Discovery Obligations Leading to,
           and Resulting From, the November 2006 Stipulation. ............... 20

           1.   The November 2006 Stipulation was Necessary
                Because of Maxim's Discovery Abuses. ....................... 20

           2.   Maxim Did Not Comply with the November
                2006 Stipulation ........................................................ 21

           3.   Maxim's Misconduct Forced Master Chips
                and the Arbitrator to Rely on Publicly
                Available Information ................................................. 21

      B.   The Arbitrator was Entitled to Consider Publicly
           Available Information ........................................................... 22

           1.   An arbitrator is permitted to consider all
                relevant evidence. ...................................................... 22

           2.   The November 2006 Stipulation did not
                limit the evidence the Arbitrator could consider ............. 22

      C.   The Cases Cited by Maxim are Distinguishable ....................... 23

IV.   The Court Should Award Master Chips its Attorneys'
      Fees, Because Maxim's Challenges to the Arbitration
      Award are Completely Devoid of Merit ........................................ 23

CONCLUSION .............................................................................. 25

OPPOSITION TO PETITION TO VACATE ARBITRATION AWARD
Case No. C 08 00721 JW

# TABLE OF AUTHORITIES

Page

## Cases

Allendale Nursing Home, Inc. v. Local 1115 Joint Bd.,
  377 F. Supp. 1208 (S.D.N.Y. 1974)............................................................ 16

Brayton Purcell LLP v. Recordon & Recordon,
  487 F. Supp. 2d 1124 (N.D. Cal. 2007) ..................................................... 24

Certain Underwriters at Lloyd's v. Argonaut Insurance Company,
  264 F.Supp.2d 926 (N.D. Cal. 2003)......................................................... 8,15

Coastal General Construction Services v. Virgin Islands Housing Authority,
  238 F. Supp. 2d 707 (D.V.I. 2002) ............................................................ 15,16

Colavito v. Hockmeyer Equipment Corp.,
  605 F. Supp. 1482 (S.D.N.Y. 1985)........................................................... 24

Commercial Refrigeration, Inc. v. Layton Construction Co.,
  319 F. Supp. 2d 1267 (D. Utah 2004)........................................................ 9,24

Executone Info. Systems, Inc. v. Davis,
  26 F.3d 1314 (5th Cir. 1994)..................................................................... 24

General Steel Corp. v. World Missions Ministries,
  Case No. 06-cv-00245-PSF-MEH, 2006 U.S. Dist.
  LEXIS 78386 (D. Colo. Oct. 27, 2006) ..................................................... 24,25

Hoteles Condado Beach, La Concha & Convention Center
v. Union De Tranquistas Local 901,
  763 F.2d 34 (1st Cir. 1985) ....................................................................... passim

Industrial Risk Insurers v. M.A.N. Gutehoffnunghutte GmbH,
  141 F.3d 1434 (11th Cir. 1998).................................................................. 7,8,10

Iran Aircraft Industries v. Avco Corp.,
  980 F.2d 141 (2d Cir. 1992)....................................................................... 23

Lander Company, Inc. v. MMP Investments, Inc.,
  107 F.3d 476 (6th Cir. 1997)..................................................................... 10

M & C Corp. v. Erwin Behr GmbH & Co.,
  KG, 87 F.3d 844 (6th Cir. 1996)  .............................................................. 9

Ministry of Defense of the Islamic Republic of Iran v. Gould Marketing, Inc.,
  887 F.2d 1357 (9th Cir. 1989)................................................................... 9

iii

**Page**

**Cases (cont.)**

*Pacific Reinsurance Management Corp. v. Ohio Reinsurance Corp.*,
   935 F.2d 1019 (9th Cir. 1991)............................................................... 8,19

*Parsons & Whittemore Overseas Co., Inc. v. Societe Generale
de L'Industrie du Papier (RAKTA)*,
   508 F.2d 969 (2d Cir. 1974)................................................................. 7,9

*Robertson-Ceco Corp. v. Nat'l Union Fire Insurance Co.*,
   292 F. Supp. 2d 1082 (N.D. Ill. 2003) ................................................. 16,17

*Totem Marine Tug & Barge, Inc. v. North American Towing, Inc.*,
   607 F.2d 649 (5th Cir. 1979)................................................................ 23

*Trans Chemical Ltd. v. China Nat'l Mach. Import & Export Corp.*,
   978 F. Supp. 266 (S.D. Tex. 1997) ....................................................... 23,24

*United Paperworks Int'l Union AFL-CIO v. Misco, Inc.*,
   484 U.S. 29, 98 L. Ed. 2d 286, 108 S. Ct. 364 (1987)............................ 8

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us*,
   126 F.3d 15 (2d Cir. 1997)................................................................... 7,9


**ICC International Court of Arbitration Rules**

Rules of Arbitration, Article 20 ................................................................ 22

Rules of Arbitration, Article 21 ................................................................ 22

Rules of Arbitration, Article 22 ................................................................ 22

Rules of Arbitration, Article 30(2)............................................................ 15

Rules of Arbitration, Article 30(3)............................................................ 6

Rules of Arbitration, Appendix III............................................................. 6

Rules of Arbitration, Appendix III, Art. 1(10).............................................. 15

iv

Page

**Legislation**

9 U.S.C. § 207 ................................................................................................. 9

Belgian Act of July 21, 1961.............................................................................. 3

Convention on the Recognition and Enforcement of Foreign
Arbitral Awards, Article V................................................................................. *passim*

Federal Arbitration Act, Section 10 ................................................................... 7,8, 10

v

1

**INTRODUCTION**

2     A party seeking to vacate an international arbitration award faces a very, very steep climb.

3 The rulings may be wrong on the law. They may be wrong on the facts. They may even be

4 arbitrary and capricious. Even so, federal law and policy command judges to show the highest

5 deference. As long as "even a barely colorable justification" exists for the arbitrator's decision,

6 the judge must "emphatically decline" to question it.

7     This Petition to Vacate does not test those broad limits. Each supposed error by the

8 arbitrator turns out, after even cursory examination, to have been absolutely correct.

9     Petitioner and Cross-Respondent Maxim Integrated Products, Inc. ("Maxim") claims that

10 the arbitrator improperly allowed Respondent and Cross-Petitioner Master Chips BVBA ("Master

11 Chips") to increase its damages claim to more than $10 million on the eve of arbitration. In fact,

12 Master Chips's claim was *always* more than $10 million, going back to its original Belgian court

13 filing. Maxim knew that. Because of the financial harm inflicted on Master Chips's business by

14 Maxim, and because Maxim refused to pay its share of the arbitration costs, Master Chips was

15 temporarily unable to advance the fees required to support its full claim. But both sides

16 recognized that Master Chips intended to increase its demand to its original size as soon as it

17 could.

18     Next, Maxim claims that the arbitrator improperly allowed an expert witness to testify in

19 French. In fact, after the expert explained that "subtle distinctions" in the law could be best

20 expressed in that language, Maxim's attorneys agreed that it would be appropriate for him to

21 testify in French followed by Dutch translations as needed. "Voila, that is a fair solution,"

22 proclaimed Maxim's attorney. This supposedly French-challenged attorney then declined several

23 offers to translate the witness's testimony. And no wonder. Her law firm's website reports that

24 she is "fluent" in French.

25     Finally, Maxim claims that the arbitrator ignored a discovery stipulation by permitting

26 Master Chips to present publicly available information. In fact, because Maxim violated its

27 discovery obligations, Master Chips had no choice but to rely on the public records. Further, the

28

1

1    records were perfectly legitimate sources of information, and Maxim had ample opportunity to

2    review them and to offer rebuttal evidence.

3         The arbitrator, an experienced and highly qualified professional, ruled correctly on each

4    issue.  But even if he had been wrong, the Petition would still fail in its purpose.  For the law

5    does not permit a federal district court to second-guess an arbitrator under these circumstances.

6                              **STATEMENT OF FACTS**

7         The parties to this dispute were business partners until Maxim, after substantially

8    underpaying commissions due to Master Chips, improperly terminated their relationship.  In

9    doing so, Maxim benefited itself and wrecked Master Chips's business.

10        Maxim is a manufacturer of analog semiconductors located in Sunnyvale, California.  In

11   1987, it licensed Master Chips, a Belgian company, to distribute its products in Belgium on an

12   exclusive basis.  This arrangement lasted over a decade and proved profitable for both parties,

13   largely because of Master Chips's efforts.  Master Chips brought on as customers several major

14   European companies, including Alcatel Telecom ("Alcatel"), Philips, and Option.  Alcatel

15   became the largest customer of Maxim's products in Belgium.  [Pet. To Vacate, ¶14; *see* Ex. 51

16   at 4-5][1]

17        In 1998, Maxim determined that it could make more money by selling directly to Alcatel,

18   Philips, and Option.  It thus tried to modify its exclusive distribution agreement with Master

19   Chips.

20        On December 1, 1998, the parties entered into a new distribution agreement (the "1998

21   Agreement").  [Ex. 2]  Under this agreement, Master Chips would no longer have the right to

22   distribute Maxim's products in Belgium to Alcatel, Philips, and Option.  Instead, Maxim would.

23

24

25
_____

26   [1]  All Exhibits identified by number were submitted with Maxim's Petition to Vacate.  All
     Exhibits identified by letter are attached to the Declaration of Sabine Thielemans, filed
27   concurrently herewith, unless otherwise noted.

28
                                           2

1  The agreement identified these customers as "House Accounts."  For each sale Maxim made to

2  these House Accounts, it would pay Master Chips a specified commission.  [Ex. 2 (I(B))]

3      Maxim failed to pay Master Chips commissions due from its sales to the House Accounts.

4  [*See* Ex 51 at 53-70]

5      On September 7, 2001, Maxim notified Master Chips that the 1998 Agreement would

6  terminate in 18 months.  Maxim recognized "the year's [sic] of service by Master Chips in the

7  capacity of a Maxim distributor" and gave no reason for the termination.  [Ex. 3]

8      At the time of the termination, 60% of Master Chips's annual revenue resulted from its

9  business arrangement with Maxim.  Maxim's improper termination, along with its failure to pay

10  the required commissions, destroyed Master Chips's business.  [*See* Ex. 51 at 31-32]

11      Under the circumstances, and given the length of the parties' relationship, 18 months

12  notice of termination was patently unreasonable.  It also violated Belgian law.[2]  The Belgian Act

13  of July 21, 1961 (the "1961 Act"), as amended, provides:

14          A concession for an unspecified period of time, subject to the sales concession of
            this law, except by one of the parties flagrantly defaulting in its obligations,
15          cannot be terminated unless it is with a reasonable period of notice or an
            equitable compensation to be determined by the parties at the termination of the
16          contract.

17  [1961 Act, Art. 2]  Maxim did not offer to pay Master Chips any compensation.

18      Article 3 of the 1961 Act provides for additional compensation for a licensor's improper

19  termination, taking into account "the known excess value with regard to clientele which was

20  brought on board by the concessionary and that stays with the licensor after the termination of the

21  contract."  Alcatel, Philips, and Option all remained customers of Maxim after the termination

22  and continued to generate millions of dollars of revenues for Maxim.  [*See* Ex. 51 at 47-53]

23

24

25

_____

26  [2]  The 1998 Agreement provided:  "This Agreement and the performance thereof shall be
27  governed by and construed in accordance with the laws of Belgium."  [Ex. 2 (16(F))]

28

3

1    After receiving Maxim's termination letter, Master Chips sued Maxim in the Commercial

2    Court of Brussels on October 30, 2001, seeking to recover the full amount of damages resulting

3    from Maxim's misconduct: over $10 million. [Pet. To Vacate, ¶17; *see* Ex. 51 at 7]

4    Maxim moved to dismiss Master Chips's complaint based on an arbitration provision in

5    the 1998 Agreement.  Maxim figured that it would be difficult for Master Chips to advance the

6    costs necessary to seek the full amount of its damages in an arbitration proceeding.  The Brussels

7    Court granted Maxim's motion to dismiss, and the Court of Appeal affirmed.  [*See* Ex. 51 at 7]

8    On November 30, 2005, Master Chips initiated an arbitration proceeding with the ICC

9    International Court of Arbitration (the "Court").  [Ex. 4]  Upon the proposal of the Dutch

10   National Committee, the Court appointed Eric van Ginkel as sole arbitrator. [Ex. 9 at 2]  Mr. van

11   Ginkel (the "Arbitrator") is an experienced and widely respected international arbitrator.[3]

12   In its Petition for Arbitration, Master Chips emphasized its dire financial situation.  It

13   asked that the arbitration take place before a single arbitrator, and that it not require extensive

14   travel. [Ex. 4 at 4-6]  Moreover, Master Chips explained that it initially could not afford to pay

15   the advance costs required to recover its full damages.  In a section called "Necessity of

16   temporary limitation of the claim," Master Chips stated:

---

22   [3] In addition to the ICC, Mr. van Ginkel is an arbitrator and/or mediator for the American
     Arbitration Association, the Australian Centre for International Commercial Arbitration, the
23   International Centre for Dispute Resolution, the International Mediation and Arbitration Center,
     the National Arbitration Forum, and the World Intellectual Property Organization.

24
25   Mr. van Ginkel holds Juris Doctor degrees from Columbia Law School and the Law
     Faculty of Leiden University, as well as a Master of Laws degree in International Dispute
26   Resolution from the Straus Institute for Dispute Resolution at Pepperdine University School of
     Law.  He is also a graduate of the Harvard Law School Negotiation Project.  Mr. Van Ginkel is
27   currently an adjunct professor at Pepperdine's Strauss Institute.  *See* www.businessadr.com.

4

Noting the fact that the cost of an ICC arbitration is calculated in function of the amounts claimed, executing these arbitration proceedings would be de facto impossible for the claimant should the claimant actually claim that to which it is entitled, namely:

- a reasonable compensation for notice, estimated at 6.968.089,55 Eur;
- a reasonable additional compensation for clientele, estimated at 1.272.000,00 Eur;
- a compensation for damages incurred by the unilateral modification of the pricing policy, still not estimated as of today;
- the refunding of the amounts that were paid by the claimant during the period of notice for the advertisement of MXIM products and the technical support to the clientele by a MAXIM employee (FAE), still not estimated as of today;
- the accurate calculation and payment of commissions, still not estimated as of today.

The precarious financial situation in which the claimant finds himself since the termination of the agreement by MAXIM . . . does not allow the claimant to advance the arbitration costs, which are to be calculated on the basis of the claims to which he is actually entitled, in their entirety or partially in this phase of the proceedings.

Consequently, the claimant is reduced to, out of sheer necessity, however explicitly, to claim a lump sum of 750.000 Eur with regard to MAXIM.

[Ex. 4 at 15]  The amounts noted above equate to over $10 million.  Master Chips expressly reserved the right to increase the amount of its damages claim.  [Ex. 4 at 16]

As detailed *infra*, Master Chips repeatedly reminded Maxim and the Arbitrator over the course of the arbitration proceeding that its damages totaled over $10 million, and that it would seek this amount assuming payment of the corresponding advance costs.

The Terms of Reference (which outline the scope and procedure aspects of the arbitration) were issued on June 28, 2006.  They noted the true amount of Master Chips's claimed damages (as stated in its Petition for Arbitration), its inability to pay costs covering that amount, and its reservation of right to increase its demand.  Accordingly, they identified the amount "currently in dispute" as to Master Chips's claims as "provisionally" 750,000€.  [Ex. 9 at 6, 11]

Master Chips formally increased its damages claim to over $10 million in its initial "memorial" on September 22, 2006.  [Ex. A]  Both sides recognized that this was the amount at issue throughout the memorial (*i.e.*, briefing) stage of the proceeding, as well as during the hearings in November 2006.  [*See* pp. 11-12, *infra*]

5

1    The Court's Rules of Arbitration (the "Rules") provide that advance costs correspond to

2    the amount of the parties' claims, and that "[t]he advance on costs fixed by the Court shall be

3    payable in equal shares by the Claimant and the Respondent." [Rules, Art. 30(3); Appendix III]

4    Given Master Chips's damages claim of over $10 million, as stated in its initial memorial and

5    echoed throughout the arbitration proceeding, the Court instructed the parties on January 5, 2007,

6    to pay $52,500 within 15 days. [Ex. 25]  This amount, which corresponded to the amount of

7    Master Chips's claim, confirms that Maxim knew the true amount of Master Chips's claim.

8    Master Chips promptly forwarded its share of the advance costs, $52,500, to the Court.

9    But Maxim refused to pay its share, in contravention of the Rules and the Court's instructions.

10    In light of Maxim's refusal to pay its share of the advance costs, Master Chips had no

11    choice but to temporarily reduce the amount of its formal damages claim to $2 million in

12    February 2007 until it could raise the necessary advance costs itself. [Ex. 31][4]

13    By May 2007, Master Chips raised the funds to pay advance costs covering damages of

14    approximately $10 million.  On May 4, Master Chips forwarded $56,778 to the Court.  [Ex. 38]

15    A second round of hearings with expert witnesses was held in May 2007.  "In addition to

16    the several memorials submitted in accordance with the Procedural Timetable, counsel for each

17    of the parties submitted extensive post-hearing briefs on May 31, 2007, accompanied by

18    voluminous documentary evidence, transcripts of the testimony of witnesses, and copies of

19    countless scholarly articles and court decisions." [Ex. 51 at 3]

20    On November 9, 2007, the Arbitrator issued a Partial Award in favor of Master Chips.

21    Among other things, he ruled that Maxim violated the 1961 Act by its unilateral termination of

22

23

24

25

----

26    [4] Article 30(3) of the Rules provides that "any party shall be free to pay the whole of the advance

27    on costs in respect of the principal claim or the counterclaim should the other party fail to pay its

share."

28

1   the 1998 Agreement, because 30 months (rather than 18 months) would have been a reasonable

2   termination period. [Ex. 51 at 74] Furthermore, he ruled that Maxim underpaid commissions to

3   Master Chips in an amount exceeding $2 million. [Ex. 51 at 75]

4        The Arbitrator ordered Maxim to pay Master Chips $2,124,904, plus interest, as well as

5   an additional amount to be stated in a subsequent award. [Ex. 51 at 76]

6   <div align="center">**STANDARD OF REVIEW**</div>

7        Maxim's statement of the standards of vacatur is incomplete and incorrect.  Maxim

8   ignores the abundant case law setting forth the extremely narrow authority vested in federal

9   judges to review arbitration awards.  Moreover, Maxim mistakenly includes the grounds listed in

10   Section 10 of the Federal Arbitration Act (FAA) as bases for vacating an international arbitration

11   award.  In fact, the grounds are limited to the seven contained in Article V of the Convention on

12   the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention").

13   **I.**     **The Power of Federal Judges to Vacate International Arbitration Awards is**

14          **Extremely Narrow.**

15        Vacating an international arbitration award is proper under only the most extraordinary

16   circumstances.  Courts must "emphatically decline" invitations to review arbitral proceedings for

17   errors of fact or law.  *Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de*

18   *L'Industrie du Papier (RAKTA)*, 508 F.2d 969, 977 (2d Cir. 1974).  It is well established that a

19   court's disagreement with an arbitrator's decision does not warrant vacatur.  In fact, even an

20   "arbitrary and capricious" award must be confirmed.  *Industrial Risk Insurers v. M.A.N.*

21   *Gutehoffnunghutte GmbH*, 141 F.3d 1434, 1446 (11th Cir. 1998).

22        Courts give "substantial deference" to arbitrators' rulings in order to "avoid undermining

23   the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and

24   expensive litigation."  *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us*, 126 F.3d 15, 25

25   (2d Cir. 1997).  Thus, as long as an arbitrator's reasoning is expressed "in terms that offer even a

26   barely colorable justification for the outcome reached," the award should stand.  *Id.*

27        This Court, relying on Supreme Court and Ninth Circuit precedent, has noted:

28

<div align="center">7</div>

1    Judicial review . . . is quite limited, since the Court 'must not decide the rightness
     or wrongness of the arbitrators' contract interpretation, only whether the panel's
2    decision 'draws its essence' from the contract." [*quoting Pacific Reinsurance
     Management Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1024 (9th Cir.
3    1991)].    In other words, "as long as the arbitrator is even arguably construing or
     applying the contact and acting within the scope of his authority, that a court is
4    convinced he committed a serious error does not suffice to overturn his decision."
     *United Paperworks Int'l Union AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38, 98 L.
5    Ed. 2d 286, 108 S. Ct. 364 (1987).

6    *Certain Underwriters at Lloyd's v. Argonaut Ins. Co.*, 264 F.Supp.2d 926, 939 (N.D. Cal. 2003).

7        In its Petition, Maxim faults the Arbitrator for various procedural choices.    None of

8    Maxim's criticisms, even if justified, would provide grounds for vacating the award.

9        "An arbitrator enjoys wide latitude in conducting an arbitration hearing.
         Arbitration proceedings are not constrained by formal rules of procedure or
10       evidence." []    Arbitration rules . . . are intentionally written loosely, in order to
         allow arbitrators to resolve disputes without the many procedural requirements of
11       litigation."

12   *Industrial Risk Insurers*, 141 F.3d at 1443-44 (citation omitted).

13       As discussed below, the grounds for vacating an international arbitration award are

14   different, and more limited, than the grounds stated in Section 10 of the FAA.    For this reason,

15   the cases and statutory provisions cited by Maxim are inapt.    Even under the FAA, however,

16   awards can only be vacated under extreme circumstances.  As one court recently explained:

17       The award that results from arbitration to which parties to a contract have bound
         themselves is not particularly amenable to judicial review.  Indeed, the standard
18       of review is "among the narrowest known to the law." []  Bearing in mind that the
         parties to binding arbitration have contracted to use arbitration rather than
19       litigation as a means of resolving disputes, and that arbitrators are generally
         selected for their expertise in a particular area, courts accord maximum deference
20       to an arbitrator's decision. []  This deference is given to findings of fact: "errors
         in the arbitrator's … findings of fact do not merit reversal." []  It is also given to
21       legal conclusions: "an arbitrator's erroneous interpretations or applications of law
         are not reversible." [] . . . "By agreeing to arbitrate, a party 'trades the procedures
22       and opportunity for review of the court room for the simplicity, informality, and
         expedition of arbitration.'" []  Having agreed to make that trade, the parties
23       cannot easily set aside the arbitration award for which they bargained.

24

25

26

27

28
                                        8

1  *Commercial Refrigeration, Inc. v. Layton Construction Co.*, 319 F. Supp. 2d 1267, 1269-1270

2  (D. Utah 2004) (citations omitted).[5]

3  **II.    The Grounds for Vacating International Arbitration Awards are Limited to Those**
       **Contained in Article V of the Convention.**

4
       There is no dispute that the arbitration award falls under the Convention.  (*See* Pet. To

5
   Vacate, ¶8)  Therefore, it must be confirmed unless the Court finds "one of the grounds for

6
   refusal or deferral of recognition or enforcement of the award specified in the said Convention."

7
   9 U.S.C. §207.  That means Maxim is limited to the seven defenses listed in Article V of the

8
   Convention.  *See Ministry of Defense of the Islamic Republic of Iran v. Gould Marketing, Inc.*,

9
   887 F.2d 1357, 1364 n.11 (9th Cir. 1989) ("A party seeking to avoid enforcement is limited to the

10
   seven defenses as listed in article V of the Convention."); *Industrial Risk Insurers*, 141 F.3d at

11
   1445 ("The Convention lists the exclusive grounds justifying refusal to recognize an

12
   [international] arbitral award.") (*quoting M & C Corp. v. Erwin Behr GmbH & Co., KG*, 87 F.3d

13
   844, 851 (6th Cir. 1996)).  "Courts construe such defenses to enforcement narrowly."  *Ministry of*

14
   *Defense*, 887 F.2d at 1364 n.11 [6]

15

16

17

18
   _____

19  [5] Arbitration awards have been confirmed in the face of alleged improprieties far more egregious
   than those alleged here.  Indeed, in several cases cited by Maxim, courts confirmed arbitration

20  awards despite striking irregularities.  For example, in *Parsons & Whittemore*, 508 F.2d 969, the
   court affirmed confirmation of an award in a dispute between an American company and an

21  Egyptian company.  The American company alleged breach of contract after the Egyptian
   company called off plans for the construction of a mill in Egypt because of the imminent Arab-

22  Israeli Six Day War.  The arbitrator refused to delay proceedings even though this refusal meant
   that the American's company's "key witness" (the United States Charge d'Affairs in Egypt

23  during the Six Day War) could not testify.  The Second Circuit nonetheless found that the award
   should be confirmed, since "inability to produce one's witnesses before an arbitral tribunal is a

24  risk inherent in an agreement to submit to arbitration."  *Id.*, at 975.

25
   [6] *But see Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us*, 126 F.3d 15, 24-25 (2d Cir.

26  1997) (holding that the Convention allows a court in the country in which the arbitration award
   was made to apply its domestic arbitral law in an enforcement proceeding).

27

28
                                                9

1    Of the seven defenses listed in Article V of the Convention, Maxim refers to only one: it

2    alleges that it was "unable to present its case."[7]  Since clearly none of the Arbitrators' alleged

3    improprieties rendered Maxim unable to present its case, Maxim turns to Section 10(a)(3) of the

4    FAA for additional ammunition.  It contends that the award can also be set aside if the arbitrator

5    neglected "to postpone the hearing upon sufficient cause," or for "any other [arbitrator]

6    misbehavior by which the rights of any party have been prejudiced."  [MPA, 11]  But these

7    grounds are inapplicable, as they are not listed in Article V of the Convention.  *See Industrial*

8    *Risk Insurers*, 141 F.3d at 1443 ("[N]o defense against enforcement of an international arbitral

9    award . . . is available . . . on any other grounds not specified by the Convention.").

10    Courts have recognized that the grounds listed in Article V of the Convention are more

11    limited than the grounds listed in Section 10 of the FAA.  For that reason, it is "harder to knock

12    out an award under the Convention" than under the FAA.  *See Lander Company, Inc. v. MMP*

13    *Investments, Inc.*, 107 F.3d 476, 480 (6th Cir. 1997) (*citing M & C*, 87 F.3d at 850-51)).

14    <center>**ARGUMENT**</center>

15    I.    **The Arbitrator Did Not Act Improperly by Neglecting to Postpone Hearings.**

16    Maxim's primary argument is that the Arbitrator should have postponed the November

17    2006 and May 2007 hearings based on changes in the amount of Master Chips's official damages

18    claim.  However, Maxim defended against the full amount of Master Chips's damages claim

19    throughout the proceeding, and changes to the official amount had absolutely no impact.

20    A.    **Maxim was Not Prejudiced by the Arbitrator's Decision Not to Postpone the**

21    **November 2006 and May 2007 Hearings.**

22        1.    **Maxim knew the amount of Master Chips's damages, and the likelihood that**
          **it would ultimately seek that amount, throughout the arbitration.**

23    Maxim suggests that it was caught off-guard by changes in the amount of Master Chips's

24    damages claim.  This is untrue.  In its Petition for Arbitration, filed on November 30, 2005,

25    

26    _____

[7] *See* Article V(1)(b) ("The party against whom the award is invoked was not given proper notice
27    of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to
present his case.")
28

<center>10</center>

1   Master Chips discussed in detail "the amount to which it is entitled," *i.e.*, over $10 million. [Ex.

2   4 at 15; *see* p. 6, *supra*]  It temporarily limited its claim, however, "out of sheer necessity"

3   because it could not afford to pay advance costs covering the entire amount of its damages.

4   Master Chips expressly reserved the right to increase its damages claim at a later time.[8]

5        In its April 14, 2006 Answer, Maxim acknowledged the full amount of damages claimed

6   by Master Chips.  Regarding Master Chips's claim under Article 3 of the 1961 Act, Maxim

7   stated: "The amount of the claim (EUR 1,272,000) equals the amount of goodwill.  The so-called

8   goodwill amount is calculated in the auditor's report and is disputed by respondent [Maxim]

9   because, among other reasons, its obvious lack of impartiality, lack of supporting documents and

10  its is biased nature." [Ex. 7 at 8]  Likewise, with regard to Master Chips's claim under Article 2

11  of the 1961 Act, Maxim stated:  "The amount claimed, i.e., EUR 6,968,089.55, is believed to be

12  the current approximate value of Master Chips' business. . . . However, this is not the correct

13  measure under the Belgian Act and there is no case law to support this position. [*Id.*]

14       Maxim in its Answer acknowledged Master Chips's right to increase its damages claim at

15  a later time in the proceeding:  "Whereas Master Chips provisionally limits its claim to 750.000

16  EUR and whereas it requests to make a reservation for the increase of its claim.  However,

17  respondent believes that any such increase, if any, must be filed by Master Chips in the

18  framework of the current arbitration proceedings." [Ex. 7 at 11]

19       The June 23, 2006 Terms of Reference also confirmed the amount of damages claimed by

20  Master Chips, and its right to ultimately seek that amount.  It repeated verbatim the damages

21  stated in the Petition for Arbitration, *i.e.*, more than $10 million, and explained that Master

22  Chips's "current financial condition does not permit it to claim the full amount hereof," but that it

23  "seeks to reserve the right to increase/expand its demand" [Ex. 9 at 6]

24

25

26  _____

27  [8] Even before Master Chips filed its Petition for Arbitration, Maxim knew the amount of its
    claimed damages as a result of the earlier lawsuit.

28

1    The Terms of Reference thus identified the amount "currently in dispute," as to Master

2  Chips's claims, as "provisionally" EUR 750,000.00. [Ex. 9 at 11] [9]

3    Master Chips formally increased its damages claim to "the full amount to which it

4  believes itself to be entitled"—over $10 million—in its initial memorial, filed on September 22,

5  2006. [Ex. A]  This did not surprise Maxim.  Indeed, in its own initial memorial of the same

6  date, Maxim offered a defense against a claim of this amount. [Ex. B]

7    The Arbitrator's August 17, 2006 Procedural Order No. 2 required that "copies of all

8  relevant exhibits, case law and statutes are to be provided with the briefs." [Ex. 10]  Throughout

9  the memorial stage of the proceeding, the amount at issue was indisputably over $10 million.

10    The parties' second memorials were due on October 11, 2006.  Even though Master Chips

11  had formally increased its damages claim three weeks earlier, Maxim waived its right to file a

12  counter-memorial.  In an email to the Arbitrator, dated October 6, Maxim explained

13       We are satisfied that after our initial memorial, a replique and duplique will be
         sufficient for us to fully present Maxim's case to the arbitral tribunal, we intend
14       to waive our counter-memorial due 11th October, and file our next submissions by
         20th October, thus aiming at rearranging our own time schedule *without it*
15       *necessarily having an impact on the dates of the evidentiary hearing*."

16  [Ex. C (emphasis added)] [10]  Thus, Maxim expressly recognized that Master Chips's increased

17  damages claim would not require postponing the upcoming November 2006 hearing.[11]

18    The hearing took place as scheduled in early November.  Three months later, given

19  Maxim's refusal to pay its share of advance costs, Master Chips had no choice but to temporarily

20

21

22  ———————————

23  [9] The Arbitrator summarized the situation in his Award:  "Although originally MC limited the
    amount of its claim to €750,000, the Terms of Reference allowed both parties to expand the

24  amounts of their respective claims and counterclaims at a later date." [Ex. 51 at 3]

25  [10] Maxim's email noted that it had "expected most of [Master Chips's claims] for having litigated

26  the same case against Master Chips in two instances before Belgian courts." [Ex. C]

27  [11] Unlike Maxim, Master Chips filed its second memorial on October 11, 2006.  There, Master
    Chips reiterated the amount of its damages claim, *i.e.*, over $10 million. [Ex. D]

28
                                              12

1    reduce the amount of its official damages claim.  On February 1, 2007, Master Chips filed a

2    "formal request" explaining the situation:

3       In order to avoid the proceedings to be blocked following the abuse by
      Respondent of its position of power by suddenly refusing without any valid

4       reason payment of the second advance on costs, Claimant is forced to bring the
      amount of its claim to an amount corresponding to the advances on costs already

5       paid.

6    [Ex. 31 at 3]  Thus, while the amount at issue was temporarily limited to $2 million, there was no

7    question as to the true amount of Master Chips's claimed damages.

8      Master Chips paid the remaining advance costs itself, thus officially increasing its

9    damages claim back to the proper amount, three months later.  The brief period during which the

10   claim was reduced—from February 1, 2007 to May 4, 2007—did not coincide with any briefing,

11   hearings, or discovery.  Put simply, Maxim suffered no prejudice. [12]

12      **2.**     **Maxim's conduct at the November 2006 and May 2007 hearings was**
       **unaffected by the amount of Master Chips's damages claim.**

13

14      Maxim did not initially suggest postponing the November 2006 hearings.  On the

15   contrary, on October 6, 2006—when there was no question that the amount at issue was over $10

16   million—Maxim informed the Arbitrator that it intended to waive its counter-memorial "without

17   it necessarily having an impact on the dates of the evidentiary hearing." [Ex. C]

18      The November 2006 hearing, and all of other aspects of the proceeding, would have been

19   the same even if Master Chips's official damages claim had remained constant.  Master Chips's

20   legal claims did not change since it filed its Petition for Arbitration in November 2005.  Indeed,

21   its claims were no different from those in the litigation commenced in Belgian Court in 2001.

22   Likewise, Master Chips's position as to its damages did not change from day one.

23

24

25    [12] Maxim half-heartedly asserts that Master Chips added a new claim under Belgian Agency
   Agreement Act in its memorials.  [MPA, 5:7-9]  But Master Chips's reliance on this Act

26   constituted a legal theory—not a new claim—and the parties were "free to submit any legal
   theory for their claims at any time through the Hearing of December 5, 2006." [Ex. H]  Besides,

27   the Arbitrator ultimately rejected Master Chips's reliance on this Act. [Ex. 51]

28

1    Maxim points to only one thing it would have done differently if Master Chips's damages

2    claim had remained constant: it allegedly would have "subpoena[ed] Alcatel in order to support

3    its defense to the Commissions Claim." [MPA, 14:1-2]  But Maxim still could have subpoenaed

4    Alcatel after Master Chips increased its claim in September 2006.  It simply chose not to.[13]

5    Maxim's Executive Account Manager testified that Maxim had all the Alcatel data it

6    needed:  "we have accurate tracking records for sure of what we sell to Alcatel, part number by

7    part number, including distribution, including subcontractors. . . . I know perfectly that we have

8    records of everything that is sold all over the world to Alcatel."  [Ex. F (Testimony of Jean

9    François Bougerol)]  So Maxim's claim that it would have subpoenaed Alcatel is unfounded.

10    Maxim's argument that the May 2007 hearings would have gone differently is

11    nonsensical.  The May 2007 hearings involved only _expert_ witnesses.  All _fact_ witnesses testified

12    at the November 2006 hearing.  The experts, Marc Willemart for Master Chips and Geert Bogaert

13    for Maxim, addressed legal issues concerning the 1961 Act, such as the burden of proof.  Neither

14    Mr. Willemart nor Mr. Bogaert addressed Master Chips's damages.  They would have testified

15    the same way regardless of the official amount of Master Chips's damages claim.

16    **3.    Master Chips was forced to temporarily reduce the amount of its damages
       claim because Maxim violated the Rules.**

17

       Maxim was responsible for Master Chips's need to temporarily reduce its damages claim

18    in February 2007.  The Rules required Master Chips and Maxim to split the advance costs

19    equally.  Accordingly, after Master Chips announced in its September 2006 that it was formally

20    raising the amount of its damages claim, it counted on Maxim to pay its share of the advance

21    costs to cover this amount.  Maxim refused to pay its share, even in the face of a letter from the

22

23

24    _____

25    [13] Contrary to Maxim's assertion, discovery was not closed when initial memorials were filed on

26    September 22, 2006.  While the Arbitrator's Procedural Order No. 2 included a "provisional"
       timetable with a September 8 discovery cut-off, the Arbitrator made clear that this "provisional"

27    deadline was subject to change [Ex. 10 at 1]  Indeed, Maxim continued to request production of
       documents through December 2006.  [_See_ Ex. 17]

28

1  Court specifically instructing it to do so.  Maxim should not benefit from its violation of the

2  Rules by preventing Master Chips from recovering the full amount of its damages.

3  **B.    Allowing Master Chips to Increase its Damages Claim was Consistent with the Rules.**

4

5       Maxim alleges that Master Chips's "attempt to increase its damages [in May 2007] was in

6  violation of ICC Rules because Master Chips had filed no Formal Request to increase its

7  damages."  [Pet., 3:21-23]  But the Rules do not require that a party file a "formal request" to

8  increase its damages claim; they require only that the parties pay corresponding advance costs.

9  While Maxim contends otherwise, it does not point to <u>any</u> specific Rule.  In fact, the Rules invite

10  changes to the amount of parties' damages claims over the course of the proceedings:

11       As provided in Article 30(2) of the Rules, the advance on costs may be subject to
   readjustment at any time during the arbitration, in particular to take into account

12  ***fluctuations in the amount in dispute***, changes in the amount of the estimated
   expenses of the arbitrator, or the evolving difficulty or complexity of arbitration
   proceedings.

13  [Rules, Appendix III, Art. 1(10) (emphasis added)] [14]

14  **C.    The Cases Cited by Maxim are Distinguishable.**

15

16       Maxim cites three cases in support of its position that the Arbitrator should have

17  postponed the hearings.  None of these cases is on point, and none of them helps Maxim.

18       In *Certain Underwriters at Lloyd's, London v. Argonaut Ins. Co.*, 264 F. Supp.2d 926

19  (N.D. Cal. 2003), this Court <u>upheld</u> an arbitrator's decision to issue an order on December 26

20  without giving petitioner an opportunity to respond to the motion filed two days earlier.  The

21  court noted that "this compressed time frame was partly of [petitioner's] own making," *id.*, at

22  942, as is the case here, given Maxim's failure to pay its share of advance costs.

23       In *Coastal General Construction Services v. Virgin Islands Housing Authority*, 238 F.

24  Supp. 2d 707 (D.V.I. 2002), a case involving the FAA rather than the Convention, the court

25

26  [14] Although not required by the Rules, Master Chips filed a "formal request" on June 6, 2007.
   [Ex. 46]

27

28

15

1  overturned an award based on documents submitted less than 24 hours before the scheduled

2  hearing. But those documents were not only late, they were fraudulent. *Id.*, at 708. Indeed, the

3  court noted that the two principals of the company submitting the documents were later convicted

4  of fraud. *Id.*, at 708 n.1. Here, Maxim does not claim fraud. Besides, as detailed above, Maxim

5  knew Master Chips's total damages since the beginning of the dispute.

6      In *Allendale Nursing Home, Inc. v. Local 1115 Joint Bd.*, 377 F. Supp. 1208 (S.D.N.Y.

7  1974), another case involving the FAA rather than the Convention, the court vacated an award

8  where the arbitrator refused to grant an adjournment after "a crucial, if not the most crucial,

9  representative" of plaintiff was taken to the hospital and therefore unavailable during cross-

10  examination of defendant's witnesses. *Id.*, at 1214. As plaintiff was not represented by a lawyer,

11  this individual's presence was necessary for plaintiff to reasonably question witnesses. *Id.* There

12  is nothing equivalent here. Furthermore, in *Allendale Nursing Home*, the court emphasized that

13  the arbitrator had previously granted at least two adjournments to defendant, and it was

14  impossible to reconcile those adjournments with his refusal to grant one to plaintiff. *Id.* In the

15  proceeding at issue here, Master Chips never asked to continue a hearing.

16      If the Court wishes to consider cases applying the FAA, it should examine *Robertson-*

17  *Ceco Corp. v. Nat'l Union Fire Insurnace Co.*, 292 F. Supp. 2d 1082  (N.D. Ill. 2003). In that

18  factually similar case, the court denied a motion to vacate an arbitration award and instead

19  confirmed the award, the court offered the following summary of facts:

20      Robertson-Ceco initially claimed approximately $ 4.2 million (the amount it
        estimated it had paid to obtain the releases of the plaintiff-shareholders), but
21      noted that the actual releases could have cost as much as $ 6.75 million (the
        difference between the initial tender offer and the amount actually paid per
22      share). After full arbitration proceedings, including discovery, briefing and both
        preliminary and merits hearings, the arbitration panel made an award in
23      Robertson-Ceco's favor in the amount of $ 7,446,103.

24  *Id.*, at 1084. The court rejected respondent's argument that "it was deprived of due process"

25  because "it had no opportunity to defend against an award of the magnitude given by the panel."

26  *Id.*, at 1085. This is precisely what Maxim claims here. The court found this argument

27  unpersuasive, as should the Court in this case:

28

[B]eginning with the Statement of Claim, Robertson-Ceco explained the potential size of the award, based on the difference between the original tender offer and the actual price paid per share. As that measure had been put forth as a possibility from the beginning of the arbitration, National Union was not prejudiced by the arbitrators' final award. *Id.*

## II.    The Arbitrator Did Not Act Improperly by Allowing Master Chips's Expert to Testify In French.

Maxim argues that the Court should vacate the arbitration award because the Arbitrator allowed Master Chips's expert to testify in French. But allowing Master Chips's expert to testify in French—a language spoken by the Arbitrator and counsel for both parties—was perfectly reasonable. Maxim clearly suffered no prejudice from the arrangement, to which it agreed.

### A.    Maxim Agreed to Have Master Chips's Expert Testify in French.

The transcript of the May 2007 hearing [Ex. 42] shows that Maxim agreed to have Master Chips's expert, Marc Willemart, testify in French, with translation provided into Dutch as necessary. In a dialogue among the Arbitrator, Mr. Willemart, and two of Maxim's attorneys, Bieke Noels and Jan Swinnen, Maxim's counsel blessed the arrangement "fair."

| | |
|---|---|
| Mr. Willemart: | For me, the subtle distinctions, it is easier in French. |
| Ms. Noels (for Maxim): | Otherwise, can we have it translated? |
| Mr. Willemart: | But you may also speak in Dutch. |
| The Arbitrator: | If you prefer, you can tell me what you want in French and then maybe -- |
| Mr. Swinnen (for Maxim): | Repeat it in Dutch. |
| The Arbitrator: | --repeat it in Dutch. |
| Ms. Noels (for Maxim): | Voila, that is a fair solution. |

[Ex. 42 (B-1-2)]    Maxim now contends that this "fair solution" is grounds for vacating the arbitration award.[15]

_____

[15] The following exchange then took place between Maxim's counsel, Jan Swinnen, and Master Chips's counsel, Sabine Thielemans:

| | |
|---|---|
| Ms. Thielemans: | . . . I will pose my questions in French If you deem it necessary, then I will translate into Dutch. |
| Mr. Swinnen: | If you would be so kind to do that. |
| Ms. Thielemans: | Then we will do that. |

[Ex. 42 (B-2)]

17

**B.     Maxim Suffered No Prejudice from this Eminently Practical Arrangement.**

    **1.     Maxim's Counsel Had No Difficulty Understanding Master Chips's Expert.**

Maxim's attorneys were free to ask for a translation whenever necessary. They rarely did. During Mr. Willemart's testimony, they asked for translation only twice. Each time a translation was immediately provided, and the questioning resumed without any objections or problems. In fact, more than once Ms. Noels was asked if she would like a translation, and she declined. [*e.g.*, Ex. 42 (B-3 (Mr. Willemart: "Would you like a translation?" Ms. Noels: "No, thank you.")); Ex. 42 (B-7-8 (Ms. Thielemans: "Do we need to translate anything?" Ms. Noels: "No."))]

    **2.     Maxim's Counsel Understands French.**

Maxim contends that its counsel, specifically Ms. Noels, "could not understand" Mr. Willemart. [MPA, 15:7] This is untrue. Three of Maxim's attorneys attended the May 2007 hearing: Ms. Noels, Mr. Swinnen, and Ingrid Meeussen. According to the firm's website, www.lafili-law.be, all three of these attorneys—including Ms. Noels—speak "fluent" French.[16]

Furthermore, there is no allegation that Mr. Swinnen or Ms. Meeussen do not speak French, or that they did not completely understand Mr. Willemart's testimony. In fact, at the hearing Mr. Swinnen and Ms. Meeussen each made remarks in French (as did Maxim's own expert, Geert Bogaert). [*See* Ex. 42A] Even if Ms. Noels did not speak fluent French, there is no reason why she would need to, since two other members of Maxim's legal team did.[17]

---

[16] The relevant webpage is attached to the Declaration of Seth I. Appel, filed concurrently herewith. French, of course, is one of the official languages of Belgium.

[17] Ms. Noels was not the only attorney capable of handling Mr. Willemart's testimony. Indeed, Ms. Meeussen and Mr. Swinnen asked Mr. Willemart <u>numerous</u> questions. [*e.g.*, Ex. 42 at B-13, *et seq.* (Ms. Meeussen: "May I ask an additional question? Are you aware of a certain practice which is being applied by certain courts at which they say: for each year of concession, we give 1 month period of notice?"")); Ex. 42 at B-31, *et seq.* (Mr. Swinnen: "Can I ask you a few questions . . . .").

1    **C.    The Cases Cited by Maxim are Distinguishable.**

2        Maxim maintains that permitting Mr. Willemart to testify in French was tantamount to

3    permitting "*ex parte* evidence." [MPA, 15]  In support, Maxim cites *Pacific Reinsurance*

4    *Management Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019 (9th Cir. 1991).  But that case, in

5    which the Ninth Circuit <u>confirmed</u> an arbitration award, supports Master Chip's position.

6        *Pacific Reinsurance Management Corp.* involved a three-member arbitration panel: one

7    representing the appellants, one representing the appellees, and the third a neutral.  The

8    appellants complained that their opponents had communicated financial information to their own

9    arbitrator and the neutral, but not to appellants' arbitrator.  Nonetheless, the Ninth Circuit did not

10   find reason to vacate the award—even under the relaxed standards of the FAA.  It explained that

11   the financial information was "readily accessible to appellants' arbitrator," and that there was

12   "ample opportunity" to dispute the figures.  *Id.*, at 1025.  Likewise, because of the offer to

13   translate whenever Maxim's counsel was unable to follow Mr. Willemart's French, the testimony

14   was "readily accessible" to Maxim, and there was "ample opportunity" to refute it.

15       Maxim also cites *Hoteles Condado Beach, La Concha & Convention Center v. Union De*

16   *Tranquistas Local 901*, 763 F.2d 34 (1st Cir. 1985).  This factually inapposite case involved a

17   hotel worker who was fired for exposing himself to a female guest.  In an arbitration action

18   against his employer, the arbitrator refused to allow the hotel guest to testify unless her husband

19   left the room; the woman refused to testify under those circumstances.  The reviewing court,

20   while confessing that "it is difficult to understand the arbitrator's ruling," refused to set aside the

21   arbitrator's decision on the basis of his sequestration of the woman's husband.  *Id.*, at 39 ("The

22   sequestration of Mr. Flores, taken alone, did not so prejudice the Company's right to present its

23   case as to require that the award be vacated.").  But the arbitrator also refused to give any weight

24   to the testimony given at the trial of the hotel worker.  The combination of the two decisions -

25   effectively blocking the guest from testifying and then rejecting the trial testimony – "effectively

26   denied the Company an opportunity to present *any evidence* in the arbitration proceeding." *Id.*, at

27

28

                                                    19

40 (emphasis added).  By contrast, in the present action, Maxim had the opportunity to cross-examine Mr. Willemart, to put on its own experts, and to present as much evidence as it wished.

### III.    The Arbitrator Did Not Act Improperly in his Treatment of the November 2006 Stipulation.

Maxim's final argument is that the Arbitrator erred by "ignoring" a November 2006 stipulation concerning Maxim's discovery obligations (the "November 2006 Stipulation").  This argument is meritless.  First, Maxim did not comply with the November 2006 stipulation—a stipulation that was only necessary because of Maxim's discovery abuses.  Second, the Arbitrator did not "ignore" the November 2006 stipulation.  He considered this stipulation, along with Maxim's discovery abuses, and issued a reasoned order based on all the available evidence.

### A.    Maxim Flouted its Discovery Obligations Leading to, and Resulting From, the November 2006 Stipulation.

#### 1.    The November 2006 Stipulation was Necessary Because of Maxim's Discovery Abuses.

In August 2006, Master Chips requested documents pertaining to Maxim's sales to Alcatel.  Master Chips sought these documents to determine the amount due in commissions under the 1998 Agreement.  Master Chips again asked Maxim to produce these document in its initial memorial.  Master Chips requested them a third time on October 10, 2006.  [Ex. G]  Each time Maxim responded incompletely or not at all.

On November 1, the Arbitrator ordered Maxim to produce the requested documents the following day: "Maxim is ordered to produce the spreadsheets requested with regard to all time periods requested. . . . I find that the request by Master Chips is not unreasonable under the circumstances.  It should be given every opportunity to prove its case."  [Ex. G]

Maxim produced some documentation on November 2 with a request to supplement later.  The Arbitrator "reluctantly" agreed but with this warning: "I should point out to Respondent that the weight of any evidence that might be held to favor its position and that concerns the missing documentation may be adversely affected by this delay of disclosure.  [Ex. H]

1    The additional documentation produced by Maxim on November 4, like that previously

2    produced by Maxim, was incomplete.

3    Because Maxim still had not produced the requested documents at the time of the

4    November 2006 hearing, the parties entered into a stipulation before the Arbitrator. Under the

5    November 2006 Stipulation, Maxim agreed to produce an Excel spreadsheet indicating all sales

6    (with limited exceptions) of 34 specified products by Maxim to Alcatel, from January 1, 1998

7    through June 30, 2006, within two weeks. [Ex. 13]

8    **2.    Maxim Did Not Comply with the November 2006 Stipulation.**

9    Maxim did not produce the agreed-upon spreadsheet within two weeks. In fact, it did not

10    produce anything within that time. Accordingly, in emails dated December 2 and December 8,

11    Master Chips again asked the Arbitrator to order Maxim to produce the documents. [Exs. 14, 16]

12    In its Procedural Order No. 6, issued on December 11, the Arbitrator ordered Maxim to

13    produce the agreed-upon spreadsheet by December 15. He noted that any further delay "may

14    have implications with respect to the weight that this evidence, or the lack thereof, will carry in

15    the overall determination of the relevant facts in this case." [Ex. 17]

16    Maxim did not produce the spreadsheet called for in the November 2006 Stipulation until

17    December 18, and that spreadsheet was incomplete. On December 20, the Arbitrator ordered

18    Maxim to explain its deficient production. [Ex. I] Maxim did not respond.

19    **3.    Maxim's Misconduct Forced Master Chips and the Arbitrator to Rely on Publicly Available Information.**

20

21    On December 29, Master Chips filed an "Analysis" extrapolating Maxim's sales data

22    from Alcatel's publicly available information. [Ex. 21] Maxim did not file a response. Given

23    Maxim's non-compliance with its discovery obligations and with the November 2006 Stipulation,

24    the extrapolation was the only way Master Chips could determine the amount it was due.

25    In its Procedural Order No. 7, issued on April 14, 2007 [Ex. 36], the Arbitrator properly

26    concluded that Master Chips's reliance on publicly available information was appropriate.

27            Respondent has failed to produce detailed sales figures relating to any sales to Alcatel that were made through third parties . . . .

28

> In the event that I were to find that such sales are nonetheless commissionable, Respondent failed to provide such information at its peril. In the absence of data supplied by Respondent, Claimant has the right to present its own best evidence. Claimant is therefore free to either obtain such data directly from Alcatel, or to extrapolate in a reasonable manner such data from publicly available information.

**B.    The Arbitrator was Entitled to Consider Publicly Available Information.**

    **1.    An arbitrator is permitted to consider all relevant evidence.**

The Rules give broad discretion to the Arbitrator with regard to evidentiary and other matters. *See, e.g.*, Rules, *e.g.*, Art. 20, 21, 22. *See also Hoteles Condado Beach*, 763 F.2d at 39 (recognizing that "the arbitrator's role is to resolve disputes, based on his consideration of all relevant evidence"). After Maxim failed to produce relevant documents, it was well within the Arbitrator's discretion to consider Maxim's publicly available sales data.

    **2.    The November 2006 Stipulation did not limit the evidence the Arbitrator could consider.**

Maxim suggests that the November 2006 Stipulation somehow barred the Arbitrator from considering publicly available information. [MPA, 16:1-6 ("[T]he parties had limited their disclosure obligations . . . . The Alcatel public records included information far beyond this limited information agreed to by the parties.")] It is unclear why. The November 2006 Stipulation concerned Maxim's "disclosure obligations;" it did not purport to limit the evidence the Arbitrator was allowed to consider. On the contrary, the Arbitrator is allowed to consider all relevant evidence, independent of the parties' disclosure obligations.

Contrary to Maxim's assertion, the Arbitrator did not "ignore" the November 2006 Stipulation. The Arbitrator considered it – and Maxim's "failure to provide useable evidence, with respect to Alcatel." He properly focused on the best evidence available. [Ex. 51 at 64-66][18]

---

[18] Maxim claims that materials relied on by the Arbitrator led to "gross overstatement of damages because the records concerned *all* of Alcatel's sales *worldwide* regardless of whether a sale was commissionable." [MPA, 15:28-16:1] This is simply untrue. As the Award makes clear, the Arbitrator carefully limited his analysis to commissionable sales. [Ex. 51 at 53-70]

1    Maxim says it "had no opportunity to rebut Alcatel's public records." [MPA, 16:7-8]

2 Master Chips first referred to the public records on Alcatel's website in its initial memorial. [Ex.

3 A] Maxim had ample opportunity to rebut these records: in its memorials; in response to Master

4 Chips's December 29 "Analysis;" at the May 2007 hearing (held three weeks after Procedural

5 Order No. 7 issued); and in its post-hearing memorial. Each time it failed to do so.

6 **C.    The Cases Cited by Maxim are Distinguishable.**

7    Maxim's cases cited in support of its third argument again do not support its position.

8    *Totem Marine Tug & Barge, Inc. v. North Am. Towing, Inc.*, 607 F.2d 649 (5th Cir. 1979)

9 is factually and legally inapplicable. It involved an arbitration between American parties

10 conducted in this country under the Rules of the American Arbitration Association. The court

11 did not apply the limited Convention defenses. In *Totem*, the arbitrators telephoned one party's

12 counsel to get damages figures and then adopted those numbers. The call was placed several

13 days after the hearings had closed, and the opposing party was not even notified—even though its

14 counsel was in the same building where the arbitrators were deliberating. *Id.*, at 652.

15    *Iran Aircraft Industries v. Avco Corp.*, 980 F.2d 141 (2d Cir. 1992) is likewise

16 distinguishable. The court refused to enforce an award issued by the Iran-United States Claims

17 Tribunal because the Tribunal had deliberately misled a party as to the type of proof required. At

18 a pre-hearing conference, the Tribunal had specifically told the party not to produce certain

19 invoices; later it ruled against the party based on its failure to produce those same invoices. Here,

20 by contrast, the Arbitrator never discouraged Maxim from producing any documents. Rather, the

21 Arbitrator repeatedly ordered Maxim to produce the documentation requested by Master Chips.

22 **IV.    The Court Should Award Master Chips its Attorneys' Fees, Because Maxim's**
**Challenges to the Arbitration Award are Completely Devoid of Merit.**

23

24    Courts may award attorneys' fees to a party who successfully opposes a challenge to an

arbitration award—even where there is no statutory or contractual basis for a fee award—if the

25 challenges to the award are "without merit" or "without justification," or are "legally frivolous,

26 that is, brought in bad faith to harass rather than to win." *Trans Chem. Ltd. v. China Nat'l Mach.*

27

28

1   *Import & Export Corp.*, 978 F. Supp. 266, 311 (S.D. Tex. 1997).  *See also  Executone Info.*

2   *Systems, Inc. v. Davis*, 26 F.3d 1314, 1331 (5th Cir. 1994); *Colavito v. Hockmeyer Equip. Corp.*,

3   605 F. Supp. 1482, 1488 (S.D.N.Y. 1985).

4        This standard applies both to domestic arbitration awards under the FAA and international

5   arbitration awards under the Convention.  *Trans Chem.*, 978 F. Supp. at 311-312.[19]

6        As shown above, Maxim's challenge to the arbitration award is completely meritless.

7   Maxim relies on the wrong body of law, yet still cannot cite any cases supporting its position.

8   The Court can reasonably infer that Maxim is acting in bad faith, to delay payment of the award

9   or coerce a favorable settlement.  Maxim could not possibly believe its arguments satisfy the

10  standard for setting aside an international arbitration award.

11       *Commercial Refrigeration, Inc. v. Layton Constr. Co.*, 319 F. Supp. 2d 1267 (D. Utah

12  2004) is instructive.  There, the court confirmed arbitration awards and denied motions to vacate.

13  It  also awarded attorney's fees, reasoning:

> While losing an arbitration may be unpleasant for an attorney to communicate and a client to digest, the experience is not significantly improved by the instigation of a doomed—and no doubt costly—legal action.  Having in mind the standard of review and its effect on the relative strengths of the parties' positions, the Court grants Layton's motion for an award of reasonable attorneys' fees in the action before this Court.

14

15

16

17  *Id.*, at 1271.  The court added:  "Both federal and state decisions regarding judicial review of

18  arbitration awards make it abundantly clear that the pertinent standard is very, very difficult to

19  meet, and the parties would be well-advised to take that standard into consideration before

20  undertaking to persuade a court to vacate an arbitrator's ruling."  *Id.*, at 1271 n. 5.  *See also*

21  *General Steel Corp. v. World Missions Ministries*, Case No. 06-cv-00245-PSF-MEH, 2006 U.S.

22

23

24  _____

25  [19] This Court recognized the *Trans Chem.* standard last year in *Brayton Purcell LLP v. Recordon*

26  *& Recordon*, 487 F. Supp. 2d 1124, 1127 (N.D. Cal. 2007) (awarding fees based on Copyright Act but acknowledging a fee award would also have been appropriate if defendants had acted "in

27  bad faith or without sufficient justification").

28

1   Dist. LEXIS 78386, at *6 (D. Colo. Oct. 27, 2006) (awarding attorneys' fees to party that

2   successfully opposed petition to vacate because it was "essentially unjustified").

3          Maxim's Petition to Vacate serves no legitimate purpose.  The arbitration award may be

4   unpleasant for Maxim's attorneys and difficult for Maxim to digest, but that is no reasons for

5   Maxim to waste judicial resources by filing a frivolous petition.  A fee award is proper.

6                                         **<u>CONCLUSION</u>**

7          The Court should deny Maxim's Petition to Vacate in its entirety, and grant Master

8   Chips's Petition to Confirm.  Because Maxim's Petition is completely without justification, the

9   Court should award Master Chips's its attorneys' fees incurred in connection with this action.

10  Dated: April 28, 2008                        Respectfully submitted,

11                                               HARVEY SISKIND LLP
                                                 LAWRENCE J. SISKIND
12                                               SETH I. APPEL

13
                                                 By: _____/s/_____
14                                                          Seth I. Appel

15                                               Attorneys for Respondent and Cross-Petitioner
                                                 MASTER CHIPS, BVBA
16

17

18

19

20

21

22

23

24

25

26

27

28
                                             25