HARVEY SISKIND LLP
LAWRENCE J. SISKIND (SBN 85628)
Email: siskind@harveysiskind.com
SETH I. APPEL (SBN 233421)
Email: sappel@harveysiskind.com
Four Embarcadero Center, 39th Floor
San Francisco, CA 94111
Telephone: (415) 354-0100
Facsimile: (415) 391-7124

Attorneys for Respondent
MASTER CHIPS, BVBA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| MAXIM INTEGRATED PRODUCTS, INC., | Case No. C 08 00721 JW |
| Petitioner, | **DECLARATION OF SABINE THIELEMANS IN OPPOSITION TO PETITION TO VACATE, AND IN SUPPORT OF PETITION TO CONFIRM, ARBITRATION AWARD** |
| v. | |
| MASTER CHIPS, BVBA, | |
| Respondent. | Date: June 2, 2008 |
| | Time: 9:00 am |
| | The Honorable James Ware |
| | Courtroom 8, 4th Floor |

I, Sabine Thielemans, declare as follows:

1. I am an attorney at NovaLex, counsel for Master Chips, BVBA ("Master Chips") in an arbitration proceeding against Maxim Integrated Products, Inc. ("Maxim") that took place in the ICC International Court of Arbitration (Case No. 14123/RCH/JHN). I have personal knowledge of the matters stated herein, and, if called as a witness, I could and would testify competently thereto.

DECLARATION OF SABINE THIELEMANS
Case No. C 08 00721 JW

1      2.    I participated in the preparation of Master Chips's initial memorial, filed on

2  September 22, 2006, in the above-referenced arbitration. Attached hereto as Exhibit A is a true

3  and correct copy of a certified translation of excerpts from that document, prepared by Ingrid

4  Piron, a sworn translator with the Oudenaarde Judicial District, which accurately reflects the

5  contents thereof.

6      3.    Maxim filed its initial memorial in the above-referenced arbitration on September

7  22, 2006. Attached hereto as Exhibit B is a true and correct copy of a certified translation of

8  excerpts from that document, prepared by Ingrid Piron, a sworn translator with the Oudenaarde

9  Judicial District, which accurately reflects the contents thereof.

10     4.    Attached hereto as Exhibit C is a true and correct copy of an email I received on

11  October 6, 2006 from Jan Swinnen.

12     5.    I participated in the preparation of Master Chips's second memorial, filed on

13  October 11, 2006, in the above-referenced arbitration. Attached hereto as Exhibit D is a true and

14  correct copy of a certified translation of excerpts from that document, prepared by Ingrid Piron, a

15  sworn translator with the Oudenaarde Judicial District, which accurately reflects the contents

16  thereof.

17     6.    I witnessed the testimony of Jean François Bougerol in the above-referenced

18  arbitration. Attached hereto as Exhibit E is a true and correct copy of an excerpt from the

19  transcript of Mr. Bougerol's testimony.

20     7.    I participated in the preparation of Master Chips's discovery request served on

21  October 6, 2006. Attached hereto as Exhibit F is a true and correct copy of a certified translation

22  of that document, prepared by Ingrid Piron, a sworn translator with the Oudenaarde Judicial

23  District, which accurately reflects the contents thereof.

24     8.    Attached hereto as Exhibit G is a true and correct copy of email correspondence

25  between the arbitrator, Eric van Ginkel, and me, and other counsel in the above-referenced

26  arbitration.

27

28

04/28/2008

9.    Attached hereto as Exhibit H is a true and correct copy of email correspondence between Mr. van Ginkel, and me, and other counsel in the above-referenced arbitration.

10.    Attached hereto as Exhibit I is a true and correct copy of email correspondence between Mr. van Ginkel, and me, and other counsel in the above-referenced arbitration.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed this **28** day of April, 2008, in Brussels, Belgium.

_____
Sabine Thielemans

# EXHIBIT A

## SWORN TRANSLATOR'S DECLARATION

I, the undersigned, Mrs Ingrid Piron, sworn translator with the Oudenaarde Judicial District, hereby declare that this translation bearing my signature is an accurate and complete English translation of the attached Dutch text, also bearing my signature.

## VERKLARING BEËDIGD VERTALER

Hierdoor verklaar ik, Mevr. Ingrid Piron, ondergetekende, beëdigd vertaler bij Arrondissement Oudenaarde, dat deze vertaling met mijn handtekening een juiste en volledige Engelse vertaling is van aangehechte Nederlandse tekst, ook met mijn handtekening.

Herzele, 23 April 2008

Ingrid Piron.

```
INGRID PIRON
SWORN TRANSLATOR
ARRONDISSEMENT OUDENAARDE
ZOTTEGEM-HERZELE CANTON
REP.№645/2004 OF 27.10.04
BERGAFSTRAAT 6
HILLEGEM 9550 HERZELE
BELGIUM
```



25/04 2008 16:39 FAX +32 2 735 34 23    NOVALEX    ☑003/024

---

International Chamber of Commerce
International Court of Arbitration

14123/RCH/JHN

**FIRST STATEMENT**

---

**for**

**MASTER CHIPS BVBA, company incorporated under Belgian law, with registered office at
8500 Kortrijk (Belgium), Jan Persijnstraat 2, with company registration number
0425352027;**

<u>Claimant on lead claim,</u>
defendant on counterclaim,

**Hereinafter referred to as "MASTER CHIPS"**

With as counsel: Counsellors Leo Goovaerts and Sabine Thielemans, office in 1200 Brussels
(Belgium), Kerselarenlaan 118;


**against**


**MAXIM INTEGRATED PRODUCTS INC., company incorporated under the law of the State
of California (USA), with registered office at Sunnyvale, California 94086, USA, 120 San
Gabriel Drive;**

<u>Defendant on lead claim,</u>
claimant on counterclaim,

**Hereinafter referred to as "MAXIM";**

With as counsel: Counsellors Bieke Noels and Jan Swinnen, lawyers at 2600 Antwerp-
Berchem (Belgium), Kardinaal Mercierlei 44;

## I.1 THE FACTUAL CIRCUMSTANCES

**I.1.1** Based upon the exclusive sales concession agreement (item B.1a), dated 1 December 1998, between Master Chips and MAXIM, Master Chips, in continuation of the distribution agreement dated 1 October 1987 (item 1b), was the only concession holder of MAXIM products in Belgium.

MAXIM is a publicly traded, multinational designer, developer and manufacturer of integrated circuits. It employs 8,000 people, has a global distribution network and an annual turnover of USD 1.672 billion (figures financial year 2005 - items B.4).

MAXIM ended contractual relationships and unilaterally determined a period of notice of 18 months via letter sent by international courier and received by Master Chips on 7 September 2001.

A report from the internal auditor of Master Chips showed that, according to an internationally recognised accounting method, the value of the activity of Master Chips at the moment of the termination was EUR 6,968,089.55 and the value of the clientele was EUR 1,272,000.00 (items B.6).

**I.1.2** The impact of the termination of the agreement on Master Chips was significant, considering that 60% of their own turnover was lost with the lose of distribution for MAXIM.

Based on an audit of the sales statistics with accounts processing of the invoices, the internal auditor for the concluding party confirmed that an average of 60% of the then total turnover of Master Chips, i.e., EUR 1,728,970 in 2000 (item B.5a) and EUR 3,726,206.59 in 2001 (item B.5b), was realised based on the agreement with MAXIM (detailed figures from financial year 2000 and the first and second quarters of 2001 cf. item B.6b, p. 6-7).

Also after the termination of the distribution contract, during the period of notice, the turnover of the Master Chips products was indeed still half of the total turnover, i.e., 53.60% for the period January 2002 - August 2002 (item B.6c p.2) and 48.1% for 2003 (item B.6d), although the period of notice concluded in February 2003.

**I.1.3** Therefore, the total turnover for Master Chips shrank from EUR 3,726,206.59 in 2001 (year in which the distribution was terminated) to EUR 2,008,856.07 in 2002; to EUR 913,861.38 in 2003; to EUR 771,311.58 in 2004 (items B.5b up to and including 5d); and to 480,175.07 in 2005 (item D.1)
The interim figures for 2006 (January up to and including July) suggest that the turnover for 2006 is in no way positively evolving.

**I.1.4** In addition to its turnover, Master Chips also saw the commissions amounts that MAXIM paid to it pursuant to the agreement reduced to nothing (1998-2000: USD 196,103.85, 2001: USD 125,446.94, 2002: USD 6,018.35 and 2003 [Jan.-Feb.]: USD 6,667.35) (items A.5,12,13,26,27,28,61, and D.5).

**I.1.5** A look at the <u>evolution in the annual results</u> of Master Chips teaches us that they could still have achieved a growth in 2001 compared to 2000 (EUR 308,110.48 compared to EUR 129,564.20 - items B.5a and 5b).

Therefore, Master Chips was denounced only on 7 September 2001 by MAXIM and the effects of the loss of the distribution revenue (turnover distribution clientele and commissions) were not fully felt until 2002 (gain of just EUR 596.89, item B.5c) and even more so in 2003 where the net result was literally negative (- EUR 283,332.47, item B.5d). Master Chips still noted a loss of EUR 53,016.65 (items B.5d). In 2005, the losses from the ordinary operations (- EUR 37,079.77) were covered by the surrender of the Manager's insurance (item D.1 and D.3).

The interim figures for 2006 are again negative (January-July 2006: - EUR 50,439.48, item D.2).

## I.4 THE COMPENSATION COMING TO MASTER CHIPS IS FAIR – NO ADDITIONAL EQUITABLE COMPENSATION FOR TERMINATION

### I.4.1 A substitute compensation equal to the actual value of a company

**I.4.1.1** The termination of the agreement closed between the parties falls under the application of the Law of 1961 on the unilateral termination of exclusive distribution agreements of indefinite duration as amended by the Law of 13 April 1971 ("Exclusive distribution law"), which MAXIM never contested and, in fact, explicitly confirmed.

Article 2 of the abovementioned law states that: *"A sales concession granted for an indefinite duration, subject to this law, can, except in the case of serious failure of either party to complete its obligations, cannot be terminated without a reasonable period of notice or an equitable compensation determined by the parties at the termination of the contract. If the parties cannot come to an agreement, then the courts will rule in fairness, possibly with regard to the use."*

Therefore, Master Chips is entitled in the first instance to a reasonable period of notice or an equitable compensation for termination,
is largely exaggerated and not adequately proven
**I.4.1.2** The purpose of the period of notice is to offer the terminated party the opportunity to find an equivalent situation. Therefore, this is regarding the time that the terminated party reasonably needs in order to provide a substitute[1].

It cannot be reasonably expected from Master Chips that they find, within a period of 18 months, other channels in which to realise 60% of its turnover, i.e., 60% of EUR 3,726,206.59 in 2001 (year in which the distribution was terminated - see point I.1.2 above).

As already stated above (sub I.2.2), there are only two companies on the market in competition with Maxim, and it is therefore impossible, in all practicality, for Master Chips to find an equivalent concessions contract, seeing as the two competitor companies each have their own distribution network and have confirmed their disinterest in entering into a cooperation with Master Chips.

Since the forced termination of the distribution of MAXIM products, the financial situation of Master Chips is extremely precarious, even to this day.

As described under points I.1.2 up to and including I.1.5 above, Master Chips has know a continuous decline in its turnover figures since MAXIM terminated the distribution on 2001 and have not succeeded, now four years after the termination of the agreement by MAXIM and despite continuous attempts (point I.1.6), in turning the tide and pulling itself out of the red figures, in fact, it is quite the contrary.

Hence the conclusion that, due to the termination of the MAXIM distribution, Master Chips is no longer viable and is slowly, but surely, dying.

Therefore, the determination of a period of notice is not useful in the case Master Chips.

---

[1] Brussel, 9 mei 1985, *R.W.*, 1985-86, 1210

The granting of a "reasonable" period of notice is therefore just as impossible and as such, Maxim should, as compensation, reimburse the actual value of the company.

**I.4.1.3** Maxim contests the possibility, based on Article 2 of the Exclusive distribution law, to claim compensation that corresponds to the value of the enterprise at the moment of termination. They refer to the criteria generally accepted by Belgian jurisprudence and have decided that the granting of a period of notice of 18 months is amply sufficient.

As already elaborated in sub I.2.4-5 above, given the one-sided, incomplete and incorrect interpretation of the criteria cited by Maxim, a period of notice of just 18 months is completely unjustifiable.

**I.4.1.4** Maxim also forgets that it is not the termination of a distribution agreement as such, but the giving of a period of notice that is too short upon the termination, as in this case, that is at fault and it follows integrally that the damage resulting from this fault must be reimbursed[2].

It was already found in sub I.4.1.2 above that Master Chips, due to and since the loss of the distribution for Maxim, has been surviving on the brink of disaster. The reserves that Master Chips has been able to pull from up to now (see, for example, the contribution of the surrender of the Manager's insurance in the results) are not inexhaustible. Because of the loss of the Maxim distribution, Master Chips will be forced to declare bankruptcy, which is indeed confirmed by the most recent evolution.

Therefore, the damage is consistent with the value of the enterprise at the moment of the - incorrect - termination of the agreement (assessment, see sub I.4.2).

**I.4.1.5** Moreover, even if it were so that Article 2 of the Exclusive distribution law did not allow for an integral compensation corresponding with the value of the enterprise (quod non), then Master Chips still has the right to an integral compensation for its losses based on the Law of 13 April 1995 concerning commercial agency agreements.

With regard to the activities of Master Chips as agent and "designer" (see sub I.2.4 above) and with regard to the commissions that they - in part - received for this, the Commercial agency law is also indeed applicable in addition to the Exclusive distribution law.

Both laws can be cumulatively applied. Both the Exclusive distribution law of 1961 and the Commercial agency law of 1995 can be applied to each component of the activity, depending on whether the activity is understood as either concession or as commercial agency activity, respectively.

Article 21 of the Commercial agency law states that: "*To the extent that the commercial agent is entitled to the goodwill indemnity determined in Article 20, and the amount of such compensation does not fully reimburse the actual previous loss, the commercial agent can, provided the extent of the actual previous loss justifies this, in addition to this compensation obtain restitution amounting to the difference between the amount of the actual previous loss and the amount of the compensation.*"

---

[2] P. KILESTE & P. HOLLANDER, "*Examen de jurisprudence. La loi du 27 juillet 1961 relative à la résiliation des concessions de vente exclusive à durée indéterminée (1992-1997)*", *T.B.H.*, 1998, nr. 19 en 38.

Article 21 refers to Article 20 which provides that: *"After the termination of the agreement, the commercial agent has the right to a goodwill indemnity when he has acquired new customers for the principal ..., to the extent that this continues to provide the principal with substantial benefits. ... The amount of this goodwill indemnity is determined through taking into account both the realised expansion of the business and the acquisition of clients. The goodwill indemnity may not amount to more than the amount of one years compensation calculated based on the average of the five previous years or based on the average compensation in the previous years if agreement lasted for less than five years."*

This will be further elaborated upon in sub II below, which will show without a doubt that Master Chips does indeed have the right to a goodwill compensation for clientele based on Article 20 of the Commercial agency law or if necessary, a clientele indemnity under Article 3 of the Exclusive distribution law, so that the condition of applicability of Article 21 is met and the total loss, being the loss of the value of the enterprise, should be reimbursed.

## I.4.2 The claimable amount of EUR 6,968,089.55 (see Annex II)

Taking into account the established case law and doctrine and the share of the turnover from the MAXIM products in the then total turnover for Master Chips, the effect of the termination on the viability of Master Chips and the context in which MAXIM expects the implementation of the period of notice from Master Chips (see sub I.3), the period of notice must be converted into a substitute compensation corresponding with the value of the activity of Master Chips in the year of termination, i.e., EUR 6,968,089.55.

This value for Master Chips is already a result of the judicial proceedings brought before the courts of Brussels by the internal auditor of Master Chips, this being calculated by the internal auditors Vandelanotte, by Maxim itself and by the internal auditors of Maxim, being criticised by KPMG and with a reply served by Vandelanotte (items B.6a, b, c and item A.17 Maxim).

For the sake of legibility of the current statement, Master Chips refers to the discussion regarding this matter in annex II, which forms an integral part of this statement.



## II.4 ESTIMATE FOR THE CLIENTELE INDEMNITY

### II.4.1 Clientele and goodwill

Maxim maintains that the compensation for clientele cannot coincide with the value of the goodwill seeing as Master Chips has only one activity.

Taking into account the fact that the termination of the distribution agreement brought on such a large economic shock that Master Chips was ultimately no longer able to keep its head above water - what is in reality actually happening (see supra) - it is, in this case, indeed logical that the actual value of the goodwill should be reimbursed by Maxim as compensation.

Master Chips refers here to the calculations done by its internal auditor (see Annex II) based on which the goodwill of Master Chips is formulated at EUR 1,272,000 (item A.6a).

### II.4.2 Estimate under Article 20 of the Commercial agency law

Article 20 stipulates the goodwill indemnity on the maximum amount of one years compensation calculated based on the average of the five previous years or based on the average compensation in the previous years if agreement lasted for less than five years.

In order to reach a correct calculation, it is therefore crucial that a clear picture of the commissions coming to Master Chips be formed before everything else (see part III).

## II.4 CONCLUSION REGARDING THE COMPENSATION OF THE CLIENTELE

Based on the previous arguments and taking into account the effect of the termination of the agreement on the viability of Master Chips, it is found that Maxim owes Master Chips payment of a compensation for the loss of its clientele, in accordance with the value thereof in the year of the termination, i.e., EUR 1,272,000 (item A.6a).

Of course, a correct determination of the commissions (part III) in this context is of great importance for, among other things, the calculation of the value of a client like Alcatel.

Finally, it should be noted that the takeover of the clients of Master Chips by Maxim had already begun during the period of notice, given that Maxim was also then actively inviting the clients of Master Chips to buy directly from Maxim (see I.3.1).

### III.3.5 Conclusion regarding the commissions

Although the submitted items provide anything but a complete and correct picture, it is clear that Maxim withheld significant amounts from the commissions for Master Chips.

Given the distractions that can be made from the items, it must also be understood that even the undisclosed items will show that significant amounts from the commissions were not paid.

However, it is not possible for Master Chips to make a calculation of the lost commissions in this manner, given the jumble of documents and spreadsheets submitted to it by Maxim.

By extrapolation and taking into account the ratios from the numbers in 1999 given for the USA and Belgium (going from there that these figures are the most reliable where the production still occurred at Alcatel so that Maxim may have had very few figures existing on subcontractors), the total of non-commissioned deliveries can be estimated at USD 2,000,000 for 1999; USD 8,000,000 for 2000 and at least the same amount for 2001.[3 and 4]

Given the gaps in the information, Master Chips still repeats its demand for complete, clear and uniform presentation of items (spreadsheets), at least for the components included in Annex III, details regarding numbers and prices for sales via Arrow, and for sales to Flextronics, Alcatel USA and China.

If Maxim does not immediately confirm their voluntary acceptance to meet these demands following the submission of this statement, Master Chips will request that the arbitrator mandatorily require this from Maxim, unless they are of the belief that, based on the above arguments elaborated upon with sufficient precision, that ex aequo et bono, the amount of commissions still owed can be determined.

A correct determination of the commissions is indeed of importance in the context of the calculation of the clientele indemnity (part II) for, among other things, the calculation of the value of a client like Alcatel.

## IV. THE TOTAL CLAIMED AMOUNT

---

[3] Op basis van de onder punt III.3.3.2 punt 2 geciteerde informatie afkomstig van de website van Alcatel aangaande de totaal geleverde ADSL-lijnen per jaar, het aantal componenten dat voor dergelijke productie vereist was en de eenheidsprijs per component.
[4] Dhr. Di Quattro heeft eveneens aan Master Chips beestings dat in de periode 1998-2001 de omzet van Maxim bij Alcatel 20 à 30 miljoen Eur per jaar bedroeg waarvan een groot gedeelte betrekking had op het ADSL project.

Master Chips saw itself forced to limit its claim to compensation, based on financial considerations, in a petition for arbitration to a fixed amount of EUR 750,000, albeit subject to interest due on the principal amount and subject to a later expansion of its claim.

However, given the resistance put up by Maxim with regard to any subsequent exercise by Master Chips of its rights in a separate arbitration procedure, Master Chips, in order to safeguard its rights, sees itself as forced to claim the full amount to which it believes itself to be entitled:

- a compensation of the losses, estimated at EUR 6,968,089.55;
- a compensation for clientele, estimated at EUR 1,272,000.00;
- a compensation for the loss suffered due to the prices and publicity policies implemented by Maxim, which have so far not been estimated;
- the reimbursement of the amounts that were paid during the period of notice by Master Chips for the publicity for Maxim products and the technical support provided to the clientele by a Maxim employee (FAE), estimated at USD 77,303 and USD 43,861.49, respectively;
- the correct payment of commissions, which were impossible to precisely estimate until now, hence, a provisional amount of USD 500,000 for non-payment of the owed commissions, pending the possibility of calculating the exact estimate thereof.

**FOR THESE REASONS,**

**Based on the previous statements and considerations,**

**And subject to extension or modification of its claim,**

**MASTER CHIPS REQUESTS THAT THE ARBITRATOR,**

Order Maxim to pay to Master Chips the following:

- a compensation of the losses, estimated at EUR 6,968,089.55;

- a compensation for clientele, estimated at EUR 1,272,000.00;

- a compensation for the loss suffered due to the prices and publicity policies implemented by Maxim, to be estimated ex aequo et bono by the arbitrator;

- the reimbursement of the amounts that were paid during the period of notice by Master Chips for the publicity for Maxim products and the technical support provided to the clientele by a Maxim employee (FAE), estimated at USD 77,303 and USD 43,861.49, respectively;

- a provisional amount of USD 500,000 for non-payment of the owed commissions.

- the interest due on the principal amount;

Master Chips directs that this, subject to extension or modification of its claim, be entered into the records;

Order Maxim to pay for all costs incurred in the context of the arbitration.

Done in Brussels on 22 September 2006

For Master Chips,
Counsel members

Counsellor Leo Goovaerts                    Counsellor Sabine Thielemans

Internationale Kamer van Koophandel
Internationaal Hof van Arbitrage

14123/RCH/JHN

**EERSTE MEMORIE**

voor

**MASTER CHIPS BVBA**, vennootschap naar Belgisch recht, met maatschappelijke zetel te 8500 Kortrijk (België), Jan Persijnstraat 2, met ondernemingsnummer 0425352027 ;

Eiseres op hoofdeis,
Verweerster op tegeneis,

Hierna genoemd 'MASTER CHIPS'

Met als raadslieden : Mr. Leo Goovaerts en Mr. Sabine Thielemans, kantoor houdende te 1200 Brussel (België), Kerselarenlaan 118 ;

tegen

**MAXIM INTEGRATED PRODUCTS INC.**, vennootschap naar het recht van de staat California (USA), met maatschappelijke zetel te Sunnyvale, California 94086, USA, 120 San Gabriel Drive ;

Verweerster op hoofdeis,
eiseres op tegeneis,

hierna genoemd 'MAXIM';

Met als raadslieden: Mr. Bieke Noels en Mr. Jan Swinnen, advocaten te 2600 Antwerpen-Berchem (België), Kardinaal Mercierlei 44;

## I.1  DE FEITELIJKE OMSTANDIGHEDEN

**I.1.1**  Op grond van de tussen Master Chips en MAXIM gesloten alleenverkoopconcessie-overeenkomst d.d. 1 december 1998 (stuk B.1a) werd Master Chips, in voortzetting van de distributieovereenkomst daterend van 1 oktober 1987 (stuk 1b), de enige concessiehouder in België van MAXIM producten.

MAXIM is een beursgenoteerde multinational, ontwerper, ontwikkelaar en producent van geïntegreerde circuits, telt 8000 werknemers, heeft een wereldwijd distributienetwerk en een jaaromzet van 1,672 miljard US$ (cijfers fiscaal jaar 2005 - stukken B.4).

Per internationale koerierdienst verstuurd schrijven ontvangen door Master Chips op 7 september 2001, beëindigde MAXIM de contractuele relaties en bepaalde éénzijdig een opzegtermijn van 18 maanden.

Uit het rapport van de bedrijfsrevisor van Master Chips bleek dat volgens een internationaal erkende boekhoudkundige methode, de waarde van de activiteit van Master Chips op het moment van de opzegging 6.968.089,55 Euro bedroeg en de waarde van de cliëntele 1.272.000,00 Euro (stukken B.6).

**I.1.2**  De impact van de beëindiging van de overeenkomst op Master Chips was dramatisch aangezien door het wegvallen van de MAXIM distributie 60% van haar omzet wegviel.

Op basis van een audit van de verkoopsstatistieken met de boekhoudkundige verwerking van de facturen, bevestigt de bedrijfsrevisor van concluante dat gemiddeld 60% van de toenmalige totale omzet van Master Chips, namelijk 1.728.970 Eur in 2000 (stuk B.5a) en 3.726.206,59 Eur in 2001 (stuk B.5b), gerealiseerd werd op basis van de overeenkomst met MAXIM (gedetailleerde cijfers van boekjaar 2000 en het eerste en tweede kwartaal van 2001 cf. stuk B.6b p.6-7).

Ook na het verbreken van het distributiecontract, tijdens de opzegperiode, bedroeg de omzet van de producten van Master Chips trouwens nog steeds de helft van de totale omzet, nl. 53,60% voor de periode januari 2002 - augustus 2002 (stuk B.6c p.2) en 48,1% voor 2003 (stuk B.6d), hoewel de opzegtermijn een einde nam in februari 2003.

**I.1.3**  De totale omzet van Master Chips slonk bijgevolg van 3.726.206,59 Eur in 2001 (jaar van de opzegging van de distributie), naar 2.008.856,07 Eur in 2002, naar 913.861,38 Eur in 2003, naar 771.311,58 Eur in 2004 (stukken B.5b t/m 5d) en naar 480.175,07 Eur in 2005 (stuk D.1)
De tussentijdse cijfers voor 2006 (januari t/m juli) wijzen erop dat de omzet voor 2006 geenszins positief evolueert.

**I.1.4**  Master Chips zag behoudens haar omzet trouwens ook de bedragen aan commissielonen die MAXIM haar op basis van de overeenkomst betaalde tot nul herleid worden (1998-2000: 196 103,85 $, 2001: 125 446,94 $, 2002: 6 018,35 $ en 2003 (jan-febr): 6 667,35 $) (stukken A.5,12,13,26,27,28,61, en D.5).

**I.1.5** Een blik op de <u>evolutie in de jaarresultaten</u> van Master Chips leert ons overigens dat zij in 2001 nog een groei kon realiseren ten aanzien van 2000 (308.110,48 Eur t.a.v. 129.564,20 Eur - stukken B.5a en 5b).

Master Chips werd dan ook pas op 7 september 2001 door MAXIM opgezegd en de effecten van het wegvallen van de distributieopbrengsten (omzet distributieclïénteel en commissies) lieten zich dan ook ten volle voelen in 2002 (winst van amper 596,89 Eur, stuk B.5c) en meer nog in 2003 waar het nettoresultaat letterlijk negatief was (-283.332,47 Eur, stuk B.5d). Ook in 2004 noteerde Master Chips nog altijd een verlies van 53.016,65 Eur (stukken B.5d). In 2005 werden de verliezen uit de gewone bedrijfsvoering (-37.079,77 Eur) gedekt door de afkoop van de bedrijfsleidersverzekering (stuk D.1 en D.3).
De tussentijdse cijfers voor 2006 zijn weerom negatief (januari-juli 2006 : -50.439,48 Eur, stuk D.2).

## I.4 DE AAN MASTER CHIPS TOEKOMENDE SCHADEVERGOEDING

### I.4.1 Een vervangende schadevergoeding gelijk aan de actuele waarde van een bedrijf

**I.4.1.1** De beëindiging van de door partijen gesloten overeenkomst valt onder toepassing van de Wet van 1961 betreffende de éénzijdige beëindiging van de voor onbepaalde tijd verleende concessies van alleenverkoop zoals gewijzigd door de Wet van 13 april 1971 ('Alleenverkoopwet'), hetgeen door MAXIM nooit werd betwist en zelfs expliciet werd bevestigd.

Artikel 2 van voornoemde wet bepaalt dat : *"Een voor onbepaalde tijd verleende, aan deze wet onderworpen verkoopconcessie kan, behalve bij grove tekortkoming van een van de partijen aan haar verplichtingen, niet worden beëindigd dan met een redelijke opzeggingstermijn of een billijke vergoeding die door partijen wordt bepaald bij de opzegging van het contract. Zijn partijen het niet eens, dan doet de rechter uitspraak naar billijkheid, eventueel met inachtneming van de gebruiken."*

Master Chips heeft derhalve in eerste instantie recht op een redelijke opzeggingstermijn of een billijke opzeggingsvergoeding,

**I.4.1.2** Het doel van de opzeggingstermijn is aan de opgezegde partij de mogelijkheid te bieden een gelijkwaardige situatie terug te vinden. Het gaat dus om de tijd die de opgezegde partij redelijkerwijze nodig heeft om in een vervanging te kunnen voorzien[1].

Redelijkerwijze kon niet van Master Chips verwacht worden om op 18 maanden tijd 60% van haar omzet, namelijk 60% van 3.726.206,59 Eur in 2001 (jaar van de opzegging van de distributie - zie hierboven punten I.1.2) via andere kanalen te realiseren.

Zoals hierboven reeds aangehaald (sub I.2.2) zijn er slechts twee concurrenten van Maxim op de markt en is het dus voor Master Chips **de facto** onmogelijk een gelijkwaardig concessiecontract te vinden aangezien de 2 concurrerende bedrijven elk over een eigen distributienetwerk beschikken en bevestigd hebben niet geïnteresseerd te zijn in een samenwerking met Master Chips.

Sinds de gedwongen stopzetting van de distributie van MAXIM producten is de financiële toestand van Master Chips dan ook tot op vandaag uiterst precair.

Zoals hierboven beschreven onder de punten I.1.2 tot en met I.1.5 kent Master Chips sinds de opzegging van de distributie door MAXIM in 2001 een continue daling van haar omzetcijfers en slaagt zij er, inmiddels vier jaar na de opzegging van de MAXIM overeenkomst en ondanks verwoede pogingen (punt I.1.6), niet in het tij te doen keren en uit de rode cijfers te komen, wel integendeel.

Vandaar de vaststelling dat door de stopzetting van de MAXIM distributie Master Chips niet langer levensvatbaar is en een langzame maar zekere dood sterft.

Het bepalen van een opzegtermijn is in het geval van Master Chips bijgevolg niet zinvol.

---

[1] Brussel, 9 mei 1985, *R.W.*, 1985-86, 1210

Het toekennen van een 'redelijke' opzeggingstermijn is bijgevolg eveneens onmogelijk en ter compensatie dient dan ook de actuele waarde van het bedrijf te worden vergoed door Maxim.

**I.4.1.3** Maxim betwist de mogelijkheid om op basis van artikel 2 van de Alleenverkoopwet een schadevergoeding te vorderen die overeenstemt met de waarde van de onderneming op het moment van de opzegging. Zij verwijst naar de door de Belgische rechtspraak algemeen aanvaarde criteria en besluit dat de toekenning van een opzegtermijn van 18 maanden ruimschoots volstaat.

Zoals hierboven sub I.2.4-5 reeds uitgewerkt, is gelet op de eenzijdige, onvolledige en onjuiste invulling van de aangehaalde criteria door Maxim, een opzegtermijn van slechts 18 maanden helemaal niet te rechtvaardigen.

**I.4.1.4** Maxim vergeet bovendien dat niet het beëindigen van een distributieovereenkomst als dusdanig maar wel het geven van een té korte opzeggingstermijn bij deze opzeg, zoals in casu, een fout uitmaakt en dat de schade die uit deze fout volgt integraal moet vergoed worden[2].

Reeds hierboven sub I.4.1.2 werd vastgesteld dat Master Chips door en sinds het wegvallen van de distributie van Maxim op het randje van de afgrond leeft. De reserves waaruit Master Chips totnutoe heeft kunnen puren (zie bijvoorbeeld de inbreng van de afkoop van de bedrijfsleidersverzekering in de resultaten) zijn echter niet onuitputtelijk. Door het verlies van de Maximdistributie zal Master Chips dus genoodzaakt zijn de boeken neer te leggen, wat de meest recente evolutie trouwens bevestigt.

De schade stemt bijgevolg overeen met de waarde van de onderneming op het ogenblik van de - foutieve - beëindiging van de overeenkomst (berekening zie sub I.4.2).

**I.4.1.5** Bovendien, zelfsal zou het zo zijn dat artikel 2 van de Alleenverkoopwet een integrale schadevergoeding overeenstemmend met de waarde van de onderneming niet toelaat (quod non), dan nog heeft Master Chips op basis van de Wet van 13 april 1995 op de handelsagentuur recht op een integrale vergoeding van haar schade.

Gelet op de activiteiten van Master Chips als agent en 'designer' (zie hierboven sub I.2.4) en gelet op de commissielonen die ze daarvoor - gedeeltelijk - ontving, is immers naast de Alleenverkoopwet van 1961 ook de Agentuurwet van toepassing.

Beide wetgevingen kunnen cumulatief worden toegepast. Op elk onderdeel van de activiteit kan namelijk, al naargelang de activiteit als concessie- dan wel als agentuuractiviteit moet worden opgevat, de Alleenverkoopwet van 1961 respectievelijk de Agentuurwet van 1995 worden toegepast.

Artikel 21 van de Agentuurwet bepaalt dat: *"Voorzover de handelsagent recht heeft op de uitwinningsvergoeding bepaald in artikel 20 en het bedrag van deze vergoeding de werkelijk geleden schade niet volledig vergoedt, kan de handelsagent, mits hij de omvang van de werkelijk geleden schade bewijst, boven deze vergoeding schadeloosstelling verkrijgen ten*

---

[2] P. KILESTE & P. HOLLANDER, *"Examen de jurisprudence. La loi du 27 juillet 1961 relative à la résiliation des concessions de vente exclusive à durée indéterminée (1992-1997)"*, T.B.H., 1998, nr. 19 en 38.

*belope van het verschil tussen het bedrag van de werkelijk geleden schade en het bedrag van die vergoeding."*

Artikel 21 verwijst daarbij naar artikel 20 dat bepaalt dat: *"Na de beëindiging van de overeenkomst heeft de handelsagent recht op een uitwinningsvergoeding wanneer hij de principaal nieuwe klanten heeft aangebracht ..., voorzover dit de principaal nog aanzienlijke voordelen kan opleveren. ... Het bedrag van deze uitwinningsvergoeding wordt bepaald rekening houdend zowel met de gerealiseerde uitbreiding van de zaken als met de aanbreng van klanten. De uitwinningsvergoeding mag niet meer bedragen dan het bedrag van een jaar vergoeding berekend op basis van het gemiddelde van de vijf voorafgaande jaren of op basis van de gemiddelde vergoeding in de voorafgaande jaren indien de overeenkomst minder dan vijf jaar heeft geduurd."*

Zoals hieronder sub II meer in detail zal worden uitgewerkt, leidt het geen twijfel dat Master Chips inderdaad recht heeft op een uitwinningsvergoeding voor cliënteel op basis van artikel 20 van de Agentuurwet c.q. een cliënteelsvergoeding onder artikel 3 van de Alleenverkoopwet, zodat aan de voorwaarde van toepasbaarheid van artikel 21 voldaan is en de totale schade, zijnde het verlies van de waarde van de onderneming, dient vergoed te worden.


I.4.2  Het gevorderde bedrag van 6.968.089,55 Eur  (zie Annex II)

Rekening houdend met de vaststaande rechtspraak en rechtsleer en het aandeel van de omzet van de producten van MAXIM in het toenmalige totale zakencijfer van Master Chips, het effect van de opzeg op de levensvatbaarheid van Master Chips en de context waarbinnen MAXIM van Master Chips de uitvoering van een opzegtermijn verwachtte (zie sub I.3), dient de opzegtermijn te worden omgezet in een vervangende schadevergoeding overeenstemmend met de waarde van de activiteit van Master Chips in het jaar van de opzegging, namelijk 6.968.089,55 Euro.

Deze waarde van Master Chips werd reeds naar aanleiding van de gerechtelijke procedures voor de Brusselse rechtbanken door de bedrijfsrevisor van Master Chips, zijnde Bedrijfsrevisoren Vandelanotte berekend, door Maxim zelf en door de bedrijfsrevisoren van Maxim, zijnde KPMG bekritiseerd en door Vandelanotte van repliek gediend (stukken B.6a, b, c en stuk A.17 Maxim).

Met het oog op de leesbaarheid van huidige memorie, verwijst Master Chips naar de bespreking desaangaande in annex II die integraal deel uitmaakt van deze memorie.

**II.4  BEGROTING VAN DE CLIËNTEELSVERGOEDING**

II.4.1  Cliënteel en goodwill

Maxim stelt dat de vergoeding voor cliënteel niet kan samenvallen met de waarde van de goodwill aangezien Master Chips meer dan één activiteit heeft.

Rekening houdend met het gegeven dat de beëindiging van de distributieovereenkomst een dermate grote economische schok heeft teweeggebracht dat Master Chips uiteindelijk niet langer in staat zal zijn het hoofd boven water te houden – wat in realiteit trouwens ook aan het gebeuren is (cf. supra) -, is het *in casu* wel degelijk logisch dat ter compensatie de actuele waarde van de goodwill dient te worden vergoed door Maxim.

Master Chips verwijst hiervoor naar de berekeningen van haar bedrijfsrevisor (zie Annex II) op basis waarvan de goddwil van Master Chips op 1.272.000 Euro (stuk A.6a) werd gesteld.

II.4.2  Begroting onder artikel 20 van de Agentuurwet

Artikel 20 bepaalt de uitwinningsvergoeding op maximum het bedrag van een jaar vergoeding berekend op basis van het gemiddelde van de vijf voorafgaande jaren of op basis van de gemiddelde vergoeding in de voorafgaande jaren indien de overeenkomst minder dan vijf jaar heeft geduurd.

Om tot een juiste berekening te kunnen komen is het dus cruciaal dat vóór alles een duidelijk beeld kan worden gevormd van de aan Master Chips toekomende commissieloenen (zie deel III).

## II.4   CONCLUSIE WAT BETREFT DE VERGOEDING VAN HET CLIËNTEEL

Op basis van voorgaande argumentering en rekening houdend met het effect van de beëindiging van de overeenkomst op de levensvatbaarheid van Master Chips, is Maxim Master Chips de betaling van een vergoeding verschuldigd voor het verlies van haar cliënteel, overeenstemmend met de waarde ervan in het jaar van de opzegging, namelijk 1.272.000 Euro (stuk A.6a).

Uiteraard is een juiste bepaling van de commissielonen (deel III) in dit kader van groot belang voor onder meer de berekening van de waarde van een cliënt als Alcatel.

Tot slot dient te worden opgemerkt dat de overname van cliënteel van Master Chips door Maxim reeds begonnen is tijdens de opzegperiode, aangezien Maxim ook toen al op actieve wijze klanten van Master Chips uitnodigde rechtstreeks bij haar te kopen (zie I.3.1).

### III.3.5  Conclusie wat betreft de commissielonen

Hoewel de overgemaakte stukken allesbehalve een compleet en correct beeld geven, is het duidelijk dat Maxim Master Chips belangrijke bedragen aan commissielonen heeft onthouden.

Gelet op de afleidingen die kunnen gemaakt worden uit de overgelegde stukken, moet er bovendien worden van uitgegaan dat ook uit de niet-overgelegde stukken zal blijken dat belangrijke bedragen aan commissielonen niet werden uitgekeerd.

Het is Master Chips echter niet mogelijk een berekening te maken van de op die manier misgelopen commissielonen gelet op de mengelmoes van documenten en spreadsheets die haar door Maxim werden overgemaakt.

Via extrapolatie en rekeninghoudende met de ratio's van de aantallen in 1999 doorgegeven voor de USA en België (er vanuitgaande dat deze cijfers de meest betrouwbare zijn daar de produktie dan nog bij Alcatel zelf gebeurde zodat Maxim er alleszins niet veel cijfers aangaande onderaannemers kunnen bestaan hebben), kan het totaal van niet gecommissioneerde leveringen geschat worden op 2.000.000 $ voor 1999, op 8.000.000 $ voor 2000 en minstens evenveel voor 2001.[3 en 4]

Gelet op de hiaten in de informatie herhaalt Master Chips alsnog haar vraag tot volledige, overzichtelijke en eenvormige overlegging van stukken (spreadsheets), minstens voor de componenten opgenomen in Annex III, details wat betreft aantallen en prijzen voor verkopen via Arrow, en voor verkopen aan Flextronics en Alcatel USA en China.

Indien Maxim niet onmidellijk volgend op de overmaking van deze memorie bevestigt dit verzoek vrijwillig te zullen inwilligen, zal Master Chips de arbiter vragen Maxim daartoe te verplichten, tenzij deze van oordeel zou zijn dat op basis van de hierboven uitgewerkte argumenten met voldoende precisie dan wel ex aequo et bono het bedrag aan nog verschuldigde commissielonen kan worden bepaald.

Een juiste bepaling van de commissielonen is immers van belang in het kader van de berekening van de clïenteelsvergoeding (deel II) voor onder meer de berekening van de waarde van een cliënt als Alcatel

---

## IV.  DE IN TOTAAL GEVORDERDE BEDRAGEN

---

[3] Op basis van de onder punt III.3.3.2 punt 2  geciteerde informatie afkomstig van de website van Alcatel aangaande de totaal geleverde ADSL-lijnen per jaar, het aantal componenten dat voor dergelijke produktie vereist was en de eenheidsprijs per component.

[4] Dhr. Di Quattro heeft eveneens aan Master Chips bevestigd dat in de periode 1998-2001 de omzet van Maxim bij Alcatel 20 à 30 miljoen Eur per jaar bedroeg waarvan een groot gedeelte betrekking had op het ADSL project.

Uit financiële overwegingen zag Master Chips zich gedwongen om haar vordering in het verzoekschrift tot arbitrage te beperken tot een forfaitair bedrag van 750.000 Eur, zij het onder voorbehoud van interesten verschuldigd op de hoofdsom en onder voorbehoud van latere uitbreiding van haar vordering.

Gelet echter op het verzet van Maxim met betrekking tot een eventuele latere uitoefening door Master Chips van haar rechten in een aparte arbitrageprocedure, ziet Master Chips zich, teneinde haar rechten te vrijwaren, genoodzaakt haar vordering te brengen tot de reële bedragen waar zij recht meent op te hebben:

- een vergoeding van de schade, begroot op 6.968.089,55 Eur;
- een vergoeding voor cliënteel, begroot op 1.272.000,00 Eur;
- een vergoeding voor de schade geleden door het door Maxim gevoerde prijzen- en publiciteitsbeleid, tot op heden nog niet begroot;
- de terugbetaling van de bedragen die tijdens de opzegperiode door Master Chips betaald werden voor de publiciteit voor Maxim producten en de technische ondersteuning aan het cliënteel door een Maxim werknemer (FAE), begroot op respectievelijk 77 303 $ en 43 861,49 $
- de correcte betaling van commissielonen, tot op heden onmogelijk precies te begroten, vandaar, een provisioneel bedrag van 500 000 $ voor de niet-betaling van verschuldigde commissielonen, in afwachting van de mogelijkheid tot de precieze begroting ervan.


**OM DEZE REDENEN,**

**Op basis van voorgaande uiteenzettingen en overwegingen,**

**En onder voorbehoud van uitbreiding of wijziging van haar vordering,**

**VRAAGT MASTER CHIPS DE ARBITER,**


Maxim te veroordelen tot betaling aan Master Chips van:

- een vergoeding van de schade, begroot op 6.968.089,55 Eur;

- een vergoeding voor cliënteel, begroot op 1.272.000,00 Eur;

- een vergoeding voor de schade geleden door het door Maxim gevoerde prijzen- en publiciteitsbeleid, door de Arbiter ex aequo et bono te begroten;

- de terugbetaling van de bedragen die tijdens de opzegperiode door Master Chips betaald werden voor de publiciteit voor Maxim producten en de technische ondersteuning aan het cliënteel door een Maxim werknemer (FAE), begroot op respectievelijk 77 303 $ en 43 861,49 $;



- een provisioneel bedrag van 500 000 $  voor de niet-betaling van verschuldigde commissielonen.

- de interesten verschuldigd op de hoofdsom;

Master Chips akte te verlenen van haar voorbehoud tot uitbreiding of wijziging van haar vordering;

Maxim te veroordelen tot betaling van alle kosten die in het kader van de arbitrage werden gemaakt.

Gedaan te Brussel op 22 september 2006

Voor Master Chips,
Haar raadslieden

Meester Leo Goovaerts                    Meester Sabine Thielemans

# EXHIBIT B

## SWORN TRANSLATOR'S DECLARATION

I, the undersigned, Mrs Ingrid Piron, sworn translator with the Oudenaarde Judicial District, hereby declare that this translation bearing my signature is an accurate and complete English translation of the attached Dutch text, also bearing my signature.

## VERKLARING BEëDIGD VERTALER

Hierdoor verklaar ik, Mevr. Ingrid Piron, ondergetekende, beëdigd vertaler bij Arrondissement Oudenaarde, dat deze vertaling met mijn handtekening een juiste en volledige Engelse vertaling is van aangehechte Nederlandse tekst, ook met mijn handtekening.

Herzele, 23 April 2008

```
INGRID  PIRON
SWORN   TRANSLATOR
ARRONDISSEMENT   OUDENAARDE
ZOTTEGEM-HERZELE  CANTON
REP.№645/2004 OF 27.10.04
BERGAFSTRAAT   6
HILLEGEM 9550 HERZELE
BELGIUM
```

Ingrid Piron.

## II.     RELEVANT ARTICLES FROM THE LAW: ARTICLES 2 AND 3 OF THE EXCLUSIVE DISTRIBUTION LAW.

### 1.     Article 2 exclusive distribution law.

Article 2 of the exclusive distribution law states as follows:

*A sales concession granted for an indefinite duration, subject to this law, can, except in the case of serious failure of either party to complete its obligations, cannot be terminated without a reasonable period of notice or an equitable compensation determined by the parties at the termination of the contract. If the parties cannot come to an agreement, then the courts will rule in fairness, possibly with regard to the use.*

<u>To clarify</u>: when a distribution agreement for an indefinite duration that was entered into, and that falls under this exclusive distribution law, is terminated by the concession granter (in this case Maxim) without there being any serious shortcoming on the part of the distributor (in this case MC), then the concession granter has the choice to allow a reasonable period of notice or a fair substitute compensation for termination.

The principle is that the parties attempt to reach an agreement regarding the length of the reasonable period of notice or the magnitude of the fair substitute compensation for termination at the moment of the termination. If the parties cannot come to an agreement, then the courts will rule in fairness, possibly with regard to the use.

In practice, the situation is such that the terminating party is usually the party that unilaterally determines the duration of the period of notice. The party that does not agree with this (i.e., the party that claims that the given period of notice is not reasonable) can attempt to reach a fair substitute compensation for termination via the courts.

In the present case, the parties, prior to the termination, have negotiated a possible substitute compensation for termination or period of notice, but have not reached an agreement. Maxim has then opted to terminate the distribution agreement by the allowance of a period of notice, which they unilaterally determined to be 18 months. MC is of the opinion that this period is unreasonable and too short; hence their claim for an additional fair substitute compensation for termination. In its petition for arbitration, MC suggests that this fair substitute compensation for termination must be equal to the self-estimated value of all of its corporate activities at the time of the termination, or EUR 6,968,089.55.

### 2.     Article 3 exclusive distribution law.

Article 3 of the exclusive distribution law states as follows:

*Where the sales concession, as provided for in Article 2, is terminated by the concession grantor on grounds other than a serious shortcoming on the part of the concession holder, or where the latter terminates the contract due to a serious shortcoming on the part of the concession grantor, then the concession holder is entitled to an additional fair compensation. This compensation, where appropriate, is estimated based on the following elements: 1° The*

*added value concerning the clientele that is know to the concession holder is brought in and remains with the concession grantor after the termination of the contract; 2° The costs incurred by the concession holder in view of the exploitation of the concession and which could yield benefits for the concession grantor after the termination of the contract; 3° The severance pay that the concession holder owes to its personnel that it is forced to dismiss as a result of the termination of the sales concession. If the parties cannot come to an agreement, then the courts will rule in fairness, possibly with regard to the use.*

To clarify:

In this case, only an advanced compensation under Article 3 sub 1° of the exclusive distribution law, i.e., a compensation for the added value of the clientele. Therefore, Article 3, 2° and 3° are of no relevance in the present dispute.

Under Article 3, 1° of the exclusive distribution law, the distributor who has been terminated with a period of notice or a substitute compensation for termination can still claim additional compensation for the added value of the clientele, as long as the following conditions are met:

- ➢ That there is significant added value of the clientele for the concession grantor.
- ➢ That the distributor brought in these clients himself.
- ➢ That the significant added value of the clientele remains loyal to the concession grantor after the termination of the contract.

In this case, MC has estimated this at EUR 1,272,000, or the value claimed for its "Goodwill".

1. MC claims, under Article 2 of the exclusive distribution law, an amount of EUR 6,968,089.55 by way of fair substitute compensation for termination. This amount should be the actual value of the total MC corporate activity in the year 2001 (the year in which 60% of the MC corporate activity came from the Maxim distribution, the year 2001). In other words, MC seeks to obtain the total value of its company, therefore the self-estimated takeover price, via the mechanism of the fair substitute compensation for termination under Article 2 of the Exclusive distribution law.

This is in complete opposition to the principle of "terminability" of an agreement. In this manner, MC is creating a distribution agreement for life. Indeed, by claiming the total corporate value at the moment of termination, MC is making the termination impossible in all practicality. Nevertheless, this is not the ratio legis of the exclusive distribution law.

The fair compensation under Article 2 of the Exclusive distribution law serves to cover the loss that results from the non-compliance with a reasonable period of notice and **not the loss that results from the termination of the exclusive distribution agreement as such!** The obligation to pay a compensation for termination is of a remunerative nature; in fact, it takes the place of the requirement to provide a reasonable period of notice when no, or an insufficient, deadline has been met[1].

2. There is no known case in the case law in which the total corporate value at the moment of the termination was used as a basis for calculating the fair substitute compensation for termination, let alone that such a compensation equal to the total corporate value at the moment of the termination was ever granted. As cited in the doctrine, the calculation method that is unanimously accepted as the equivalent to the period that had to be granted and calculated based on the semi-average gross profit that the distributor accrued in the years prior to the termination. In most cases, an expert is appointed to make this calculation. (Bundle D, item 2, DESTRYCKER Ariane, Concessieovereenkomsten [Concession Agreements], Kluwer Law, ADVO instalment 33, Economic law, February 1999, no. p. 26).

On the contrary, in the case law, terminated distributors that speculate on large compensations are punished. For example, the judgement passed by the Court of Appeal of Liege on 30 April 1999[2]:

The concession holder has abruptly terminated the cooperation, after having ignored the proposed period of notice of 3 years given by the concession grantor. **The court decided that due to his behaviour, the concession holder had merely speculated on large compensations.** On the basis of fairness, the court significantly reduced the substitute compensation for termination by estimating this for only one year.

3. It must be noted that the experts appointed by Maxim emphasise that the way in which MC estimates the fair substitute compensation for termination is in opposition to the usual and generally accepted method for calculating this compensation. Very briefly summarised, KBMG suggests the following: the estimated claim under Article 2 of the exclusive distribution law is in complete opposition with the purpose of this legal article, containing

---

[1] Zie aangehaalde rechtspraak Cass. 4 december 2003, R.W., 2005-2006, 257, cfr. supra onder Hoofdstuk B, III, 1.1, 4.

[2] Zie DAELE, Karel, 'De billijkheid in de Alleenverkoopwet, een fata morgana?', N.J.W., 2003, p.225, bundel D, stuk 4.



006/014

double counting and unreliable parameters and moreover, is estimated on all the activities of the company (see Bundle A, items 17).

4. One important point: in accordance with the case law and doctrine (classic interpretation as from the establishment of the exclusive distribution law to 2000-2002), there is no fair substitute compensation for termination owed at all in the present case, now that the allocated period of 18 months is found to be more than reasonable in light of this case law and doctrine.

The tables with an overview of "reasonable periods of notice", as determined based on a number of predetermined criteria in accordance with the classic theory in case law and doctrine, concur with this. See Bundle D, item 2, DESTRYCKER Ariane, Concessieovereenkomsten [Concession Agreements], Kluwer Law, ADVO instalment 33, Economic law, February 1999, p. 73-90. To clarify: these are tables with examples of case law from the classic period; therefore, those where the new interpretation of the concepts "reasonable" and "fairness" were not taken into account.

Moreover, it is true that MC obtained a similar distribution within the 2 months after termination, which shows that the period was more than reasonable.

## E. REVIEW OF THE CLAIM FOR COMPENSATION OF THE ADDED VALUE OF THE MC CLIENTELE TO ARTICLE 3 OF THE EXCLUSIVE DISTRIBUTION LAW.

**I.      GENERAL.**

1. MC still believes that it is entitled to an additional fair compensation for, among other things, the added value concerning the clientele that it brought in and that remained with Maxim after the termination of the concession. MC estimates this claim at EUR 1,272,000.00. This sum should represent the goodwill within MC at the time of the termination.

2. Concerning the amount (EUR 1,272,000.00) of the claim, Maxim has noted that this coincides with the goodwill. The so-called goodwill is calculated in the report from the internal auditor Vandelanotte (MC's expert, see Bundle MC, Part A, item 2). This report is being contested by Maxim due to the obvious lack of objectivity, its biased nature, the lack of supporting items, etc. In addition, this report, and the way in which the additional fair compensation for the added value of the clientele was calculated, is severely criticised and questioned by KPMG (Bundle A, items 17). Thus, the claimed amount, by way of double counting, is already contained in the advanced compensation for termination, as shown in the comments from KPMG regarding the report from the internal auditor Vandelanotte (see Bundle A, items 17).

## H. DECISION.

### I.     REGARDING THE CLAIM OF MC BASED ON ARTICLE 2 OF THE EXCLUSIVE DISTRIBUTION LAW:

Both in accordance with the classic interpretation of Article 2 of the exclusive distribution law as well as with the modernised application thereof, under the influence of a more accurate interpretation of the concept of fairness and the ratio legis of the exclusive distribution law, the claim of MC should be dismissed, since the allocated period of 18 months is more than reasonable.

### II.     REGARDING THE CLAIM OF MC BASED ON ARTICLE 3 OF THE EXCLUSIVE DISTRIBUTION LAW:

MC does not meet its burden of proof in accordance with Article 3, 1° of the exclusive distribution law. None of the 3 conditions have been fulfilled and they must all be cumulatively fulfilled. The claim must be dismissed for this reason.

### III.     REGARDING THE PRICES POLICY, CHANGES TO THE PUBLICITY POLICY AND THE ALLEGED UNDERMINING OF THE ALLOCATED PERIOD OF NOTICE:

To this end, MC has adequately shown that these allegations are wrongful and not proven in the least.

Each claim based on one of these allegations must be dismissed.

### IV.     REGARDING COMMISSIONS:

Pursuant to the agreement between the parties, Maxim owes the payment of no less than all of the commissions to MC.

The burden of proof in this case is with MC, which has failed in this. The claim of MC regarding additional commissions must be dismissed.


Antwerp, 22/09/2006
Counsel for the concluding party,


Bieke Noels                                                     Jan Swinnen

## II.    RELEVANTE WETSARTIKELEN: ARTIKELEN 2 EN 3 VAN DE ALLEENVERKOOPWET.

### 1.    Artikel 2 alleenverkoopwet.

Artikel 2 alleenverkoopwet luidt als volgt:

*Een voor onbepaalde tijd verleende, aan deze wet onderworpen verkoopconcessie kan, behalve bij grove tekortkoming van een van de partijen aan haar verplichtingen, niet worden beëindigd dan met een redelijke opzeggingstermijn of een billijke vergoeding die door partijen worden bepaald bij de opzegging van het contract. Zijn partijen het niet eens, dan doet de rechter uitspraak naar billijkheid, eventueel met inachtneming van de gebruiken.*

Ter verduidelijking: wanneer een distributieovereenkomst die voor onbepaalde duur is aangegaan en die onder deze alleenverkoopwet valt, wordt beëindigd door de concessiegever (in casu Maxim) zonder dat er een grove tekortkoming is in hoofde van de distributeur (in casu MC), dan heeft de concessiegever de keuze om een redelijke opzegtermijn of een vervangende billijke opzegvergoeding toe te kennen.

Het principe is dat partijen trachten tot een overeenstemming te komen over de lengte van de redelijke opzegtermijn of de grootte van de billijke vervangende opzegvergoeding op het ogenblik van de opzegging. Als dat niet lukt, zal de rechter uitspraak doen naar billijkheid eventueel met inachtneming van de gebruiken.

In de praktijk is het zo dat de partij die opzegt meestal eenzijdig de duur van de opzegtermijn bepaalt. De partij die het daar niet mee eens is (i.e. de partij die beweert dat de gegeven opzegtermijn niet redelijk is), kan trachten een billijke vervangende opzegvergoeding te bekomen via de rechtbank.

In onderhavig geval hebben partijen voorafgaand aan de opzegging onderhandeld over een mogelijke vervangende opzegvergoeding of opzegtermijn, doch zijn niet tot overeenstemming gekomen. Maxim heeft dan geopteerd om de distributieovereenkomst te beëindigen door toekenning van een opzegtermijn, die zij éénzijdig heeft bepaald op 18 maanden. MC is van oordeel dat deze termijn niet redelijk en te kort is, reden waarom zij een bijkomende billijke vervangende opzegvergoeding vordert. In haar verzoekschrift tot arbitrage stelt MC dat deze vervangende opzegvergoeding gelijk zou moeten zijn aan de door haar geschatte waarde van al haar bedrijfsactiviteiten ten tijde van de opzegging ofwel, 6.968.089,55 Euro.

### 2.    Artikel 3 alleenverkoopwet.

Artikel 3 alleenverkoopwet luidt als volgt:

*Ingeval de verkoopconcessie als bedoeld in artikel 2 door de concessiegever wordt beëindigd op andere gronden dan een grove tekortkoming van de concessiehouder, of ingeval deze laatste het contract beëindigt wegens grove tekortkoming van de concessiegever, kan de concessiehouder aanspraak maken op een billijke bijkomende vergoeding. Deze vergoeding wordt, al naar het geval, geraamd in functie van de volgende elementen :1° De bekende meerwaarde inzake cliëntele die door de concessiehouder is aangebracht en die aan de*



*concessiegever verblijft na de beëindiging van het contract;2° De kosten die de concessiehouder gedaan heeft met het oog op de exploitatie van de concessie en die aan de concessiegever voordelen mochten opleveren na het eindigen van het contract;3° Het rouwgeld dat de concessiehouder verschuldigd is aan het personeel dat hij verplicht is te ontslaan tengevolge van de beëindiging van de verkoopconcessie. Zijn partijen het niet eens, dan doet de rechter uitspraak naar billijkheid, eventueel met inachtneming van de gebruiken.*

Ter verduidelijking:

In casu wordt enkel een vergoeding gevorderd op grond van artikel 3 onder 1° alleenverkoopwet , i.e. een vergoeding voor meerwaarde cliënteel. Artikel 3, 2° en 3° zijn dan ook niet relevant in onderhavig geschil.

Op grond van artikel 3, 1°  alleenverkoopwet kan de distributeur die is opgezegd met een opzegtermijn of vervangende opzegvergoeding, nog een bijkomende vergoeding vorderen voor meerwaarde cliënteel, mits aan volgende voorwaarden is voldaan:

➢ Dat er een aanzienlijke meerwaarde aan cliënteel is voor de concessiegever.
➢ Dat de distributeur het cliënteel zelf heeft aangebracht.
➢ Dat de aanzienlijke meerwaarde aan cliënteel trouw blijft aan de concessiegever na de beëindiging van het contract.

In casu begroot MC deze op 1.272.000 Euro oftewel de beweerde waarde van haar 'Goodwill'.

1. MC vordert op grond van artikel 2 alleenverkoopwet een bedrag van € 6.968.089,55 ten titel van billijke vervangende opzegvergoeding. Dit bedrag zou de actuele waarde zijn van totale bedrijfsactiviteit van MC anno 2001 (waar de Maxim distributie 60% van MC's bedrijfsactiviteit zou uitmaken anno 2001). Met andere woorden, MC tracht de totale waarde van haar bedrijf, de door haar geschatte overnameprijs dus, te bekomen via het mechanisme van de billijke vervangende opzegvergoeding ex artikel 2 Alleenverkoopwet.

Dit druist volledig in tegen het principe van 'opzegbaarheid' van overeenkomsten. Op deze wijze creëert MC een distributieovereenkomst voor het leven. Immers, door de totale bedrijfswaarde op het ogenblik van opzegging te vorderen, maakt MC de opzegging de facto onmogelijk. Dit is evenwel niet de ratio legis van de alleenverkoopwet.

De billijke vergoeding ex artikel 2 Alleenverkoopwet dient de schade te dekken die voortvloeit uit de niet-naleving van een redelijke opzeggingstermijn en **niet de schade die voortvloeit uit de beëindiging van de alleenverkoopovereenkomst alsdusdanig!** De verplichting een opzeggingsvergoeding te betalen is van compenserende aard; zij komt immers in de plaats van de verplichting om een redelijke opzeggingstermijn te geven wanneer geen of een onvoldoende termijn werd nageleefd[1].

2. In de rechtspraak is er <u>geen enkel geval</u> gekend waarin de totale bedrijfswaarde op het ogenblik van de opzegging als grondslag voor de berekening van de billijke vervangende opzegvergoeding wordt gebruikt. Laat staan dat ooit een dergelijke vergoeding gelijk aan de totale bedrijfswaarde op het ogenblik van de opzegging is toegekend. Zoals aangehaald in de rechtsleer is de unaniem aanvaarde berekeningswijze deze als equivalent met de termijn die had moet worden toegekend en berekend op basis van de gemiddelde semi-brutowinst die de distributeur haalde in de jaren voorafgaand aan de opzegging. Voor de berekening wordt in het merendeel der gevallen een deskundige aangesteld. (Bundel D, stuk 2 DESTRYCKER Ariane, Concessieovereenkomsten, Kluwer Rechtswetenschappen, ADVO aflevering 33, Economisch recht, februari 1999, nr. p. 26).

Integendeel, in de rechtspraak worden opgezegde distributeurs die speculeren op omvangrijke vergoedingen afgestraft. Ter illustratie, het arrest van het hof van beroep te Luik van 30 april 1999[2]:

De concessiehouder had de samenwerking abrupt beëindigd, na de door de concessiegever voorgestelde opzeggingstermijn van 3 jaar te hebben geweigerd. **Het hof besloot dat de concessiehouder, door zijn gedrag, louter had gespeculeerd op omvangrijke vergoedingen.** Op basis van de billijkheid reduceerde het hof de vervangende opzeggingsvergoeding aanzienlijk door deze slechts op één jaar te begroten.

3. Er moet opgemerkt worden dat ook de door Maxim aangestelde deskundigen, benadrukken dat de wijze waarop MC de billijke vervangende opzegvergoeding begroot indruist tegen de gebruikelijke en algemeen aanvaarde wijze van berekening van deze vergoeding. Zeer summier samengevat stelt KPMG het volgende: de vordering ex artikel 2 alleenverkoopwet is volledig tegen de zin van dit wetsartikel begroot, bevat dubbeltellingen en onbetrouwbare

---

[1] Zie aangehaalde rechtspraak Cass. 4 december 2003, R.W., 2005-2006, 257, cfr. supra onder Hoofdstuk B, III, 1.1, 4.

[2] Zie DAELE, Karel, 'De billijkheid in de Alleenverkoopwet, een fata morgana?', N.J.W., 2003, p.225, bundel D, stuk 4.

parameters en gaat bovendien uit van alle activiteiten van de vennootschap. (zie bundel A, stukken 17).

4. Een niet onbelangrijk punt: conform de rechtspraak en rechtsleer (klassiek interpretatie vanaf totstandkoming alleenverkoopwet tot 2000-2002), is er in onderhavig geval niet in het minst een billijke vervangende vergoeding verschuldigd, nu de toegekende termijn van 18 maanden meer dan redelijk is in het licht van deze rechtspraak en rechtsleer.

De tabellen met een overzicht van 'redelijke opzegtermijnen' zoals bepaald aan de hand van een aantal vaststaande criteria conform de klassieke stelling in rechtspraak en rechtsleer, beamen dit. Zie bundel D, stuk 2, DESTRYCKER Ariane, Concessieovereenkomsten, Kluwer Rechtswetenschappen, ADVO aflevering 33, Economisch recht, februari 1999, p. 73-90. Ter verduidelijking: dit zijn tabellen met voorbeelden van rechtspraak uit de klassieke periode, dus waarbij nog geen rekening is gehouden met de nieuwe invulling van het begrip 'redelijkheid' en billijkheid'.

Bovendien is het zo dat MC een gelijkaardige distributie heeft bekomen binnen de 2 maanden na opzegging, wat aantoont dat de termijn meer dan redelijk was.



## E. TOETSING VAN DE VORDERING TOT VERGOEDING MEERWAARDE CLIËNTEEL VAN MC AAN ARTIKEL 3 ALLEENVERKOOPWET.

### I.    ALGEMEEN.

1. MC meent nog gerechtigd te zijn op een billijke bijkomende vergoeding voor onder meer de meerwaarde inzake cliënteel die door haar is aangebracht en die aan Maxim verblijft na beëindiging van de concessie. MC begroot deze vordering op 1.272.000,- Euro. Deze som zou de goodwill vertegenwoordigen binnen MC ten tijde van de opzegging.

2. Wat de hoegrootheid (1.272.000,- Euro) van de vordering betreft, merkt Maxim op dat die samenvalt met de goodwill. De zgn. goodwill is berekend in het rapport van bedrijfsrevisor Vandelanotte (MC's expert, zie bundel MC, Deel A, stuk 2). Dit rapport wordt door Maxim betwist omwille van duidelijk gebrek aan objectiviteit, eenzijdigheid, gebrek aan ondersteunende stukken etc. Verder wordt dit rapport en de wijze waarop de billijke bijkomende vergoeding voor meerwaarde cliënteel ernstig bekritiseerd en in vraag gesteld door KPMG (bundel A, stukken 17). Zo zit het gevorderd bedrag bij wijze van dubbeltelling reeds vervat in de gevorderde opzegvergoeding, zoals blijkt uit de commentaar van KPMG bij het verslag van de bedrijfsrevisor Vandelanotte (zie bundel A stukken 17).



## H. BESLUIT.

### I.    BETREFFENDE DE VORDERING VAN MC OP GROND VAN ARTIKEL 2 ALLEENVERKOOPWET:

Zowel conform de klassieke interpretatie van artikel 2 alleenverkoopwet als de vernieuwde toepassing ervan o.i.v. een juistere interpretatie van het begrip billijkheid en de ratio legis van de alleenverkoopwet, moet de vordering van MC worden afgewezen, waar de toegekende termijn van 18 maanden meer dan redelijk is.

### II.    BETREFFENDE DE VORDERING VAN MC OP GROND VAN ARTIKEL 3 ALLEENVERKOOPWET:

MC voldoet niet aan haar bewijslast conform artikel 3, 1° alleenverkoopwet. Geen van de 3 voorwaarden zijn vervuld en ze dienen allen cumulatief te zijn vervuld. Om die redenen moet de vordering worden afgewezen.

### III.    TERZAKE HET PRIJZENBELEID, WIJZIGING IN HET PUBLICITEITSBELEID EN BEWEERDE UITHOLLING VAN DE TOEGEKENDE OPZEGTERMIJN:

Hiervoor heeft MC op afdoende wijze aangetoond, dat deze aantijgingen onterecht zijn en minstens niet bewezen.

Elke vordering gebaseerd op één van deze aantijgingen, moet worden afgewezen.

### IV.    TERZAKE COMMISSIELONEN:

Maxim heeft minstens alle aan MC krachtens de overeenkomst tussen partijen verschuldigde commissielonen betaald.

De bewijslast terzake ligt bij MC, die faalt. De vordering van MC inzake bijkomende commissielonen moet worden afgewezen.


Antwerpen, 22/09/2006
Voor concluante, haar raadslieden,


Bieke Noels    Jan Swinnen



# EXHIBIT C

**Van:** Jan Swinnen [jan.swinnen@lafili-law.be]
**Verzonden:** vendredi 6 octobre 2006 20:23
**Aan:** Eric van Ginkel
**CC:** Bieke Noels; Sabine Thielemans; Leo Goovaerts
**Onderwerp:** ICC Arbitrage N° 14123/RCH/JHN - MAXIM INTEGRATED PRODUCTS Inc.
(U.S.A.) / MASTER CHIPS BVBA (Belgium)

Dear Arbitrator,

1.
Under procedural order number 2, our counter-memorial to the initial memorial of Master Chips is due on 11th October.

However, it has become apparent that it will be impossible for us to meet this date requirement, due to interference of other pressing client matters, some of which cannot possibly be postponed, such as amongst others a court hearing I have to attend next Tuesday, and which will likely also require up to two days of preparation.

Since, however:
  1. our first memorial was already to a large extent anticipating on Master Chips' arguments in support of its claims (we expected most of them for having litigated the same case against Master Chips in two instances before Belgian courts), and hence can be considered as constituting a counter-memorial (except maybe for the part concerning the commission claim, on which we do need to elaborate), and
  2. we are satisfied that after our initial memorial, a replique and dupplique will be sufficient for us to fully present Maxim's case to the arbitral tribunal, we intend to waive our counter-memorial due 11th October, and file our next submissions by 20th October, thus aiming at rearranging our own time schedule without it necessarily having an impact on the dates of the evidentiary hearing.

We presume this will not jeopardize these proceedings and that it will not be considered to do so. In the opposite event, we must respectfully request an extension of time to 20th October for the filing of our counter-memorial. In that case, it is likely that also the dates for repliques, dupliques and evidentiary hearing will need to be rearranged. Can you please let us know your decision as to this matter at your earliest convenience, and no later than October 10th?

2.
The evidentiary hearing only being a month away, may we also ask you to inform the parties of your decision as to which expert witness the arbitral tribunal appoints in accordance with Paragraph 5 of Procedural Order n° 2 and which mission is conferred upon the expert, following the proposals you have received from both parties to that effect 3 weeks ago on 13 and 14 September?

3.
Also, in the course of next week, we will attempt to make a common list of uncontested facts with opposing counsel as per Paragraph 4 of Procedural Order n° 2.


With best regards,

Jan Swinnen & Bieke Noels

# EXHIBIT D

## SWORN TRANSLATOR'S DECLARATION

I, the undersigned, Mrs Ingrid Piron, sworn translator with the Oudenaarde Judicial District, hereby declare that this translation bearing my signature is an accurate and complete English translation of the attached Dutch text, also bearing my signature.

## VERKLARING BEÈDIGD VERTALER

Hierdoor verklaar ik, Mevr. Ingrid Piron, ondergetekende, beëdigd vertaler bij Arrondissement Oudenaarde, dat deze vertaling met mijn handtekening een juiste en volledige Engelse vertaling is van aangehechte Nederlandse tekst, ook met mijn handtekening.

Herzele, 23 April 2008

Ingrid Piron.

INGRID PIRON
SWORN TRANSLATOR
ARRONDISSEMENT OUDENAARDE
ZOTTEGEM-HERZELE CANTON
REP.№845/2004 OF 27.10.04
BERGAFSTRAAT 6
HILLEGEM 9550 HERZELE
BELGIUM

International Chamber of Commerce
International Court of Arbitration

14123/RCH/JHN

**SECOND AND SUMMARY STATEMENT**

for

**MASTER CHIPS BVBA**, company incorporated under Belgian law, with registered office at 8500 Kortrijk (Belgium), Jan Persijnstraat 2, with company registration number 0425352027;

<u>Claimant on lead claim,</u>
defendant on counterclaim,

Hereinafter referred to as **"MASTER CHIPS"**

With as counsel: Counsellors Leo Goovaerts and Sabine Thielemans, office in 1200 Brussels (Belgium), Kerselarenlaan 118;

versus

**MAXIM INTEGRATED PRODUCTS INC.**, company incorporated under the law of the State of California (USA), with registered office at Sunnyvale, California 94086, USA, 120 San Gabriel Drive;

<u>Defendant on lead claim,</u>
claimant on counterclaim,

Hereinafter referred to as **"MAXIM"**;

With as counsel: Counsellors Bieke Noels and Jan Swinnen, lawyers at 2600 Antwerp-Berchem (Belgium), Kardinaal Mercierlei 44;

**I.2.6** Conclusion regarding the allocated period of notice

Neither the "traditional" interpretation, nor the "new" interpretation of Article 2 and, more specifically, the fairness to which it is referring, allows the justification of, in this case, a period of notice of 18 months.

Given the one-sided and incorrect interpretation of the criteria cited by Maxim, a period of notice of just 18 months in the classic interpretation is completely unjustifiable. The importance of the concession in the activities of the concession holder and the impact of the termination on the entire enterprise of the concession holder will, in this case, be the decisive criteria seeing as, in all practicality, it is impossible that Master Chips will have the opportunity to develop an equivalent situation and the termination of the concession by Maxim is what is putting - even now - its viability at stake.

Even if one could accept in this case that the classic application of the criteria must be moved away from, although this evolution in the doctrine is still disputed and the case law is only fragmentarily applied, there is still no reason in this case to limit the period of notification to 18 months out of the consideration for fairness.

For that matter, Maxim does nothing but benefit from the termination of the concession agreement with a period of notice of 18 months, while Master Chips has been fighting to keep its head above water ever since the termination.

The principal of equilibrium that the legislator had in mind, according to Maxim, at the creation of the Exclusive distribution law is indeed not respected in this context, albeit to the detriment of Master Chips.

## I.4 THE COMPENSATION COMING TO MASTER CHIPS IS FAIR – NO ADDITIONAL EQUITABLE COMPENSATION FOR TERMINATION

### I.4.1 A substitute compensation equal to the actual value of a company

**1.4.1.1** The termination of the agreement closed between the parties falls under the application of the Law of 1961 on the unilateral termination of exclusive distribution agreements of indefinite duration as amended by the Law of 13 April 1971 ("Exclusive distribution law"), which MAXIM never contested and, in fact, explicitly confirmed.

Article 2 of the abovementioned law states that: *"A sales concession granted for an indefinite duration, subject to this law, can, except in the case of serious failure of either party to complete its obligations, cannot be terminated without a reasonable period of notice or an equitable compensation determined by the parties at the termination of the contract. If the parties cannot come to an agreement, then the courts will rule in fairness, possibly with regard to the use."*

Therefore, Master Chips is entitled in the first instance to a reasonable period of notice or an equitable compensation for termination, is largely exaggerated and not adequately proven

**I.4.1.2** The purpose of the period of notice is to offer the terminated party the opportunity to find an equivalent situation. Therefore, this is regarding the time that the terminated party reasonably needs in order to provide a substitute[1].

It cannot be reasonably expected from Master Chips that they find, within a period of 18 months, other channels in which to realise 60% of its turnover, i.e., 60% of EUR 3,726,206.59 in 2001 (year in which the distribution was terminated – see point I.1.2 above).

As already stated above (sub I.2.2), there are only two companies on the market in competition with Maxim, and it is therefore impossible, in all practicality, for Master Chips to find an equivalent concessions contract, seeing as the two competitor companies each have their own distribution network and have confirmed their disinterest in entering into a cooperation with Master Chips.

Since the forced termination of the distribution of MAXIM products, the financial situation of Master Chips is extremely precarious, even to this day.

As described under points I.1.2 up to and including I.1.5 above, Master Chips has know a continuous decline in its turnover figures since MAXIM terminated the distribution on 2001 and have not succeeded, now four years after the termination of the agreement by MAXIM and despite continuous attempts (point I.1.6), in turning the tide and pulling itself out of the red figures, in fact, it is quite the contrary.

Hence the conclusion that, due to the termination of the MAXIM distribution, Master Chips is no longer viable and is slowly, but surely, dying.

---

[1] Brussel, 9 mei 1985, *R.W.*, 1985-86, 1210

Therefore, the determination of a period of notice is not useful in the case Master Chips.
The granting of a "reasonable" period of notice is therefore just as impossible and as such,
Maxim should, as compensation, reimburse the actual value of the company.

**I.4.1.3** Maxim contests the possibility, based on Article 2 of the Exclusive distribution law, to
claim compensation that corresponds to the value of the enterprise at the moment of
termination. They refer to the criteria generally accepted by Belgian jurisprudence and have
decided that the granting of a period of notice of 18 months is amply sufficient.

As already elaborated in sub I.2.4-5 above, given the one-sided, incomplete and incorrect
interpretation of the criteria cited by Maxim, a period of notice of just 18 months is
completely unjustifiable.

**I.4.1.4** Maxim also forgets that it is not the termination of a distribution agreement as such,
but the giving of a period of notice that is too short upon the termination, as in this case, that
is at fault and it follows integrally that the damage resulting from this fault must be
reimbursed[2].

It was already found in sub I.4.1.2 above that Master Chips, due to and since the loss of the
distribution for Maxim, has been surviving on the brink of disaster. The reserves that Master
Chips has been able to pull from up to now (see, for example, the contribution of the
surrender of the Manager's insurance in the results) are not inexhaustible. Because of the loss
of the Maxim distribution, Master Chips will be forced to declare bankruptcy, which is indeed
confirmed by the most recent evolution.

Therefore, the damage is consistent with the value of the enterprise at the moment of the -
incorrect - termination of the agreement (assessment, see sub I.4.2).

**I.4.1.5** Moreover, even if it were so that Article 2 of the Exclusive distribution law did not
allow for an integral compensation corresponding with the value of the enterprise (quod non),
then Master Chips still has the right to an integral compensation for its losses based on the
Law of 13 April 1995 concerning commercial agency agreements.

With regard to the activities of Master Chips as agent and "designer" (see sub I.2.4 above)
and with regard to the commissions that they - in part - received for this, the Commercial
agency law is also indeed applicable in addition to the Exclusive distribution law.

Both laws can be cumulatively applied. Both the Exclusive distribution law of 1961 and the
Commercial agency law of 1995 can be applied to each component of the activity, depending
on whether the activity is understood as either concession or as commercial agency activity,
respectively.

Article 21 of the Commercial agency law states that: "*To the extent that the commercial agent
is entitled to the goodwill indemnity determined in Article 20, and the amount of such
compensation does not fully reimburse the actual previous loss, the commercial agent can,
provided the extent of the actual previous loss justifies this, in addition to this compensation*

---

[2] P. KILESTE & P. HOLLANDER, "*Examen de jurisprudence. La loi du 27 juillet 1961 relative à la résiliation des
concessions de vente exclusive à durée indéterminée (1992-1997)*", T.B.H., 1998, nr. 19 en 38.

*obtain restitution amounting to the difference between the amount of the actual previous loss and the amount of the compensation."*

Article 21 refers to Article 20 which provides that: *"After the termination of the agreement, the commercial agent has the right to a goodwill indemnity when he has acquired new customers for the principal ..., to the extent that this continues to provide the principal with substantial benefits. ... The amount of this goodwill indemnity is determined through taking into account both the realised expansion of the business and the acquisition of clients. The goodwill indemnity may not amount to more than the amount of one years compensation calculated based on the average of the five previous years or based on the average compensation in the previous years if agreement lasted for less than five years."*

This will be further elaborated upon in sub II below, which will show without a doubt that Master Chips does indeed have the right to a goodwill compensation for clientele based on Article 20 of the Commercial agency law or if necessary, a clientele indemnity under Article 3 of the Exclusive distribution law, so that the condition of applicability of Article 21 is met and the total loss, being the loss of the value of the enterprise, should be reimbursed.

I.4.2 The claimable amount of EUR 6,968,089.55 (see Annex II)

Taking into account the established case law and doctrine and the share of the turnover from the MAXIM products in the then total turnover for Master Chips, the effect of the termination on the viability of Master Chips and the context in which MAXIM expects the implementation of the period of notice from Master Chips (see sub I.3), the period of notice must be converted into a substitute compensation corresponding with the value of the activity of Master Chips in the year of termination, i.e., EUR 6,968,089.55.

This value for Master Chips is already a result of the judicial proceedings brought before the courts of Brussels by the internal auditor of Master Chips, this being calculated by the internal auditors Vandelanotte, by Maxim itself and by the internal auditors of Maxim, being criticised by KPMG and with a reply served by Vandelanotte (items B.6a, b, c and item A.17 Maxim).

For the sake of legibility of the current statement, Master Chips refers to the discussion regarding this matter in annex II, which forms an integral part of this statement.

## II.4 ESTIMATE FOR THE CLIENTELE INDEMNITY

### II.4.1 Clientele and goodwill

Maxim maintains that the compensation for clientele cannot coincide with the value of the goodwill seeing as Master Chips has only one activity.

Taking into account the fact that the termination of the distribution agreement brought on such a large economic shock that Master Chips was ultimately no longer able to keep its head above water - what is in reality actually happening (see supra) - it is, in this case, indeed logical that the actual value of the goodwill should be reimbursed by Maxim as compensation.

Master Chips refers here to the calculations done by its internal auditor (see Annex II) based on which the goodwill of Master Chips is formulated at EUR 1,272,000 (item A.6a).

### II.4.2 Estimate under Article 20 of the Commercial agency law

Article 20 stipulates the goodwill indemnity on the maximum amount of one years compensation calculated based on the average of the five previous years or based on the average compensation in the previous years if agreement lasted for less than five years.

In order to reach a correct calculation, it is therefore crucial that a clear picture of the commissions coming to Master Chips be formed before everything else (see part III).

## II.4 CONCLUSION REGARDING THE COMPENSATION OF THE CLIENTELE

Based on the previous arguments and taking into account the effect of the termination of the agreement on the viability of Master Chips, it is found that Maxim owes Master Chips payment of a compensation for the loss of its clientele, in accordance with the value thereof in the year of the termination, i.e., EUR 1,272,000 (item A.6a).

Of course, a correct determination of the commissions (part III) in this context is of great importance for, among other things, the calculation of the value of a client like Alcatel.

Finally, it should be noted that the takeover of the clients of Master Chips by Maxim had already begun during the period of notice, given that Maxim was also then actively inviting the clients of Master Chips to buy directly from Maxim (see I.3.1).

III.3.5 <u>Conclusion regarding the commissions</u>

Although the submitted items provide anything but a complete and correct picture, it is clear that Maxim withheld significant amounts from the commissions for Master Chips.

Given the distractions that can be made from the items, it must also be understood that even the undisclosed items will show that significant amounts from the commissions were not paid.

However, it is not possible for Master Chips to make a calculation of the lost commissions in this manner, given the jumble of documents and spreadsheets submitted to it by Maxim.

By extrapolation and taking into account the ratios from the numbers in 1999 given for the USA and Belgium (going from there that these figures are the most reliable where the production still occurred at Alcatel so that Maxim may have had very few figures existing on subcontractors), the total of non-commissioned deliveries can be estimated at USD 2,000,000 for 1999; USD 8,000,000 for 2000 and at least the same amount for 2001.[3 and 4]

Given the gaps in the information, Master Chips still repeats its demand for complete, clear and uniform presentation of items (spreadsheets), at least for the components included in Annex III, details regarding numbers and prices for sales via Arrow, and for sales to Flextronics, Alcatel USA and China.

If Maxim does not immediately confirm their voluntary acceptance to meet these demands following the submission of this statement, Master Chips will request that the arbitrator mandatorily require this from Maxim, unless they are of the belief that, based on the above arguments elaborated upon with sufficient precision, that ex aequo et bono, the amount of commissions still owed can be determined.

A correct determination of the commissions is indeed of importance in the context of the calculation of the clientele indemnity (part II) for, among other things, the calculation of the value of a client like Alcatel.

---

## IV.    THE TOTAL CLAIMED AMOUNT

---

[3] Op basis van de onder punt III.3.3.2 punt 2 geciteerde informatie afkomstig van de website van Alcatel aangaande de totaal geleverde ADSL-lijnen per jaar, het aantal componenten dat voor dergelijke productie vereist was en de eenheidsprijs per component.
[4] *Dhr. Di Quattro heeft eveneens aan Master Chips beestings dat in de periode 1998-2001 de omzet van Maxim bij Alcatel 20 à 30 miljoen Eur per jaar bedroeg waarvan een groot gedeelte betrekking had op het ADSL project.*

Master Chips saw itself forced to limit its claim to compensation, based on financial considerations, in a petition for arbitration to a fixed amount of EUR 750,000, albeit subject to interest due on the principal amount and subject to a later expansion of its claim.

However, given the resistance put up by Maxim with regard to any subsequent exercise by Master Chips of its rights in a separate arbitration procedure, Master Chips, in order to safeguard its rights, sees itself as forced to claim the full amount to which it believes itself to be entitled:

- a compensation of the losses, estimated at EUR 6,968,089.55;
- a compensation for clientele, estimated at EUR 1,272,000.00;
- a compensation for the loss suffered due to the prices and publicity policies implemented by Maxim, which have so far not been estimated;
- the reimbursement of the amounts that were paid during the period of notice by Master Chips for the publicity for Maxim products and the technical support provided to the clientele by a Maxim employee (FAE), estimated at USD 77,303 and USD 43,861.49, respectively;
- the correct payment of commissions, which were impossible to precisely estimate until now, hence, a provisional amount of USD 500,000 for non-payment of the owed commissions, pending the possibility of calculating the exact estimate thereof.

**FOR THESE REASONS,**

**Based on the previous statements and considerations,**

**And subject to extension or modification of its claim,**

**MASTER CHIPS REQUESTS THAT THE ARBITRATOR,**

Order Maxim to pay to Master Chips the following:

- a compensation of the losses, estimated at EUR 6,968,089.55;

- a compensation for clientele, estimated at EUR 1,272,000.00;

- a compensation for the loss suffered due to the prices and publicity policies implemented by Maxim, to be estimated ex aequo et bono by the arbitrator;

- the reimbursement of the amounts that were paid during the period of notice by Master Chips for the publicity for Maxim products and the technical support provided to the clientele by a Maxim employee (FAE), estimated at USD 77,303 and USD 43,861.49, respectively;

- a provisional amount of USD 500,000 for non-payment of the owed commissions.

- the interest due on the principal amount;


Master Chips directs that this, subject to extension or modification of its claim, be entered into the records;

Order Maxim to pay for all costs incurred in the context of the arbitration.

Done in Brussels on ~~22 September~~ *11 October* 2006


For Master Chips,
Counsel members




Counsellor Leo Goovaerts                    Counsellor Sabine Thielemans

Internationale Kamer van Koophandel
Internationaal Hof van Arbitrage

14123/RCH/JHN

**TWEEDE EN SYNTHESE MEMORIE**

voor

**MASTER CHIPS BVBA**, vennootschap naar Belgisch recht, met maatschappelijke zetel te 8500 Kortrijk (België), Jan Persijnstraat 2, met ondernemingsnummer 0425352027 ;

Eiseres op hoofdeis,
Verweerster op tegeneis,

**Hierna genoemd 'MASTER CHIPS'**

Met als raadslieden : Mr. Leo Goovaerts en Mr. Sabine Thielemans, kantoor houdende te 1200 Brussel (België), Kerselarenlaan 118 ;

tegen

**MAXIM INTEGRATED PRODUCTS INC.**, vennootschap naar het recht van de staat California (USA), met maatschappelijke zetel te Sunnyvale, California 94086, USA, 120 San Gabriel Drive ;

Verweerster op hoofdeis,
Eiseres op tegeneis,

**hierna genoemd 'MAXIM';**

Met als raadslieden: Mr. Bieke Noels en Mr. Jan Swinnen, advocaten te 2600 Antwerpen-Berchem (België), Kardinaal Mercierlei 44;

**I.2.6  Conclusie betreffende de toegekende opzegtermijn**

Noch de 'klassieke' interpretatie noch de 'nieuwe' interpretatie van artikel 2 en meerbepaald de billijkheid waarnaar verwezen wordt, laten toe om in casu een opzeggingstermijn van 18 maanden te verantwoorden.

Gelet op de eenzijdige en onjuiste invulling van de aangehaalde criteria door Maxim is een opzegtermijn van slechts 18 maanden in de klassieke interpretatie helemaal niet te rechtvaardigen. Het belang van de concessie in de activiteiten van de concessiehouder en de repercussie van de opzegging op de gehele onderneming van de concessiehouder zullen in casu trouwens de doorslaggevende criteria zijn aangezien Master Chips de facto onmogelijk in de gelegenheid zal zijn een gelijkwaardige situatie uit te bouwen en het beëindigen van de concessie door Maxim zodoende haar leefbaarheid - ook nu nog - in het gedrang brengt.

Zelfsal zou men aanvaarden dat in casu dient afgestapt van de klassieke toepassing van de criteria, hoewel deze evolutie in de rechtsleer nog sterk wordt betwist en door de rechtspraak slechts fragmentair wordt toegepast, dan nog is er in casu geen reden om uit billijkheidsoverwegingen de opzegtermijn tot 18 maanden te beperken.

Maxim put overigens niets dan voordelen uit de beëindiging van de concessieovereenkomst met een opzegtermijn 18 maanden terwijl Master Chips sinds de opzegging moet blijven vechten om het hoofd boven water te houden.

Het evenwichtsprincipe dat de wetgever volgens Maxim zelf voor ogen had bij de creatie van de Alleenverkoopwet is in deze context inderdaad niet nageleefd, zij het ten nadele van Master Chips.

**I.4  DE AAN MASTER CHIPS TOEKOMENDE SCHADEVERGOEDING IS BILLIJK – GEEN BLIK°**
**BILLIJKE OPZEGVERGOEDING**

I.4.1  Een vervangende schadevergoeding gelijk aan de actuele waarde van een bedrijf

**I.4.1.1**  De beëindiging van de door partijen gesloten overeenkomst valt onder toepassing van
de Wet van 1961 betreffende de éénzijdige beëindiging van de voor onbepaalde tijd verleende
concessies van alleenverkoop zoals gewijzigd door de Wet van 13 april 1971
('Alleenverkoopwet'), hetgeen door MAXIM nooit werd betwist en zelfs expliciet werd
bevestigd.

Artikel 2 van voornoemde wet bepaalt dat : *"Een voor onbepaalde tijd verleende, aan deze
wet onderworpen verkoopconcessie kan, behalve bij grove tekortkoming van een van de
partijen aan haar verplichtingen, niet worden beëindigd dan met een redelijke
opzeggingstermijn of een billijke vergoeding die door partijen wordt bepaald bij de opzegging
van het contract. Zijn partijen het niet eens, dan doet de rechter uitspraak naar billijkheid,
eventueel met inachtneming van de gebruiken."*

Master Chips heeft derhalve in eerste instantie recht op een redelijke opzeggingstermijn of
een billijke opzeggingsvergoeding,
is ruimschoots overdreven en niet afdoende bewezen
**I.4.1.2**  Het doel van de opzeggingstermijn is aan de opgezegde partij de mogelijkheid te
bieden een gelijkwaardige situatie terug te vinden. Het gaat dus om de tijd die de opgezegde
partij redelijkerwijze nodig heeft om in een vervanging te kunnen voorzien[1].

Redelijkerwijze kon niet van Master Chips verwacht worden om op 18 maanden tijd 60% van
haar omzet, namelijk 60% van 3.726.206,59 Eur in 2001 (jaar van de opzegging van de
distributie - zie hierboven punten I.1.2) via andere kanalen te realiseren, of, zo men de
'nieuwe' interpretatie van de betekenis van dit artikel aanhoudt (zie hierboven sub I.2.1), zich
een netto-inkomen te verschaffen dat gelijkwaardig is aan het gederfde inkomen, desnoods
door een volledige of gedeeltelijke reconversie van haar activiteiten.

Zoals hierboven reeds aangehaald (sub I.2.2) zijn er slechts twee concurrenten van Maxim op
de markt en is het dus voor Master Chips **de facto** onmogelijk een gelijkwaardig
concessiecontract of netto-inkomen te vinden aangezien de 2 concurrerende bedrijven elk
over een eigen distributienetwerk beschikken en bevestigd hebben niet geïnteresseerd te zijn
in een samenwerking met Master Chips.

Sinds de gedwongen stopzetting van de distributie van MAXIM producten is de financiële
toestand van Master Chips dan ook tot op vandaag uiterst precair.

Zoals hierboven beschreven onder de punten I.1.2 tot en met I.1.5 kent Master Chips sinds de
opzegging van de distributie door MAXIM in 2001 een continue daling van haar omzetcijfers
en slaagt zij er, inmiddels vier jaar na de opzegging van de MAXIM overeenkomst en
ondanks verwoede pogingen (punt I.1.6), niet in het tij te doen keren en uit de rode cijfers te
komen, wel integendeel.

---

[1]  Brussel, 9 mei 1985, *R.W.*, 1985-86, 1210

Vandaar de vaststelling dat door de stopzetting van de MAXIM distributie Master Chips niet langer levensvatbaar is en een langzame maar zekere dood sterft.

Het bepalen van een opzegtermijn is in het geval van Master Chips bijgevolg niet zinvol. Het toekennen van een 'redelijke' opzeggingstermijn is bijgevolg eveneens onmogelijk en ter compensatie dient dan ook de actuele waarde van het bedrijf te worden vergoed door Maxim.

**I.4.1.3**  Maxim betwist de mogelijkheid om op basis van artikel 2 van de Alleenverkoopwet een schadevergoeding te vorderen die overeenstemt met de waarde van de onderneming op het moment van de opzegging. Zij verwijst naar de door de Belgische rechtspraak algemeen aanvaarde criteria en besluit dat de toekenning van een opzegtermijn van 18 maanden ruimschoots volstaat.

Zoals hierboven sub I.2.4-5 reeds uitgewerkt, is gelet op de eenzijdige, onvolledige en onjuiste invulling van de aangehaalde criteria door Maxim, een opzegtermijn van slechts 18 maanden helemaal niet te rechtvaardigen, evenmin door een beroep te doen op de temperende werking van de billijkheid zo men de 'nieuwe' interpretatie van de wetgeving zou toepassen.

**I.4.1.4** Maxim vergeet bovendien dat niet het beëindigen van een distributieovereenkomst als dusdanig maar wel het geven van een té korte opzeggingstermijn bij deze opzeg, zoals in casu, een fout uitmaakt en dat de schade die uit deze fout volgt integraal moet vergoed worden[2].

Reeds hierboven sub I.4.1.2 werd vastgesteld dat Master Chips door en sinds het wegvallen van de distributie van Maxim op het randje van de afgrond leeft. De reserves waaruit Master Chips totnutoe heeft kunnen puren (zie bijvoorbeeld de inbreng van de afkoop van de bedrijfsleidersverzekering in de resultaten) zijn echter niet onuitputtelijk. Door het verlies van de Maximdistributie zal Master Chips dus genoodzaakt zijn de boeken neer te leggen, wat de meest recente evolutie trouwens bevestigt.

De schade stemt bijgevolg overeen met de waarde van de onderneming op het ogenblik van de - foutieve - beëindiging van de overeenkomst (berekening zie sub I.4.2).

**I.4.1.5**      Bovendien, zelfsal zou het zo zijn dat artikel 2 van de Alleenverkoopwet een integrale schadevergoeding overeenstemmend met de waarde van de onderneming niet toelaat (quod non), dan nog heeft Master Chips op basis van de Wet van 13 april 1995 op de handelsagentuur recht op een integrale vergoeding van haar schade.

Gelet op de activiteiten van Master Chips als agent en 'designer' (zie hierboven sub I.2.4) en gelet op de commissielonen die ze daarvoor - gedeeltelijk - ontving, is immers naast de Alleenverkoopwet van 1961 ook de Agentuurwet van toepassing.

Beide wetgevingen kunnen cumulatief worden toegepast. Op elk onderdeel van de activiteit kan namelijk, al naargelang de activiteit als concessie- dan wel als agentuuractiviteit moet worden opgevat, de Alleenverkoopwet van 1961 respectievelijk de Agentuurwet van 1995 worden toegepast.

---

[2]  P. KILESTE & P. HOLLANDER, *"Examen de jurisprudence. La loi du 27 juillet 1961 relative à la résiliation des concessions de vente exclusive à durée indéterminée (1992-1997)"*, T.B.H., 1998, nr. 19 en 38.

Artikel 21 van de Agentuurwet bepaalt dat: "*Voorzover de handelsagent recht heeft op de uitwinningsvergoeding bepaald in artikel 20 en het bedrag van deze vergoeding de werkelijk geleden schade niet volledig vergoedt, kan de handelsagent, mits hij de omvang van de werkelijk geleden schade bewijst, boven deze vergoeding schadeloosstelling verkrijgen ten belope van het verschil tussen het bedrag van de werkelijk geleden schade en het bedrag van die vergoeding.*"

Artikel 21 verwijst daarbij naar artikel 20 dat bepaalt dat: "*Na de beëindiging van de overeenkomst heeft de handelsagent recht op een uitwinningsvergoeding wanneer hij de principaal nieuwe klanten heeft aangebracht ..., voorzover dit de principaal nog aanzienlijke voordelen kan opleveren. ... Het bedrag van deze uitwinningsvergoeding wordt bepaald rekening houdend zowel met de gerealiseerde uitbreiding van de zaken als met de aanbreng van klanten. De uitwinningsvergoeding mag niet meer bedragen dan het bedrag van een jaar vergoeding berekend op basis van het gemiddelde van de vijf voorafgaande jaren of op basis van de gemiddelde vergoeding in de voorafgaande jaren indien de overeenkomst minder dan vijf jaar heeft geduurd.*"

Zoals hieronder sub II meer in detail zal worden uitgewerkt, leidt het geen twijfel dat Master Chips inderdaad recht heeft op een uitwinningsvergoeding voor cliënteel op basis van artikel 20 van de Agentuurwet c.q. een cliënteelsvergoeding onder artikel 3 van de Alleenverkoopwet, zodat aan de voorwaarde van toepasbaarheid van artikel 21 voldaan is en de totale schade, zijnde het verlies van de waarde van de onderneming, dient vergoed te worden.

I.4.2  Het gevorderde bedrag van 6.968.089,55 Eur  (zie Annex II)

Rekening houdend met de vaststaande rechtspraak en rechtsleer en het aandeel van de omzet van de producten van MAXIM in het toenmalige totale zakencijfer van Master Chips, het effect van de opzeg op de levensvatbaarheid van Master Chips en de context waarbinnen MAXIM van Master Chips de uitvoering van een opzegtermijn verwachtte (zie sub I.3), dient de opzegtermijn te worden omgezet in een vervangende schadevergoeding overeenstemmend met de waarde van de activiteit van Master Chips in het jaar van de opzegging, namelijk 6.968.089,55 Euro.

Deze waarde van Master Chips werd reeds naar aanleiding van de gerechtelijke procedures voor de Brusselse rechtbanken door de bedrijfsrevisor van Master Chips, zijnde Bedrijfsrevisoren Vandelanotte berekend, door Maxim zelf en door de bedrijfsrevisoren van Maxim, zijnde KPMG bekritiseerd en door Vandelanotte van repliek gediend (stukken B.6a, b, c en stuk A.17 Maxim).

Met het oog op de leesbaarheid van huidige memorie, verwijst Master Chips naar de bespreking desaangaande in annex II die integraal deel uitmaakt van deze memorie.

## II.4  BEGROTING VAN DE CLIËNTEELSVERGOEDING

### II.4.1  Cliënteel en goodwill

Maxim stelt dat de vergoeding voor cliënteel niet kan samenvallen met de waarde van de goodwill aangezien Master Chips meer dan één activiteit heeft.

Rekening houdend met het gegeven dat de beëindiging van de distributieovereenkomst een dermate grote economische schok heeft teweeggebracht dat Master Chips uiteindelijk niet langer in staat zal zijn het hoofd boven water te houden – wat in realiteit trouwens ook aan het gebeuren is (cf. supra) -, is het *in casu* wel degelijk logisch dat ter compensatie de actuele waarde van de goodwill dient te worden vergoed door Maxim.

Master Chips verwijst hiervoor naar de berekeningen van haar bedrijfsrevisor (zie Annex II) op basis waarvan de goddwil van Master Chips op 1.272.000 Euro (stuk A.6a) werd gesteld.

### II.4.2  Begroting onder artikel 20 van de Agentuurwet

Artikel 20 bepaalt de uitwinningsvergoeding op maximum het bedrag van een jaar vergoeding berekend op basis van het gemiddelde van de vijf voorafgaande jaren of op basis van de gemiddelde vergoeding in de voorafgaande jaren indien de overeenkomst minder dan vijf jaar heeft geduurd.

Om tot een juiste berekening te kunnen komen is het dus cruciaal dat vóór alles een duidelijk beeld kan worden gevormd van de aan Master Chips toekomende commissieloenen (zie deel III).

**II.4  CONCLUSIE WAT BETREFT DE VERGOEDING VAN HET CLIËNTEEL**

Op basis van voorgaande argumentering en rekening houdend met het effect van de beëindiging van de overeenkomst op de levensvatbaarheid van Master Chips, is Maxim Master Chips de betaling van een vergoeding verschuldigd voor het verlies van haar cliënteel, overeenstemmend met de waarde ervan in het jaar van de opzegging, namelijk 1.272.000 Euro (stuk A.6a).

Uiteraard is een juiste bepaling van de commissielonen (deel III) in dit kader van groot belang voor onder meer de berekening van de waarde van een cliënt als Alcatel.

Tot slot dient te worden opgemerkt dat de overname van cliënteel van Master Chips door Maxim reeds begonnen is tijdens de opzegperiode, aangezien Maxim ook toen al op actieve wijze klanten van Master Chips uitnodigde rechtstreeks bij haar te kopen (zie I.3.1).

### III.3.5  Conclusie wat betreft de commissielonen

Hoewel de overgemaakte stukken allesbehalve een compleet en correct beeld geven, is het duidelijk dat Maxim Master Chips belangrijke bedragen aan commissielonen heeft onthouden.

Gelet op de afleidingen die kunnen gemaakt worden uit de overgelegde stukken, moet er bovendien worden van uitgegaan dat ook uit de niet-overgelegde stukken zal blijken dat belangrijke bedragen aan commissielonen niet werden uitgekeerd.

Het is Master Chips echter niet mogelijk een berekening te maken van de op die manier misgelopen commissielonen gelet op de mengelmoes van documenten en spreadsheets die haar door Maxim werden overgemaakt.

Via extrapolatie en rekeninghoudende met de ratio's van de aantallen in 1999 doorgegeven voor de USA en België (er vanuitgaande dat deze cijfers de meest betrouwbare zijn daar de produktie dan nog bij Alcatel zelf gebeurde zodat Maxim er alleszins niet veel cijfers aangaande onderaannemers kunnen bestaan hebben), kan het totaal van niet gecommissioneerde leveringen geschat worden op 2.000.000 $ voor 1999, op 8.000.000 $ voor 2000 en minstens evenveel voor 2001.[3 en 4]

Gelet op de hiaten in de informatie herhaalt Master Chips alsnog haar vraag tot volledige, overzichtelijke en eenvormige overlegging van stukken (spreadsheets), minstens voor de componenten opgenomen in Annex III, details wat betreft aantallen en prijzen voor verkopen via Arrow, en voor verkopen aan Flextronics en Alcatel USA en China.

Indien Maxim niet onmidellijk volgend op de overmaking van deze memorie bevestigt dit verzoek vrijwillig te zullen inwilligen, zal Master Chips de arbiter vragen Maxim daartoe te verplichten, tenzij deze van oordeel zou zijn dat op basis van de hierboven uitgewerkte argumenten met voldoende precisie dan wel ex aequo et bono het bedrag aan nog verschuldigde commissielonen kan worden bepaald.

Een juiste bepaling van de commissielonen is immers van belang in het kader van de berekening van de cliënteelsvergoeding (deel II) voor onder meer de berekening van de waarde van een cliënt als Alcatel

---

## IV.  DE IN TOTAAL GEVORDERDE BEDRAGEN

---

[3] Op basis van de onder punt III.3.3.2 punt 2 geciteerde informatie afkomstig van de website van Alcatel aangaande de totaal geleverde ADSL-lijnen per jaar, het aantal componenten dat voor dergelijke productie vereist was en de eenheidsprijs per component.

[4] Dhr. Di Quattro heeft eveneens aan Master Chips bevestigd dat in de periode 1998-2001 de omzet van Maxim bij Alcatel 20 à 30 miljoen Eur per jaar bedroeg waarvan een groot gedeelte betrekking had op het ADSL project.

Uit financiële overwegingen zag Master Chips zich gedwongen om haar vordering in het verzoekschrift tot arbitrage te beperken tot een forfaitair bedrag van 750.000 Eur, zij het onder voorbehoud van interesten verschuldigd op de hoofdsom en onder voorbehoud van latere uitbreiding van haar vordering.

Gelet echter op het verzet van Maxim met betrekking tot een eventuele latere uitoefening door Master Chips van haar rechten in een aparte arbitrageprocedure, ziet Master Chips zich, teneinde haar rechten te vrijwaren, genoodzaakt haar vordering te brengen tot de reële bedragen waar zij recht meent op te hebben:

- een vergoeding van de schade, begroot op 6.968.089,55 Eur;
- een vergoeding voor cliënteel, begroot op 1.272.000,00 Eur;
- een vergoeding voor de schade geleden door het door Maxim gevoerde prijzen- en publiciteitsbeleid, tot op heden nog niet begroot;
- de terugbetaling van de bedragen die tijdens de opzegperiode door Master Chips betaald werden voor de publiciteit voor Maxim producten en de technische ondersteuning aan het cliënteel door een Maxim werknemer (FAE), begroot op respectievelijk 77 303 $ en 43 861,49 $;
- de correcte betaling van commissielonen, tot op heden onmogelijk precies te begroten, vandaar, een provisioneel bedrag van 500 000 $ voor de niet-betaling van verschuldigde commissielonen, in afwachting van de mogelijkheid tot de precieze begroting ervan;
- de intresten.

**OM DEZE REDENEN,**

**Op basis van voorgaande uiteenzettingen en overwegingen,**

**En onder voorbehoud van uitbreiding of wijziging van haar vordering,**

**VRAAGT MASTER CHIPS DE ARBITER,**

Maxim te veroordelen tot betaling aan Master Chips van:

- een vergoeding van de schade, begroot op 6.968.089,55 Eur;

- een vergoeding voor cliënteel, begroot op 1.272.000,00 Eur;

- een vergoeding voor de schade geleden door het door Maxim gevoerde prijzen- en publiciteitsbeleid, door de Arbiter ex aequo et bono te begroten;

- de terugbetaling van de bedragen die tijdens de opzegperiode door Master Chips betaald werden voor de publiciteit voor Maxim producten en de technische ondersteuning aan het cliënteel door een Maxim werknemer (FAE), begroot op respectievelijk 77 303 $ en 43 861,49 $;



- een provisioneel bedrag van 500 000 $   voor de niet-betaling van verschuldigde commissielonen;

- de interesten verschuldigd op de hoofdsom.


Master Chips akte te verlenen van haar voorbehoud tot uitbreiding of wijziging van haar vordering;

Maxim te veroordelen tot betaling van alle kosten die in het kader van de arbitrage werden gemaakt.

Gedaan te Brussel op 11 oktober 2006


Voor Master Chips,
Haar raadslieden



Meester Leo Goovaerts                          Meester Sabine Thielemans

# EXHIBIT E

Hearing restarted at 2.20

*Arbiter* Are there any items that need to be discussed before we resume examination of witnesses?  No?

Could you call Mr Bougerol?  Will he testify in French or in English?

*Mr Swinnen* English

*Mr Swinnen* Mr Bougerol, please take a seat

*Arbiter* Mr Bougerol, we do not place witnesses under oath in these proceedings but I would like to ask you to affirm that you will speak the truth, the whole truth and nothing but the truth.

*BOUGEROL:* I will

*Mr Swinnen* Mr b, you're a French national, you live in France, you're currently a maxim employee, is that correct?

*BOUGEROL:* I am.

*Mr Swinnen* what is your current job at Maxim ?

*BOUGEROL:* I am Executive Account Manager for Alcatel, I cover Alcatel as an account manager worldwide and I was appointed executive in September 1994 and took over Alcatel since 2002.

*Mr Swinnen* In your witness statement I read that on August 31st of 2006 you have talked on the phone with a certain Mr Christophe Verboven who is Alcatel's purchase manager for Belgium.  Is that correct?

*BOUGEROL:* it is

*Mr Swinnen* who initiated this call?

*BOUGEROL:* myself

*Mr Swinnen* You called Mr Verboven?

*BOUGEROL* Yes

*Mr Swinnen* To what purpose?

*BOUGEROL* To prepare this session, to ask him a few questions

*Mr Swinnen* what kind of questions where you going to ask him?

*BOUGEROL* I wanted to know if he is able to help me understand which parts were designed where, in which Alcatel application.   He immediately said: that's weird

because I was contacted by Master Chips a couple of days ago with the same questions. Is it related to Master Chips?

*Mr Swinnen* What parts did you intend to ask him about?

*BOUGEROL* we spoke about the 708, DG 409, the 1651 and the 3232.

*Mr Swinnen* Were that the same parts that Master Chips had inquired about with Mr Verboven?

*BOUGEROL* Yes

*Mr Swinnen* What did Master Chips want to know from Mr Verboven according to what Mr Verboven told you?

*BOUGEROL* He mentioned the name of Johan, he told me Johan

*Mr Swinnen* who is Johan?

*BOUGEROL* he said that someone named Johan from Master Chips asked him to sign a draft explaining that those part used by Alcatel in both US, China and probably also in Europe were designed in Belgium and he said : there's no way for me to sign this kind of document.

*Mr Swinnen* why did he say that he didn't want to sign such a affidavit or such a witness statement?

*BOUGEROL* He said that it would be very probably wrong, we can not say … it is too simple to say that all these parts have been designed in Belgium and after that been shipped to the US and Shanghai Bell, its is quite impossible said Christophe.  And he said : as you  know, because obviously in my day to day job I work with Christophe and I know that it is extremely difficult.

*Mr Swinnen* Did he give any other context? Because your witness statement says that he quoted a number of other things.  I would just like you to relate into your own words the conversation you had with Christophe Verboven.

*BOUGEROL* Christophe told me that he didn't want to interfere in this negotiation or discussion, he said: I will not sign anything.  And I wanted to stay polite with my customer and not harass him because I perceived that he was a little exited being contacted by both parties, by Master Chips and myself.  And he said: you know Jean-François we have a good relationship and I don't want to be involved at all in this one.  And by the way it is now part of the Alcatel history, it's in our archives and it's quite impossible to investigate and to know which part was designed in what.  We have so many boards in applications. Each board has had different revisions.  So how do you want me to know which socket, according to time and location and application, was designed by who or where. It is quite impossible.  It would be a nightmare to try and understand the complete history.  This is why he wanted to get out and he said: you can not know.  Also based on how Alcatel works, how they select the products.  First they use preferred suppliers, and Maxim is preferred

because the work with Alcatel Corporate in Paris. So this is a first way to select products. They work with products which come from preferred suppliers.

The second point is they work with products which are already qualified and in the internal database. For example the DG 409 was used in 97 and after in Alcatel CIT in France. So someone in the US or Europe or wherever can pick from the Alcatel database a part number which has a 1 AB number, 1 AB meaning an Alcatel part number. It is already qualified by Alcatel because one Alcatel location uses it so another Alcatel designer can select a part which is already qualified. It is for them a way not to spend too much money to requalify a product which is already used. So knowing how they proceed, tracking which part is used in which application and when and so on: no way.

*Mr Swinnen* I heard you say that Maxim is a preferred supplier for Alcatel and that had something to do with Paris?

*BOUGEROL* Yes, as you know Maxim and Alcatel have strong relationships, they're a strategic customer and we are a strategic partner or a preferred supplier. They have a list of suppliers, a supplier base they want to work with and Maxim is one of their preferred suppliers. Meaning the designers have a green light to work with those products. This is how Alcatel works. They want to avoid designers picking products everywhere and having supplying issues afterwards. So the job of working with Alcatel is first to work with their corporate in Paris.

*Mr Swinnen* Does that mean that Maxim in Europe is a preferred suppliers for Alcatel or worldwide?

*BOUGEROL* Worldwide

*Mr Swinnen* Much larger than Belgium?

*BOUGEROL* Yes

*Mr Swinnen* Has that anything to do with Master Chips introducing Maxim to Alcatel or is it a relation that is much bigger than just Master Chips?

*BOUGEROL* It is much bigger than Master Chips because we speak here about the Vice President relationships from both corporates of Maxim and Alcatel.

*Mr Swinnen* What you're saying is that Alcatel has some kind of database in which they list a certain number of approved parts from different suppliers and that whenever their own design teams or engineer teams are working on a project they can just go to the database and choose parts?

*BOUGEROL* Yes and it is called QEACS

*Mr Swinnen* is that one of the reasons why … because we heard this morning Mr Sangali say that it is very common for clients to incorporate Maxim or probably other manufacturer's products in certain of their designs without any intervention by a Maxim FAE. Is that related to this database?

*BOUGEROL* Yes, that is correct because our products are not application specific IC's but they are standard parts or commodities. So they're pick off the shelf products and especially in Alcatel they pick products which are not dedicated to Alcatel but very common products and they can use them in every board. And if it's already qualified in their QEACS system, it's easy going for them.

*Mr Swinnen* One last question, going back to your conversation with Mr Verboven. Mr Verboven said that, when asked by Master Chips whether he would like to confirm for Master Chips' benefit that the Max 708 RESA, the Max 708 SESA, the DG 409 DY, the Max 1651 CSA and the Max 3232 CSE had all been designed in Belgium, Mr Verboven has answered that this assumption was very likely wrong. Do you think Mr Verboven is qualified within Alcatel to know what he's talking about?

*BOUGEROL* obviously absolutely, yes because he has full access on QUEACS. On top of that he is the person who is internally in the Alcatel organisation in charge of dealing with Maxim, because he has the two responsibilities: to be the purchaser for Belgium but also worldwide leader for linear products and in this function he deals with Maxim directly. So he is absolutely knowledgeable.

*Mr Swinnen* thank you, I have no further questions at this time.

*Mr Govaerts* can we have 5 minutes?

*Arbiter* it is 2.33 right now, what time would you like to be back?

*Mr Govaerts* 2.40

*Arbiter* ok we recess until 2.40


The hearing is resumed at 2.40


*Mr Govaerts* does Mr Bougerol want me to ask questions in French, if that is easier for him?

*BOUGEROL* In English is ok

*Mr Govaerts* in English is OK?

*BOUGEROL* my English is not so good?

*Mr Govaerts* mine is not either. So, you work for Maxim since?

*BOUGEROL* August 2000

*Mr Govaerts* Are you aware that there have been contacts between Maxim and Master Chips before?

*BOUGEROL* Yes

*Mr Govaerts* are you aware that those contacts started In 1987?

*BOUGEROL* No, I did not know the details

*Mr Govaerts* But you know that they are and were in contact since a long time?

*BOUGEROL* In fact I ignored completely Master Chips' existence before Heidi Perry calling me and saying : I would like you to help me, do you have any tracking records of business done between Alcatel and Maxim.  And I asked: who is Master Chips. She says : it's a distributor, a former one.

*Mevr Thielemans* And when was that?

*BOUGEROL* Last August

*Mevr Thielemans* Of this year?

*BOUGEROL* Yes, so I didn't have any clue about when we started working with Master Chips or when

*Mr Govaerts* Do you know that they have been officially contracting between them since 1997?

*BOUGEROL* honestly, I didn't know any detail about what kind of contract they had. What I know is that we have a distributor in the past working in Belgium called Master Chips.  I knew when I called Mr Verboven and worked with him on a daily basis that Master Chips tried to contact him, but I didn't have any idea about when Master Chips worked with us, what kind of agreement or contract they signed with us.

*Mr Govaerts* So you as an executive account manager of Alcatel worldwide in France

*BOUGEROL* Yes, I'm located in France but executive means that I go around worldwide. So I can travel going in the US, in China or other parts of Europe.

*Mr Govaerts* Do you know that this morning Mr Sangali said that the design wins involved in the following parts Max 708, Max 1651 and Max 3232 were recorded by Maxim as wins at Alcatel Belgium?  Which seems to me being in complete contradiction with the report you make in your witness statement because there you make Mr Verboven say that all designed in Belgium was very likely wrong.  This morning one of your colleagues came to say the opposite.  Do you know that in the conclusions Maxim itself recognised that those parts had been designed in Belgium?

*BOUGEROL* No, I don't see any contradiction in what

*Mr Govaerts* that is my last question.  Have you ever confirmed by mail or letter the content of your witness statement to Mr Verboven so that if he wanted he could react to this document?

*BOUGEROL* No

*Mr Govaerts* thank you, that's all.

*BOUGEROL* May I say something?  You say that there is a contradiction between what Walter Sangali told you and what I wrote and I didn't perceive any contradiction. What you repeated to me is that Walter Sangali mentions that we had some design wins with those 708, 409 and 1651 and 3232 in Belgium.  What I stated here in my statement is that Christophe Verboven said: we can not say which parts exactly, that all above parts where all designed in Belgium.

*Mr Govaerts* monsieur, mais c'est la raison pour laquelle je vous demande si vous avez confirmé le contenu de l'entretien téléphonique …

Mr s : excuse me, I would like to do this in English because only Dutch and English are the official languages

*Mr Govaerts* ok, That is the reason for which I asked you if ever you have confirmed the content of your witness statement yes or no.

*BOUGEROL* No

*Mr Govaerts* ok, that's all I wanted to know.  Thank you very much, that's all for me.

*Arbiter* Mr Swinnen, do you have a redirect?

*Mr Swinnen* yes I do, I would like you to … because Mr Govaerts did not let you finish on that and I think I will … why are you saying that there is no contradiction between on the one hand Maxim shows records and Walter Sangali declared this morning that the Max 708, 1651 and 3232 were designed in Alcatel location in Belgium by the Benelux FAE … why is there no contradiction between that and Mr Verboven saying that the assumption that those parts, those parts being the Max 707 RESA, Max 708 SESA, DG 409 DY, Max 1651 CSA and Max 3232 CSE, that the assumption that those parts were all designed in Belgium is very likely wrong?

*BOUGEROL* Because it is exactly the point of the witness statement.  Products can be used and could be designed in one location, in one application, in one project or one board but can be used also in other boards, locations and applications.  So there can be one in for example Belgium and there can be one also in the US and gathered all together.  What Alcatel can not easily find out is where initially those parts came from.  And that as I said initially, the DG 409 were used and are still used in Alcatel CIT France but that does not mean that Alcatel Belgium or Master Chips has not designed it in the application.  It is used in different applications in France, in Belgium, in the US.  So there are no contradictions.  What Walter Sangali says is obviously correct and what I say is correct and both are not in contradiction.

*Mr Swinnen* When I read the full witness statement or the full account of your conversation with Mr Verboven, I see that when he says that the assumption that those parts were all designed in in Belgium – he refers to the parts that are listed above, which are the parts that I enunciated before : Max 708 RESA and SESA, DG 409 DY, Max 1651 CSA and Max 3232 CSE – he says that the assumption that those

were all designed in in Belgium was very likely wrong. Do we need to read that in conjunction with the question that Master Chips had asked him, namely to draft a statement to the effect that all the parts below used today in Alcatel applications in the US and Asia had been designed in Belgium? In other words, is it possible that any of these parts may ever be designed in in Belgium or may ever have been designed in in Belgium and that Mr Verboven is here saying that despite that possibility it is very likely wrong to assume that all these parts as used today in Alcatel applications in US or Asia have been designed in Belgium. Is that correct?

*BOUGEROL* it is correct, it is impossible. And I just want to answer to another question: did I give the statement to Alcatel? The answer is no and why? Because that last sentence explains that. Alcatel wanted to stay away from this issue. So this is why I did not, because I didn't want to involve them any more.

*Mr Swinnen* last question for you. You are currently the Maxim executive account manager for Alcatel worldwide

*BOUGEROL* I am, yes

*Mr Swinnen* you have been doing that job since when?

*BOUGEROL* September 2004 but two years before I already did the job without the title.

*Mr Swinnen* so you have effectively done the function of executive account manager for Alcatel worldwide for 4 years, even though you only had the title for 2 years?

*BOUGEROL* correct

*Mr Swinnen* despite having been Alcatel worldwide manager for 4 years, you had never heard of Master Chips prior to August 2006?

*BOUGEROL* yes, correct

*Mr Swinnen* thank you, no further questions

*Arbiter* any recross?

*Mr Govaerts* one final question. It is said that Alcatel has no tracking records of the details about all that because it is in their archives? Do you think that Maxim has tracking records of this?

*BOUGEROL* I think that we have database, a design in database. So we have some records that my management, including Walter Sangali, has access to. So very probably he has access to some information where he can check for example that the Max 3232 is used in one application, but it is very possible also that all products are not in that database because every day what we have is some components are used and selected by our customers that we don't know about and it's a surprise for us. We don't know where the products are going to. And visa versa, sometimes we declare as account manager a product as working in an application and we never

see any order.  So there is a mismatch between the reality and what we have in the database.

*Mr Govaerts* That means you have records and do you think Maxim knows exactly what they ordered at Alcatel year after year?

*BOUGEROL* Do you mean that we would have records year after year about any product by application or only products?

*Mr Govaerts* how much what you bought at Alcatel every year?

*BOUGEROL* what we sell?  Yes we have very accurate tracking records for sure of what we sell to Alcatel, part number by part number, including distribution, including subcontractors.

*Mr Govaerts* thank you very much.

*Mevr Thielemans* did I hear you say including subcontractors?

*BOUGEROL* subcontractors such as Flextronics, because they order through Alcatel numbers.  So it goes to our incentive.  We receive an incentive on whatever we sold to Alcatel so I know perfectly that we have records of everything that is sold all over the world to Alcatel.

*Mr Govaerts* thank you

*Mr Swinnen* No further questions

*Arbiter* thank you.  Do you need a recess for the next witness?

*Mr Swinnen* We have no next witness.

*Arbiter* that's right, the next witness is due tomorrow morning.

*Mr Swinnen* actually he's flying in later today but not at a useful time.

*Arbiter* So we're done for today?

*Mevr Thielemans* we hebben de affidavit van Marc Willemart die wij u gestuurd hebben, daar is verwezen in de tekst zelf naar annexen, rechtspraak die hij ons gestuurd heeft dus hebben we nog een kopie voor u daarvan klaargemaakt.

*Arbiter* goed, hij zei ook dat hij nog een nieuwe tabel aan het maken was. Die is er nog niet zeker?

*Mevr Thielemans* nee, nog niet, daar hebben we in ieder geval geen nieuws van.

*Arbiter* want die zou zeer behulpzaam zijn natuurlijk.

*Mevr Thielemans* we zullen vragen hoever het ermee staat.

*Mr Govaerts* morgen om 10 uur?

*Arbiter* morgen om 10 uur.  We stand adjourned, thank you.

# EXHIBIT F

## SWORN TRANSLATOR'S DECLARATION

I, the undersigned, Mrs Ingrid Piron, sworn translator with the Oudenaarde Judicial District, hereby declare that this translation bearing my signature is an accurate and complete English translation of the attached Dutch text, also bearing my signature.

## VERKLARING BEëDIGD VERTALER

Hierdoor verklaar ik, Mevr. Ingrid Piron, ondergetekende, beëdigd vertaler bij Arrondissement Oudenaarde, dat deze vertaling met mijn handtekening een juiste en volledige Engelse vertaling is van aangehechte Nederlandse tekst, ook met mijn handtekening.

Herzele, 28 April 2008

Ingrid Piron.

INGRID PIRON
SWORN TRANSLATOR
ARRONDISSEMENT OUDENAARDE
ZOTTEGEM-HERZELE CANTON
REP.W645/2004 OF 27.10.04
BERGAFSTRAAT 6
HILLEGEM 9550 HERZELE
BELGIUM

---

### PETITION

### In terms of Article 20, 5° of the ICC Rules of Arbitration

---

Whereas Master Chips, in the discovery phase of the current procedure, requested Maxim by letter dated 11 August 2006, to present the following:

> *lists of Maxim products ... which were purchased worldwide by ALCATEL TELECOM, PHILIPS and OPTION to be processed in their products, of the company through which:*

> ➤ *they were ordered;*
>   - *by Alcatel Belgium, or*
>   - *by one of its worldwide branches or subsidiaries. For example, but not limited to: Alcatel USA, Alcatel Singapore, Alcatel Australia, Alcatel Brazil, Alcatel Spain, Alcatel Italy, or*
>   - *by an Alcatel subcontractor worldwide (for example, but not limited to: Flextronics in the Czech Republic, Jabil in China, Ambit in Taiwan, Cis Techno in Taiwan and Solectron);*

> ➤ *they were delivered;*
>   - *by Maxim USA, or*
>   - *by one of its branches or subsidiaries (such as, for example, but not limited to Maxim U.K., Maxim France, Maxim Hong Kong), or*
>   - *by companies otherwise affiliated (such as, for example, but not limited to Arrow: supply company and distributor for Maxim in the USA)*

> *and for which the concluding party, in the light of its role as initiator of the "design win", has a right to commissions as agreed by the parties.*

> *In each case, these lists must state the customer's name, the invoice number, the date of payment, the amount for which the delivery was made, the number of goods delivered, their unit prices and the Maxim type numbers, so that the commissions owed can be correctly calculated.*

> *To calculate the goodwill that ALCATEL TELECOM, PHILIPS and OPTION hold for Master Chips, the requested items for the period from 1 January 1998 (being the beginning of the commission arrangement) to 30 June 2006 are to be presented.*

That, in accordance with this request, Master Chips, on 8 September 2006, received from Maxim one box (measuring 30 x 40 x 40 cm) completely filled with items (estimated weight of 7°kg), as well as two large envelopes of items.

That the contents were limited to orders and order confirmations by and for Alcatel Belgium and invoices drawn up by Maxim France for Alcatel Belgium, albeit only to February 2003, inclusive.

That the deliveries to subcontractors of the House Accounts (Alcatel, Philips and Option) were missing, as well as a full overview of the deliveries via Arrow, the

1

14123/RCH/JHN
Master Chips v. Maxim
Items

deliveries to the USA (some quarters were missing altogether or were incorrectly marked as non-commissionable) and the deliveries/orders from February 2003 to date.

That, in addition, the order forms and order confirmations were not uniformly summarised (the envelopes contain a jumble of spreadsheets drawn up differently in each case, which cannot be checked for completeness) and delivered in bulk instead of in the form of clear listings stating the data as requested by Master Chips.

That this amounts to a refusal by Maxim to present the necessary items to enable Master Chips — and the arbitrator — to get a correct picture of the claim regarding the commissions involved.

* * *

Whereas, moreover, that, although given the volume of the items and the lack of uniform and clear listings, they cannot be precisely analysed and although the items therefore provide all but a complete and correct picture, it is clear that many "mistakes" occurred when allocating commissions.

That, in addition, given the conclusions that can be drawn from the submitted items, it must be inferred that it will also appear from the non-submitted items that substantial commissions were not paid.

That Master Chips refers to its statement(s) and the present application in terms of Article 23, 1° of the ICC Rules of Arbitration with regard to the protective measures for this analysis and determination of the unpaid amounts.

That, given the gaps in the information, Master Chips repeated its request for complete, clear and uniform presentation of items (spreadsheets) in its first statement dated 22 September 2006, at least for the components included in Annex III of the statement, details regarding numbers and prices for sales via Arrow, and for sales to Flextronics, Alcatel USA and China.

That, moreover, Master Chips already pointed out several times that it cannot be a problem for Maxim — as the latter nevertheless continues to assert — namely to ascertain when certain deliveries are used to manufacture Alcatel products. That, after all, it is sufficient that Alcatel — to this day an important customer of Maxim's — provide Maxim with a list of companies which manufacture for it as subcontractors — which can be no problem for Alcatel — and that, in the case of orders by one of these companies, it is indicated whether it concerns an Alcatel project or not. That this applies equally to Arrow's deliveries, seeing that Arrow, as Maxim's distributor, should also be able to provide a perfect picture of precisely what it delivered to Alcatel (or its subcontractors).

That a correct determination of the commissions is indeed of importance in the context of the calculation of the clientele indemnity (Master Chips statement part II) for, among other things, the calculation of the value of a client like Alcatel.

2

14123/RCH/JHN
Master Chips v. Maxim
Items

That Master Chips, at that stage, already announced that if Maxim did not confirm that it would voluntarily comply with this request immediately subsequent to the submission of this statement, Master Chips would request the Arbitrator to compel Maxim to do so.

That, to date, two weeks after having submitted its statement, Master Chips has received no reaction whatsoever from Maxim in this regard.

That Article 20, 5° of the ICC Rules of Arbitration provides that *"the arbitral tribunal may request the parties at any point in the procedure to submit additional evidence"*.

That, consequently, it is appropriate that, <u>unless</u> the Arbitrator is of the belief, based on the arguments elaborated upon with sufficient precision in the statements submitted by Master Chips, that ex aequo et bono, the amount of commissions still owed can be determined, the Arbitrator mandatorily require Maxim to still submit the items requested by Master Chips to enable Master Chips to process the data in its following statements.


**ACCORDINGLY,**

In the arbitration procedure with reference 14123/RCH/JHN,

In the context of the abovementioned circumstances and with explicit reference to its first statement dated 22 September 2006,

Without prejudice to any rights and without adverse admission,


**MASTER CHIPS BVBA requests the Arbitrator concerned, Mr. Eric VAN GINKEL, to order, by means of interim arbitral Judgement, that MAXIM:**

present all the items as requested by Master Chips in its letter dated 11 August 2006, re-stated above, and repeated in its statement dated 22 September 2006,

more specifically:

- clear, complete and uniform spreadsheets,

- stating the customer's name, invoice number, payment date, for which amount the delivery was made, the number of goods, their unit prices and the Maxim type numbers,

- for all the deliveries:

    - to the companies who manufactured as subcontractors for the House Accounts (Alcatel, Philips en Option), at least for Flextronics;
    - to Alcatel USA and Alcatel China;
    - via Arrow;
    - from February 2003 to date,

3



14123/RCH/JHN
Master Chips v. Maxim
Items

- and at least for the components stated in Annex III to the statement presented for Master Chips on 22 September 2006.

For Master Chips bvba
Its Counsellors,

Leo Goovaerts
Sabine Thielemans

Brussels, 6 October 2006

4

---

**VERZOEKSCHRIFT**

**ex artikel 20, 5° van het ICC-Arbitragereglement**

---

Overwegende dat Master Chips in het kader van de discovery fase van huidige procedure per schrijven van 11 augustus 2006, Maxim de overlegging verzocht van:

> *lijsten van Maximproducten ... die wereldwijd door ALCATEL TELECOM, PHILIPS en OPTION, werden aangekocht voor verwerking in hun producten en dit ongeacht door welke onderneming:*
>
> ➤ *ze werden besteld:*
>  *- door Alcatel België, of*
>  *- door een van haar wereldwijde vestigingen of dochterondernemingen Bijvoorbeeld doch niet exclusief: Alcatel USA, Alcatel Singapore, Alcatel Australia, Alcatel Brasil, Alcatel Spain, Alcatel Italy, of*
>  *- door een onderaannemer van Alcatel wereldwijd (bijvoorbeeld doch niet exclusief: Flextronics-Tsjechië, Jabil-China, Ambit Taiwan, Cis Techno Taiwan, Solectron)*
>
> ➤ *ze werden geleverd:*
>  *- door Maxim USA, of*
>  *- door een van haar filialen of dochterondernemingen (zoals bijvoorbeeld doch niet exclusief Maxim U.K., Maxim France, Maxim Hong Kong), of*
>  *- door anders gelieerde bedrijven (zoals bijvoorbeeld doch niet exclusief Arrow: toeleveringsbedrijf en distributeur voor Maxim in de USA)*
>
> *en waarvoor concluante gezien haar rol van initiator in de 'design win', recht heeft op commissies zoals door partijen werd overeengekomen.*
>
> *Deze lijsten dienen telkens de naam van de klant, het factuurnummer, de betalingsdatum, voor welk bedrag geleverd werd, het aantal geleverde goederen, de en eenheidsprijs ervan en het Maxim typenummer te vermelden om een juiste berekening van de verschuldigde commissielonen mogelijk te maken.*
>
> *Teneinde de waarde voor Master Chips te kunnen berekenen van ALCATEL TELECOM, PHILIPS en OPTION als cliënt, dienen de hiervoor gevraagde stukken te worden overgelegd voor de periode van 1 januari 1998 (zijnde het begin van de commissieregeling) tot op 30 juni 2006.*

Dat ingevolge dit verzoek Master Chips op 8 september 2006 een doos (afmetingen 30 x 40 x 40 cm) volledig gevuld met stukken (geschat op 7 kg) alsmede twee grote omslagen met stukken ontving van Maxim.

Dat de inhoud beperkt was tot bestellingen en orderbevestigingen door en voor Alcatel België en facturen opgesteld door Maxim France voor Alcatel België, zij het slechts tot en met februari 2003.

Dat de leveringen aan onderaannemingen van de House Accounts (Alcatel, Philips en Option) ontbraken, evenals een compleet overzicht van de leveringen via Arrow, de leveringen aan de USA (sommige kwartalen ontbreken volledig of werden

1

onterecht als niet-commissioneerbaar bestempeld) en de leveringen/bestellingen van februari 2003 tot op heden.

Dat de facturen, bestelbons en orderbevestigingen bovendien niet eenvormig werden samengevat (de omslagen bevatten een mengelmoes van telkens anders opgestelde spreadsheets waarvan niet kan worden nagegaan of zij al dan niet volledig zijn) en als bulk werden afgeleverd in plaats van in de vorm van overzichtelijke listings met vermelding van de gegevens zoals door Master Chips gevraagd.

Dat dit neerkomt op een weigering van Maxim om de nodige stukken over te leggen die Master Chips - en de arbiter - moeten toelaten een precies en juist beeld te krijgen van de vordering aangaande de commissielonen inzake.

* * *

Overwegende bovendien dat hoewel gezien de omvang van de stukken en het gebrek aan eenvormige en overzichtige listings, de analyse ervan niet precies kan worden uitgevoerd en hoewel dus de stukken allesbehalve een compleet en correct beeld geven, het duidelijk is dat er heel wat 'fouten' zijn gebeurd bij het toekennen van commissielonen.

Dat bovendien gelet op de afleidingen die kunnen gemaakt worden uit de overgelegde stukken, er moet worden van uitgegaan dat ook uit de niet-overgelegde stukken zal blijken dat belangrijke bedragen aan commissielonen niet werden uitgekeerd.

Dat Master Chips voor deze analyses en vaststelling van niet uitgekeerde bedragen verwijst naar haar memorie(s) in het verzoekschrift van heden ex artikel 23, 1° van het ICC-Arbitragereglement betreffende de bewarende maatregelen.

Dat gelet op de hiaten in de informatie Master Chips in haar eerste memorie dd. 22 september 2006 haar vraag tot volledige, overzichtelijke en eenvormige overlegging van stukken (spreadsheets) herhaalde en dit minstens voor de componenten opgenomen in Annex III bij de memorie, details wat betreft aantallen en prijzen voor verkopen via Arrow, en voor verkopen aan Flextronics en Alcatel USA en China.

Dat Master Chips er bovendien reeds meermaals op wees dat het voor Maxim geen probleem kan zijn - zoals deze nochtans blijft beweren - te weten te komen wanneer bepaalde leveringen dienen voor de productie van Alcatelproducten. Dat het immers volstaat dat dat Alcatel - tot op heden een belangrijke klant van Maxim - Maxim een lijst van bedrijven opgeeft die voor haar in onderaanneming produceren - wat voor Alcatel geen probleem kan zijn - en dat in geval van bestellingen door één van deze bedrijven aangeduid wordt of het een Alcatelproject betreft of niet. Dat dit evenzeer geldt voor de leveringen via Arrow aangezien Arrow als distributeur van Maxim een perfect beeld kunnen geven van wat precies aan Alcatel (of haar onderaannemers) wordt geleverd.

Dat een juiste bepaling van de commissielonen immers van belang is in het kader van de berekening van de cliënteelsvergoeding (deel II memorie Master Chips) voor onder meer de berekening van de waarde van een cliënt als Alcatel.

Dat Master Chips daarbij reeds aankondigde dat indien Maxim niet onmiddellijk volgend op de overmaking van deze memorie zou bevestigen dit verzoek vrijwillig te zullen inwilligen, Master Chips de arbiter zou vragen Maxim daartoe te verplichten.

Dat op heden, twee weken naar neerlegging van haar memorie, Master Chips geen enkele reactie van Maxim desaangaande heeft ontvangen.

Dat artikel 20, 5° van net ICC-Arbitrageregelement voorziet dat "het scheidsgerecht kan de partijen op ieder ogenblik van de procedure vragen om aanvullend bewijsmateriaal over te leggen".

Dat het bijgevolg passend is, tenzij de Arbiter van oordeel zou zijn dat op basis van de in de door Master Chips neergelegde memorie(s) uitgewerkte argumenten met voldoende precisie dan wel ex aequo et bono het bedrag aan nog verschuldigde commissielonen kan worden bepaald, de Arbiter inzake Maxim zou verplichten de door Master Chips gevraagde stukken alsnog over te maken zodat Master Chips de gegevens ervan in haar volgende memories zou kunnen verwerken.


**ZO IS HET DAT,**

In de arbitrale procedure gekend onder de referentie 14123/RCH/JHN,

In het kader van bovenvermelde omstandigheden en onder uitdrukkelijke verwijzing naar haar eerste memorie dd. 22 september 2006,

Onder alle voorbehoud en zonder nadelige erkentenis,

**MASTER CHIPS BVBA de Arbiter inzake, dhr. Eric VAN GINKEL, verzoekt om MAXIM middels tussentijdse arbitrale uitspraak te veroordelen:**

tot volledige overlegging van de stukken zoals gevraagd door Master Chips bij schrijven van 11 augustus 2006, hierboven hernomen, en herhaald bij memorie van 22 september 2006,

meerbepaald:

- overzichtelijke, complete en eenvormige spreadsheets,

- met vermelding van de naam van de klant, het factuurnummer, de betalingsdatum, voor welk bedrag geleverd werd, het aantal geleverde goederen, de eenheidsprijs ervan en het Maxim typenummer,

- voor de totale leveringen:

    -- aan de bedrijven die in onderaanneming produceren voor de House Accounts (Alcatel, Philips en Option), minstens voor Flextronics;
    -- aan Alcatel USA en Alcatel China;
    -- via Arrow;
    -- van februari 2003 tot op heden,

14123/RCH/JHN
Master Chips v. Maxim
Stukken

- en dit minstens voor de componenten vermeld in Annex III bij de memorie neergelegd voor Master Chips op 22 september 2006.

Voor Master Chips bvba
Haar raadslieden,

Mr. Leo Goovaerts
Mr. Sabine Thielemans

Brussel, 6 oktober 2006

4

# EXHIBIT G

**Van:** Eric van Ginkel [eric@ericvanginkel.com]
**Verzonden:** woensdag 1 november 2006 1:30
**Aan:** 'Jan Swinnen'; 'Sabine Thielemans'; 'Leo Goovaerts'
**CC:** 'Jan Heiner Nedden'; 'Bieke Noels'
**Onderwerp:** RE: 14123/RCH/JHN - Master Chips v. Maxim

**Urgentie:** Hoog
Dear Counsel,

It is already very late (1:00 AM in The Hague) and I promised you a ruling on October 31st regarding the outstanding issues that we discussed during the Conference Call of October 17th. I have read the further briefs regarding the first two issues in the agenda set forth in Mrs. Thielemans' e-mail dated October 17. As to the other issues, I told you during the conference call how I would rule, but promised a reasoned Procedural Order.
In view of the late hour and my state of fatigue, allow me to just tell you for now how I am ruling with regard to these four issues listed in the afore-mentioned agenda. I may put them in a more formal procedural order as soon as I am able to.

1.      Master Chip's request for a Conservatory measure pursuant to Article 12 (1) of the Rules is hereby denied. I fail to see a logical link between the information about Maxim about an inquiry by the Securities and Exchange Commission regarding the timing of options on the one hand and this proceeding on the other hand. The financial information that is public about Maxim does not leave me with the impression that Maxim would be unable to pay any award that may be rendered against it. As Master Chip has repeatedly pointed out, Maxim is a large company with substantial gross sales and substantial net profits.

2.      Master Chip's request for the production of additional documents as set forth in its request of October 6, and as further clarified in its submissions of October 13 and 28, is hereby granted. Maxim is ordered to produce the spreadsheets requested with regard to all the time periods requested. Without ruling on whether or not these documents will prove to be relevant, I find that the request by Master Chips is not unreasonable under the circumstances. It should be given every opportunity to prove its case. If there is any uncertainty in the minds of Maxim or its counsel, I urge you to pick up the telephone and call the attorneys for Master Chips and ask them for any clarification they need. May I remind all counsel that this is an arbitration and not a court action, and that in arbitration the parties are to be given a lot more leeway.

        As announced earlier, Maxim is ordered to use its best efforts to produce these documents by Thursday, November 2, 2006. If this proves to be impossible (demonstrably) I may give you some further leeway, but in principle this timing stands as previously discussed. I believe counsel for Maxim had already taken preliminary measures to be able to produce these documents if ordered to do so.

3.      As I announced during our Conference call of October 17th, the Request by Master Chips that the memorial submitted by Maxim on or about October 6, 2006 be ignored by the Arbitrator is hereby granted. I will read only the memorial that was submitted by e-mail, and not the slightly changed version submitted later in hard copy.

4.      As announced during our Conference call of October 17th, Maxim's request that I declare inadmissible the arguments that the claims by Master Chips can also be based on the Agency Law of 13 April 1995 is denied. Parties are free to submit any legal theory for their claims at any time through the Hearing of December 5, 2006.

May I further refer to the rest of the Agenda of October 17th, and point out the following:

5.      Parties still need to put together a common file of exhibits. It would be ideal if I can receive this

on a CD-ROM at some stage of the proceedings, so that I do not have to carry these documents back and forth between Los Angeles and Brussels.  You may do this following next week's hearings.

6.       Hearings of November 6, 7, and 8:
        a.     Please let me know asap which hotel we will be using;
        b.     I understand that counsel for Maxim has made arrangements for the recording and transcription of the proceedings by BEC, and will provisionally carry this expense;
        c.     Parties still need to organize the scheduling of witnesses (including executives of the parties) who they wish to examine and/or cross-examine.  Please be sure that you do this well ahead of the hearings of next week so that witnesses can be called without having to wait for someone to show, and conversely, that witnesses do not have to wait unnecessarily for many hours.

Please note that I can be reached by e-mail most of the time, and in urgent cases by **mobile phone, 00-31-6-26.99.15.90**.  I am not sure at this time whether this phone will work in Belgium.  But then I should be reachable at the hotel.

Thank you.


Sincerely,
Eric van Ginkel
Sole Arbitrator

## *Eric van Ginkel*
**LL.M. in Dispute Resolution**
**Arbitrator & Mediator**
11693 San Vicente Blvd. #908
Los Angeles, CA 90049
*tel:*  (310) 836-1919
*fax:* (310) 815-0255
*cell:* (310) 569-9505
*e-mail:*  eric@ericvanginkel.com
*website:* www.BusinessADR.com

---

**From:** Jan Swinnen [mailto:jan.swinnen@lafili-law.be]
**Sent:** Tuesday, October 31, 2006 1:10 PM
**To:** Sabine Thielemans; Leo Goovaerts
**Cc:** Eric van Ginkel; Jan Heiner Nedden; Bieke Noels
**Subject:** 14123/RCH/JHN - Master Chips v. Maxim

Dear all,

Please find attached an affidavit by specialist Geer Bogaert on the Belgian legislation on exclusive distribution agreements, as well as his resumé.


Best regards,
Jan Swinnen & Bieke Noels

# EXHIBIT H

**Van:** eric@ericvanginkel.com
**Verzonden:** vrijdag 3 november 2006 1:09
**Aan:** Sabine Thielemans
**CC:** Jan Heiner Nedden; Bieke Noels; Leo Goovaerts; Jan Swinnen
**Onderwerp:** RE: additional disclosure
Dear Counsel,

I just came home to my address in Amsterdam and found your e-mail correspondence. I note that Mr. Swinnen sets forth in great detail the missing information, and I conclude that although it is perhaps substantial, the vast majority of the requested information has now been produced. His e-mail to Mrs. Thielemans and Mr. Goovaerts also sets forth in great detail which materials have been produced and which are missing.

It strikes me that Master Chips and its counsel can proceed with the analysis of the materials that have been produced. The fact remains that, for the reasons stated, the Respondent is unable to produce the balance of the data until Saturday. In such circumstances it serves little purpose for me to compel earlier production as the person at Maxim who is responsible for the compliation of these documents is unavailable. It does strike me as odd that this person chose to go abroad, presumably on vacation, at this critical time in the proceedings. One might even wonder whether it was prudent of Respondent to delegate this important task to only one person. But all that has occurred and there is little that I can do at this time to correct it.

On the other hand, it also strikes me as odd that Mrs. Thielemans does not seem to be able to reach Mr. Goovaerts anymore after 16:00 hrs., only a few days prior to the evidentiary hearing.

Be all this as it may, I will - albeit reluctantly - grant Respondent's request to be allowed to produce the missing documents by Saturday, November 4, 2006, at the earliest possible time, in such a manner that Master Chips still has an opportunity to study these materials on Saturday. Please consult each other amicably as to how you can make that happen. Also please be clear with each other as to the method of disclosure on Saturday, so that Claimant sees the transmission as soon as it has taken place. For example, (and only by way of example) Mr. Swinnen could call Mrs. Thielemans by mobile phone and notify her / Claimant as to the time that the delivery may be expected, and again at the moment of the delivery.
I should point out to Respondent that the *weight* of any evidence that might be held to favor its position and that concerns the missing documentation *may* be adversely affected by this delay of disclosure.

Under these circumstances, I would suggest to Counsel to see whether it wouldn't be best if Ms. Heide Perry be heard at a later day than Monday, November 6th, in order to give Claimant a better chance to digest the information before cross-examining her. But as I have stated before, I leave the scheduling of witnesses entirely up to the parties, so please come to an understanding with each other on these matters.

Yours sincerely,

Eric van Ginkel
Sole Arbitrator

-------- Original Message --------
Subject: RE: additional disclosure
From: "Sabine Thielemans" <sabine.thielemans@novalex.be>
Date: Thu, November 02, 2006 3:57 pm

To: "Eric van Ginkel" <eric@ericvanginkel.com>
Cc: "Jan Heiner Nedden" <ica3@iccwbo.org>, "Bieke Noels"
<bieke.noels@lafili-law.be>, "Leo Goovaerts"
<leo.goovaerts@novalex.be>, "Jan Swinnen" <jan.swinnen@lafili-law.be>

Geachte heer Arbiter,
Ik neem nu pas kennis van het e-mailbericht van Mr. Swinnen met in bijlage (een gedeelte van) de
bijkomende stukken, van het feit dat hij mij zou proberen te bereiken hebben en van zijn vraag tot uitstel.
Onder voorbehoud van de mening van Mr. Goovaerts, met wie ik op dit uur niet meer kan overleggen,
meen ik dat onze houding tegenover de herhaalde vragen tot uitstel door de raadslieden van Maxim
inmiddels duidelijk is.
De stukken werden direct na overmaking door Mr Swinnen, door een medewerker doorgestuurd aan
cliënt die zich eveneens georganiseerd had voor een onmiddellijke eerste analyse.
De tijd die Maxim bijkomend krijgt, is voor ons weerom verloren tijd en bovendien kostbare tijd nu Mr.
Swinnen zelf aankondigt dat de getuigenverhoren van volgende week hoofdzakelijk over de commissies
zullen gaan. De opmerking als zou het toch 'slechts' om niet-relevante stukken gaan druist trouwens
lijnrecht in tegen de beslissing van de arbiter terzake.
Ten overvloede herhalen wij dat tegenpartij sedert maanden weet welke stukken wij vragen en de
arbiter weken geleden heeft aangekondigd en herhaald dat de stukken vandaag ter beschikking dienden
te zijn.
U zal derhalve oordelen.
Hoogachtend,
**Sabine Thielemans**
**Novalex Advocaten / Avocats / Lawyers**
---------------------------------------------------------------
Kerselarenlaan 118 Avenue des Cerisiers
Brussel  1200 Bruxelles
T. +32.(0)2.738.01.38
F. +32.(0)2.735.34.23
www.novalex.be
sabine.thielemans@novalex.be
---------------------------------------------------------------
This e-mail is for the use of the intended recipient(s) only. If you have received this e-mail in error, please notify the sender
immediately and then delete it. If you are not the intended recipient, you must not use, disclose or distribute this e-mail without the
author's prior permission. It may contain information which is confidential and/or covered by legal, professional or other privilege.
We have taken precautions to minimise the risk of transmitting software viruses, but we advise you to carry out your own virus
checks on any attachment to this message. We cannot accept liability for any loss or damage caused by software viruses.

-----Oorspronkelijk bericht-----
**Van:** Jan Swinnen [mailto:jan.swinnen@lafili-law.be]
**Verzonden:** donderdag 2 november 2006 20:08
**Aan:** Eric van Ginkel
**CC:** Jan Heiner Nedden; Bieke Noels; Leo Goovaerts; Sabine Thielemans
**Onderwerp:** RE: additional disclosure
Dear Arbitrator,
Failing a reply to my request for partial continuance from opposing counsel, whom I have not
been able to reach over the phone either, I have no other option but to respectfully submit the
request as outlined below to you.
With best regards,
Jan Swinnen

---

**From:** Jan Swinnen
**Sent:** Thursday, November 02, 2006 5:52 PM
**To:** 'Sabine Thielemans'; Leo Goovaerts
**Cc:** Eric van Ginkel; Jan Heiner Nedden; Bieke Noels
**Subject:** additional disclosure
Dear Counsel,
Pursuant to the email of arbitrator Van Ginkel of 1st November 2006, requesting additional
disclosure by Maxim, please find herewith attached a zip-file in which I have bundled all
previously done and all new disclosure.
For easy use, please unzip into a directory of your choice, making sure that the "use folder

names" option is checked.

In this zip file you will find detailed information on:

- All Maxim sales to Alcatel worldwide between 1st January 1998 and 1st March 2003
- All Maxim sales to Alcatel worldwide between 2nd March 2003 and 30th June 2006 of parts (+ DG409) which can be cross referenced as a design win in any of the FAE reports (see below)
- Provisional information on all Maxim sales to Alcatel worldwide on parts which cannot be cross referenced to any FAE design win (MAX707ESA, MAX907ESA,MAX232ACSE, MAX232AEWE, MAX1649CSA, MAX649CSA, MAX651ESA, MAX774ESA, MAX774CSA, ICL7642ECPD and MAX3491CSD) between 2nd March 2003 and 30th June 2006. (see also below)
- All Alcatel related Maxim sales to Arrow between 1st January 1998 and 30th June 2006.
- All potentially Alcatel related Maxim sales to Flextronics between 1st January 1998 and 30th June 2006.
- All Maxim sales to Philips between 1st January 1998 and 1st March 2003, which can be cross referenced to a Benelux FAE design win. (for period after this through June 2006 see below)

In this zip file we have also included (although not requested by Master Chips) all FAE reports Maxim has been able to retrieve from 1st January 1998 through 30th June 2006.

(For the avoidance of doubt, please note that Maxim does not concede that any cross reference of any specific part sold to a design win in the enclosed Benelux FAE reports is sufficient for the sale being commissionable).

Please note that there have been no sales at all by Maxim to any alleged subcontractor for Alcatel on the ADSL project (other than Flextronics), such as Jabil, Ambit, Cis Techno or Solectron. As a consequence, none can be reported.

Please also note that in the period from 1st January 1998 through 30th June 2006, there has not been a single design win at Option, and consequently there have been no Maxim sales which can be cross referenced to any such design win, and none can be reported.

None of the above spreadsheets contains information as to the dates on which the relevant invoices have been paid. Maxim concedes that all of them have been paid.

Heide Perry, who at Maxim is responsible for compiling all this information, has been unable to fully complete two sub-sections of the disclosure request:

- First, at this point only provisional information (part numbers, number of parts sold, ship to location) is available on Maxim sales to Alcatel between 2nd March 2003 and 30th June 2006 on sales of selected parts (MAX707ESA, MAX907ESA,MAX232ACSE, MAX232AEWE, MAX1649CSA, MAX649CSA, MAX651ESA, MAX774ESA, MAX774CSA, ICL7642ECPD and MAX3491CSD), which can not be cross referenced to any design win. Heide still needs to compile that information into a detailed spreadsheet which will also contain price per part and invoiced amounts.
- Equally, at this time she has only been able to gather raw data (not compiled in a spread sheet) on any Maxim sales to Philips from 2nd March 2003 through 30th June 2006, which can be cross referenced to a Benelux FAE design win.

Heide Perry is currently abroad with her family, away from her office, and although she has worked hard even from her remote location to compile all the above information, her limited access to Maxim's system prevents her from completing these last two sections by tonight. She is also organizing herself to return to her home base earlier than planned in order to be able to complete them. As a result, she should be able to complete her assignment by Saturday of this week. She will also be available for cross examination by Master Chips at the evidentiary hearings of next week.

In view of the above, and also in view of the fact that the missing information only pertains to periods after 1st March 2003, and therefore has no direct bearing on any commission entitlement, whereas next week's evidentiary hearings will no doubt largely if not exclusively focus on commission related matters, we do not consider it unreasonable to request you to grant Maxim a continuance through Saturday 4th November for the missing information. Should you not grant such a continuance, we will have no other option but to submit a continuance request to the arbitrator instead.

With best regards,
Jan Swinnen

# EXHIBIT I

**Van:** Eric van Ginkel [eric@ericvanginkel.com]
**Verzonden:** woensdag 20 december 2006 18:54
**Aan:** 'Sabine Thielemans'
**CC:** 'Leo Goovaerts'; 'Jan Swinnen'; 'Bieke Noels'; Jan Heiner Nedden
**Onderwerp:** RE: 14123/RCH/JHN - Master Chips v. Maxim

**Urgentie:** Hoog
Dear Counsel,

1.      Thank you, Mrs. Thielemans for your response.

2.      I now look forward to Mr. Swinnen's response which I expect to receive no later than Friday, December 22nd.

3.      Please note that I want to hold the hearing with experts and oral argument no later than in the month of January. I request counsel to COORDINATE with each other which day(s) in January 2007 is/are most convenient. The sooner I know that, the better, as I already know that (no matter which days you decide on) I will have to change scheduled mediations during the month of January to accommodate you. Please remember that I am unavailable on Mondays and Tuesdays, as I teach on Monday afternoon, and the earliest day I can fly to Brussels is therefore Tuesday (arriving on a Wednesday). Ideally, therefore, I would like to hold hearings on a Thursday or Friday, or, if necessary on a Saturday.

Yours sincerely,
Eric van Ginkel
Sole Arbitrator

## *Eric van Ginkel*

**LL.M. in Dispute Resolution**
**Arbitrator & Mediator**
11693 San Vicente Blvd. #908
Los Angeles, CA 90049
*tel:* (310) 836-1919
*fax:* (310) 815-0255
*cell:* (310) 569-9505
*e-mail:* eric@ericvanginkel.com
*website:* www.BusinessADR.com

---

**From:** Sabine Thielemans [mailto:sabine.thielemans@novalex.be]
**Sent:** Wednesday, December 20, 2006 7:51 AM
**To:** Eric van Ginkel
**Cc:** Leo Goovaerts; Jan Swinnen; Bieke Noels
**Subject:** FW: 14123/RCH/JHN - Master Chips v. Maxim

Geachte heer Arbiter,

Wij verwijzen naar uw e-mailbericht van maandag.

**1. a  Wat de volledigheid van de overgemaakte stukken betreft** merken wij op dat:

- een aantal componenten waarvan partijen op 8 november 2006 de overmaking overeenkwamen niet werden opgenomen in de Excel-sheet: MAX6357, MAX4144, MAX856, MAX707;
- geen informatie aangaande de verkopen via Arrow werd overgemaakt niettegenstaande partijen op 8 november overeenkwamen dat Maxim het nodige zou doen desaangaande;
- Maxim op heden geen commentaar of stukken heeft meegedeeld aangaande het op 5 november jl. neergelegde

verzoekschrift tot overmaking van een daarin nader omschreven geheimhoudingsovereenkomst (van belang bij het aantonen van de designactiviteiten van Master Chips en derhalve het recht op commissielonen voor welbepaalde componenten).

**1.b**  Daarbij aansluitend, gelet op het feit dat:

- uit een eerste algemene analyse van de Excel-sheet de verkopen die gebeurd zijn via Arrow (toeleveringsbedrijf voor Alcatel en distributor van Maxim) van CRUCIAAL belang blijken te zijn gelet op de dicrepantie tussen de totale verkoopcijfers die volgen uit deze sheet en de totale ADSL-productie zoals aangetoond via besluiten en getuigenverklaringen;
- Master Chips op heden geen enkele reactie mocht bekomen van Flextronics, onderaannemer voor Alcatel, op haar verzoek én aanmaning tot overmaking van de aankoopcijfers voor Maxim componenten gebruikt in Alcatel ADSL toepassingen;

en gelet op het feit dat:

- zowel dhr. Bougerol als dhr. Sangalli, beiden werknemer van Maxim, tijdens de getuigenverhoren verklaarden over de precieze cijfers te beschikken van alle verkopen wereldwijd aan Alcatel (Bougerol p. 8:"*I know perfectly that we have records of everything that is sold all over the world to Alcatel*", inclusief "*subcontractors such as Flextronics*");
- ten overvloede, aangezien Arrow tevens distributor is van Maxim, Maxim een precies zicht moet hebben of tenminste op eenvoudig verzoek moet kunnen krijgen, van de verkopen van Arrow aan Alcatel (cf. voor de contractswijziging van 1998 diende Master Chips voor haar distributieverkopen aan Alcatel ook via Maxim prijsaanvragen en offertes te bekomen + diende zij de distributieverkoop aan Maxim te rapporteren);

dient Maxim tot overlegging te worden verplicht van de wereldwijde verkopen van Maximcomponenten aan Alcatel via Arrow en via Flextronics. Zo u dit nodig acht om hierover te kunnen beslissen, geachte heer Arbiter, zullen wij dit verzoek in een formeel verzoekschrift opnemen.

**2. Wat betreft de tijd nodig** om de reeds ontvangen informatie te verwerken, gaan wij ervan uit dit nog deze week te kunnen beëindigen, zoniet tegen eind deze week al ver te staan met deze analyse.

**3. Een inschatting van meer precieze bedragen** zullen wij bijgevolg eveneens (zie punt 2) tegen eind deze week kunnen meedelen, zij het onder voorbehoud van eventuele bijkomend over te maken documenten (punt 1.b).

De schade die Maxim veroorzaakt door via alle mogelijke middelen de procedure te dwarsbomen en op die manier Master Chips en haar raadsman voortdurend op te zadelen met bijkomend werk en kosten, zal daarbij in rekening dienen te worden gebracht.

**4. Wat betreft de data waarop de experten kunnen gehoord worden,** lieten wij reeds per e-mail van 5 december weten dat "*Mr. Marc Willemart beschikbaar is op 18 en 22 december 2006 en tijdens de eerste helft van januari met uitzondering van 11 januari 2007*".
Mr. Swinnen liet op zijn beurt weten dat Mr. Bogaert pas in maart 2007 tijd zou kunnen vrijmaken, dat eventueel 22 december "*would likely be possible*"  en stelde verder nog te wachten op diens beschikbaarheden van begin januari 2007.

Sindsdien hebben wij desaangaande geen nieuws meer.

Wij blijven bij onze repliek desaangaande van 7 december - de onbeschikbaarheid van Mr. Bogaert kan niet tot gevolg hebben dat de arbitrale procedure nog verder zou uitlopen (tot na maart 2007). Het is totaal absurd dat een expert van één van de partijen een ganse procedure zou kunnen blokkeren. Indien Maxim er niet in slaagt haar expert begin januari een paar uur ter beschikking te stellen voor de toelichting van zijn rapport, dient hij geacht te worden niet verder tussen te komen inzake.

Wij verwachten dus, geachte heer Arbiter, een zeer snel antwoord van Mr. Swinnen in de hoop u zodoende een datum te kunnen voorleggen en u toe te laten de procedure te organiseren binnen de nog beschikbare tijdslimieten.

Hoogachtend,

**Sabine Thielemans**
Novalex Advocaten / Avocats / Lawyers
--------------------------------------------------------
Kerselarenlaan 118 Avenue des Cerisiers
Brussel 1200  Bruxelles
T. +32.(0)2.738.01.38
F. +32.(0)2.735.34.23
www.novalex.be
sabine.thielemans@novalex.be
--------------------------------------------------------

This e-mail is for the use of the intended recipient(s) only. If you have received this e-mail in error, please notify the sender immediately and then delete it. If you are not the intended recipient, you must not use, disclose or distribute this e-mail without the author's prior permission. It may contain information which is confidential and/or covered by legal, professional or other privilege. We have taken precautions to minimise the risk of transmitting software viruses, but we advise you to carry out your own virus checks on any attachment to this message. We cannot accept liability for any loss or damage caused by software viruses.

-----Oorspronkelijk bericht-----
**Van:** Eric van Ginkel [mailto:eric@ericvanginkel.com]
**Verzonden:** lundi 18 décembre 2006 23:47
**Aan:** 'Jan Swinnen'; 'Sabine Thielemans'; 'Leo Goovaerts'; 'Bieke Noels'
**CC:** 'Jan Heiner Nedden'
**Onderwerp:** RE: 14123/RCH/JHN - Master Chips v. Maxim

Dear Counsel,

1.      I would like to hear from you whether or not all requested documents have now been produced.

2.      Please let me know how long you and your client will need to process this information.

3.      Please let me know your best estimate of the amounts claimed by your client (some amounts were not capable of being determined yet).

3.      Please inform me of a number of dates (as soon as possible) that your experts are BOTH available, so that we can schedule the hearing in which we can meet with the experts and in which I can hear your oral arguments.

4.      Based on that information we can proceed with the new timetable.


Sincerely yours,
Eric van Ginkel
Sole Arbitrator

### *Eric van Ginkel*
**LL.M. in Dispute Resolution**
**Arbitrator & Mediator**
11693 San Vicente Blvd. #908
Los Angeles, CA 90049
*tel:*  (310) 836-1919
*fax:* (310) 815-0255
*cell:* (310) 569-9505
*e-mail:*  eric@ericvanginkel.com
*website:* www.BusinessADR.com

--------------------------------------------------------

**From:** Jan Swinnen [mailto:jan.swinnen@lafili-law.be]
**Sent:** Monday, December 18, 2006 11:42 AM

**To:** Sabine Thielemans; Leo Goovaerts
**Cc:** Jan Heiner Nedden; Bieke Noels; Eric van Ginkel
**Subject:** RE: 14123/RCH/JHN - Master Chips v. Maxim

Dear Counsel,

Please find attached the requested information in electronic format as per the order of arbitrator Van Ginkel. I have write-protected the file, but it can be opened as a read-only file.

With best regards,
Jan Swinnen

---

**From:** Jan Swinnen
**Sent:** Monday, December 18, 2006 4:33 PM
**To:** 'Sabine Thielemans'; 'Leo Goovaerts'
**Cc:** 'Jan Heiner Nedden'; Bieke Noels; 'Eric van Ginkel'
**Subject:** RE: 14123/RCH/JHN - Master Chips v. Maxim

Dear Counsel,


I am now in receipt of the arbitrator's email below.

Pursuant to this email and the arbitrator's order contained therein, I have immediately sent an email to Mark Casper of Maxim, requesting that he would forward the relevant file to me in Excel format.


With best regards,
Jan Swinnen

---

**From:** Eric van Ginkel [mailto:eric@ericvanginkel.com]
**Sent:** Friday, December 15, 2006 7:39 PM
**To:** 'Sabine Thielemans'
**Cc:** 'Leo Goovaerts'; 'Jan Heiner Nedden'; Jan Swinnen; Bieke Noels
**Subject:** RE: 14123/RCH/JHN - Master Chips v. Maxim
**Importance:** High

Dear Counsel,
I agree that the submission of an Excel document will make life much easier for Claimant and will enable an analysis that is not possible with a pdf document. I therefore order Respondent to produce the document in Excel format forthwith upon receipt of this e-mail.
Yours sincerely,
Eric van Ginkel
Sole Arbitrator

## *Eric van Ginkel*

**LL.M. in Dispute Resolution**
**Arbitrator & Mediator**
11693 San Vicente Blvd. #908
Los Angeles, CA 90049
*tel:* (310) 836-1919
*fax:* (310) 815-0255
*cell:* (310) 569-9505
*e-mail:* eric@ericvanginkel.com
*website:* www.BusinessADR.com

**From:** Sabine Thielemans [mailto:sabine.thielemans@novalex.be]
**Sent:** Friday, December 15, 2006 8:35 AM
**To:** Eric van Ginkel
**Cc:** Leo Goovaerts; Jan Heiner Nedden; Jan Swinnen; Bieke Noels
**Subject:** 14123/RCH/JHN - Master Chips v. Maxim

Geachte heer Arbiter,

Wij ontvangen zonet per e-mail van Mr. Swinnen het "detailed and organized report" opgesteld door Maxim.

Bij de eerste aanblik stellen wij vast dat het oorspronkelijk gaat om een Excel-file… op papier en daarna ingescand en doorgestuurd in de vorm van een pdf.bestand.

In tegenstelling tot de gevraagde en door u opgelegde Excelformat, kan de overgemaakte pdf-format niet automatisch worden bewerkt (berekening van totalen per component, etc.) zoals werd overeengekomen en later door u bevestigd bij procedural order.

Dit is pure sabotage met het uitsluitend oogmerk Master Chips andermaal uit te putten en haar op te zadelen met een maximum aan (advocaten- en andere) kosten en verloren manuren.

Wij vragen u Maxim te bevelen ons alsnog de originele Excelformat te sturen en dit voor 20u (CET) vanavond.

Zoniet gaan wij ervan uit dat u de gepaste gevolgen zal trekken en zal beslissen wat er verder dient te gebeuren.

Hoogachtend,

**Leo Goovaerts**
**Sabine Thielemans**
Novalex Advocaten / Avocats / Lawyers
--------------------------------------------------------
Kerselarenlaan 118 Avenue des Cerisiers
Brussel 1200 Bruxelles
T. +32.(0)2.738.01.38
F. +32.(0)2.735.34.23
www.novalex.be
sabine.thielemans@novalex.be
--------------------------------------------------------

This e-mail is for the use of the intended recipient(s) only. If you have received this e-mail in error, please notify the sender immediately and then delete it. If you are not the intended recipient, you must not use, disclose or distribute this e-mail without the author's prior permission. It may contain information which is confidential and/or covered by legal, professional or other privilege. We have taken precautions to minimise the risk of transmitting software viruses, but we advise you to carry out your own virus checks on any attachment to this message. We cannot accept liability for any loss or damage caused by software viruses.