1   Tod L. Gamlen, State Bar No. 83458
    Jerry Salcido, State Bar No. 233282
2   **BAKER & McKENZIE LLP**
    660 Hansen Way
3   Palo Alto, CA 94304-1044
    Telephone: +1 650 856 2400
4   Facsimile: +1 650 856 9299
    tod.l.gamlen@bakernet.com
5   jerry.m.salcido@bakernet.com

6   Attorneys for Petitioner
    MAXIM INTEGRATED PRODUCTS, INC.

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  MAXIM INTEGRATED PRODUCTS, INC.,     **CIVIL ACTION**

12              Petitioner,              **Case No. C 08 00721 JW**

13         v.                            **REPLY DECLARATION OF BIEKE**
                                         **NOELS IN SUPPORT OF MAXIM**
14  MASTER CHIPS BVBA,                   **INTEGRATED PRODUCTS, INC.'S**
                                         **PETITION TO VACATE**
15              Respondent.              **ARBITRATION AWARD**

16                                       **Date:   June 2, 2008**
                                         **Time:   9:00 a.m.**
17                                       **Dept.:  8, Hon. James Ware**

18

19

20      I, Bieke Noels, hereby make the following declaration under penalty of perjury under the

21  laws of California and the United States. I declare that the facts stated herein are true, correct and

22  within my own personal knowledge. If called as a witness and sworn I could competently testify to

23  these facts.

24      1.      I am a partner in Lafili, Van Crombrugghe & Partners, Desguinlei 214, B-2018

25  Antwerp, Belgium. I served as Maxim Integrated Products, Inc.'s ("Maxim") counsel in defending

26  Maxim in the International Chamber of Commerce, International Court of Arbitration ("ICC

27  Court"), Case No. 14123/RCH/JHN, *Master Chips BVBA v. Maxim Integrated Products, Inc.* As

28  such I have personal knowledge of the facts in this declaration. My co-counsel was Jan Swinnen,

Baker & McKenzie LLP
660 Hansen Way
Palo Alto, CA 94304
+1 650 856 2400

PALDMS/359022.1

1

Case No. C08 00721 JW
REPLY DECL OF BIEKE NOELS IN SUPP OF MAXIM'S PETITION TO VACATE ARBITRATION AWARD

1    also a partner in Lafili, Van Crombrugghe & Partners, Desguinlei 214, 2018 Antwerp, Belgium.

2    Additionally, other members of my firm, including Ingrid Meeussen, Gunther Thuysbaert, and Peter

3    Vandeput, assisted in Maxim's representation during the Arbitration proceedings.

4        2.      On January 30, 2008 I provided my "Declaration of Bieke Noels in Support of

5    Maxim Integrated Products, Inc.'s Petition to Vacate Arbitration Award," which I hereby

6    incorporate by reference as though set forth in full.

7        3.      In this declaration I am providing facts in reply to Master Chips BVBA's ("Master

8    Chips") "Opposition to Petition to Vacate, and in Support of Petition to Confirm, Arbitration

9    Award." Specifically, I provide testimony on the following topics: the current status of the

10    arbitration hearings; facts relating to Master Chips' assertions that Maxim was not prejudiced by the

11    arbitrator's allowing Master Chips' legal expert, Marc Willemart ("Willemart") to testify in French;

12    and, facts relating to amounts that Master Chips incurred in pursuing this litigation.

13    **A.**    **Current Status of the Arbitration Proceedings**

14        4.      On November 9, 2007, the arbitrator rendered the award which is the subject of this

15    Petition, that is, the Partial Award in favor of Master Chips in the ICC Arbitration Proceedings,

16    which awarded damages to Master Chips in the amount of $2,124,904 based on Master Chips'

17    claims for past commissions, undue payment of publicity expenses, and reimbursement of

18    contributions made to the field applications engineer.

19        5.      The Partial Award also found in favor of Master Chips for its claims under Sections 2

20    and 3 of the 1961 Belgian Distributor Act, but the arbitrator deferred awarding an amount of

21    damages on those claims until after the arbitrator-appointed expert, Mr. Carlo Van Der Herten, made

22    his findings and calculations.

23        6.      Mr. Van Der Herten has completed his review and has provided the parties and the

24    arbitrator with his conclusions. Based on Mr. Van Der Herten's conclusions the arbitrator could

25    award Master Chips an addition $5 million in damages, which would bring the total amount of

26    damages to more than $7 million. The arbitrator has yet to issue his Final Award.

27

28

Baker & McKenzie LLP
660 Hansen Way
Palo Alto, CA 94304
+1 650 856 2400

2

Case No. C 08 00721 JW
REPLY DECL OF BIEKE NOELS IN SUPP OF MAXIM'S PETITION TO VACATE ARBITRATION AWARD

PALDMS/359022.1

**B.    Facts Relating to the Prejudice that Resulted from the Arbitrator's Permitting Willemart to Testify in French**

7.    The following facts relate to the prepartion for, and conducting of, my examination of Willemart at the May 7, 2007 hearing.

a.    I was the Maxim attorney responsible for handling that part of the case dealing with the examination of Willemart, Master Chips' expert witness on Belgian law.  My co-counsel, Jan Swinnen and Ingrid Meeussen, were responsible for other aspects of the case, but they were not responsible for preparing for the examination of Willemart.

b.    The parties agreed to produce expert reports prior to the November 2006 hearings.  Master Chips produced the report of its expert witness, Willemart, on October 30, 2006, that is, six (6) months before Willemart eventually testified on May 7, 2007.  In accordance with Procedural Order No. 1, which established that evidence could be produced in English or Dutch, Willemart's report was provided to Maxim in both a Dutch version and a French version.  A true and correct copy of Willemart's October 30, 2006 report in Dutch is attached hereto as **EXH. 52.**

c.    Based on Procedural Order No. 1 and Procedural Order No. 2 (which stated that a translator was not needed at the arbitration hearings), and the fact that Willemart's report was produced in Dutch, I reasonably concluded that Willemart would give his testimony in Dutch.  Accordingly, I prepared to examine Willemart in Dutch, which included studying the underlying authorities for the basis of his opinion in the Dutch language.  I expected Willemart to testify in Dutch, and had I known that the arbitrator was going to allow Willemart to testify in French I would have brought an official translator to the hearing.

d.    On May 7, 2007 the examination of Willemart by Master Chips lawyers commenced.  At the commencement of that examination the arbitrator allowed Willemart to testify in French, which caught me totally by surprise.  I immediately objected to Willemart's testifying in French and asked the arbitrator to enforce Procedural Order No. 1, which orders that evidence can be submitted in English or Dutch; this is reflected in the transcript, **EXH. 42,** May0707B-1.  At the end of the hearing I again objected to Willemart's testifying in French and I complained to the arbitrator that I was unable to conduct a thorough examination of Willemart due to the language barrier; those

Baker & McKenzie LLP
660 Hansen Way
Palo Alto, CA 94304
+1 650 856 2400

PALDMS/359022.1

1  objections are not reflected in the transcript because the transcript is incomplete.

2      e.    Master Chips' attorney, Sabine Thielemans, did offer to translate Willemart's

3  testimony, but such an offer did not ameliorate the prejudice for several reasons: (i) Willemart was

4  to repeat his own testimony in Dutch, but he did not; (ii) Maxim should not have to rely on opposing

5  counsel to translate an adverse witness's testimony; and (iii) the timing of the arbitration proceedings

6  precluded our having everything Willemart stated translated into Dutch by his attorney.  In this latter

7  regard, the Arbitrator allocated only one day for the experts of both parties to be examined and

8  Willemart's untranslated testimony took up most of the allocated time.  I was obliged to hurry

9  through his examination in order to finish in a manner that would allow Maxim's expert an

10  opportunity to present testimony.  The added delay of translating Willemart's testimony would have

11  prevented Maxim from examining its own expert witness.

12      f.    Jan Swinnen was present at the initial and concluding stages of Willemart's

13  testimony, but he was absent for most of Willemart's testimony as he was preparing for that portion

14  of the case for which he was responsible.

15  8.    The following facts relate to my ability to speak French.

16      a.    I have always lived in the Dutch speaking community of Belgium.  My native

17  language is Dutch and I grew up speaking Dutch in a Dutch language community, I attended Dutch

18  speaking schools and pursued all of my educational studies in the Dutch language.

19      b.    Belgium has three communities—a community is similar to a state of the

20  United States—and all three have an official language.  There is a German, French, and Dutch

21  community.  In each of those communities it is against the law to use any language other than the

22  official language in official settings, such as legal proceeding.

23      c.    Although I lived in Belgium's Dutch community, when I was 12 years old I

24  began to study French at school.  I continued studying French until I was 18 years old.  I have some

25  ability to speak and understand French.  Although I can follow basic conversation in French, my

26  French is not sufficient to conduct a judicial examination on a professional level.

27      d.    In the 14 years that I have been practicing law I have never used French in a

28  Belgian court.  I conduct all of my oral arguments and examine all of my witnesses in Dutch before

Baker & McKenzie LLP
660 Hansen Way
Palo Alto, CA 94304
+1 650 856 2400

PALDMS/359022.1

4

Case No. C 08 00721 JW
REPLY DECL OF BIEKE NOELS IN SUPP OF MAXIM'S PETITION TO VACATE ARBITRATION AWARD

1   the Belgian judicial system.

2          e.    It is true that my firm's website states that I am "fluent" in French. The

3   ability to speak French is a skill that is mentioned for all of the lawyers of my firm on the English

4   version of the website. The level of speaking this language, however, differs between all lawyers.

5   My level of French is to be considered as "High School French," which is a basic knowledge of the

6   language and the ability to generally communicate in French, but is not a level that would be used in

7   a professional setting such as a judicial proceeding. There is a substantial difference between

8   Willemart's ability to speak French—it is his mother tongue—and my "High School French." To

9   put it in perspective, if as a native speaker Willemart's vocabulary probably consists of 20,000

10  words or more, mine consists of about 1,500 words. Thus, when I was confronted with Willemart's

11  French testimony in the May 2007 arbitration hearing, my limited ability to speak and understand

12  French prevented me from adequately conducting his examination.

13  **C.    Facts Relating to Amounts that Master Chips Incurred in Pursuing this Litigation**

14        9.    Master Chips filed legal proceedings against Maxim in the courts of Belgium in 2001

15  asserting claims for past commissions and for the alleged premature termination of Maxim's and

16  Master Chips' Distributor Agreement. The Commercial Court of Brussels dismissed these

17  proceedings on that grounds that they are subject to arbitration in accordance with the parties'

18  Distributor Agreement. Master Chips appealed the decisions and in December 2004 the Court of

19  Appeal of Brussels affirmed. That court litigation, therefore, lasted from 2001–2004. Thereafter, in

20  November 2005, is when Master Chips initiated the arbitration proceedings that are the subject of

21  this petition.

22        10.    In the arbitration proceedings Master Chips has submitted a report to the Arbitrator

23  stating that it has incurred attorneys fees of €2,250,750.89 ($3,505,994.14). Attached hereto as

24  **EXH. 53** is a true correct copy of those portions of Master Chips' report to the Arbitrator regarding

25  attorney fees incurred.

26  ///

27  ///

28  ///

Baker & McKenzie LLP
660 Hanson Way
Palo Alto, CA 94304
+1 650 856 2400

5

PALDMS/359022.1

Case No. C 08 00721 JW
REPLY DECL OF BIEKE NOELS IN SUPP OF MAXIM'S PETITION TO VACATE ARBITRATION AWARD

1      I declare under penalty of perjury under the laws of California and the United States that the

2  foregoing is true and correct and that this declaration was executed on May 19, 2008 at

3  ANTWERP_____, Belgium.



Bieke Noels

Baker & McKenzie LLP
660 Hansen Way
Palo Alto, CA  94304
+1 650 856 2400

PALDMS/359022.1

Case No. C 08 00721 JW
REPLY DECL OF BIEKE NOELS IN SUPP OF MAXIM'S PETITION TO VACATE ARBITRATION AWARD

# EXHIBIT
# 52

Meesters Leo GOOVAERTS en Sabine
THIELEMANS
Advocaten,
Kerselarenlaan, 118
1200 BRUSSEL


en  per telefax 02/735.34.23


30 oktober 2006


Geachte Confraters,


Betreft: Uw dossier MASTER CHIPS / MAXIM - Expertise
     O. Ref.: MW/06.6058/mb

Ik voldoe graag aan uw verzoek tot adviesverlening over de voorwaarden en
de mate waarin uw cliënte, de Bvba MASTER CHIPS (hierna MASTER
CHIPS) met maatschappelijke zetel te België, 8500 Kortrijk, Jan
Persijnstraat nr. 2, gerechtigd is bepaalde schadevergoedingen te bekomen
ingevolge de beëindiging door MAXIM INTEGRATED PRODUCTS Inc.
(hierna MAXIM), vennootschap naar Californisch Recht (U.S.A), waarvan
de zetel gevestigd is te Sunnyvale, California 94086 USA, 120 San Gabriel
Drive, van de contractuele betrekkingen die beide partijen hebben
onderhouden met het oog op de distributie van de producten van MAXIM
door MASTER CHIPS.

Uit het dossier dat U me hebt overhandigd blijkt essentieel dat:

1.     De distributie van de producten in België en in Luxemburg is tussen partijen
     aangevat in 1987 (contract van 1 oktober 1987, in het bijzonder art. 1.0, 4.1
     en bijlage 1). Dit contract werd aangegaan voor een periode van één jaar,
     hernieuwbaar voor opeenvolgende periodes van één jaar behoudens
     voorafgaande opzeg van 30 dagen (Art. 2.0).

     Het contract was onderworpen aan de wet van de staat Californië en elk
     eventueel geschil diende te worden geregeld middels een arbitrage in het
     kader van de regels van de American Arbitration Association (Art. 16.0)

1

Een nieuw contract, dat dat van 1 oktober 1987 vervangt, werd door partijen ondertekend op 1 december 1998.

Vanuit het standpunt dat ons bezighoudt, bestaan de voornaamste verschillen tussen beide teksten in:

- de toekenning aan MAXIM van het recht om direct en door middel van betaling van commissies aan MASTER CHIPS aan drie nominatief aangehaalde klanten te verkopen (Art. 1B en bijlage B) en eventueel aan andere kopers (Art. 1B en D) eveneens middels betaling van commissies.

- behalve voor de filialen van deze 3 klanten in Luxemburg, wordt het grondgebied van dit land niet hernomen.

- De Belgische wet vervangt de Amerikaanse wet (Art. 16F)

- De American Arbitration Association wordt door het Hof van Arbitrage van de Internationale Kamer van Koophandel, CCI, vervangen (Art. 16G)

- Behalve de precisering dat het tweede contract op 1 oktober 1998 aanvangt, zijn de modaliteiten inzake de duur van de overeenkomst dezelfde als in het contract van 1987.

2. MAXIM heeft per brief van 31 augustus 2001, ontvangen op 7 september 2001, de beëindiging betekend van het contract met een opzeg van 18 maanden.

3. Achtereenvolgens hebben de Rechtbank van Koophandel (vonnissen van 17 februari 2003) en het Hof van Beroep van Brussel (Arresten van 14 december 2004) de geldigheid van de arbitrageclausule erkend en de bevoegdheid van de Belgische rechtsmachten afgewezen zowel inzake vergoedingen als met betrekking tot commissies.

4. MASTER CHIPS heeft bijgevolg het Arbitragehof van de CCI gevat middels een verzoekschrift van 30 november 2005.

   Rekening houdend met het antwoord van 14 april 2006 van MAXIM op dit verzoekschrift, heeft de aangestelde arbiter, Mijnheer Eric Van Ginkel, LLM., op 23 juni 2006 een akte van opdracht (Terms of reference) opgesteld houdende met name verschillende rechtsvragen aan partijen.

   Ik neem me voor om de mij gevraagde adviezen te verlenen in het kader van een analyse volgens volgend schema:

1) Synthetische uiteenzetting van de wettelijke bepalingen van Belgisch recht betreffende de vergoedingen waarop een distributeur aanspraak kan maken in geval van beëindiging van het contract door de tegenpartij;

2) Ontwikkeling en toepassing op onderhavig geval van de bepalingen uiteengezet sub 1

3)     Antwoord op de rechtsvragen vervat in de terms of reference in zoverre er in de
       voorafgaande uiteenzettingen nog niet op zou zijn geantwoord.


**1.     SYNTHETISCHE UITEENZETTING VAN DE WETTELIJKE BEPALINGEN
         VAN BELGISCH RECHT BETREFFENDE VERGOEDINGEN WAAROP
         HANDELSTUSSENPERSOON AANSPRAAK KAN MAKEN IN GEVAL VAN
         BEEINDIGING VAN HET CONTRACT DOOR DE TEGENPARTIJ**

**1.1     DE CONCESSIEHOUDER**

1.1.1.   Toepassingsvoorwaarden van de wet van 27 juli 1961

         Volgens de Belgische wet van 27 juli 1961 zoals gewijzigd door een wet van 13 april
         1971, betreffende de eenzijdige beëindiging van verkoopconcessies van onbepaalde duur,
         kan een concessiehouder, dat wil zeggen een tussenpersoon die optreedt in het kader van
         opeenvolgende verrichtingen van aankoop en verkoop van de toegestane producten, op
         vergoedingen aanspraak maken wanneer:

a.       Er een contractuele relatie van onbepaalde duur bestaat die op een gestructureerde wijze
         de verdeling van producten organiseert die door een concessiehouder van een
         concessiegever worden aangekocht om door hem doorverkocht te worden, (zie
         bijvoorbeeld op dit punt een niet gepubliceerd arrest van 22 oktober 1999 van het Hof van
         Beroep van Luik n° 1997/RG/349, in bijlage 1 en het gepubliceerde arrest van 8 februari
         van het Hof van Beroep van Brussel, RDC 2003, bladzijde 500)

b.       De partijen voor een onbepaalde duur gebonden zijn in die zin dat een contract van
         bepaalde duur een contract van onbepaalde duur wordt wanneer het meer dan twee keer
         werd hernieuwd en dat een opzeg niet geldig kan worden gegeven meer dan zes maanden
         en minder dan drie voor het verstrijken van de lopende termijn (Art. 3bis van de wet).

c.       De concessie exclusief is in een gebied of op een bepaald cliënteel, quasi-exclusief (de
         concessiehouder verkoopt de quasi totaliteit van de producten in zijn gebied of aan zijn
         cliënteel) of gepaard gaat met bepaalde belangrijke verplichtingen (Art. 1 § 1, 2,.3 van de
         wet)

         Het exclusieve karakter van een verkoopconcessie wordt bewezen door het
         gemeenschappelijke voornemen van partijen dat het eventueel wint van de termen van het
         contract, en niet door de loutere omstandigheid dat de concessiehouder in feite de enige
         verkoper zou zijn van de concessieproducten in zijn gebied of aan zijn cliënteel (zie
         hieromtrent het arrest van 8 maart 2005 van het Hof van Beroep te Brussel
         n°2001/AR/1555, in bijlage 2).

         Anderzijds staan rechtstreekse verkopen van de concessiegever in het gebied of aan het
         cliënteel die aan de concessiehouder werden voorbehouden niet in de weg aan het
         exclusieve karakter van de concessie (zie de noot van Marc Willemart, "Concession

3

exclusive ou le monopole partagé" onder het arrest van 23 februari 1995 van het Hof van
Cassatie, JLMB 1995, p 1356, arrest dat eveneens in RDC 1995 wordt gepubliceerd,
bladzijde 483 en in RW 1995-1996, p. 237); wel integendeel, de toekenning van
commissies aan de concessiehouder op de rechtstreekse verkoop van producten in het
toegestane gebied, bewijst het alleenverkooprecht van de concessie (comm. Bruxelles, 28
januari 1999, RG 4391/98 in bijlage 3).

1.1.2. Vergoedingen die aan een concessiehouder verschuldigd kunnen zijn ingevolge de
beëindiging van het contract

Wanneer partijen voor onbepaalde duur gebonden zijn door een contract van
verkoopconcessie onderworpen aan de wet van 27 juli 1961, waaraan een eind wordt
gesteld door de concessiegever zonder dat de beëindiging door een grove fout van de
concessiehouder wordt gerechtvaardigd, kan laatstgenoemde aanspraak maken:

a.    op een redelijke opzegtermijn of, bij gebreke daaraan, op een billijke compenserende
vergoeding (art.2 van de wet van 27 juli 1961). De opzeg en dus zijn duur moeten
betekend worden op het ogenblik van de beëindiging van het contract; bij gebreke daaraan
gaat het om een contractsbreuk zonder opzeg en is de concessiegever exclusief gehouden
een rechtvaardige compenserende vergoeding te betalen.

In geval van een ontoereikende opzegtermijn is de compenserende vergoeding
verschuldigd ten belope van de termijn waarin de concessiehouder niet van een opzeg
heeft genoten (ziet met name Marc Willemart en Ariane Destrycker, "De
Concessieovereenkomst in België", Kluwer 1996, n° 70)

Thans wordt algemeen aangenomen dat de duur van de opzeg bepaald dient te worden in
functie van de tijd die de concessiehouder nodig heeft om zich te bevrijden van zijn
verplichtingen jegens derden die uit de uitvoering van het contract volgen en/of om zich
opnieuw in een gelijkwaardige situatie te bevinden, niet noodzakelijkerwijs ingevolge het
sluiten van een concessiecontract dat gelijkwaardig is aan de beëindigde concessie (Cass.
10 februari 2005, JLMB 2005, p. 1.440)

De voorziening die aanleiding heeft gegeven tot dit arrest van het Hof van Cassatie was
gericht tegen een beslissing van het Hof van Beroep te Brussel van 21 maart 2003
beschreven in de noot "Un pont trop loin" van Ariane Destruycker en mijzelf (JLMB
2006, p. 957); Deze noot stelt vast dat wanneer de opzegtermijn bepaald kan worden
(zoals dit voorheen over het algemeen het geval was) in functie van de tijd die nodig is
voor de ontdekking en de organisatie van een nieuwe gelijkwaardige concessie, zij
eveneens bepaald kan worden in functie van de concrete noodwendigheden van de
afstoting van de activiteit waaraan de concessiegever een einde heeft gesteld en van de
reconversiemogelijkheden van de onderneming naar een andere activiteit die niet
noodzakelijkerwijs dient overeen te komen met een gelijkwaardige concessie.
Deze interpretatie van artikel 2 van de wet werd als nieuw beschouwd maar indien men
het nader bekijkt stelt men vast dat dit niet altijd het geval is aangezien vrij vaak in aan
deze rechtspraak voorafgaande beslissingen de duur van de opzegtermijn verbonden werd

4

met de tijd die de concessiehouder nodig heeft om zich te heroriënteren; Uiteraard dient de beoordeling in feite verbonden worden met de specifieke eigenschappen van de onderneming en van het product dat het voorwerp uitmaakte van de beëindigde concessie.

De criteria die worden aangewend om de duur van de redelijke opzegtermijn te bepalen worden vandaag goed door de rechtspraak bepaald (ziet met name het arrest van 8 februari van het Hof van Beroep van Brussel, n° 1999/AR/3452, in bijlage 4, die het merendeel van de aspecten van de toepassing van artikel 2 van de wet behandelt);de duur van de contractuele relaties, in aanmerking te nemen sinds hun aanvang, blijft een belangrijke factor (zie met name het arrest van 19 maart 2001 van het Hof van Beroep van Antwerpen, TBR 2003, p.524)

De compenserende vergoeding voor het ontbreken of de ontoereikendheid van de opzeg wordt zoals de opzegtermijn beoordeeld op het ogenblik van de beëindiging van het contract (het arrest van 25 maart 1976 van het Hof van Cassatie, Cass. 1976, I, 822, ligt ten grondslag aan deze oplossing) hetgeen betekent dat het bedrag van de vergoeding normaal bepaald wordt op basis van de bekende gegevens op dat ogenblik en praktisch gezien op basis van de resultaten van de twee of drie laatste jaren van normale uitvoering van het contract (ziet met name Marc Willemart, "Les concessions de vente en Belgique", Story-Scientia, 1988, n° 77).

Evenwel door het gegeven dat de wet de rechter uitdrukkelijk uitnodigt om naar billijkheid te beslissen, wordt aangenomen dat hij met elementen rekening kan houden die dateren van na de beëindiging en waarvan hij kennis heeft op het ogenblik van zijn oordeel; dit punt dat niet klaarblijkelijk van toepassing is in deze zaak is omstreden (zie met name Marc Willemart en Ariane Destrycker, noot "Un pont trop loin" in JLMB 2006, bladzijde 957)

Om rechtvaardig te zijn wordt de vergoeding bepaald zodat ze gelijkwaardig is aan de voordelen die de concessiehouder uit de uitvoering van het contract zou hebben gehaald gedurende de opzegtermijn en waarvan hij niet heeft genoten, dit op basis van de gemiddelde semi-bruto winst die hij op het ogenblik van de beëindiging van het contract behaalde; met de gemiddelde semi-bruto winst wordt bedoeld de netto winst verhoogd met de algemene niet samendrukbare kosten hetgeen soms geformuleerd wordt als overeenstemmend met de gemiddelde bruto winst verminderd met de samendrukbare algemene kosten (zie met name Marc Willemart, o.c., nummers 77 e.v. en Claude Verbraeken en Aimery van Schoutheete, "Manuel des contrats de distribution commerciale", Kluwer 1997, bladzijde 49, n°45)

b.    Op een billijke bijkomende vergoeding bepaald naargelang het geval in functie van drie elementen :

-    de aanzienlijke meerwaarde van het cliënteel dat de concessiehouder heeft aangebracht en dat verworven blijft voor de concessiegever na de beëindiging van het contract;
-    de kosten die de concessiehouder heeft gemaakt en die de concessiegever ten goede komen na het verstrijken van het contract;

- en het rouwgeld dat de concessiehouder aan het personeel verschuldigd is dat hij ingevolge de beëindiging van het contract diende te ontslaan (Art. 3, 1°, 2° en 3° van de wet van 27 juli 1961)

De voorwaarden voor het recht op een aanvullende vergoeding voor cliënteel worden duidelijk door de wet bepaald; men moet verplicht vaststellen:

- het bestaan van een cliënteelsmeerwaarde tussen het begin en het einde van de concessie,
- dat deze stijging van cliënteel door de concessiehouder werd aangebracht,
- dat zij voor de concessiegever verworven blijft na het eind van het contract (zie daaromtrent het arrest van 17 maart 1998 van het Hof van Beroep van Luik, RDC 1999 bladzijde 272 of het arrest van 15 december 2000 van het Hof van Beroep van Brussel n° 1998/AR/3467, in bijlage 5 of nog M. Willemart en A. Destrycker, o.c., n° 83-88)

Kosten aangegaan door de concessiehouder kunnen slechts in overweging genomen worden als de concessiegever er na het verstrijken van het contract voordeel uit haalt; het is een feitenkwestie.

Ook al worden ze vaak afgewezen op grond van het vermoeden dat hun gevolgen te kort duren om voordeel op te leveren voor de concessiegever na het einde van het contract, (Marc Willemart o.c., n° 93) kunnen publiciteitskosten weerhouden worden wanneer wordt bewezen dat zij geschikt zijn om een effect te sorteren na het einde van de concessie (zie de voorbeelden aangehaald in Marc Willemart, o.c., p. 81, noot 34 en nog recenter een arrest van 17 maart 1998 van het Hof van Beroep van Luik, RDC 1999, p. 272)

De wettekst is volkomen duidelijk wat het rouwgeld betreft en het vraagt des te minder bijkomende uitleg aangezien geen schadevergoeding op deze basis in het geding lijkt te zijn in deze zaak.


## 1.2    DE HANDELSAGENT

1.2.1   Toepassingsvoorwaarden van de wet van 13 april 1995

De wet van 13 april 1995 heeft de omzetting in Belgisch recht gerealiseerd van de richtlijn 86/653/EEG van 18 december 1986 betreffende de coördinatie van de wetgeving van de lidstaten betreffende de onafhankelijke handelsagenten; derhalve en in tegenstelling tot wat geldt voor de verkoopsconcessie zijn de modaliteiten en de gevolgen van de beëindiging van een handelsagentuur gelijkaardig in de verschillende lidstaten van de Europese Unie.

Gelijkaardigheid is echter geen uniformiteit, zodat het nodig is voor de beoordeling van deze wet in het kader van huidig geval om met enkele bijzonderheden van de Belgische wet en met bepaalde stellingen uit de rechtsleer en rechtspraak rekening te houden.

Artikel 1, alinea 1 van de wet van 13 april 1995 definieert de handelsagentuur-overeenkomst als "een overeenkomst waarbij de ene partij, de handelsagent, door de

andere partij, de principaal, zonder dat hij onder diens gezag staat, permanent en tegen vergoeding belast wordt met het bemiddelen en eventueel het afsluiten van zaken in naam en voor rekening van de principaal."

De handelsagent is een tussenpersoon die tussenkomt in het stadium van de onderhandeling en eventueel van het sluiten van zaken voor rekening van een derde terwijl de concessiehouder een koper (her)verkoper voor eigen rekening is. (zie Eric Dursin en Koen Van Den Broeck, Handelsagentuur, Deel I, Mys & Breesch, 1997, n°6 en 7, en n°17 tot 19).

Het woord "zaken" moet benadrukt worden omdat het activiteiten beoogt die veel breder zijn dan een tussenkomst beperkt tot de realisatie van verkoop- of aankoopverrichtingen beoogd door de Europese richtlijn (Art. 1.2.) (zie hieromtrent Eric Dursin en Koen Van Den Broeck, o.c. n° 32 en 33)

De tussenkomst van de agent in de onderhandeling van zaken voor rekening van de principaal is het criterium van het statuut van agent in de wet van 13 april 1995 want het is het voorwerp zelf van zijn taak (ziet met name Kooph. Antwerpen, 13 oktober 2005, n° A/04/4792, in bijlage 6); Wij citeren hier J. Struyck - P. M. Maeyart – H. Cousy – D. Struyven – O. Van Achter – H. Van Houtte – M. Looyens: "Uit artikel 1 van de wet, ("Eventueel afsluiten van zaken"), kan men afleiden dat de essentie van de agentuur in de bemiddeling en niet in het afsluiten van zaken ligt. De agent die cliënteel aanbrengt en die succesvolle onderhandelingen voert, geniet de speciale bescherming van de wet ("De Handelsagentuurovereenkomst", die Keure, 1995 n°11).

Opdat de agent niet aan de autoriteit van de principaal zou worden ondergeschikt, bepaalt de wet dat hij zijn activiteiten organiseert zoals hij wil en dat hij vrij beschikt over zijn tijd, hetgeen hem onderscheidt van de handelsvertegenwoordiger in dienstverband (Art. 1et 2) - (Marc Willemart en Stéphane Willemart, Le contrat d'agence commerciale, Dossier du JT n°52, Larcier 2005, n°1)

De regelmatigheid van de activiteit van de tussenpersoon, al dan niet bijkomend aan een andere activiteit, en dus de duurzaamheid ervan vormen tezamen met de vergoeding de wezenlijke voorwaarden voor de toepasbaarheid van de wet (zie Marc Willemart en Stéphane Willemart, o.c. n°1 en de verwijzingen die in noten 17 en 18 worden aangehaald) .

1.2.2.  De vergoedingen die aan een handelsagent verschuldigd kunnen zijn in geval van beëindiging van het contract :

a.      behoudens in geval van beëindiging van het contract wegens grove fout van de agent of wegens uitzonderlijke omstandigheden, heeft de agent recht op een minimum opzegtermijn die 6 maanden kan bereiken, op basis van een maand per aangevangen jaar van uitvoering van het contract (Art. 18 §1 van de wet).

b.      overeenkomstig artikel 20 van de wet heeft de handelsagent recht op een vergoeding, die als "uitwinningsvergoeding" wordt gekwalificeerd, wanneer hij nieuwe klanten aan de

principaal heeft aangebracht of aanzienlijk de zaken met het bestaande cliënteel heeft uitgebreid, voor zover deze activiteit nog wezenlijke voordelen zou verschaffen aan de principaal, en dit behoudens de in hetzelfde artikel limitatief opgesomde gevallen naast het geval van de grove fout.

De wet bepaalt dat het bedrag van de vergoeding wordt bepaald zowel rekening houdend met het belang van de ontwikkeling van de zaken als met de aanbreng van cliënteel en dat ze het bedrag niet kan overschrijden van een jaar vergoedingen dat volgens het gemiddelde van de vijf laatste jaren wordt berekend, of, als de duur van het contract lager is dan vijf jaar, volgens het gemiddelde van de vorige jaren.

De agent moet dus bewijzen, om recht te hebben op een uitwinningsvergoeding, dat hij klanten heeft aangebracht voor de principaal of dat hij zijn zaken heeft uitgebreid en dat de principaal hieruit nog wezenlijke voordelen zal behalen.

De gelijkaardigheid van de voorwaarden voor het recht op uitwinningsvergoeding van de handelsagent en van het recht van de concessiehouder op een aanvullende vergoeding voor aanbreng van cliënteel rechtvaardigt niettegenstaande bepaalde modaliteiten eigen aan de ene of de andere regeling, dat ervaring opgedaan door de toepassing van de wet van 27 juli 1961 de interpretatie van artikel 20 van de wet van 13 april 1995 toelicht (op dit punt zie Marc Willemart en Stéphane Willemart o.c. p. 82 tot 85).

Het rechtvaardigheidscriterium moet eveneens, en hoewel het niet uitdrukkelijk in de wettekst wordt opgenomen, in overweging genomen worden omdat de richtlijn er melding van maakt en omdat het een algemeen principe van het contractenrecht betreft (zie Eric Dursin en Koen Van Den Broeck o.c. n° 614).

Wat het bedrag van de vergoeding betreft, kunnen bepaalde criteria worden gedistilleerd uit de bekende rechtspraak na een tiental toepassingsjaren van de wet van 13 april 1995; men ziet met name in deze rechtspraak (voorbeelden die uit de kroniek van rechtspraak van Annick Mottet Haugaard en Thomas Faelli in DAOR 2005 worden overgenomen, p. 209 en volgenden, n° 80) dat rekening wordt gehouden met de volgende elementen:

- het belang van de commissies die door de agent in de loop van de laatste jaren worden ontvangen (Antwerpen 8 mei 2000 en Luik 7 november 2000)
- het zakenvolume dat de principaal realiseert of verder zal realiseren met het cliënteel dat door de agent werd opgebouwd (Brussel 6 september 2000)
- de duur van de contractuele relaties (Luik 7 november 2000 en 30 maart 2001)
- de evolutie van het aantal klanten en de omzet (Luik 19 maart 1997, CIV. 13 februari 1998, Kooph. Brussel 17 maart 2000, COM. Charleroi 22 juni 2000, Brussel 6 september 2000 en Luik 30 maart 2001)

Men stelt op basis van dezelfde bron vast dat beslissingen die het maximum van een jaar commissies toekennen de aandacht vestigen op de duur van de relaties (comm. Brussel 15 november 1999 en Luik 30 maart 2001 aangehaald in n° 81); uit dit laatste arrest in noot 183 van het boek van Marc Willemart en Stéphane Willemart, o.c., bladzijde 85, volgt dat het Hof in deze zaak naast de duur van de relaties, eveneens het belang van het

cliënteel, de specificiteit van de producten en de stabiliteit van de omzet in overweging heeft genomen.

Men dient tenslotte met betrekking tot de evaluatie van de cliënteelsvergoeding te benadrukken dat de gemiddelde vergoeding die in overweging dient genomen te worden om het bedrag van de uitwinningsvergoeding te berekenen alle commissies omvat die door de agent in verband met het contract worden ontvangen, zonder onderscheid volgens hun aard en zonder vermindering van een deel dat met professionele kosten overeenstemt; met andere woorden het gaat om het bruto bedrag dat door de agent wordt ontvangen (Brussel 29 april 2002 DAOR 2002 bladzijde 257)

c.    De wet van 13 april 1995 voorziet anderzijds in het recht van de agent op schadevergoeding wanneer de uitwinningsvergoeding waarop hij recht heeft zijn volledige schade niet dekt en dit ten belope van het verschil tussen het bedrag van de werkelijk geleden schade en het bedrag van deze vergoeding (Art. 21)

De rechtsleer en de rechtspraak kwalificeren deze schadevergoeding met de notie "herstellende vergoeding" ("indemnité réparatrice").

De bekende rechtspraak stelt duidelijk vast dat de schade die herstelbaar is door de toekenning van schadevergoeding verschillend moet zijn van de waarde van het cliënteel dat middels de uitwinningsvergoeding wordt schadeloos gesteld; met andere woorden artikel 21 van de wet kan niet dienen om het plafond van een jaar commissies te ontduiken dat voor het cliënteel door artikel 20 wordt bepaald (Brussel 29 april 2002 DAOR 2002, bladzijde 257)

In de voornoemde kroniek van rechtspraak van Mottet-Haugaard en Faelli vindt men als voorbeeld van "herstelbare schade" krachtens artikel 21 van de wet een contractsbreuk die wordt gepleegd in omstandigheden die ernstig de eerbaarheid van de agent en derhalve zijn professionele hoedanigheid aantasten (Luik 28 januari 2000 en kooph. Brussel 17 maart 2000 aangehaald in n° 84)

Volgens P. Dekeyser en N. Beaufils die door deze kroniek worden aangehaald, zou het verlies van niet afgeschreven investeringen eveneens krachtens artikel 21 van de wet schadeloos gesteld kunnen worden (Agence commerciele et représentation commerciale, la loi du 13 avril 1995, JTT 1996 page 10)

Deze voorbeelden zijn ophelderend maar natuurlijk niet limitatief.

1.2.3.    De wet van 13 april 1995 stelt een korte verjaringstermijn (een jaar) in na de beëindiging van het contract voor vorderingen die ontstaan uit handelsagenturen (art. 26) terwijl inzake verkoopsconcessies enkel de gemeenrechtelijke verjaringstermijn van toepassing is.
Deze eenjarige verjaringstermijn is van toepassing op de vordering in betaling van een uitwinningsvergoeding, maar ze kan worden gestuit door een eenvoudige kennisgeving van het voornemen van de agent om zijn rechten te doen gelden (artikel 20, laatste alinea)

9

Deze laatste bepaling is mijns inziens niet van toepassing op de herstellende schadevergoeding van artikel 21 (zie hieromtrent Marc Willemart en Stéphane Willemart, "le contrat d'agence commerciale", dossier du J.T., n° 52, p. 94 en noot 203).

## 1.3. CUMUL VAN DE STATUTEN VAN CONCESSIEHOUDER, AGENT EN ANDERE VORMEN VAN HANDELSTUSSENPERSOON

1.3.1. Wanneer de tussenpersoon parallel optreedt in het kader van elk van beide wetten

Sinds de inwerkingtreding van de wet van 13 april 1995 betreffende de handelsagentuurovereenkomst, staan de rechtsleer en de rechtspraak de cumul van de statuten van exclusieve concessiehouder en agent toe wanneer dezelfde distributeur tussenkomt in de verkoop van producten, soms in één en soms in de andere van deze twee juridische statuten; de wet op de eenzijdige beëindiging van een exclusieve verkoopsconcessie van onbepaalde duur enerzijds en die betreffende de handelsagentuurovereenkomst anderzijds zijn elk van toepassing op het gedeelte van de activiteiten van de tussenpersoon die zij aanbelangen (zie het onuitgegeven vonnis van de Rechtbank van Koophandel van Brussel van 15 maart 2002 dat door Marc Willemart en Stéphane Willemart wordt aangehaald in "Le contrat d'agence commerciale", dossier n° 52 van het Journal des Tribunaux, bladzijde 7, noot3).

Voor de inwerkingtreding van deze wet van 13 april 1995, was het geheel van gemengde contractuele relaties, dat wil zeggen een combinatie van zowel een verkoopsconcessie als een handelsagentuur, gewoonlijk gebonden aan de wettelijke regeling van de belangrijkste van beide activiteiten, aangezien de andere als bijkomstig ten aanzien van de eerste werd beschouwd; deze oplossing lijkt niet meer aanvaardbaar aangezien er gelijktijdig twee handelsactiviteiten bestaan die elkeen aan de toepassingsvoorwaarden voldoen van een eigen en bovendien dwingende wettelijke regeling (in deze zin J. Stuyck e.a., o.c., n° 30 bladzijde 25, Eric Dursin en Koen Van Den Broeck, o.c., n° 61)

1.3.2. Wanneer de tussenpersoon handelt in het kader van één van beide wetten en gelijktijdig in een statuut handelt dat niet aan een dwingende wet is gebonden

Dit is de hypothese van een handelstussenpersoon die ofwel een verkoopsconcessie ofwel een handelsagentuurovereenkomst uitvoert in zodanige omstandigheden dat, in het eerste geval de wet van 27 juli 1961 van toepassing is en in het tweede die van 13 april 1995, en die bovendien tussenkomt in het distributiecircuit in de hoedanigheid van bijvoorbeeld een aannemer van diensten, gevolmachtigde, commissionair, zakenagent (over deze verschillende situaties zie Eric Dursin en Koen Van Den Broeck, o.c. n° 5, 8 en volgenden) of nog op een wijze die uitsluitend onder het gemeen recht valt; de hypothese van de vertegenwoordiger – werknemer kan hier worden uitgesloten omdat zijn statuut van ondergeschiktheid onverenigbaar is met een activiteit als zelfstandige tegenover eenzelfde principaal.

Naar onze mening zal, wanneer één van beide hoofdactiviteiten (commissie of agentuur) op significante wijze wordt uitgeoefend door een tussenpersoon die tussenkomst in het

distributiecircuit van een product of in de onderhandeling van zaken, zal de wet betreffende deze activiteit van toepassing zijn omdat zij dwingend is (Art. 4 en 6 van de wet van 27 juli 1961 voor activiteiten uitgeoefend in België en 20, 23 en 27 van de wet van 13 april 1995 voor de handelsagenten gevestigd in België); het bijvoeglijk naamwoord "significant" heeft ten doel de activiteiten van koper/herverkoper en onderhandelaar van zaken uit te sluiten die een volkomen minieme bijkomstigheid uitmaken van een hoofdactiviteit vreemd aan beide betrokken wetten zoals bijvoorbeeld de uitbater van een salon van esthetische zorgen die af en toe een van de producten die hij gebruikt verkoopt (zie het vonnis van 21 oktober 1999, rechtbank van koophandel te Brussel in bijlage 7).

De toepassing van een van beide onderzochte wetten ingevolge het dwingende karakter heeft voor gevolg dat het betrokken contract in geen enkel geval als een bijkomstigheid van een andere activiteit die niet van een dwingend wettelijk statuut geniet.

Bijgevolg moet deze andere activiteit naar mijn mening normaal genieten van de wettelijke bescherming die verbonden is aan de hoofdactiviteit en dit in toepassing van de oplossing die gold voor de bijkomstige activiteit van agent van een concessiehouder vóór de inwerkingtreding van de wet van 13 april 1995 (zie hierboven onder punt1.3.1).

Hiervoor is natuurlijk nog vereist dat de activiteit die niet wordt beschermd door de wet van toepassing op een hoofdactiviteit, in de kontekst zelf van de contractuele relatie het accessorium ervan uitmaakt; beide activiteiten moeten verbonden zijn op een zulkdanige wijze dat ze onder eenzelfde relatie vallen doordat dezelfde doelstellingen worden nage streefd.

Immers, zowel voor de fabrikant of hoofddistributeur van een product of van een soort zaken, als voor zijn concessiehouder of agent, is het nagestreefde doel resultaten te behalen die winsten opleveren en niet om van een wettelijk systeem te genieten; bijgevolg wanneer een dergelijk systeem van toepassing is, moet het logischerwijs het geheel van de resultaten en winsten in aanmerking nemen die door de verschillende distributiewijzen worden gerealiseerd.

De basisprincipes van het gemeen contractenrecht vereisen de interpretatie en de toepassing ervan te goeder trouw en in billijkheid (Art. 1334 en 1335 van het Burgerlijk Wetboek)

## 2.    ONTWIKKELING EN TOEPASSING OP HUIDIG GEVAL VAN DE BEPALINGEN UITEENGEZET SUB 1)

2.1.    Gelijktijdige toepassing van de wet van 27 juli 1961 en die van 13 april 1995?

2.1.1.  MASTER CHIPS kwam naar mijn mening tussen als concessiehouder van MAXIM (zie 1.1.1.a).

De bepalingen zowel van het eerste als van het tweede contract, overigens erg gelijksoortig in al hun economische aspecten, organiseren een gestructureerde relatie tussen beide partijen voor de distributie van de betrokken producten door middel van aankopen en verkopen.

Deze relatie is van onbepaalde duur geworden krachtens de beschikkingen van artikel 3 van de wet van 27 juli 1961 (zie punt 1.1.1. b)

Voor het overige heeft MAXIM een einde gesteld aan de contractuele relaties door een opzeg van achttien (18) maanden, volstrekt onverenigbaar met de contractuele bepalingen betreffende de jaarlijkse vernieuwing van het contract, en in perfecte overeenstemming met het concept van een contract van onbepaalde duur.

Ik ben eveneens de mening toegedaan dat de concessie exclusief was omdat, niettegenstaande de kwalificatie van de contracten als zijnde "niet-exclusief", hun uitvoering de bedoeling van een relatie van exclusiviteit heeft doen blijken (zie hieromtrent punt 1.1.1. c).

De wet van 27 juli 1961 is dus van toepassing en dit zelfs na de inwerkingtreding van het tweede contract (zie punt 1.3.). Er blijkt voor het overige geen onenigheid te bestaan omtrent dit punt.

2.1.2.  Het is daarentegen naar mijn mening niet vaststaand dat de wet van 13 april 1995 van toepassing is in het kader van de rechtstreekse verkopen die door MAXIM sedert de inwerkingtreding van het tweede contract worden gesloten en dit ondanks het feit dat de toekenning van commissies op de rechtstreekse verkopen van aard is om een handelsagentuur te suggereren.

Men moet immers controleren of de tussenkomst van MASTER CHIPS in de onderhandeling omtrent deze verkopen overeenstemt met deze vereist door artikel 1 van de wet; het is een feitenkwestie en een rechtsvraag.
Voor het overige, is het duidelijk dat de criteria van duurzaamheid, vergoeding en onafhankelijkheid (ziet sub 1.2.1) worden vervuld.

Het blijkt klaarblijkelijk niet uit het contract ondertekend op 1 januari 1998 dat MASTER CHIPS als opdracht had om verrichtingen van aankoop en verkoop van producten van MAXIM in naam en voor rekening te onderhandelen van laatstgenoemde; in werkelijkheid bevat het geheel van de bepalingen van dit contract (zoals van het vorige) naast maatregelen van technische en commerciële bijstand, de organisatie van verrichtingen van aankoop en verkoop, waarbij slechts enkele lijnen aan de rechtstreekse verkopen worden gewijd en aan hun commissioneerbaarheid (artikel 1b en bijlage b).

Men vindt echter in deze lijnen de aanwijzing dat het recht op commissie ondergeschikt wordt gemaakt aan de vaststelling van een " **involvement in the design win**" van MASTER CHIPS.

Aldus moet MASTER CHIPS, om op rechtstreekse verkopen gecommissioneerd te worden, tussengekomen zijn in de opmaak van de design waarbij de producten van MAXIM door de klant worden geïntegreerd.

De feitenkwestie bestaat erin te bepalen wat de exacte aard is van de tussenkomsten van MASTER CHIPS bij de klanten teneinde na te gaan of zij overeenstemt met het concept van een onderhandeling die tot het sluiten van zaken door MAXIM leidt?

De rechtsvraag bestaat er in te weten in welke mate de activiteiten die door het nader onderzoek van de feitenkwestie onder de aandacht worden gebracht, overeenstemmen met het concept van tussenkomst in de onderhandeling over de zaak in de zin van artikel 1 van de wet (zie 1.2.1)

Tenslotte, ben ik van mening dat, als wordt vastgesteld dat de opdracht van MASTER CHIPS erin bestond om aan potentiële kopers voor te stellen om de producten van MAXIM in hun eigen productie van producten of diensten te integreren zodat deze tussenkomst de beslissing van het prospect om zaken met MAXIM af te sluiten veroorzaakte, de wet van 13 april 1995 van toepassing geacht zou moeten worden wat de rechtstreekse verkopen betreft.
Voor het vervolg van de analyse behandel ik achtereenvolgens en om volledig te zijn, de hypothese van een bevestigend antwoord op deze vraag (geval A) en die van een negatief antwoord (geval B).

2.2.    Wat de opzeg betreft

2.2.1.  *In het geval A*: (gelijktijdige toepassing van de wet van 27 juli 1961 en die van 13 april 1995)
        In deze hypothese alleen biedt de wet op de verkoopsconcessie van onbepaalde duur aan MASTER CHIPS de mogelijkheid recht te hebben op een langere opzegtermijn dan de 18 maanden waarvan zij heeft genoten en bijgevolg op een compenserende vergoeding ten belope van het aantal bijkomende maanden opzegtermijn die MAXIM had moeten geven.

        Bij gebreke aan een wettelijk minimum hoger dan 6 maanden en aan een overeenkomst waarin een langere contractuele opzegtermijn wordt voorzien, heeft MASTER CHIPS niet het recht om aanspraak te maken op een opzeggingsvergoeding krachtens een handelsagentuurovereenkomst.

        Rekening houdend met de gebruikelijke criteria om de opzegtermijn te bepalen inzake concessies en die in huidig geval in aanmerking genomen dienen te worden (duur van de relaties, uitgestrektheid van het gebied, percentage van de activiteiten van de concessiehouder, bekendheid en merk van het product, omzet en resultaten), lijkt de opzegtermijn van 18 maanden ontoereikend in vergelijking met de termijnen die in vergelijkbare gevallen door de rechtspraak worden erkend; ik verwijs in dit verband naar de beslissingen die worden aangehaald in "Duur opzeggingstermijn: achttien maanden" van de tabel gevoegd bij Marc Willemart en Ariane Destrycker o. c. p. 207 - 208).

13

Een bijzonder element van huidig geval is de beslissende rol die de MASTER CHIPS heeft gespeeld bij de keuze van de producten van MAXIM door de drie belangrijke klanten gekwalificeerd als "house accounts" (volgens hetgeen mij werd meegedeeld en met name onder 1.3.1 van de terms of reference vermeld) en waarschijnlijk bij andere klanten.

De commissies die op deze basis aan MASTER CHIPS werden betaald sinds de inwerkingtreding van het 2$^{de}$ contract, maken mijns inziens deel uit van de omzet die in aanmerking genomen dient te worden voor de berekening van de compenserende vergoeding voor een ontoereikende opzegtermijn, hoewel zij betaald zouden zijn in het kader van het deel "agentuur" van het contract.

Immers, de activiteiten van handelsagentuur en dus de betaling van de overeenkomstige commissies zouden zijn voortgezet tijdens de volledige duur van de opzegtermijn verschuldigd aan de concessiehouder, zoals dat het geval is geweest voor de opzeg van achttien (18) maanden waarvan hij heeft genoten.

Beide activiteiten waren immers onverbrekelijk met elkaar verbonden in het kader van het contract zodat hun resultaten niet uit elkaar kunnen worden gehaald.

Het is gepast hier te wijzen op de beslissende rol van de billijkheid in verband met de beoordelingsvrijheid van deze vragen door een rechter; men dient hier bovendien rekening houden met artikel 16 C van het contract volgens hetwelk **"this agreement shall bring no prejudice whatsoever to the existing rights of MAXIM and distributors based on their anterior contractual relationship"**
Ik meen niet dat het technische advies dat mij wordt gevraagd een nauwkeurigere beoordeling van de duur van de opzegtermijn en een evaluatie van de compenserende vergoeding moet omvatten; mijn rol van deskundige bevat immers in mijn ogen slechts de levering aan de arbiter en partijen van de beoordelingselementen van deze vraag zonder er zelf over te oordelen wanneer de beoordeling door de aard zelf van zijn onderwerp niet zuiver objectief kan zijn.

Dit verhindert me niet om ter beschikking te blijven om op elke eventuele aanvullende vraag te antwoorden over deze kwesties.

2.2.2.  *In het geval B*: (gelijktijdige toepassing van de wet van 27 juli 1961 en het gemeen recht) In zo'n feitelijke situatie is de juridische positie ingevolge dezelfde redenen gelijkaardig met degene die onder punt 2.2.1. werd uiteengezet; de duur van de opzegtermijn verschuldigd krachtens de wet van 27 juli 1961 dient immers op dezelfde wijze beoordeeld te worden en de gevolgen inzake vergoeding eveneens gelet op de eenheid van de contractuele relatie, zelfs wanneer deze gedeeltelijk onderworpen is aan het gemeen recht, die leidt tot eenheid van resultaten in zoverre zij zowel de duur als het bedrag van de opzegtermijn beïnvloeden.

14

2.3     Wat het cliënteel betreft

2.3.1   *in het geval A:*
        Men dient te beoordelen of de voorwaarden voor het recht op schadevergoeding hiervoor
        vervuld zijn enerzijds in het kader van de wet van 27 juli 1961 en anderzijds in het kader
        van de wet van 13 april 1995; pro memorie, het gaat erom een door Master Chips
        aangebrachte meerwaarde of stijging van cliënteel vast te stellen die verblijft aan MAXIM
        of die haar nog wezenlijke voordelen dient te verschaffen na het einde van de
        overeenkomst (zie hoger sub 1.1.2, b en 1.2.2. b)

        In positief geval dient het clienteel afzonderlijk beoordeeld te worden al naar gelang zij
        onder de concessie vielen dan wel onder de agentuur aangezien de evaluatiemethode
        verschillend is.

        Pro memorie, inzake concessie is de rechtspraak erg onzeker hoewel steeds vaker de bruto
        marge van de concessiehouder in aanmerking wordt genomen eerder dan zijn netto winst
        (zie hieromtrent mijn noot "essai sur l'indemnité de clientèle du concessionnaire de
        vente", onder Mons, 12 octobre 1998, JLMB 1999, 511) terwijl het voor de handelsagent
        gaat over het totaal van zijn vergoedingen die hij ontvangt op eender welke basis met een
        maximum van een jaar op basis van het gemiddelde van de laatste 5 jaar.

        Voorbeelden van berekening van cliënteelsvergoedingen vindt men in de tabel gevoegd
        bij Marc Willemart en Ariane Destrycker, o.c. p. 203 en volgenden voor wat het aspect
        concessie betreft; men moet echter rekening houden met het feit dat ten tijde van de
        publicatie van deze tabel de rechtspraak nog meestal slechts met de netto winst rekening
        hield om de vergoeding tussen ongeveer 6 en 24 maanden van deze nettowinst te bepalen
        terwijl de rechtspraak momenteel meer en meer rekening houdt met de brutomarge van de
        concessiehouder in de loop van de laatste jaren (over het algemeen 3) van uitvoering van
        het contract voor de betekening van de opzeg; het Hof van Beroep van Brussel bepaalt het
        bedrag van de cliënteelsvergoeding meestal tot 10% van het totaal van de brutomarge die
        door de concessiehouder gedurende de drie laatste jaren werd verwezenlijkt, terwijl het in
        talrijke beslissingen gaat over de gemiddelde maandelijkse brutowinst van de laatste 3
        jaren vermenigvuldigd met 3 tot 12 maanden.

        Ik ben thans bezig een tabel op te stellen die de rechtspraak daterend van na 1997 kort
        samenvat zowel inzake de duur van de opzegtermijn als inzake het bedrag van de
        toegekende vergoedingen aan verkoopsconcessiehouders; ik zal deze tabel ter beschikking
        stellen zodra deze afgewerkt is.

        Ik meen dat ik in huidig stadium van deze nota niet nauwkeuriger dien te zijn.

        Wat het cliënteel in handelsagentuur betreft, meen ik dat de beslissende rol die MASTER
        CHIPS heeft gespeeld ten aanzien van belangrijke klanten die rechtstreekse kopers zijn
        geworden, evenals het belang van de omzet van MAXIM ten aanzien van de rechtstreekse
        klanten, belangrijke elementen zijn voor de beoordeling van het bedrag van de
        uitwinningsvergoeding.

2.3.2.  *In het geval B*:
Om wille van dezelfde redenen als uiteengezet onder punt 2.2.2, zeer in het bijzonder de billijkheid en de beschikkingen van artikel 16 punt C. van het contract, ben ik van oordeel dat de omzet van MASTER CHIPS inzake commissies in overweging dient worden genomen tezelfdertijd als de resultaten als concessiehouder in het kader van de evaluatie van de cliënteelsvergoeding die haar toekomt en waarvan de principes werden uiteengezet voor het geval A.


2.4.   Wat de schadevergoeding betreft

2.4.1  *In het geval A:*
Door het forfaitaire karakter van het wettelijke schadevergoedingsregime van de concessiehouder kan de schade die hij lijdt ten gevolge van de beëindiging van zijn contract niet in overweging genomen worden buiten hetgeen door de artikelen 2 (opzeggingsvergoeding) en 3 (bijkomende vergoeding) van de wet van 27 juli 1961 wordt voorzien krachtens deze wet (zie hoger punt 1.1.2 )
Daarentegen, in het kader van een gelijktijdige toepassing van deze wet en die van 13 april 1995, op de respectievelijke activiteiten als concessiehouder en handelsagent, kan MASTER CHIPS, als zij een uitwinningsvergoeding verkrijgt die lager is dan de werkelijk geleden schade, een vergoeding tot herstel van deze schade vorderen.

Op deze basis, en alleen op deze basis, kan het verlies van de waarde van de onderneming mijns inziens vergoed worden door de arbitrale beslissing; dit verlies vormt immers een schade te onderscheiden van het verlies van het cliënteel (zie hoger punt 1.2.2 c)

Ik meen niet dat mijn taak als deskundige een volledigere analyse omvat van het principe en het bedrag van een eventuele schadevergoeding voor MASTER CHIPS ingevolge het verlies van de waarde van haar onderneming; ik blijf echter ter beschikking om elke beschikbare aanvullende inlichting hieromtrent te verstrekken die de arbiter of de partijen nuttig achten.


2.5    Wat de door MASTER CHIPS gemaakte kosten betreft

Het geval A dient hier niet van het geval B onderscheiden te worden omdat in het kader van de handelsagentuur geen enkele schadevergoeding voor kosten voorzien is krachtens de wet van 13 april 1995, behoudens ten titel van schadevergoeding voorzien in artikel 21.

In het kader van de wet van 27 juli 1961 schijnen de kosten van reclame en het aandeel van het loon van de FAE die door MASTER CHIPS werden gedragen goed overeen te stemmen met de hypothese vervat in artikel 3.2 van deze wet, zodat de eventuele terugbetaling ervan voornamelijk afhangt van de vraag of zij al dan niet een voordeel opleveren voor MAXIM na het einde van het contract.

Dit is een feitenkwestie die een beoordeling vereist die mijn inziens de grenzen van mijn opdracht overschrijdt.

2.6.    Wat de commissies betreft

Uit het verzoekschrift in arbitrage blijkt dat MASTER CHIPS voorhoudt dat zij niet alle commissies ontvangen heeft die haar volgens haar toekomen ingevolge de rechtstreekse verkopen die door MAXIM sinds de inwerkingtreding van het $2^{de}$ contract werden gerealiseerd.

De beoordeling van deze vorderingen vanwege MASTER CHIPS overschrijdt eveneens de grenzen van mijn rol, ik meen dat het niet mijn plaats is mij hierover uit te spreken tenzij om te herinneren aan de evidente waarheid dat wanneer een contractspartij de bedragen niet betaald die aan zijn wederpartij toekomen wegens de uitvoering van het contract en ongeacht de aard ervan, de betaling opgeëist kan worden.

Ik zal mij beperken tot de opmerking dat als bijkomende commissies verschuldigd blijven deze in aanmerking dienen genomen te worden bij de beoordeling van de overeenkomstige vergoedingen waarvan geoordeeld zal worden dat ze aan MASTER CHIPS verschuldigd zijn.


2.7.    Wat betreft de verjaring

Antwoordend op uw vraag naar de eventuele verjaring van de vorderingen van uw cliënte op basis van de artikelen 20 en 21 van de wet, stel ik vast dat de overeenkomst beëindigd was bij het verstrijken van de opzegtermijn van 18 maanden die betekend werd op 31 augustus 2001, hetzij eind februari 2003; welnu, MASTER CHIPS had MAXIM gedagvaard vanaf 30 oktober 2001 dus zelfs nog voor het ogenblik waarop de eenjarige verjaringstermijn is beginnen te lopen enerzijds wat betreft de betaling (met name) van 1.272.222 EURO wegens aanbreng van cliënteel en financiële schade en anderzijds wat betreft de betaling van commissies.

De verjaring die is beginnen lopen eind februari 2003 werd gestuit ingevolge deze vorderingen tot de uitspraak op 14 december 2004 vervat in de arresten van het Hof van Beroep die op 14 december de onbevoegdheid van de gewone rechtsmachten bevestigden (Zie De Page, Boekdeel VII/2 nr. 1177 en volgenden en nr. 1198).
De nieuwe verjaringstermijn die is aangevangen op deze datum werd op haar beurt gestuit, voordat ze is verstreken, door het verzoekschrift in arbitrage van 30 november 2005.

De gerechtelijke vordering voor wat betreft het cliënteel was weliswaar gebaseerd meer op artikel 3 van de wet van 27 juli 1961 dan op de wet van 13 april 1995; Ik meen echter dat noch artikel 26 van laatstgenoemde wet, noch de laatste alinea van artikel 20 van deze wet de noodzaak van een vordering binnen de termijn van een jaar doen afhangen van het inroepen van de wettelijke grondslag ervan. Mijns inziens is het vereist en voldoende dat het voorwerp van de vordering gepreciseerd wordt zelfs indien dit pas later gebeurt voor wat betreft de wettelijke grondslag ervan.

Welnu, de dagvaarding voor de Rechtbank van Koophandel strekt volgens de weergave ervan in het arrest duidelijk tot "de betaling van een vergoeding van 1.272.000 EURO wegens meerwaarde van cliënteel wegens gedwongen stopzetting van alle activiteit".

Deze formulering lijkt mij voldoende te beantwoorden aan de kennisgeving aan de principaal van het gegeven dat de handelsagent "voornemens is zijn rechten te doen gelden" zoals vereist door artikel 20 van de wet van 1995.

Dit geldt des te meer voor de schadevergoeding en de commissies waarvan volgens de weergave ervan in de arresten van het Hof van Beroep van Brussel het voorwerp duidelijk omschreven werd, zonder inroeping van een wetsbepaling.

De tekst van de dagvaardingen zou ertoe kunnen bijdragen deze redenering verder uit te werken.


3.  **ANTWOORDEN OP DE RECHTSVRAGEN VERVAT IN DE TERMS OF REFERENCE IN ZOVERRE ER NOG NIET OP GEANTWOORD WERD IN DE VOORAFGAANDE UITEENZETTINGEN**

VRAAG 17.3
Ik heb hierboven geantwoord aangaande de principes van toepassing op deze vraag onder punt 2.1.3, geval A.
Ik voeg er eraan toe dat naar Belgisch recht de bewijslast op dit punt, zoals in het algemeen op alle andere punten in het gemeen contractenrecht, rust op de partij die een feit of feitelijke omstandigheden inroept, maar dat in het moderne recht de andere partij verplicht is om bij te dragen tot de bewijsvoering in ieder geval wanneer deze beschikt over elementen die nuttig zijn voor de beoordeling van de rechter en die onbekend zijn voor de tegenpartij.

VRAAG 17.4.4
Aangezien partijen gehouden zijn het contract getrouw uit te voeren gedurende de opzegtermijn, moet de schade voortvloeiend uit een tekortkoming aan deze verplichting hersteld worden.

Ik zie niet in welke contractuele verplichting zou ophouden opeisbaar te zijn tijdens de loop van de opzegtermijn.

VRAAG 17.4.5
Een redelijke opzegtermijn dient altijd betekend te worden door de partij die eenzijdig een voor onbepaalde tijd verleende verkoopconcessie beëindigt behalve ingeval van beëindiging wegens grove fout van de andere partij, een geval van overmacht of sommige andere omstandigheden die vreemd zijn aan huidige zaak (zie Verbraeken en de Schoutheete, o.c. p.62 tot 64)
Aan de ernstige fout, voegt de wet op de handelsagentuur de notie uitzonderlijke omstandigheden toe (artikel 19)

18

VRAAG 17.6

Voor wat betreft de bewijslast zie mijn antwoord op vraag 17.3.

Indien wordt vastgesteld dat MASTER CHIPS concurrerende producten verkocht heeft tijdens de opzegtermijn zou dit een contractuele fout uitmaken.

Enkel de schade die het gevolg is van dergelijke fout zou hersteld moeten worden maar deze fout zou de these van een contractsbreuk tijdens de opzegtermijn met verlies van het recht op schadevergoeding op basis van artikel 2 tot gevolg niet kunnen rechtvaardigen: de contractsbreuk van een verkoopconcessie wegens grove fout dient snel betekend te worden met inroeping van de fout omdat ze per definitie de voortzetting van het contract onmogelijk maakt, zelfs tijdens een opzegtermijn (ziet met name Verbraeken en van Schoutheete o.c. n° 50 bladzijde 56 en 57).

Daarentegen is, tenzij dit uitdrukkelijk is verboden in het contract (inzake agentuur binnen de grenzen vervat in artikel 24 van de wet), de verkoop van concurrerende producten na het einde van de uitvoering van het contract (de opzegtermijn) geen fout en kan dit bijgevolg geen aanleiding geven tot schadevergoeding; indien een dergelijke activiteit bewezen wordt, kan dit in principe niet in overweging worden bij de beoordeling van de duur van de opzegtermijn omdat deze bepaald dient te worden op het ogenblik van haar kennisgeving, hoewel de rechter kan, maar in geen enkel geval verplicht is er rekening mee houden in naam van de billijkheid (voor meer details over dit punt, zie Marc Willemart en Ariane Destrycker in de noot "Een brug te ver" JLMB 2006 p. 957 en volgenden).

VRAAG 17.8

De bijkomende vergoeding voorzien in artikel 3 van wet 27 juli 1961 en de compenserende opzegvergoeding voorzien in artikel 2 zijn volkomen verschillend omdat ze compleet verschillende schade beogen, met name enerzijds bepaalde verliezen in hoofde van de concessiehouder betreffende het cliënteel, gemaakte kosten en rouwgelden en anderzijds het verlies van de semi-bruto winst die de concessiehouder zou hebben behaald gedurende de opzegtermijn waarop hij recht had en waarvan hij niet genoten heeft (zie hieromtrent met name Marc Willemart o.c. n° 87 p. 76 en de noten 7 tot en met 10).

De concessiehouder zou in bepaalde gevallen recht kunnen hebben en in andere niet op een van beide vergoedingen, bijvoorbeeld indien hij van een voldoende opzegtermijn heeft genoten of geen enkele van de overeenkomst artikel 3 vergoedbare verliezen heeft geleden.

Bijgevolg dient geen enkele van beide vergoedingen de andere beïnvloeden: dit zou in strijd zijn met de wet en zelfs met de billijkheid.

Hetzelfde geldt inzake agentuur, voor wat betreft de opzeg enerzijds, en anderzijds betreffende de uitwinnings- en herstelvergoedingen voorzien in de artikelen 20 en 21 van de wet van 13 april 1995.

VRAAG 17.9

Ik meen dat dit een geval is waar een partij (MAXIM) dient bij te dragen om de arbiter opheldering te verschaffen omtrent de realiteit van de rechtstreekse verkopen die zouden

hebben plaatsgevonden zonder aanleiding te geven tot de contractueel verschuldigde commissies; de waarheid op dit punt zou dienen te blijken uit de boekhoudingsstukken van MAXIM.

Met betrekking tot commissies die verschuldigd kunnen zijn voor verkopen na het einde van het contract, past het op te merken dat volgens artikel 11 van de wet van 13 april 1995 (voor het geval dat zij van toepassing geacht zou worden) de agent recht heeft op commissie als de zaak hoofdzakelijk te danken is aan de activiteit die hij tijdens de handelsagentuurovereenkomst heeft ontplooid, als de zaak binnen zes (6) maanden vanaf de beëindiging van het contract wordt afgesloten, als de bestelling van de derde door de principaal voor de beëindiging van het contract werd ontvangen, dit alles uiteraard binnen het recht op commissies (artikel 10).

Het recht op commissies van dit type is te onderscheiden van elk recht op vergoeding en zou het bedrag ervan niet in de ene noch in de andere richting kunnen beïnvloeden.

VRAAG 17.10
 De vergoeding die de afwezigheid of ontoereikendheid van opzegtermijnen compenseert (artikel 2 van de wet van 27 juli 1961) heeft als specifiek en uitsluitend voorwerp om aan de concessiehouder (of in voorkomend geval aan de concessiegever) het equivalent van de voordelen te verschaffen die hij uit de uitvoering van een opzeg zou hebben behaald gedurende de volledige termijn waarvan geoordeeld wordt dat hij recht heeft (zie punt 1.1.2)

In het geval dat de partij die de beëindiging heeft ondergaan heeft genoten van een werkelijke opzegtermijn, moet de compenserende vergoeding slechts berekend worden in functie van de eventuele ontoereikendheid van deze opzegtermijn, dit wil zeggen het verschil tussen de totale duur waarvan wordt geoordeeld dat hij recht had en die waarvan hij heeft genoten.

Elke schade of ander nadeel dan het verlies van de voordelen die zouden gevolgd zijn uit de uitvoering van een redelijke opzegtermijn is vreemd aan de compenserende vergoeding; bijgevolg komt het verlies van de waarde van een onderneming ten gevolge van het verlies van een concessie hier niet als zodanig in aanmerking.

Dit verlies zou in het kader van de verkoopsconcessie enkel schadeloos gesteld kunnen worden dan als herstel van een andere fout dan de eenvoudige oefening van het recht om een contract van onbepaalde duur te beëindigen of, in het kader van de handelsagentuur enkel krachtens artikel 21 van de wet van 13 april 1995.

Hiermee wordt eveneens geantwoord op vraag 17.11.

VRAAG 17.12

Zie het antwoord op vraag 17.4.4.

\*\*\*    Ik hoop met dit schrijven geantwoord te hebben op alle rechtsvragen die vallen onder het
Belgische recht betreffende verkoopsconcessies en handelsagenturen, en die van aard zijn
om het geschil op te helderen dat uw cliënte heeft met MAXIM en dat momenteel
onderworpen is aan de arbitrage van Mijnheer Eric Van Ginkel, L.L.M., onder de
bescherming van het CCI; ik heb mij ingespannen om dit te doen met een maximum aan
objectiviteit op basis van de wetenschappelijke gegevens waarvan ik kennis heb in
verband met de uitoefening van mijn beroep en mijn onderzoekswerkzaamheden en
geschriften in deze materie en heb mij daarbij zoveel mogelijk bij het recht gehouden
eerder dan bij de feiten.

Ik blijf te uwer beschikking om op elke vraag te antwoorden waaromtrent Mijnheer de
Arbiter of één van de partijen een aanvullende toelichting van mijn kant zouden wensen
en, u dankend voor uw vertrouwen, verzoek ik u te willen geloven, Geachte Confraters, in
mijn toegewijde gevoelens.

Marc Willemart

21

# Exhibit 53



Master Chips Bvba / Maxim Integrated Products, Inc.

**STAAT VAN KOSTEN EN ERELONEN**

**(Voornaamste prestaties / niet-exhaustieve lijst)**

**Mr. Leo Goovaerts**
**Mr. Sabine Thielemans**
**Mr. Philip Peerens**

# NOVALEX ADVOCATEN - KOSTEN EN ERELONEN - ARBITRAGE

| Periode | Advocaat | Uurtarief Erelonen | Uurtarief Kosten (1/3) | TARIEF K&E | Aantal Uren | Bedrag (EUR) | Subtotalen / staat | Algemeen totaal (EUR) |
|---|---|---|---|---|---|---|---|---|
| 15/12/04 - 31/12/05 | L. Goovaerts | 330 | 110 | 440 | 208 | 91.520,00 | | |
| | S. Thielemans | 250 | 80 | 330 | 180 | 59.400,00 | | |
| | P. Peerens | 210 | 70 | 280 | 66 | 18.480,00 | | |
| | Specifieke kosten - vergadering ICC (bijl.1) | | | | | 107,00 | | |
| | Specifieke kosten - taxipost (bijlage 2) | | | | | 199,50 | 169.706,50 | |
| 01/01/06 - 30/04/06 | L. Goovaerts | 330 | 110 | 440 | 20 | 8.800,00 | | |
| | S. Thielemans | 250 | 80 | 330 | 22 | 7.260,00 | | |
| | P. Peerens | 210 | 70 | 280 | 9 | 2.520,00 | 18.580,00 | |
| 01/05/06 - 31/12/06 | L. Goovaerts | 360 | 120 | 480 | 1084 | 520.320,00 | | |
| | S. Thielemans | 270 | 90 | 360 | 1178 | 424.080,00 | | |
| | P. Peerens | 270 | 90 | 360 | 896 | 322.560,00 | | |
| | Specifieke kosten - taxipost (bijlage 3) | | | | | 35,86 | 1.266.995,86 | |
| 01/01/07 - 31/05/07 | L. Goovaerts | 360 | 120 | 480 | 242 | 116.160,00 | | |
| | S. Thielemans | 270 | 90 | 360 | 438 | 157.680,00 | | |
| | P. Peerens | 270 | 90 | 360 | 344 | 123.840,00 | | |
| | Specifieke kosten - XPO(bijlage 4) | | | | | 487,45 | 398.167,45 | |
| 01/06/07 - 07/03/08 | L. Goovaerts | 420 | 140 | 560 | 86 | 48.160,00 | | |
| | S. Thielemans | 330 | 110 | 440 | 138 | 60.720,00 | | |
| | P. Peerens | 330 | 110 | 440 | 158 | 69.520,00 | | |
| | Specifieke kosten - DHL (bijlage 5) | | | | | 77,56 | | |
| | Specifieke kosten - Datatranslations(bijl. 6) | | | | | 1.168,34 | 179.645,90 | |
| 09/03/08 - ... (provisie) | L. Goovaerts | 420 | 140 | 560 | 40 | 22.400,00 | | |
| | S. Thielemans | 330 | 110 | 440 | 40 | 17.600,00 | | |
| | P. Peerens | 330 | 110 | 440 | 40 | 17.600,00 | 57.600,00 | |

**2.090.695,71**

## EXPERTEN MASTER CHIPS IHKV DE ARBITRAGE: KOSTEN EN ERELONEN

| Datum | Omschrijving | | Bedrag (EUR) | Subtotaal (EUR) |
|---|---|---|---|---|
| 28/11/2007 | Meester Marc Willemart (legal expert) | (Bijlage 7) | 7.531,25 | |
| 13/01/2008 | Prof. Dr. Vanhoutte (legal expert) | (Bijlage 8) | 2.700,00 | **10.231,25** |

## KOSTEN ICC (ARBITRAGEKOSTEN + KOSTEN EXPERT VAN DE ARBITER) BETAALD DOOR MASTER CHIPS

| Datum | Omschrijving | | Bedrag (EUR)* | Subtotaal (EUR) |
|---|---|---|---|---|
| 25/11/2005 | Betaling Master Chips | (Bijlage 9) | 2.155,97 | |
| 27/12/2005 | Betaling Master Chips | (Bijlage 9) | 10.657,84 | |
| 2/03/2006 | Betaling Master Chips | (Bijlage 9) | 8.478,32 | |
| 11/01/2007 | Betaling Master Chips | (Bijlage 9) | 40.862,16 | |
| 9/03/2007 | Betaling Master Chips | (Bijlage 9) | 40.313,74 | |
| 2/05/2007 | Betaling Master Chips | (Bijlage 9) | 10.013,31 | |
| 4/05/2007 | Betaling Master Chips | (Bijlage 9) | 42.276,17 | |
| 6/08/2007 | Terugbetaling ICC | (Bijlage 9) | -4.921,58 | **149.835,93** |

* De omzetting van USD naar EUR is geschied aan de koers van de dag der betaling (zie rek. Uittr. Bijlagen 9)

## BEREKENING ALGEMEEN TOTAAL KOSTEN EN ERELONEN MET INTRESTEN

| Omschrijving | Bedrag (EUR) | Begindatum intresten | Einddatum intresten |
|---|---|---|---|
| NovaLex kosten en erelonen | 169.706,50 | 31/12/2005 | volledige betaling Maxim |
| NovaLex kosten en erelonen | 18.580,00 | 30/04/2006 | volledige betaling Maxim |
| NovaLex kosten en erelonen | 1.266.995,86 | 31/12/2006 | volledige betaling Maxim |
| NovaLex kosten en erelonen | 398.167,45 | 31/05/2007 | volledige betaling Maxim |
| NovaLex kosten en erelonen | 179.645,90 | 7/03/2008 | volledige betaling Maxim |
| NovaLex kosten en erelonen | 57.600,00 | 30/03/2008 | volledige betaling Maxim |
| Meester Marc Willemart (legal expert) | 7.531,25 | 28/11/2007 | volledige betaling Maxim |
| Prof. Dr. Vanhoutte (legal expert) | 2.700,00 | 13/01/2008 | volledige betaling Maxim |
| Betaling Master Chips | 2.155,97 | 25/11/2005 | volledige betaling Maxim |
| Betaling Master Chips | 10.657,84 | 27/12/2005 | volledige betaling Maxim |
| Betaling Master Chips | 8.478,32 | 2/03/2006 | volledige betaling Maxim |
| Betaling Master Chips | 40.862,16 | 11/01/2007 | volledige betaling Maxim |
| Betaling Master Chips | 40.313,74 | 9/03/2007 | volledige betaling Maxim |
| Betaling Master Chips | 10.013,31 | 2/05/2007 | volledige betaling Maxim |
| Betaling Master Chips (saldo na terugbetaling ) | 37.354,59 | 4/05/2007 | volledige betaling Maxim |
| **ALGEMEEN TOTAAL** | **2.250.762,89** | | |

| Periode | wettelijke intrestvoet |
|---|---|
| tot 31/12/2006 | 7% |
| van 01/01/2007 tot 31/12/2007 | 6% |
| van 01/01/2008 - 31/12/2008 * | 7% |

* De wettelijke intrestvoet voor het jaar 2008 werd bepaald op 7%
bij Mededeling van de Algemene Administratie van de Thesaurie, Belgisch Staatsblad van 15/01/2008)
(http://treasury.fgov.be/rente_nl.htm)