# EXHIBIT A

TO DECLARATION OF LEO GOOVAERTS
IN SUPPORT OF SUPPLEMENTAL CROSS-PETITION
TO CONFIRM ARBITRATION AWARD
(Case No. C 08 00721 JW)

**International Chamber of Commerce**

*The world business organization*

**International Court of Arbitration** • **Cour internationale d'arbitrage**

# AWARD

**ICC International Court of Arbitration** • **Cour internationale d'arbitrage de la CCI**

38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Fax +33 1 49 53 29 33
Web site www.iccarbitration.org    E-mail arb@iccwbo.org



**International Chamber of Commerce**
*The world business organization*

**International Court of Arbitration ● Cour internationale d'arbitrage**

13 November 2007 /mte
**14123/RCH/JHN**

MASTER CHIPS BVBA (Belgium) **vs/** MAXIM INTEGRATED PRODUCTS INC. (U.S.A.)

--------------------------------------------------------------------------------------
<u>Counsel in charge of the file: Jan Heiner Nedden (dir. tel: + 33 1 49 53 30 99 - dir. fax: + 33 1 49 53 57 77)</u>
<u>Email: ica3@iccwbo.org</u>

NOVALEX
Mr. Leo Goovaerts
Ms. Sabine Thielemans
Mr. Philip Peerens
Kerselarenlaan 118
1200 Brussels
Belgium

*By DHL*

LAFILI, VAN CROMBRUGGHE & PARTNERS
Ms. Bieke Noels
Mr. Jan Swinnen
Desguinlei 214
2018 Antwerp
Belgium

*By DHL*

Dear Madames, Dear Sirs,

The Secretariat of the ICC International Court of Arbitration sends you the original of the Partial Award dated 9 November 2007 rendered by the Sole Arbitrator in the above-referenced matter.

This notification of the Partial Award is made by the Secretariat pursuant to Article 28 of the ICC Rules of Arbitration. The Partial Award was approved by the Court at its session of 26 October 2007.

The Secretariat takes this occasion to draw your attention to Article 28(6) of the Rules which states:

*"Every Award shall be binding on the parties. By submitting the dispute to arbitration under these Rules, the parties undertake to carry out any Award without delay and shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made."*

.../...

**ICC International Court of Arbitration ● Cour internationale d'arbitrage de la CCI**
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Faxes +33 1 49 53 29 29 / +33 1 49 53 29 33
Website www.iccarbitration.org   E-mail arb@iccwbo.org

14123/RCH/JHN                                                          page 2

Yours sincerely,

Jan Heiner Nedden
Counsel
Secretariat of the ICC International Court of Arbitration

Encl.:     - Original of the Partial Award dated 9 November 2007

c.c.:      - Mr. Eric van Ginkel                                    *By email*

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 14123/RCH/JHN

### MASTER CHIPS BVBA

(Belgium)

vs/

### MAXIM INTEGRATED PRODUCTS INC.

(U.S.A.)

This document is an original of the Partial Award rendered in conformity with the Rules of the ICC International Court of Arbitration.

**INTERNATIONAL CHAMBER OF COMMERCE**
**INTERNATIONAL COURT OF ARBITRATION**

**ICC CASE NO. 14 123/RCH/JHN**
In the Matter of the Arbitration between:

**MASTER CHIPS BVBA**

Claimant

and

**MAXIM INTEGRATED PRODUCTS INC.**

Respondent

# PARTIAL AWARD
# SENTENCE PARTIELLE

# PARTIAL AWARD
# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................ 1

II.     THE PARTIES AND THEIR LEGAL REPRESENTATION ............................ 4

III.    THE AGREEMENT ..................................................................................... 4

IV.     PROCEDURAL HISTORY; APPOINTMENT AND JURISDICTION OF
        ARBITRATOR ............................................................................................ 7

V.      THE CLAIMS ASSERTED BY MC ............................................................ 10

VI.     MAXIM'S ANSWER TO MC'S CLAIMS AND MAXIM'S COUNTERCLAIM ........... 13

VII.    ISSUES IDENTIFIED BY THE TERMS OF REFERENCE ........................... 19

VIII.   MC'S CLAIM PURSUANT TO SECTION 2 OF THE 1961 ACT ................... 23

IX.     MC'S CLAIM PURSUANT TO SECTION 21 OF THE 1995 ACT ................. 38

X.      MC'S CLAIM THAT MAXIM UNDERMINED THE TERMINATION PERIOD ............. 42

XI.     MC'S CLAIM PURSUANT TO SECTION 3 OF THE 1961 ACT ................... 47

XII.    MC'S CLAIM FOR UNDERPAYMENT OF COMMISSIONS ON SALES TO
        HOUSE ACCOUNTS ................................................................................ 53

XIII.   CLAIM FOR DAMAGES CAUSED BY IMPROPER CONDUCT .................. 70

XIV.    COUNTERCLAIM ADVANCED BY MAXIM ............................................... 70

XV.     INTEREST ............................................................................................... 71

XVI.    FEES AND COSTS .................................................................................. 73

XVII.   SUMMARY AND PARTIAL AWARD .......................................................... 74

INTERNATIONAL CHAMBER OF COMMERCE
## INTERNATIONAL COURT OF ARBITRATION

ICC CASE NO. 14 123/RCH/JHN
In the Matter of the Arbitration between:

### MASTER CHIPS BVBA

Claimant

and

### MAXIM INTEGRATED PRODUCTS INC.

Respondent

# PARTIAL AWARD

## I.    INTRODUCTION

1.        This dispute concerns the termination of a distribution agreement between the Respondent, Maxim Integrated Products Inc. (herein "Maxim"), a manufacturer of analog devices, and Claimant, Master Chips bvba (herein "MC"), the Belgian distributor of Maxim's products until March 2003.

2.        The relationship between Maxim and MC commenced on October 1, 1987 pursuant to a distributorship agreement (herein "the 1987 Agreement") under which MC distributed Maxim's products in Belgium and Luxembourg on an exclusive basis. In the course of 1998, Maxim wanted to convert this relationship in two significant ways: it wanted to handle the three major customers of MC in Belgium directly as so-called house accounts, and, secondly, it wanted to convert the relationship between the parties for the remaining customers into a non-exclusive one.  This resulted in a non-exclusive distributorship agreement signed on December 1, 1998, effective as of October 1, 1998 (herein "the 1998 Agreement").  There is no dispute that the 1998 Agreement, although

non-exclusive by its terms, was in fact exclusive under the applicable provisions of Belgian law.

3.      In addition, although this had only a minor impact on MC's territory in terms of potential sales volume, Luxembourg was eliminated as a territory, so that the territory was restricted to Belgium. It is unclear (and not relevant to this arbitration) what happened to the distribution of Maxim's products in Luxembourg.

4.      The 1998 Agreement provided in Section 16(F) that "This Agreement and the performance thereof shall be governed by and construed in accordance with the laws of Belgium."

5.      By letter dated August 31, 2001, which MC received on September 7, 2001, Maxim gave MC notice of termination of the 1998 Agreement, to be effective in 18 months, so that the relationship ended on March 7, 2003.

6.      Initially, MC filed a complaint against Maxim with the Commercial Court in Brussels, and appealed its decision to the Court of Appeal in Brussels. On December 14, 2004, the Court of Appeal held that the Belgian courts lacked jurisdiction over the subject matter as the agreement between the parties contained a valid arbitration clause which also extended to a dispute involving the "*Wet van 27 juli 1961 betreffende de eenzijdige beëindiging van de voor onbepaalde tijd verleende concessies van alleenverkoop*" ("Act of 27 July 1961 regarding the unilateral termination of exclusive distribution agreements entered into for an unlimited term", herein referred to as "the 1961 Act").

7.      On November 30, 2005, MC filed a claim initiating this arbitration proceeding. The ICC International Court of Arbitration (herein "the Court") at its session of February 24, 2006, in accordance with Article 9(3) of the Rules, appointed Eric van Ginkel as Sole Arbitrator (herein the "Arbitrator"), upon the proposal of the Dutch National Committee. Maxim filed an Answer on April 14, 2006. The Arbitrator determined by Procedural Order No. 1 dated May 7, 2006, that the language of this arbitration was to be *English*,

with the proviso that written and oral submissions of any kind, including pleadings, evidence, texts of statutory laws and case law/jurisprudence could be either in *English* or *Dutch* without the necessity of a translation. On June 28, 2006, the parties and the Arbitrator agreed to and adopted Terms of Reference for this arbitration in accordance with Article 18 of the ICC Rules of Arbitration (herein the "Rules"). Although originally MC limited the amount of its claim to €750,000, the Terms of Reference allowed both parties to expand the amounts of their respective claims and counterclaim at a later date. The parties agreed that the IBA Rules on the Taking of Evidence in International Commercial Arbitration (herein the "IBA Rules") would apply (Procedural Order No. 2, ¶ 2A).

8.      The parties conducted discovery proceedings. An evidentiary hearing was held on November 6, 7 and 8, 2006. Further hearings were held on May 7 and 8, 2007, during which two legal experts testified about their respective understanding of the 1961 Act, as well as the *Wet van 13 april 1995 betreffende de handelsagentuurovereenkomst*" ("Act of 13 April 1995 regarding the commercial agency agreement;" herein "the 1995 Act"). Besides, counsel for each of the parties presented oral argument. At the conclusion of the hearing on May 8, 2007, the Arbitrator declared the proceedings closed in accordance with Article 22 of the Rules.

9.      In addition to the several memorials submitted in accordance with the Procedural Timetable, counsel for each of the parties submitted extensive post-hearing briefs on May 31, 2007, accompanied by voluminous documentary evidence, transcripts of the testimony of the witnesses, and copies of countless scholarly articles and court decisions. In accordance with Article 24(2) of the Rules, the Court has extended several times the time limit within which the Arbitrator must render his final Award under Article 24(2) of the Rules, most recently until December 31, 2007.

- 3 -

## II.    THE PARTIES AND THEIR LEGAL REPRESENTATION

10.    As already indicated, the Claimant is Master Chips bvba, a limited liability company organized and existing under the laws of the Kingdom of Belgium (Company No. 0425352027), with its principal place of business at Jan Persijnstraat 2, B-8500 Kortrijk.  MC is engaged in the distribution of electronic components, such as semi-conductors, power supplies, capacitors and fuses.

11.    MC is represented by Novalex Advocaten (by Leo Goovaerts, Sabine Thielemans and Philip Peerens), located at Kerselarenlaan 118, B-1200 Brussels.

12.    The Respondent, Maxim Integrated Products, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 120 San Gabriel Drive, Sunnyvale, California 94086.  Maxim designs, develops and manufactures linear and mixed-signal integrated circuits, commonly referred to as analog circuits.  Its shares are traded on NASDAQ under the symbol "MXIM".

13.    Maxim is represented by Lafili, Van Crombrugghe & Partners (by Jan Swinnen and Bieke Noels of the Antwerp office, and Ingrid Meeussen of the Brussels office), with an address at Desguinlei 214, B-2018 Antwerpen (formerly Kardinaal Mercierlei 44, B-2600 Berchem – Antwerpen).

## III.    THE AGREEMENT

14.    The parties originally entered into an exclusive distribution agreement on October 1, 1987 (the "1987 Agreement").  Maxim was incorporated in 1983, by a group of former employees of Intercil Corporation.  MC had been formed in 1985, and was a distributor for Intercil.  When Intercil terminated its relationship with MC (as the result of a merger), MC approached Maxim and became the exclusive distributor for Belgium and Luxembourg.

15.     In 1988, as a result of the personal relationships between a number of senior officers at Alcatel and Michel Verbeken, one of the two co-founders of MC, MC was able to introduce Maxim to Alcatel's Belgian subsidiary in Antwerp, and to establish a relationship with it as one of about five approved companies selling parts to Alcatel.

16.     Alcatel Antwerp had developed the so-called System 12 digital telecom exchanges, and would later (in the first half of the 1990s) invent and develop the ADSL system, a system for high-speed internet connectivity over ordinary copper telephone lines.   During the term of the Agreement, MC sold various types of Maxim analog switches and IC's to Alcatel for inclusion into System 12 exchanges and ADSL modems.

17.     In the course of 1997, Maxim first expressed its desire to change its relationship with MC and sought to convert the three largest Belgian customers, Alcatel, Option and Philips, into so-called "house-accounts" (herein "House Accounts").   Of these, Alcatel was the most important, as the ADSL technology, invented and developed in its Antwerp labs, became a worldwide success.   To this day, Alcatel (which still controls 55% of the worldwide ADSL market) is one of Maxim's largest customers, as Maxim has been supplying essential parts for Alcatel's ADSL modems and related equipment.

18.     After a period of negotiations, the parties entered into a new, modified distribution agreement that was dated as of "January" (no year) at the top of the Agreement, signed on December 1, 1998 on behalf of MC, but pursuant to Section 11A became effective as of October 1, 1998 (herein the "1998 Agreement").

19.     Pursuant to Section 16F, the "Agreement and the performance thereof shall be governed by and construed in accordance with the laws of **Belgium**." [*emphasis in original*]

20.     In accordance with Maxim's wishes, the 1998 Agreement became "non-exclusive."   *De facto*, MC remained the only Distributor of Maxim's products for Belgium, but in Section 1B of the 1998 Agreement, Maxim reserved the exclusive right

to sell the Products to its own customers, and in particular, to service the House Accounts listed in Exhibit B of the Agreement within the Territory.

21.    For reasons not quite clear from the evidence presented, the 1998 Agreement also dropped the Grand Duchy of Luxembourg from MC's territory.

22.    In consideration of Maxim obtaining the right to sell directly to the House Accounts, Alcatel, Option and Philips, MC received the right to receive "commissions" on Maxim's direct sales to the House Accounts. Contrary to the 1998 Agreement's general effective date of October 1, 1998, Maxim granted MC the right to receive commissions from January 1, 1998. The terms and conditions applying to commissions were set forth in Exhibit B to the 1998 Agreement.

23.    Less than two years and nine months after its execution on behalf of MC, Maxim terminated the 1998 Agreement.[1] Maxim's notice of termination was dated August 31, 2001; MC received the letter on September 7, 2001. The notice provided for a termination period of 18 months (herein the "Termination Period"), so that the relationship between the parties ended on March 7, 2003.

24.    The parties agree that the termination of the 1998 Agreement is governed by the 1961 Act, based on Section 1 thereof that defines which types of distribution agreements are subjected to its provisions. The Arbitrator agrees with this analysis. It is common ground, therefore, that Sections 2 and 3 of the 1961 Act are applicable to the 1998 Agreement.

25.    Section 11A of the 1998 Agreement provided that the agreement had a term of one year, each time extended automatically by another year, unless within 30 days of the end of the term one party gives notice to the other that it does not desire to extend the

---

[1] The actual date of termination must have been preceded by several discussions about termination, as MC instructed its auditors to prepare a report what would happen if Maxim would go forward and terminate the 1998 Agreement. This report is dated May 27, 2001, more than three months before the date of the notice. Thus, the actual period that the 1998 Agreement was effective without any dispute brewing was probably no more than two years.

agreement. Section 3*bis* of the 1961 Act provides in substance that an agreement with a specified term becomes an agreement with an indeterminate period when it has been renewed more than twice. Therefore, in spite of Section 11A, the parties agree that the 1998 Agreement was entered into for an indeterminate period for the purpose of both the Act of 1961 and the Act of 1995. In addition, Maxim unilaterally put the Termination Period at 18 months, confirming the indeterminate character of the 1998 Agreement.

26.     The 1998 Agreement includes an arbitration clause that applies to this arbitration. It is set forth in Section 16G and reads as follows:

> "G.     The parties agree that any disputes which may arise hereunder or in any way arising out of the interpretation or application of this Agreement shall be submitted to the international Commercial Arbitration Committee of the International Chamber of Commerce for arbitration in accordance with its rules and that the decision on such arbitration shall be final. The place of arbitration shall be the State of California, Santa Clara County unless another place be designated by mutual agreement between the parties."

## IV.   PROCEDURAL HISTORY; APPOINTMENT AND JURISDICTION OF ARBITRATOR

27.     On October 30, 2001, less than two months after it received Maxim's notice of termination, MC filed suit against Maxim in the Commercial Court of Brussels, pursuant to both Articles 2 and 3 of the 1961 Act. The Commercial Court (by its two judgments dated February 17, 2003) declined to exercise jurisdiction over this dispute, as the court acknowledged the validity of the arbitration clause in the 1998 Agreement, - even when it relates to a subject of mandatory law such as the 1961 Act. MC appealed to the Court of Appeal of Brussels, which by its judgments of December 14, 2004 confirmed the two judgments of the Commercial Court.

28.     As stated previously, on November 30, 2005, MC filed a Request for Arbitration with the International Court of Arbitration of the ICC in Paris. Respondent started to participate in the present proceedings only subsequently, on March 28, 2006.

29.     At its session of February 2, 2006, the Court, being *prima facie* satisfied that an arbitration agreement under the Rules may exist, decided that this arbitration should proceed in accordance with Article 6(2) of the ICC Rules of Arbitration (herein the "Rules"), and determined that the place of arbitration is San Jose, Santa Clara County, California. In addition, it decided that the matter would be submitted to a Sole Arbitrator.

30.     At its session of February 24, 2006, the Court, in accordance with Article 9(3) of the Rules, appointed Eric van Ginkel as Sole Arbitrator upon the proposal of the Dutch National Committee, which appointment the Arbitrator duly accepted.

31.     The Arbitrator, by fax dated March 28, 2006, granted an extension of time for Maxim to file an Answer until April 14, 2006. Accordingly, Maxim filed its Answer and Counterclaim on April 14, 2006.

32.     The Court's decision that the arbitration should proceed in accordance with Article 6(2) of the Rules was administrative in nature. The parties, however, subsequently waived any objections to the jurisdiction of the Sole Arbitrator to hear the case. (Terms of Reference ¶ 12). The parties are in agreement about the Arbitrator's jurisdiction and have agreed not to challenge the same (*Ibid.*).

33.     The Arbitrator drew up, and the parties agreed to, Terms of Reference in accordance with Article 18 of the Rules as of June 23, 2006. In addition, after holding a Scheduling Conference to consult with the parties, the Arbitrator established a Provisional Timetable in Procedural Order No. 2 dated August 17, 2006 in accordance with Article 18(4) of the Rules. It was agreed that the IBA Rules on the Taking of Evidence in International Commercial Arbitration would apply to this arbitration.

- 8 -

33A.    In accordance with Article 20(4) of the Rules, the Arbitrator, upon the suggestion of and after having consulted the parties, appointed (from among the candidates proposed by the parties) an expert by Procedural Order No. 5 dated October 31, 2006 in order to assist the Arbitrator in making certain determinations of a financial nature.    The Arbitrator thus appointed

> Mr. Carlo Van der Herten
>
> bvba FINACC & Partners
>
> Josef van Elewyckstraat 103
>
> B-1853 Strombeek-Bever, Belgium

In accordance with the aforesaid Procedural Order and in accordance with Section 6(2) of the IBA Rules, the Expert has submitted a statement confirming the independence of himself and all members of the bvba FINACC & Partners from the parties, their respective counsel and the Arbitrator.    Also in accordance with the aforesaid Procedural Order, the parties were given the opportunity to state any objections to Mr. Van der Herten's independence.    On November 8, 2006, the Arbitrator held a hearing at which the parties had an opportunity to question Mr. Van der Herten.

The aforesaid Procedural Order also included proposed terms of reference (based in part on the parties' suggestions as to questions the Arbitrator should ask of the expert).    By procedural order following this Partial Award, the Arbitrator will amend these proposed terms of reference and set a date for a hearing at which (i) the Arbitrator will consult with the parties as to the proposed terms of reference and (ii) the parties will have the opportunity to pose further questions of Mr. Van der Herten.    The Arbitrator will thereupon define the expert's terms of reference in final form.

34.    Upon substantial completion of discovery, an oral hearing took place at the Sheraton Airport Hotel at Brussels-Zaventem, on November 6, 7 and 8, 2006.    Several written pre-trial memorials were submitted on both sides.    During the hearing, oral evidence was given on behalf of MC by Mr Michel Verbeken, Mr Johan Vandamme, Mr

Van Lenbergen and Mr Robert Pippel, and on behalf of Maxim by Mr Walter Sengali, Mr Jean-François Bougerol, Mr Gert Hansen and Ms. Heide Perry.

## V.    THE CLAIMS ASSERTED BY MC

35.    MC, by its Request for Arbitration dated November 30, 2005, and as set forth in the Terms of Reference, as amplified by MC's subsequent Memorials and oral argument, advanced arguments and claims, which may be summarized as follows:

(A)    **Claim pursuant to Section 2 of the 1961 Act entitling the distributor to a reasonable termination period or equitable compensation instead.** MC claims that the 18-month Termination Period set by Maxim was insufficient, and pursuant to Article 2 of the 1961 Act, MC was entitled to a reasonable termination period or equitable compensation. Maxim's Termination Period of 18 months was unreasonable because MC could not be expected to realize 60% of its turnover through other means within that Period, *or indeed ever.* As there were only two competitors of Maxim in the relevant market (who already had their own respective distribution networks and who when MC approached them confirmed not to be interested in an arrangement with MC), it was *de facto* impossible for MC to find an equivalent distribution agreement.    The very existence of MC was threatened as an immediate result of the termination of the 1998 Agreement.  MC is currently in a state of virtual bankruptcy.  Based on (i) case law and legal doctrine, (ii) Maxim's large share in MC's overall business at the time of the termination of the 1998 Agreement, (iii) the effect of the termination on the viability of MC's business, and (iv) the context within which Maxim expected MC to carry out its contractual obligations during the Termination Period, MC claims damages by way of an equitable compensation pursuant to Section 2 of the 1961 Act equal to the actual value of the entire business of MC during the year of termination (2001), in the amount of €6,968,089.55.

(B)    **Subsidiary claim pursuant to Section 21 of the 1995 Act.** Subsidiarily, insofar as its relationship with Maxim involved the House Accounts, MC must be deemed to have

- 10 -

been an agent of Maxim under the 1995 Act. Consequently, even if Section 2 of the 1961 Act would be held not to allow an integral damage award equal to the value of the company, MC claims that it would be entitled to such award pursuant to Section 21 of the 1995 Act.

(C)    **Claim of Undermining the Termination Period.**  MC claims that Maxim violated its own Termination Period of 18 months through its policies relating to pricing, costs and publicity. During the Termination Period, Maxim was actively promoting direct sales bypassing the distributor, thereby undercutting the business of MC.

(i)    During the Termination Period, Maxim attempted to limit MC's ability to sell Maxim's products by conducting extensive advertising campaigns encouraging direct sales, while mentioning MC (as distributor) in an extremely limited way. Nonetheless, Maxim held MC to its obligation to expend 4% of total sales on publicity and advertising.

(ii)    Maxim also held MC to its obligation to continue to pay a third of the salary of a Field Application Engineer (Maxim's employee) who would render technical assistance to clients within the Territory.

Established case law and legal doctrine (which refer to the 1961 Act, equity and common sense, but especially to the doctrine of good faith) object to obligating a terminated distributor to continue to invest in such a substantial way in the promotion of the manufacturer's products without itself having any future interest in those products.

(iii)    Maxim's unilateral change in pricing policy resulted in a significant reduction of MC's profit on the sale of Maxim's products, as MC was not permitted to pass on such price increases to its customers. Maxim's actions were in violation of the principles of good faith that might be expected from a contracting party.

In connection herewith, MC seeks damages in the amounts of respectively US$77,303 for the cost of publicity expended by MC, US$43,861.49 being MC's estimated contribution to

the salary of the FAE, and €30,000 representing the estimated damages MC suffered as a result of Maxim's pricing and publicity campaign during the Termination Period.

(D)    **Claim pursuant to Section 3 of the 1961 Act providing for equitable compensation for clientele brought in for manufacturer.** MC further claims that pursuant to Section 3 of the 1961 Act, Maxim owes MC an equitable, additional compensation for the clientele that MC built up over the years and which remained with Maxim after termination of the 1998 Agreement.  MC estimates the equitable compensation for such clientele at €1,272,000.  This estimate is based on factors that include the known added value in clientele created by the distributor and remaining with Maxim upon termination of the Agreement.

MC claims that the three conditions for Section 3 to be applicable have been fulfilled: (a) realization by MC of a substantial added value in clientele; (b) MC brought in the clientele by itself; and (c) the clientele remained with Maxim.

(E)    **Claim for underpayment of commissions on sales to House Accounts.** MC also seeks damages in an amount estimated at €1,749,953.21 representing underpayment of commissions owed MC on Maxim's sales to House Accounts pursuant to Section 1B and Exhibit B of the 1998 Agreement.

(F)    **Claim for damages caused by improper conduct.** Finally, MC seeks damages from Maxim caused by its alleged improper conduct during the arbitration proceedings, estimated *ex aequo et bono* at €100,000.

MC seeks the foregoing together with interest on the principal amounts, and all costs incurred by MC in the form of attorneys' fees and disbursements, expert fees and other costs incurred in connection with "the procedures conducted as a result of the disputes between the parties."

## VI.    MAXIM'S ANSWER TO MC'S CLAIMS AND MAXIM'S COUNTERCLAIM

36.        Maxim, by its Answer dated April 14, 2006, and as set forth in the Terms of Reference, as amplified by its subsequent Memorials and oral argument, categorically denies all claims advanced by MC. Maxim's arguments may be summarized as follows:

(A)    **As to MC's claim pursuant to Section 2 of the 1961 Act.** Considering all the circumstances, Maxim argues that the 18-month Termination Period constituted a reasonable termination period in accordance with both the classical and modern interpretation of Section 2 of the 1961 Act, and no equitable compensation is owed.

(i)        Maxim took into account additional criteria, which it argues justify the 18-month Termination Period:

○ *Extent of contract territory:* Belgium is a small territory compared to territories of other distributors of Maxim. Moreover, the 1998 Agreement reduced the territory from Belgium and Luxembourg to just Belgium.

○ *Investments made by MC:* MC's investments made for the expansion of its distribution activities were negligible at best. As of the date of entering into the 1998 Agreement (December 1, 1998), MC made a representation to that effect (in Section 11D, second sentence).

○ *Inadequate and poor performance by MC:* MC's inadequate and poor performance may be taken into account when determining whether or not the Termination Period was fair and reasonable;

○ *Distribution activities for Maxim were not the only activities of MC:* MC was active in a number of fields other than distributing Maxim's products. Even going by MC's own figures, 40% of its gross sales were represented by other activities. When the terminated distribution is only part of a distributor's activities, the Termination Period will be shorter;

- 13 -

○ *No exclusivity:* Even if parties agree that the Agreement was *de facto* exclusive, MC did not have exclusivity rights under the Agreement by its terms, - permitting a shorter Termination Period.

(ii)    As stated by MC, the objective of a Termination Period under Section 2 of the 1961 Act is to provide a terminated party the opportunity to locate an equivalent replacement, in this case a new distribution agreement with another manufacturer to distribute parts.

(iii)    MC commercialized (until some time in 2006) the "Analogic Tech" product line, which is in direct competition with Maxim's products. The implication hereof is either that (a) MC commercialized this product line prior to termination of the Agreement, in which case MC breached the Agreement and is not entitled to any compensation, or (b) MC started commercializing this product line after termination, in which case MC found an equivalent replacement, so that MC is no longer entitled to compensation under Section 2 of the 1961 Act.

(iv)    MC applies an incorrect measure of damages by demanding (in principle) an amount that Maxim believes represents the approximate value of MC's *entire* business at the time of termination. Instead, one of several criteria that should be observed is the impact of distribution activities on the total value of a company. In addition, MC fails to deduct the 18-month Termination Period from the amount claimed by it.

(v)    In any event, the purpose of 'a fair indemnity in lieu of a termination period' under Section 2 of the 1961 Act is to cover the loss resulting from non-performance *of a termination period*, - not the loss resulting from termination of an exclusive distribution agreement. The indemnity obligation is compensatory in nature, replacing the duty to offer a reasonable notice period in case no term, or an insufficient termination period was observed.

- 14 -

(vi)    Maxim did not undermine the Termination Period by allegedly no longer including MC as one of the distributors in its brochures and by changing its pricing policy.

(vii)    The 1998 Agreement continued to apply during the Termination Period.

(B)    **As to MC's subsidiary claim pursuant to Section 20 and/or 21 of the 1995 Act.** Subsidiarily, insofar as MC's relationship with Maxim involved the House Accounts, MC cannot be considered an agent of Maxim under the 1995 Act.

(i)    MC has never acted as Maxim's commercial agent, as such term is defined in the 1995 Act. The commission agreement of Exhibit B to the 1998 Agreement cannot be considered an agency agreement.

(ii)    MC did not make any claim on the basis of the 1995 Act until its memorial dated September 22, 2006, which was too late in this arbitration procedure and should therefore be dismissed as asserted untimely.

(iii)    .    Claims made pursuant to Sections 20 and 21 of the 1995 Act are extinguished unless the agent notifies the principal of his intention to assert a claim based on those sections. Therefore, MC should have notified Maxim thereof by March 7, 2004. In fact, the first indication that MC intended to assert claims under the 1995 Act were set forth in its Memorial dated September 22, 2006.

(iv)    In any event, any claim under the 1995 Act is time-barred by the general one-year statute of limitation set forth in Section 26 of the Act.

(v)    Subsidiarily,

(a) applying Section 18 of the 1995 Act to the 1998 Agreement limits MC's right to a termination period of four months (as the commission arrangement lasted from

- 15 -

January 1, 1998 until the date of the termination notice on September 7, 2001), whereas Maxim gave MC a termination period of 18 months;

(b) the purpose of Section 20 of the 1995 Act is to compensate the agent for the loss of future commissions for up to one year; and the conditions for the right to compensation under Section 20 are the same as those applying to Section 3 of the 1961 Act (see para. D below), - which have not been fulfilled; and

(c) the purpose of Section 21 of the 1995 Act is to compensate the agent for damages incurred in connection with the agency relationship, such as investments that have not yet been written off and payments to third parties owed as a result of the termination of the agency agreement. MC has not proven to have incurred any of those damages. Furthermore, Section 21 is not intended to compensate an agent for the integral value of the agent's company, and such value based on the loss of future income streams is already covered by Section 20 of the Act.

(C)     <u>**As to MC's claim of Undermining the Termination Period.**</u>  Maxim denies the allegation that its pricing and publicity policies were aimed at undermining the Termination Period.  Maxim continued to mention MC and its telephone number in its publicity materials. No specific effort was made to draw customers toward its direct sales.  Therefore, MC had to continue to contribute 4% of its sales in accordance with the Agreement.  Pursuant to Section 2A of the 1998 Agreement, Maxim had the express right to adjust prices, and did not abuse that right during the Termination Period.  MC's allegations that Maxim would have abused its contractual rights are unfounded.

(D)     <u>**As to MC's claim pursuant to Section 3 of the 1961 Act.**</u>

Maxim contests both that MC is entitled to additional compensation for the added value of clientele, and the calculation of the amount claimed.

(i)     Maxim contests the amount of the claim of €1,272,000, which equals the amount of goodwill in the auditor's report submitted by MC, because it lacks impartiality

and supporting documents and is biased in nature. 'Added value of clientele' is a concept that is less broad than 'goodwill', and therefore cannot equal it. Moreover, MC is active in more than one field of business.

(ii)　　MC failed to provide conclusive evidence for the following three elements, which it needs to show in order to be entitled to any compensation for 'added value of clientele'. Specifically, Maxim argues that MC has failed to show that:

- *The added value of clientele was considerable:* A mere added value does not suffice. The added value must be considerable, i.e. remarkable.

- *MC personally brought in this clientele.* The considerable increase in clientele must not be the result of e.g. the growth of the market or the success of Maxim's products. MC alleges that it brought in a considerable and worldwide group of customers, including Alcatel, Philips and Option. As is shown in the Agreement, these clients are 'House Accounts', Maxim's own customers. The House Accounts are subject to a separate commission scheme and do not fall within the scope of the Agreement. They cannot be included in the basis of calculating a claim under Section 3.

- *The clientele remained loyal to Maxim after termination of the Agreement.*

(E)　　**As to MC's claim for underpayment of commissions on sales to House Accounts.** Maxim argues that there is no contractual basis for MC's contention that MC is entitled to commissions for deliveries from Maxim's suppliers, and/or for deliveries to subcontractors of the House Accounts. Specifically, Maxim argues that

(i)　　MC is entitled to commissions only if it can validate its involvement, or that of the FAE, in the 'design win.'

(ii)　　All commissions due under the Agreement have been paid by Maxim to MC. Maxim has reported all necessary and useful information to MC for it to be able to determine the extent of its right to commissions.

- 17 -

(iii)    In any event, MC is not entitled to commissions after March 7, 2003, the expiration date of the notice Period.

(iv)    MC has the burden of proof that it is entitled to any additional commissions under the Agreement.

37.    **Counterclaim advanced by Maxim.** Maxim submits a counterclaim that may be summarized as follows:

(i)    During the period from January 1, 1998 until March 7, 2003, MC received commission payments on certain sales that were not commissionable under the Agreement. Specifically, MC received commission payments on all sales by Maxim to Alcatel in Belgium, even on sales concerning products for which the design win had not been done as per the Agreement, and which hence were not commissionable.

(ii)    Maxim has identified such unduly made commission payments in its post-hearing brief, and demands that they be refunded to Maxim by MC. Maxim indicates a maximum and a minimum amount of the commissions it overpaid, aggregating to a minimum sum of US$109,379.89 and a maximum sum of US$182,301.02, and suggests that the exact amounts should be determined by the expert appointed by the Arbitrator, Mr. Carlo Van Der Herten.

38.    **Relief sought by Maxim.** In sum, Maxim demands relief as follows:

(i)    As regards the merits of MC's case:
   o   Declare the claims filed by MC to be unfounded;
   o   Declare that any extension of MC's claims must be filed in the current arbitration proceedings.

- 18 -

(ii)    As regards the counterclaim:

    o  Declare the counterclaim admissible and founded, to cause Mr. Van Der Herten to quantify each portion thereof and

    o  Award that MC repay the amounts so quantified to Maxim.

(iii)   As regards interest and costs:

    o  Declare MC's claim for interest to be unfounded because it delayed arbitration procedures unduly by persisting in bringing this matter before the Belgian courts, and in any event to limit interest charges to 6% in accordance with the new law; and

    o  Deny MC's claim for costs, and award payment of all costs of attorneys' fees and expenses incurred by Maxim in connection with the court proceedings as well as this arbitration.

## VII.   ISSUES IDENTIFIED BY THE TERMS OF REFERENCE

The Terms of Reference identified the following non-exhaustive list of issues to be determined:

39.    Did the Termination Period of 18 months constitute an unreasonable Termination Period under *Section 2* of the 1961 Act? If so, on what grounds? If not, why not? Who has the burden of proof under Belgian law? See ¶52 *et seq*. (notably ¶57).

40.    Was it *de facto* impossible for MC to find an equivalent distribution agreement?

(i)    How is the fact that distribution of Maxim's products represented 60% of MC turnover relevant for the determination of a reasonable length of the Termination Period? Is this fact disputed? What do the case law and/or the legal doctrine say about contracts where distribution of the manufacturer's products represented only a small

- 19 -

percentage, or on the other extreme, 100% of the distributor's business? See ¶¶68(e), 70, and 74.

(ii)    Is the objective of a Termination Period to provide the terminated party with the *opportunity* to locate an equivalent replacement? If so, what jurisprudence or legal doctrine is/are the basis of this statement? If not, what jurisprudence and/or legal doctrine shows that this statement is inaccurate, and what is the objective instead, as stated in jurisprudence and/or legal doctrine? See ¶61 *et seq.*

(iii)   Does 'equivalent' mean that the 'new' manufacturer had to be a competitor of Maxim? Or, as Maxim argues, is it sufficient to find a new distribution agreement with another manufacturer to distribute parts? See ¶61 *et seq.*

(iv)    Did Maxim breach the 18-month Termination Period by its policies relating to pricing, costs and publicity in the sense of undermining the Termination Period in such a way that its purpose had been undermined to a large extent? What are the exact facts on which this allegation is based? What legal grounds are there to cause Maxim's behavior to constitute such a breach? On the other hand, what legal grounds are there that show that Maxim's behavior did not constitute such a breach? Why should certain contractual obligations cease to apply during the Termination Period? See ¶98 *et seq.*

(v)     Is there legal precedent for not having a notice period at all, and if so, under what circumstances? If, generally, *any* notice period is held to be unreasonable, how does this influence the determination of a fair compensation under Section 2 of the Act? See ¶76 *et seq.*

(vi)    Why is it relevant that MC has continued to experience a steady decline in revenues, which situation it has been unable to turn around? What factual allegations support this contention? See ¶76 *et seq.*

- 20 -

(vii)    MC has adduced financial information with regard to (i) Maxim's share in MC's business, and (ii) the effect of the termination on the viability of the MC's business. What are the implications of this information under Belgian law relative to MC's right to a fair compensation under Section 2? See ¶77.

41.    What is the *factual* basis for the additional criteria (¶36(A)(i)) that Maxim took into consideration when it decided on an 18-month Termination Period? What is the *factual* basis taken into consideration by MC in qualifying the 18-month Termination Period as unreasonable? Are there other criteria than the ones invoked by Maxim that need to be taken into account? How and why is each of these criteria *legally* relevant, or how and why is each of these criteria legally irrelevant? See ¶59 *et seq.*

42.    What is the *factual* basis for Maxim's allegations regarding MC's commercialization of the 'Analogic' line? Who has the burden of proof of these allegations under Belgian law? If either allegation is true, what are the respective implications under Belgian law? See ¶70.

43.    What are the facts underlying the contention that during the Termination Period Maxim limited the possibilities for MC to sell Maxim's products? What is the legal basis (case law and/or legal doctrine) for the reasoning that Maxim's actions affect the equitable compensation under Section 2 of the Act? See ¶98 *et seq.*

44.    Does Section 3 of the 1961 Act constitute a separate basis for compensation that is distinct from the rights a distributor derives from Section 2 of the Act? If not, why not? If it does form a separate basis for compensation, how is this equitable, additional compensation computed? What case law and legal doctrines support either interpretation of Section 3? See ¶112 *et seq.*

(i)    What is the legal basis for the three conditions alleged by MC? What facts support that these conditions have been fulfilled?

(ii)    How does the jurisprudence and legal doctrine define the 'added value of clientele', and how is it measured if not by looking at the goodwill of MC as reported by MC's auditors (whether or not limited to insofar as it relates to the 1998 Agreement)?

45.    Who under Belgian law has the burden of proof with respect to the claim that MC is entitled to receive additional commissions?  What are the facts necessary for the Arbitrator to establish whether or not MC is entitled to such commissions on the 'House Accounts' (especially in view of, but not limited to, MC's contention that it has well-founded doubt as to the correctness and completeness of Maxim's reports)?  What support is there for and/or against the contention that commissions are due also with respect to products sold to subcontractors?  If MC is claiming payment of commissions with respect to sales to House Accounts after March 7, 2003 (the expiration date of the Termination Period), what is the legal basis therefor?  See ¶149.

46.    As to *quantum* of the Section 2 claim, Maxim raises doubt as to the measure of damages: does it represent the current value of MC's business, does it relate to MC's entire business or just MC's business as it relates to the Agreement?  Should the 18-month Termination Period be deducted from the amount claimed by MC, and, if so, how?  Which measure of damage is the correct one under the law?  What case law and legal doctrine support this measure of damages?  See ¶53 *et seq.*

47.    Is the purpose of the compensation under Section 2 intended to cover only the loss resulting from non-performance *during* the Termination Period, instead of the total loss of the distribution rights?  Or are these two measures the same?  Is there any case law or legal doctrine that supports either theory?  See ¶79 *et seq.*

48.    If Maxim were to be found to have undermined the Termination Period by actions regarding pricing, costs and publicity, how in terms of money should that affect the amount of 'fair compensation' under Section 2?  See ¶98 *et seq.*

49.    In the event that damages under Section 3 were to be warranted as a separate basis for compensation, what constitutes an 'equitable, additional compensation', and how is it computed? See ¶112 *et seq.*

50.    Did MC, during the period from January 1, 1998 until March 7, 2003, receive commission payments on certain sales that were not commissionable under the Agreement, including on sales to Alcatel in Belgium, even on sales concerning products for which the design win had not been done as per the Agreement, and which hence were not commissionable? See ¶138 *et seq.*

51.    Must any change to MC's provisional limit of its claim of €750,000 be filed within the framework of the current arbitration proceedings, and not lead to a separate arbitration proceeding? See ¶7.

## VIII.  MC'S CLAIM PURSUANT TO SECTION 2 OF THE 1961 ACT

52.    As summarized above, MC argues that the 18-month Termination Period set by Maxim was insufficient, and that pursuant to Section 2 of the 1961 Act, MC was entitled to a reasonable termination period or equitable compensation.  Specifically, MC argues that Maxim's Termination Period of 18 months was unreasonable because MC could not be expected to realize 60% of its turnover through other means within that time, - *or ever*.

53.    According to MC, as there were only two competitors of Maxim in the relevant market (who already had their own respective distribution networks and who when MC approached them confirmed not to be interested in an arrangement with MC), it was *de facto* impossible for MC to find an equivalent distribution agreement.  The very existence of MC was threatened as an immediate result of the termination of the 1998 Agreement.  MC alleges that it is currently in a state of "virtual bankruptcy."

54.    Based on (i) case law and legal doctrine, (ii) Maxim's large share in MC's overall business at the time of the termination of the 1998 Agreement, (iii) the effect of the termination on the viability of MC's business, and (iv) the context within which Maxim expected MC to carry out its contractual obligations during the Termination Period, MC claims damages by way of an equitable compensation pursuant to Section 2 of the 1961 Act equal to the actual value of the entire business of MC during the year of termination (2001), alleged to be in the amount of €6,968,089.55.

55.    Maxim argues that, considering all the circumstances, the 18-month Termination Period constituted a reasonable termination period in accordance with both the classical and modern interpretation of Section 2 of the 1961 Act, and that no equitable compensation is owed.

56.    In order to analyze the issue as to whether MC is entitled to an additional compensation pursuant to Section 2 of the 1961 Act, the Arbitrator first needs to consider whether the Termination Period of 18 months was reasonable under the circumstances. If it was, no further compensation is owed. If the Termination Period was inadequate, the Arbitrator needs to establish what compensation is equitable on the basis of current case law and legal doctrine, given the criteria established thereby.

57.    The Arbitrator has read with great interest the Affidavits submitted on behalf of the parties by the esteemed legal scholars, Maître Marc Willemart ("Willemart") and Maître Geert E. Bogaert ("Bogaert"). The Arbitrator has no doubt that each of them belongs to an elite group of experts on this extremely complex and difficult subject of how to apply Section 2 of the 1961 Act. Both have written extensively on the issues surrounding the 1961 Act. Among the many issues covered by both scholars, Willemart specifically addressed the issue of the burden of proof with respect to the reasonableness of the Termination Period. As with respect to all other contractual issues under Belgian law, the party invoking a fact or factual circumstances has the burden of proof, but under modern law the other party has an obligation to contribute to establishing the facts, especially when it has control over the

- 24 -

factual elements that are useful for the judge or arbitrator to form his opinion and which are unknown to the opposing party. (Expertise Willemart, p.18)

58.    The Arbitrator has also studied the other literature submitted, as well as the numerous decisions by the "Court de Cassation" or "Hof van Cassatie" (the Supreme Court of Belgium, herein referred to as the "Supreme Court"), the Courts of Appeal and several commercial courts of first instance that the parties submitted to assist the Arbitrator in coming to a well-grounded decision.

59.    Thomas Faelli, in a footnote to his Note under the Supreme Court's recent decision in *D'Ieteren SA v. Garage Sébastien SA* (see ¶60), summarizes the criteria for evaluation of the reasonable termination period as follows:

"... for the evaluation of the reasonable termination period, the principal criteria generally applied by case law are:
- the length of the terminated distributorship;
- the extent of the territory;
- the share in the distributor's overall activities represented by the distributed products;
- the notoriety and nature of the products distributed, as well as the existence of competing products;
- the importance and growth of the gross revenues earned by the sale of the distributed products;
- the investments made by the distributor in connection with carrying out the distributorship." [*unofficial translation by Arbitrator*]

60.    An important part of the discussions between the legal experts who testified in this case, as well as among others who have written about the 1961 Act, seems to focus on a number of recent Supreme Court decisions, most notably the decision of 10 February 2005 (*D'Ieteren SA v. Garage Sébastien SA*, R.D.C. 2005/9 – November 2005 Note by Thomas Faelli), affirming the judgment of the Brussels Court of Appeal of 21 March 2003.  Bogaert

- 25 -

represents the group of scholars who believe that this case represents a significant modification of the way the judge (or arbitrator) needs to look at the facts and criteria. Willemart, on the other hand, represents the scholars who point out that little was changed by the February 10, 2005 Supreme Court decision, when one analyzes the many lower court decisions that have come down since then.

61.     Generally, the "classical" interpretation of Section 2 of the 1961 Act declares that the purpose of the termination period is to enable the distributor to locate a new distribution arrangement that either provides the distributor with equivalent products or with an equivalent manufacturer.  [Supreme Court, 25 March 1976 (Pas. 1, 1976, pp. 822-824)]

62.     Quoting with approval the opinion of the lower court, the Supreme Court in *D'Ieteren*, in pronouncing the so-called "new" interpretation, held as follows:

> "[T]he purpose of the legislator was to ensure for the distributor that he would have the necessary time to reorient his activities so that the termination of the distributorship agreement would not lead to his ruin;
>
> "... therefore the reasonable termination period, in order to satisfy the Act, must permit the distributor to obtain a source of net revenues equivalent to those he has lost, if need be by a total or partial conversion of his activities; and
>
> "... the distributor cannot claim a termination period that permits him in all cases to find a distributorship producing results equivalent to the lost distributorship, this being the case no matter what the risk is of this search"  [*unofficial translation by Arbitrator; paragraph-formatting added for clarity*]

The Court concluded that, rather than adding to Section 2 of the 1961 Act evaluation rules or criteria that this Section does not foresee, the judgment of the lower court applied it exactly right.

63.     The next question that arises is whether the judge or arbitrator takes into consideration only the circumstances that prevailed as of the date of the notice of termination

(*abstract* evaluation), or whether he may also consider the circumstances at the end of the termination period or even at the time of his decision (*concrete* evaluation).

64.    The viewpoint in favor of the abstract evaluation was largely based on the above cited Supreme Court decision of 25 March 1976 (see ¶61), in which the Court held that the right to damages resulting from the unilateral termination of an exclusive distributorship agreement "is born and is to be determined as of the date of the notice of termination," even if as a result of a particular provision of the terminated agreement, the latter continues to produce certain effects until the expiration of the termination period.

65.    Here too, there appear to have been important developments in the jurisprudence since 1976. Most recently, overruling the judgment of the court below, the Supreme Court's opinion of 7 April 2005 (*Toyota Belgium v. V.L.R.*, R.W. 2005-2006, p. 1176, Note D. Mertens) answered this question as follows:

"[N]either the circumstance that the reasonable termination period to which the distributor is entitled is determined as of the notice of termination nor the equity that must guide the judge excludes that in order to evaluate the reasonable termination period he takes into consideration all elements he has at his disposal at the moment of his decision;

"... the judgment of the Court of Appeal holds that 'the length of a reasonable termination period needs to be considered, *in abstracto*, at the moment of the notice and that things that happened after that must therefore not be taken into account'; ... [the Court of Appeal] draws the conclusion that the fact ... that there were or were not proposals or negotiations with other companies 'more than a year before the expiration of the termination period' cannot have an impact on the solution of the dispute;

"... the judgment [of the Court of Appeal] thereby violates Section 2 of the Act of July 27, 1961..." [*unofficial translation by Arbitrator*]

66.    The Arbitrator concludes that for purposes of applying Section 2 of the 1961 Act to this dispute, he must determine what would have been a reasonable termination period as

of the date of the notice of termination by analyzing what is equitable with the help of all elements at his disposal at the moment of his decision. These elements may include all applicable 'traditional' criteria, as well as all relevant factors that occurred after the notice of termination, taking into due consideration that the purpose of the termination period is (i) to allow the distributor the necessary time to reorient his activities so that the termination of the distributorship agreement will not lead to his ruin; (ii) to permit the distributor to obtain a source of net revenues equivalent to those he has lost, if need be by a total or partial conversion of his activities; and (iii) *not in all cases* to find a distributorship producing results equivalent to the lost distributorship (irrespective of the risks involved).

67.    It appears therefore that the "classic" interpretation is still valid today, but has been augmented by additional factors, as spelled out by the Supreme Court in *D'Ieteren* and *Toyota*. This also seems to be Willemart's conclusion, when in his affidavit (at p.4) he recounts the conclusion Ariane DeStrycker and he arrived at in their note "*Un Pont trop loin.*"

"This note concludes that when the termination period can be determined (as this was generally the case before) as a function of the time required to discover and organize a new equivalent distributorship, it can [now] also be established as a function of the concrete necessities of divesting the activity which the manufacturer has terminated and of the possibilities of conversion of the undertaking to another activity which does not necessarily need to amount to an equivalent distributorship." 2006 JLMB 957. [*unofficial translation by Arbitrator*]

68.    It is in this light that the Arbitrator needs to apply both the old and the new criteria to the Termination Period:

a. *The length of the terminated distributorship*: For purposes of determining the length of the distributorship, the Arbitrator needs to take into consideration both the 1998 Agreement and the 1987 Agreement, representing one uninterrupted time period. The length of the distributorship from its inception until the notice of

termination by Maxim is thus measured from October 1, 1987 until September 7, 2001, 24 days short of exactly 14 years. For all intents and purposes, the Maxim brand, having been in existence for only three years, and having had representation in Belgium (by a previous distributor) only in a very limited way, has been built up and established in Belgium by MC, albeit with the assistance of the advertising done by Maxim directly.

   b.  *The extent of the territory*:  For more than 11 out of the 14 years that the relationship lasted, the territory included both Belgium and Luxembourg. For the duration of the 1998 Agreement (from December 1, 1998 through September 7, 2001) the territory was reduced to Belgium.

   The fact that, as Maxim argues, Belgium is a small territory compared to territories of other distributors of Maxim is irrelevant for the purpose of determining the importance of the territory. Insofar as this distribution agreement concerned Belgium, it is important to note that it covered the entire country. The fact that the 1998 Agreement reduced the territory from Belgium and Luxembourg to just Belgium is of no consequence as Luxembourg did not constitute more than a negligible portion.

   c.  *The share in the distributor's overall activities represented by the distributed products*: The Arbitrator concludes that the share of Maxim-related sales in MC's overall activities should be determined for a reasonable time preceding the date of the notice of termination. The second report of Vandelanotte Auditors, dated June 19, 2002 (contained in MC's Exhibit 2*bis*), indicates that the share of Maxim-related sales in MC's overall sales during that period averaged 60 percent, but varied considerably from month to month. In fact, the share amounted to 58.25% for the 12-month period from July 2000 through June 2001. The Vandelanotte report concludes that for the period from January 2000 through July 2001 the average was 60.07%. For purposes of this criterion, sixty percent appears therefore to be a reasonable number.

The Arbitrator does not believe that he can, or needs to, take into account MC's "sister company", Power Chips, or, more specifically, consider the question whether MC and Power Chips ought to be treated as one and the same company, as Maxim argues. Based on the evidence before the Arbitrator, the two companies were, and still are, conducted as two separate legal entities, with different addresses and different websites, with different bank accounts and different financial statements. Without further evidence to go on, the Arbitrator sees no ground to effectively "pierce the corporate veil" of Power Chips. And even if the corporate veil could be pierced, the financials of the two companies appear to indicate that it would not really make much difference. Power Chips is substantially smaller than Master Chips, and has been only marginally profitable, averaging an annual profit from operations of roughly €10,800 over the eight years of its existence.

d. *The notoriety and nature of the products distributed, as well as the existence of competing products*: The Arbitrator observes that among the purchasers of the types of product Maxim manufactures, the brand "Maxim" is well known in Belgium. When MC first started to represent the brand in Belgium and Luxembourg, the company was still very new, and to a large degree Maxim's reputation in those countries can be credited to MC, alongside Maxim's own marketing and advertising activities. MC represented the brand at industrial fairs and conventions, paid visits to potential customers and successfully introduced Maxim products to large and very large customers, including Alcatel, Philips and Option, but also Barco, Bancsys, and many smaller companies. There are not many companies that are in direct competition with Maxim for the full 'array' of products[2] that are offered by Maxim. Even though Maxim's 2005 Annual Report lists a large number of companies as competitors, almost none of those companies appear to be competitors of Maxim with

---

[2] According to Maxim's 2005 Annual Report, Maxim's "products include, but are not limited to, data converters, interface circuits, microprocessor supervisors, operational amplifiers, power supplies, multiplexers, delay lines, real-time clocks, microcontrollers, switches, battery chargers, battery management circuits, RF circuits, fiber optic transceivers, hot-swap controllers, sensors, voltage references and T/E transmission products. … The Company's products are sold to customers in numerous markets, including automotive, communications, consumer, data processing, industrial control, instrumentation and medical industries."

respect to *all*, or substantially all, its products.  As Maxim's 2005 Annual Report stated, "[t]he mixed signal analog integrated circuit industry is intensely competitive, and virtually all major semiconductor companies presently compete with, or conceivably could compete with, *some segment* of the Company's business." [*emphasis added*]  Thus, the Arbitrator finds that most of these companies compete with Maxim only in a limited segment of Maxim's array of products.

Furthermore, although these companies compete with Maxim, Maxim does not adduce any evidence to show that such companies compete with Maxim in the relevant territory, namely Belgium, nor to what degree any of them competes in that territory.

The Arbitrator concludes that, for purposes of this criterion, it is fair to presume that the actual market in which Maxim operates in Belgium offers very few competitors that would generate an equivalent distributorship if it were available. The Arbitrator is not convinced that the number of competitors in this category is limited to two, as MC contends.  But, based on the evidence before him, the Arbitrator is convinced that that number is significantly less than the number of competitors listed in Maxim's 10-K under the heading "Competition."

e.  *The importance and growth of the gross revenues earned by the sale of the distributed products*:  The importance to MC of the gross revenues earned by the sale of Maxim's products is explained by the 2d Vandelanotte Report, which shows that they accounted for approximately 60% of MC's gross revenues.  The growth of the gross revenues started at approximately zero at the time the 1987 Agreement was entered into, and grew steadily over the years following.  In 1999, there was a marked reduction of revenues as a result of removing the House Accounts from gross revenues.  After 1999, there was substantial growth, culminating in spectacular growth in 2001 as compared to 2000: the first six months of 2001, gross revenues increased by almost 253% over the first six months of 2000.  Both in relative and

absolute terms, the Arbitrator concludes that the sale of Maxim products was very important for MC.

f. *The investments made by the distributor in connection with carrying out the distributorship*: Again turning to the 2d Vandelanotte Report, it appears that the investments made by MC in connection with carrying out the distributorship were quite modest. As Maxim points out, as of the date of entering into the 1998 Agreement (December 1, 1998), MC made a representation to that effect (in Section 11D, second sentence).

Vandelanotte concludes that the average investment did not exceed BEF 1 million, or roughly US$25,000 per annum. Compared with the average annual gross revenues of more than US$1,060,000 per Maxim fiscal year (Cl. Exh. A-38), investments therefore averaged about 2.36%, - a relatively negligible amount.

69.    In addition to the above criteria, the Arbitrator needs to consider whether there are any elements of which he is aware at the moment of his decision that are relevant for the determination of what constitutes a reasonable termination period.

70.    First, it should be noted that none of the additional criteria advanced by Maxim and outlined in ¶36A above appear to the Arbitrator to be well founded in this connection:

o *Inadequate and poor performance by MC:* In the Arbitrator's judgment, Maxim has failed to demonstrate that MC's performance was inadequate and poor. After removing the House Accounts from MC's duties as a distributor, MC's sales rebounded relatively quickly, and grew spectacularly in 2000 and 2001. By the time that Maxim terminated the 1998 Agreement, MC's sales had far exceeded the pre-1999 figures that included the House Accounts. Even if sales in the rest of the world also grew, Maxim cannot argue that therefore MC's success ought to be interpreted as poor performance.

- 32 -

o *Distribution activities were not the only activities of MC:* Although case law appears to indicate that the termination period for distributorships of products representing only a small percentage of the distributor's gross revenues (such as a brand of perfume) can be short, while the termination of a distributorship representing 100% of the distributor's business (such as a car dealership) must necessarily be longer, it is only one of a number of factors that the courts take into consideration. Nonetheless, it is obvious that the distributor who has one car dealership is totally dependent on that one distributorship. When terminated, the economic impact on the distributor's business is total and much more important than the impact would be on a distributor whose business involves multiple distributorships. See *Marc Willemart & Ariane DeStrycker*, DE CONCESSIEOVEREENKOMST IN BELGIË No. 62 (Kluwer 1996) [herein: "*Willemart & DeStrycker*"] and cases cited. Even though about 40% of MC's gross sales were represented by other activities, however, the 2d Vandelanotte Report demonstrates that without the Maxim business, the company's net results would have shown an operating loss. Thus, it was important for MC to find a distributorship (or other activity) that was at least as profitable as its distribution of Maxim products, - a goal that must have been very difficult to accomplish.

o *No exclusivity:* Although it is true, as Maxim argues, that MC did not have exclusivity rights under the Agreement, the parties agree that MC did have *de facto* exclusivity for the customers other than the House Accounts. For purposes of the determination of a reasonable termination period, MC's legal non-exclusivity was irrelevant as a factual circumstance.

o *Analogic Tech:* Maxim argues that MC had located another distributor, which would replace Maxim. It is clear, however, that Analogic Tech is a very small company, producing only a limited array of products in no way comparable to Maxim, and not able to replace the Maxim parts MC's customers bought from it.

71.    As stated previously, the judge (or arbitrator) may also consider all elements known to the judge (or arbitrator) at the time he renders his decision. As discussed by Marc Willemart and Ariane DeStrycker (in the Note "*Un pont trop loin*", 2006 JLMB 957), the lower courts, as sovereign finders of fact, have long taken elements into consideration that followed the notice of termination to help them determine the equitable length of the termination period.

72.    The examples of elements that occurred after the notice of termination, or even after the end of the termination period, that Willemart mentions in his expertise include:

(i)        the distributor had found another concession;

(ii)       the distributor had been unable to find another distributorship and conversion of his business had been difficult;

(iii)      the distributor had put itself into liquidation without having made any effort to find another commercial activity;

(iv)      the distributor had pursued sales of the distributed products after the notice of termination;

(v)       the distributor has failed to adduce any evidence of having actively pursued the discovery of new opportunities for a representation or distributorship; and

(vi)      the distributor had undertaken another activity immediately after the expiration of the termination period such that the length of the termination period that was owed had to be linked to the comparative appraisal of the results. Although these factors may be more relevant for the determination of the length of an equitable termination period, they may also affect (certainly to a much lesser degree) the amount of the compensatory payment.

73.    The Arbitrator finds that two of the factors referred to in ¶72 are present in this case: on the one hand, MC has been unable to find another distributorship, and conversion of its business has been very difficult; on the other hand, MC has adduced little evidence of having done its utmost to actively go out and discover new opportunities or to convert the

company to other activities. In the Arbitrator's opinion, for purposes of determining the length of what would have been a reasonable termination period pursuant to Section 2 of the 1961 Act, these two factors cancel each other out.

74.    Coming to a conclusion with respect to just how long the Termination Period should have been, it is important to note that a judge or arbitrator is called upon to make a finding that takes each of these criteria into consideration, but that is ultimately based on principles of equity. In other words, the judge or arbitrator does not apply the relevant criteria in the way of a mathematical formula that yields the correct number of months. Rather, it is a matter of looking at each of the criteria and the overall resulting picture that yields for the judge or arbitrator an overall sense of what is the most equitable termination period under the circumstances. See *Willemart & DeStrycker*, No. 59. Looking at all the facts and all relevant criteria in this manner, the Arbitrator concludes that the 18-month Termination Period was indeed insufficient to create an opportunity for MC to either find an equivalent distributorship or to convert and reorient its business to an alternative activity or alternative activities that would have created a comparably viable and profitable business. The Arbitrator determines that an equitable and reasonable Termination Period would have been 30 months.

75.    The Arbitrator therefore needs to determine how to compute an alternative equitable compensation in lieu of the 12 additional months that should have been part of the Termination Period.

76.    In his determination of 30 months, the Arbitrator rejects MC's contention that it is somehow entitled to recover an amount equal to the value of its entire business at the time of the termination. The Arbitrator notes that in the very extensive case law generated by the 1961 Act, there is not a single case in which the court awarded damages that were equivalent to, or even approached, the value of the entire business, not even in situations where the terminated distributorship amounted to 100% of the distributor's activities. Hence, there is absolutely no precedent for this measure of damages, and this case is not so unique as to compel the Arbitrator to adopt a new standard.

- 35 -

77.     The Arbitrator further notes that MC's contention that this should have been the equitable measure of its damages was made several months *before* the 1998 Agreement was terminated: Vandelanotte's first report (Cl. Exh. 2) dates back to May 27, 2001!  Besides, MC commenced its action in the Commercial Court in Brussels on October 31, 2001.  Thus, just seven weeks after it received Maxim's notice of termination, MC's complaint alleged again that the only equitable measure of damages was the value of MC's entire business. Clearly, MC proceeded on this theory of damages before it could ever test it against the real world in which it needed to find other activities to stay alive.  In fact, its conviction that it was entitled to this amount of damages may well have limited, or at least colored, MC's activities following termination, as if trying to prove that it had been "right all along" in its contention that it would never find an equivalent replacement of the Maxim distributorship. MC's current precarious financial condition is not relevant in this context, the more so as it may well be in part the result of its lack of commitment to convert its operations to a different activity that could lead it back to financial health.

78.     The 1961 Act does not intend to give a Belgian distributor a lifetime guarantee that its concession will never be terminated.  *See* Supreme Court, 10 February 2005, R.D.C. 2005/9 – November 2005 Note by Thomas Faelli; *see also* Court of Appeal Antwerp, 19 September 2002, T.B.H., 2003, p. 535-536.  In addition, MC is likely to have realized back in 1987 that there was a risk inherent in distributing a product for which there is limited competition in its territory, and if not then, almost certainly when MC entered into the 1998 Agreement.  Court of Appeal Antwerp, 19 September 2002, T.B.H., 2003, p. 535-536.  The need to assume that risk transmutes upon termination into the need to seek to convert and reorient in whole or in part the Company's activities.  For this purpose, taking all circumstances into consideration, a 30-month termination period appears to be equitable, fair and reasonable.

79.     Having determined that the Termination Period ought to have been 30 months, the Arbitrator needs to determine a compensatory payment for the period during which MC did not enjoy the benefit of the Termination Period (*Willemart & DeStrycker,* No. 70).  In other

words, in order to be just and equitable, the Arbitrator needs to determine the compensatory payment in such a manner that it is equivalent to the (net) benefits which the distributor would have enjoyed from implementing the distributorship agreement during the additional portion of the Termination Period, i.e. the additional 12-month period.

80.    According to Willemart, the compensatory payment is to be computed on the basis of the average (annual) semi-gross profits achieved by the distributor as of the date of the notice of termination. (Expertise Willemart, p. 5)  The average semi-gross profits mean the net profits plus the general "non-compressible" expenses ("*niet samendrukbare kosten*"), also sometimes expressed as the average gross profits less the "compressible general expenses" (see Marc Willemart, "*Les concessions de vente en Belgique*", Story-Scientia, 1988, n° 77, and Claude Verbraeken & Aimery van Schouteete, "*Manuel des contrats de distribution commerciale*", Kluwer 1997, p. 49, n° 45).

81.    Bogaert has the same formulation (Expertise Bogaert October 30, 2006, pp.12-13), indicating that the profits referred to correspond with Code 70/64 of the profit and loss account.    Bogaert also points out that the general non-compressible expenses ("*niet indrukbare kosten*") are to be added to the net profits *insofar as they relate to the exploitation of the distributorship that has been terminated*. [emphasis added]  The Arbitrator agrees with this formulation.

82.    Subsequent to the notification of this Partial Award to the parties, the Arbitrator will instruct the expert, Mr. Carlo Van Der Herten, to perform the calculation of this amount according to the formulation set forth in ¶81.  The interest on this amount shall be calculated from the date on which the additional 12-month period would have ended, i.e. March 7, 2004,[3] at the statutory annual rate of 7% through December 31, 2006, and at the statutory rate of 6% thereafter until paid.  The amounts Maxim owes to MC in this respect will be a subject of the Final Award.

---

[3] Computing interest from this date is a logical consequence of the fact that the obligation to make such a compensatory payment is not an "autonomous contractual obligation, but takes the place of the breached obligation to observe a reasonable termination period." Supreme Court, 4 December 2003 (*NV R.B.L. v. M.P.*), 2005-2006 RW 257-258.

IX.    **MC'S CLAIM PURSUANT TO SECTION 21 OF THE 1995 ACT**

83.    MC argues that insofar as its relationship with Maxim involved the House Accounts, MC must be deemed to have been an agent of Maxim under the 1995 Act. Thus, even though, as the Arbitrator holds, Section 2 of the 1961 Act does not allow an integral damage award equal to the value of the Company, MC contends that it would be entitled to such award pursuant to Section 21 of the 1995 Act.

84.    Section 1 of the 1995 Act defines the agency agreement as follows:  "an agreement pursuant to which one party, the commercial agent, is charged by the other party, the principal, without him being subject to the latter's authority, permanently and against compensation, to negotiate and possibly enter into affairs in the name and for the account of the principal." (*unofficial translation by Arbitrator*)

85.    The threshold question with respect to this claim is whether it is barred by the language of Sections 20 and 21 of the 1995 Act, or subsidiarily by the more general statute of limitations provided for in Section 26.  If it is not time-barred, the question arises whether the relationship between the parties involving the House Accounts constituted an agency relationship as defined by Section 1 of the Act.

86.    The Arbitrator holds that the claim is time-barred.  In addition, even if it were not time-barred by either or both of these provisions, the Arbitrator holds that the parties intended that the relationship between them with respect to Maxim's obligation to pay commissions for its sales to the House Accounts did not constitute an agency relationship within the meaning of the 1995 Act.

87.    Section 20 of the 1995 Act provides in relevant part that "After the termination of the agreement the agent is entitled to an indemnifying compensation whenever he has brought the principal new customers ..., insofar as this can yield substantial benefits to the

principal in the future. ... The indemnifying compensation may not exceed the amount of one year's compensation ... "[4]

Section 21 of the 1995 Act provides: "Insofar as the agent is entitled to the indemnifying compensation provided for in Section 20 and the amount of this compensation does not completely compensate for the damages actually incurred, the agent, provided he proves the actual amount of the alleged damages, can receive indemnification over and above this compensation in the amount of the difference between the amount of the damages actually incurred and the amount of that compensation." (*unofficial translations by Arbitrator*)

88.    Importantly, Section 20 expressly provides that "the agent looses his right to the indemnifying compensation unless he has informed the principal within one year after the termination of the agreement that he intends to assert his rights." (*unofficial translation by Arbitrator*)

89.    The Arbitrator notes that the provision of Section 20 goes beyond a normal statute of limitations: this is not just a bar to recovery that the defendant must assert. Here, the very existence of the right to compensation disappears if the agent has failed to satisfy the

---

[4] The complete text of Section 20 of the 1995 Act reads as follows:

"Section 20.  After the termination of the agreement the agent is entitled to an indemnifying compensation whenever he has brought the principal new customers or when he has substantially expanded the business with existing customers, insofar as this can yield substantial benefits to the principal in the future.

If the agreement contains a non-compete clause, the principal will be deemed to obtain substantial benefits in the future, subject to evidence to the contrary.

The amount of this indemnifying compensation is determined taking into consideration both the realized expansion of the business and having brought in customers.

The indemnifying compensation may not exceed the amount of one year's compensation, calculated on the basis of the average for the five preceding years, or on the basis of the average compensation in the preceding years if the agreement has continued for less than five years.

The indemnifying compensation is not owed:

    1° if the principal terminated the agreement because of a serious shortcoming atttributable to the agent, as provided in section 19, para. 1;

    2° if the agent terminated the agreement, unless the termination results from a reason attributable to the principal, as provided in section 19, para. 1, or is the result of age, disability or illness of the agent as a result of which it can no longer reasonably be required of him that he continues his activities;

    3° if the agent or his heirs, in accordance with an understanding with the principal, transfer their [*sic*] rights and obligations flowing from the agency agreement to a third party.

The agent looses his right to the indemnifying compensation unless he has informed the principal within one year after the termination of the agreement that he intends to assert his rights. (*unofficial translation by Arbitrator*)

condition that he inform the principal within one year after termination of the agreement that he intends to assert his rights. Willemart argues that the limitation of Section 20 does not apply to Section 21 (Expertise Willemart, p. 10). This contention is without merit. The language of Section 21 ("Insofar as the agent is entitled to the indemnifying compensation provided for in Section 20...") is unambiguous and clearly indicates that Section 21 is an additional right that is derived from, and dependent upon, the indemnifying compensation provided for in Section 20. Therefore, if the right to one is extinguished, the other is extinguished as well.

90.    In addition to the substantive provision of Section 20, Section 26 of the 1995 Act provides for a general statute of limitations as follows:

"Legal claims that arise out of the agency agreement shall be filed within one year after the termination of such agreement, or 5 years after the fact from which the claim arose, provided that the duration of this term shall in no event be longer than one year after the termination of this agreement." [*unofficial translation by Arbitrator*]

91.    The action required by Section 20 differs from the action required pursuant to Section 26: Section 20 requires that the agent notify the principal that he intends to assert his rights under Section 20 (and Section 21); Section 26 requires that the claim the agent wishes to assert pursuant to the 1995 Act be filed (in court, or as in this case, in arbitration).

92.    Willemart argues (Expertise Willemart, p. 17) that its rights under Section 21 (and 20) have been effectively preserved by filing its complaint on October 31, 2001. Willemart further argues that the one-year statute of limitations of Section 26 has been tolled by the legal actions taken by MC before the Belgian courts (from October 31, 2001 until the Court of Appeal's judgment of December 14, 2004). From this date, a new one-year term started within which MC timely commenced this arbitration procedure on November 30, 2005.

93.    This argument would succeed if any reference to the rights under Sections 20 and 21 of the 1995 Act had been made either in MC's complaint of October 31, 2001, or in any

- 40 -

of the pleadings before the Belgian courts. In fact, however, both the complaint and the entire proceeding focused exclusively on MC's rights under Sections 2 and 3 of the 1961 Act. Thus, neither the complaint nor the court proceedings themselves had any effect on the assertion of rights pursuant to Sections 20 and 21 of the 1995 Act or the statute of limitations of Section 26.

94.    Although it is unclear whether "the termination of the agreement" refers to the date of the notice of termination or to the end of the termination period, the Arbitrator concludes that either way the rights under Sections 20 and 21 have been extinguished and, in any event, the statute of limitations of Section 26 has run. On the outside, the one-year anniversary of the end of the Termination Period is March 7, 2004. The first time that MC asserted a right to compensation pursuant to the 1995 Act was in its memorial dated September 22, 2006, more than two years after the one-year periods of Section 20 or Section 26 had expired.

95.    MC appears to argue that it is not necessary that its notice pursuant to Section 20, or any act or deed that causes a tolling of the Section 26 statute of limitations specifically refer to the 1995 Act. The Arbitrator disagrees. Although the 1995 Act does not indicate in what form an effective notice pursuant to Section 20 must be given, and it may therefore be assumed that an informal writing suffices, Section 20 provides that the agent's rights are extinguished unless he notifies the principal "that he intends to assert his rights." Accordingly, the minimum requirement of such notice must be a reference to the rights the agent possesses pursuant to Section 20.

96.    The tolling of the statute of limitations of Section 26 is controlled by Title XX, Chapter IV of the Civil Code, more specifically, Articles 2244 - 47. (K. Van Den Broeck, *De Verjaring*, in HANDELSAGENTUUR (E. Dursin and K. Van Den Broeck, Editors), Gent, Mys & Breesch, 1997, ¶742 *et seq.*, notably ¶756). Article 2244 provides that a statute of limitations can be tolled (civilly) by filing a complaint with the court, or by serving a demand for payment or an attachment upon the person whom one wishes to prevent from asserting that the statute has run. Even a complaint filed with an incompetent judge will toll the statute

(Art. 2246). But if the complaint is declared void, or if the plaintiff waives his claim, or if the claim is denied, the tolling will be held not to have started (Art. 2247). MC has not taken any of the actions listed in Articles 2244-47 of the Civil Code. Hence, Section 26 of the 1995 Act, duly asserted by Maxim, applies and MC's claim pursuant to the 1995 Act must be denied.

97.    Even if the Arbitrator would have found that the statute of limitations had not run on MC's claim under the 1995 Act, the Arbitrator concludes that the parties did not intend that the commission payments provided for in the 1998 Agreement created an agency relationship as defined in the 1995 Act. The evidence (including, *inter alia*, the testimony of Mr. Verbeken, Transcript Verbeken, pp. 12-13), shows that the 1998 Agreement was a compromise when MC was willing to give up the House Accounts to Maxim, but only in exchange for a reasonable compensation. In spite of the requirement of a "design win", the "commissions" were simply the consideration payable by Maxim in exchange for getting to sell directly to the House Accounts. The requirement of a design win was intended to show that MC had brought about the sale and had done something for it. It did not matter whether the design win occurred before or after the effective date of the 1998 Agreement. The Arbitrator concludes therefore that MC's claim under the 1995 Act must fail also on substantive grounds.

## X.    MC'S CLAIM THAT MAXIM UNDERMINED THE TERMINATION PERIOD

98.    MC alleges that Maxim violated the Termination Period by policies relating to publicity, pricing and costs charged to MC, thereby unlawfully undercutting the business of MC.

99.    (i)    Publicity.    With respect to Maxim's publicity policy, MC contends that Maxim attempted to limit MC's ability to sell Maxim products by conducting extensive advertising campaigns that were primarily geared to promote Maxim's direct sales program in Belgium, while mentioning MC as distributor only in an extremely limited way. In spite of this, MC argues, Maxim held MC to its contractual obligation to expend 4% of total sales

on publicity and advertising. As MC's continued contributions to publicity of Maxim's products would have no (long-term) benefit to MC, MC argues that Maxim's insistence on MC's continuing to incur this expenditure amounted to an abuse of Maxim's rights, in violation of the principles of good faith and fair dealing. Established case law and legal doctrine (which refer to the 1961 Act, equity and common sense, but especially to the doctrine of good faith) object to obligating a terminated distributor to continue to invest in such a substantial way in the promotion of the manufacturer's products without itself having any future interest in those products. Accordingly, MC claims an aggregate amount of US$77,303, which equals the amount MC spent on publicity for Maxim products during the Termination Period.

100.    It is undisputed that Section 5A of the 1998 Agreement requires that MC "use its best efforts on a regular basis to ... market ... the Products within the Territory and to review and improve its sales coverage of the Territory," and that Section 5D requires that MC "develop jointly with Maxim and implement advertising and promotion ... pursuant to the budget Maxim and MC jointly have appropriated [sic] for the commercialization of Products in the Territory, including the planning and execution of campaigns, selection of media channels and the buying thereof." Section 1 of Exhibit G requires that MC "allocate/contribute a minimum of 4% of total resales towards Maxim's Products in the Territory." Exhibit G details how MC is to implement its advertising and promotional activities. Furthermore, Section 5E requires that MC "develop and finance promotional tools, and advertising materials for the field sales force, sampling campaigns, in-store demonstrations and loyalty promotion."

101.    It is also undisputed that the 1998 Agreement is entitled "Non-Exclusive Distributor Agreement", and that Section 1A appoints MC as "a non-exclusive distributor for the Products in the Territory."

102.    Furthermore, it is undisputed that generally under Belgian law, the rights and obligations of the parties to a distributorship agreement continue to apply during the termination period. (Supreme Court 19 May 1921, Pas. 1921, 380; Court of Appeal Liège 27

- 43 -

June 1995, J.L.M.B. 1996, 100, Note P. Wéry)  Thus, during the Termination Period, MC as non-exclusive distributor continued to be obligated to "allocate/contribute a minimum of 4% of total resales towards Maxim's Products in the Territory."  As the 1998 Agreement allowed Maxim to market and sell its products in Belgium for its own account in addition to MC's status as non-exclusive distributor, it was fully entitled to do whatever it wanted to promote its product in Belgium.

103.    On the other hand, the principles of good faith and fair dealing do put limits on the exercise of one's rights.  (Article 1134, para. 3 Civil Code; Supreme Court, 16 January 1986, *A.C.* 1985-86, 683; 18 February 1988, *A.C.* 1987-88, 790; 18 June 1987, *A.C.* 1986-87, 1441; 21 September 1989, *A.C.* 1989-90, 92; 30 November 1989, *A.C.* 1989-90, 442; S. Stijns, VERBINTENISSENRECHT Nos. 85-86 (Brugge, Die Keure 2005))  The judge or arbitrator needs to determine whether the exercise of contractual rights evidently crossed the normal boundaries of a reasonable, concerned and careful person. (S. Stijns, *op. cit.* No. 93)  The Arbitrator finds that one application of this principle under Belgian law is that under changed circumstances one cannot exercise (or continue to exercise) contractual rights if the hardship caused by such exercise of rights disproportionally exceeds the benefits the rightsholder derives therefrom. (*See* Supreme Court, 31 March 2006, JC063V1_l, listing as one of the applications of abuse of right, « *soit que le droit est exercé alors que l'avantage que l'on en retire est hors de toute proportion avec le préjudice que l'on cause à autrui* »)

104.    Specifically, this principle requires that Maxim should not insist on MC spending these funds towards the end of the Termination Period.  Clearly, MC should not have had to spend these moneys during the final six months that the Agreement was still in force, as it is clear that with declining sales this constituted an increased hardship for MC, while neither MC nor Maxim derived any appreciable benefit from MC's publicity during this period.  The Arbitrator finds no "abuse of right" with respect to Maxim's insisting that MC spend this amount on publicity during the first 12 months, and therefore denies this portion of the claim demanding a refund of the amounts spent on publicity.  However, the Arbitrator finds there is an "abuse of right" with respect to Maxim's insisting that MC spend money on publicity with respect to the period from September 8, 2002 through March 7, 2003.  Subsequent to the

notification of this Partial Award to the parties, the Arbitrator will instruct the expert, Mr. Carlo Van Der Herten, to investigate and determine the expenditures by MC during this six-month period. The amounts so determined shall bear interest from March 7, 2003, at the statutory annual rate of 7% through December 31, 2006, and at the statutory annual rate of 6% thereafter until payment in full. The amounts Maxim owes MC in this respect will be a subject of the Final Award.

105. (ii)  <u>Contribution to salary of FAE</u>.  MC further alleges that Maxim undermined the Termination Period by holding MC to its obligation to pay a third of the salary of a Field Application Engineer (Maxim's employee) who would render technical assistance to clients within the Territory. MC contends also with respect to this claim that established case law and legal doctrine (which refer to the 1961 Act, equity and common sense, but especially to the doctrine of good faith) object to obligating a terminated distributor to continue to invest in such a substantial way in the promotion of the manufacturer's products without itself having any future interest in those products.

106. Mr. Pippel testified that his employment with Maxim ended in February 2001, and that he was replaced formally only. The Arbitrator finds that upon Mr. Pippel's departure (resulting from illness) there was no real replacement FAE for Belgium. There was indeed a pro-forma "acting FAE" who was and remained mainly responsible for France (in whole or in part). In e-mail correspondence between MC's employee (Cl. Exh. A-72), Tom Van Tongelen and certain Maxim employees, Maxim mentioned three different names of people who would be available to respond to his questions over a 4-month period. This correspondence demonstrates how difficult it was to obtain support from Maxim's technical support staff after Mr. Pippel left.

107. Based on these findings, the Arbitrator agrees with MC that insisting on a continued contribution constitutes an abuse of rights under the case law and literature cited in ¶103. Maxim is therefore to refund to MC its contribution of US$43,861, constituting a third of the salary of the Field Application Engineer who was supposed to render technical assistance to clients within the Territory, together with interest from March 7, 2003 at the

statutory rate of 7% per annum through December 31, 2006, and at the statutory rate of 6% per annum thereafter until payment in full.

108.    (iii)    <u>Maxim's Price Increase for Select Proprietary Products</u>.  Finally, within the context of MC's allegation that Maxim undercut MC's rights during the Termination Period, MC claims that Maxim's unilateral change in pricing policy resulted in a significant reduction of MC's profit on the sale of Maxim's products, as MC was not permitted to pass on such price increases to its customers.  Again, MC contends that Maxim's actions were in violation of the principles of good faith that might be expected from a contracting party. Maxim argues that pursuant to Section 2A of the 1998 Agreement Maxim had the express right to adjust prices, and did not abuse that right during the Termination Period.

109.    Maxim does not deny that it increased wholesale prices and made clear to the distributors that they were not expected to pass on that price increase to their customers.  The question therefore is whether or not in doing so Maxim abused the right it had under Section 2A of the 1998 Agreement, under the same standards as set forth in ¶103 above. Specifically, did Maxim's price increase under the changed circumstances (existence of Termination Period) cause hardship to MC that disproportionally exceeded the benefits Maxim derived therefrom?

110.    The Arbitrator observes that the price increase was worldwide and, additionally, did not just apply to Maxim products but also to Dallas products for which MC was not the distributor.  Given that, in principle, Maxim was fully entitled to adjust wholesale prices under the 1998 Agreement, it would be difficult to assume that it would either have to (i) not implement this worldwide price increase for proprietary Maxim and Dallas Products, or (ii) implement it with the exception of the relatively small market for Maxim Products in Belgium.  This would be an absurd outcome.  Therefore, it cannot be said that a reasonably prudent person would not have taken this action to which Maxim was contractually entitled.

MC does not contend that Maxim's requirement that it not pass on the price increases to its customers was in violation of any law.

111.    For these reasons, MC's claim for damages in the amount of €30,000, representing the estimated damages MC suffered as a result of Maxim's pricing and publicity campaign during the Termination Period, is denied.


XI.    MC'S CLAIM PURSUANT TO SECTION 3 OF THE 1961 ACT

112.    MC claims that pursuant to Section 3 of the 1961 Act, Maxim owes MC an equitable additional compensation for the clientele that MC built up over the years and which remained with Maxim after termination of the 1998 Agreement.  MC estimates the equitable compensation for such clientele at €1,272,000, an amount that equals the value of MC's goodwill as computed by Vandelanotte in its report dated May 27, 2001.  According to MC, this estimate is based on factors that include the known added value in clientele created by the distributor and remaining with Maxim upon termination of the Agreement.

113.    Section 3 of the 1961 Act[5] provides as follows:

"In the event that a distributorship as referred to in Section 2 is terminated by the manufacturer ... the distributor may claim an equitable additional compensation. Depending on the [circumstances of the] case, this compensation is determined as a function of the following elements:

1.    The known added value relating to clientele that has been brought in by the distributor and that remains after termination of the agreement;

[...]

In the event the parties cannot agree, the court will make the determination on the basis of equity, and when applicable observing the customs." (*unofficial translation by Arbitrator*)

---

[5] MC also alleges this claim under Section 21 of the 1995 Act.  As the Arbitrator has ruled that the statute of limitations has run on the 1995 Act and, in any event, that no agency relationship as defined by the 1995 Act existed between the parties, this claim is not considered.

114.    In order to qualify for this compensation, MC must have satisfied the three conditions that are spelled out in the text of Section 3, para. 1 as interpreted by case law and legal scholars (*see* Ariane DeStrycker, CONCESSIEOVEREENKOMSTEN, ADVO aflevering 33, Economisch recht, February 1999, Nos. 41-44 (Kluwer Rechtswetenschappen)): (i) realization by MC of a substantial added value in clientele; (ii) MC brought in the clientele by itself; and (iii) the clientele remained with Maxim.  MC claims it has satisfied the three conditions, Maxim contends that MC has failed to provide "conclusive" evidence that it has done so.

115.    It is important to note that a distributor's right to the additional compensation under Section 3 of the 1961 Act is completely separate from the compensation he may receive pursuant to Section 2 of that Act as a result of a termination period that was too short. (*Willemart & DeStrycker*, No. 81)  As Willemart explains in his Expertise, the additional compensation provided for in Section 3 seeks to compensate the distributor for losses of clientele, costs incurred and payments to employees that had to be terminated as a result of the termination of the distributorship.  (MC claims only under the first category, i.e. the clientele.)  On the other hand, Section 2 seeks to compensate the distributor for loss of the semi-gross profits he would have earned during the termination period to which he was entitled and which he did not get to enjoy.

117.    With respect to Section 3 of the 1961 Act, the Arbitrator needs to determine whether the conditions set forth therein have been satisfied, and, if so, what is the proper measure of damages to determine the equitable amount of additional compensation under Section 3.

118.    Maxim contends in this regard that MC failed to provide conclusive evidence for these three conditions.  Maxim emphasizes that MC needs to demonstrate that:

o    The added value of clientele was considerable: a mere added value does not suffice. The added value must be considerable, i.e. remarkable.

o MC has personally brought in this clientele. The considerable increase in clientele must not be the result of *e.g.* the growth of the market or the success of Maxim's products. MC alleges that it brought in a considerable and worldwide group of customers, including Alcatel, Philips and Option. Maxim on the other hand alleges that as is shown in the 1998 Agreement, these clients are 'House Accounts', Maxim's own customers, and that the House Accounts are subject to a separate commission scheme and do not fall within the scope of the Agreement. Thus, according to Maxim, they cannot be included in the basis of calculating a claim under Section 3.

o The clientele must have remained loyal to Maxim upon the conclusion of the Termination Period.

119. The Arbitrator finds that the added value of the clientele brought in by MC was considerable. It is well established that the added value must be measured from the beginning of the relationship. On October 1, 1987, when MC first started to represent Maxim, it did take over from a Belgian distributor that had been in place for a brief period of time. As Maxim itself had only been in existence since 1983, the sales figures of the first distributor must have been near zero. From the near zero position in 1987, MC created the entire Belgian and Luxembourg clientele. In addition to the House Accounts, which by Maxim's own admission amounted to successful clients with substantial sales, MC's annual sales figure for 2001 relating to the other accounts amounted to more than €3.7 million for Maxim products. Therefore there can be no doubt that the added value of the clientele brought in by MC was considerable and remarkable.

Maxim's contention that MC's results in the Belgian market do not compare favorably with the results of other distributors in neighboring countries such as Denmark and Norway cannot be taken into consideration without further analyzing the exact nature of each market and its potential customers. Clearly, each market is different because it has different potential customers for the type of product Maxim manufactures. Without more, it would appear to be very difficult to compare one market with another. Therefore, without further

detailed information about those other markets, it is irrelevant how other distributors have performed in other markets.

120.    The Arbitrator also finds that MC brought in the clientele personally.  For example, Mr. Verbeken's testimony makes clear that without his connections at Alcatel, Maxim would probably not have become a "preferred supplier" of Alcatel.  His and Mr. Vandamme's testimony concerning the countless personal visits to other accounts, together with the introduction of the FAE to many key accounts demonstrates the personal involvement of MC's personnel in creating the clientele.

121.    Maxim's contention that by removing the House Accounts in 1998 from the context of the distributorship they are no longer a factor in the consideration of the conditions of Section 3, para. 1 is disingenuous and unfounded.  The very fact that Maxim preferred to handle these accounts directly, demonstrates that they had become accounts of considerable importance.  By removing these accounts from the 1998 Agreement and considering them House Accounts, Maxim did not relieve itself from an obligation to recognize these accounts as having been brought in by MC.  Without implying that Maxim designed the sequence of removing the most important accounts from the distributorship agreement when signing the 1998 Agreement, and shortly thereafter terminating the 1998 Agreement, the effect of those events cannot be that thereby the most important accounts are removed from consideration for purposes of Section 3 of the 1961 Act.  The principles of good faith and fair dealing require that the 1998 Agreement be construed in such a manner as to include the House Accounts in the totality of the clientele brought in by MC.

122.    In addition, if any meaning can be attributed to Section 16C of the 1998 Agreement, it applies to this situation:

"This Agreement shall bring no prejudice whatsoever to the existing rights of MAXIM and DISTRIBUTOR based on their anterior contractual relationship."

Consequently, the Arbitrator holds that the right to compensation under Sections 2 and 3 of the 1961 Act apply also to the House Accounts.

123.    Finally, absent any evidence adduced by Maxim to the contrary, it is fair to presume that the clientele has remained loyal to Maxim.  Although the initial burden of proof rests with MC in this regard, this is typically information that is within the exclusive control of Maxim.  Under Belgian law, when the initial burden of proof rests with one party, it is upon the other party to adduce such evidence as is within its control.  (E. Cerexhe, *La condamnation aux dépens: une sanction au refus de collaboration à l'administration de la preuve*, R.C.J.B. pp. 455-463 (1979); Expertise Willemart, p. 18)  Therefore, the Arbitrator holds that when MC invited Maxim to introduce evidence regarding this point (already during the proceedings before the Brussels courts), the burden of proof shifted to Maxim to show that it had lost all or a substantial portion of the clientele brought in by MC.

124.    In sum, the Arbitrator holds that as to Section 3, para. 1 of the 1961 Act, the conditions set forth therein have been satisfied.  Therefore, the question arises what is the proper measure of damages to determine the amount of equitable additional compensation under Section 3.

125.    As to the timing, the Arbitrator is guided by the Supreme Court's decision of 7 April 2005, in which the Court held with respect to claims under Section 3, para. 1:

"… the complementary indemnity to which the distributor is entitled arises and is determined at the moment of the notice of termination; … in order to satisfy the statutory criterion of equity, the judge may take into consideration all elements of which he has knowledge at the moment of his decision, notably the state of affairs of the distributor after the termination of the agreement" (*unofficial translation by Arbitrator*)

126.    In its post-hearing brief, MC goes into detail about the recent developments to which Willemart testified.  According to Willemart, the use of gross profits as a measure for the equitable compensation appears to be on the increase.  (Expertise Willemart, p.15)  In

- 51 -

spite hereof, MC maintains that the proper measure for its equitable additional compensation ought to be the goodwill of the company.  MC has maintained this position from the first Vandelanotte report of May 27, 2001.  It repeated this claim in its complaint of October 31, 2001.

127.    The Arbitrator finds that there is no precedent for finding that equitable additional compensation ought to be measured by the goodwill of the distributor's company.  Furthermore, even if there were precedent for this measure of damages, it would be inappropriate to apply it to MC's case, as only about 60% of its gross sales are attributable to sales of Maxim products.  The fact that MC's current financial position is precarious does not alter these facts.

128.    Willemart testified that "nowadays the courts more and more take into account the gross margin of the distributor that it enjoyed in the course of the last (generally 3) years of carrying out the agreement before notice of termination." (Expertise Willemart, p.15)  On the other hand, in his book written with Ariane DeStrycker (*Willemart & DeStrycker*, No. 93), the authors contend that they

"are of the opinion that an estimate of the clientele compensation on the basis of the net profits is economically more correct and equitable than on the basis of the gross or semi-gross profits.  In this latter formula, the compensation includes expenses which the manufacturer or rather the new distributor has to incur in order to obtain net profits." [*translation by Arbitrator*]

129.    Although generally the Arbitrator would tend to agree with the latter analysis, in this specific case this would not translate into a substantial difference, as the parties agree that the investments made by MC in connection with the distributorship of Maxim products was not so much in materials (compared for example with an automobile dealership) as they were in manpower (skilled engineers who could assist the potential customer in selecting the right parts for their products).

130.    As it would appear that gross margins are more easily determined than net profits, the Arbitrator holds that computation of the equitable additional compensation shall be based upon the average monthly gross margins on the sale of Maxim Products obtained during the 36-month period comprised of the second semester of 1998, the calendar years 1999 and 2000 and the first semester of 2001.  These numbers need to be increased by the gross receipts in commissions MC should have received during this same 36-month period, as determined in the next section of this Award.  The monthly average over such 36-month period shall be multiplied by twelve.

131.    Subsequent to the notification of this Partial Award to the parties, the Arbitrator will instruct the expert, Mr. Carlo Van Der Herten, to determine the monthly average of MC's gross margins as they relate to the sale of Maxim Products during the above-mentioned 36-month period and carry out the calculations in accordance with ¶130.  In accordance with the above-mentioned decision of the Supreme Court of 7 April 2005 (¶125), the amounts so calculated shall be subject to interest from the day of the notice of termination, at the statutory rate of 7% per annum through December 31, 2006, and thereafter at the statutory rate of 6% until paid in full.  The amounts Maxim owes to MC in this respect will be a subject of the Final Award.

## XII.    MC'S CLAIM FOR UNDERPAYMENT OF COMMISSIONS ON SALES TO HOUSE ACCOUNTS

132.    Section 1B of the 1998 Agreement provides in essence that Maxim undertook to pay commissions to MC, retroactively from January 1, 1998, with respect to direct sales to so-called House Accounts.  It reads as follows:

"B.  House Accounts:  MAXIM reserves the exclusive right to sell the Products to its own current and future customers and in particular to service those house accounts listed in Exhibit B hereto within the Territory, hereinafter referred to as "House Accounts".  For each sale by MAXIM to those House Accounts listed in Exhibit B, DISTRIBUTOR will be paid commissions as specified in Exhibit B.

- 53 -

Furthermore, MAXIM will pay commissions as specified in Exhibit B to DISTRIBUTOR for each sale by any branch, subsidiary or other affiliated company of MAXIM to its own current and future customers within the territory [*sic*] and in particular to the House Accounts listed in Exhibit B hereto. MAXIM will monthly report booking and billing figures for all house accounts to DISTRIBUTOR."

133.    Exhibit B provides in its first paragraph as follows:

"MAXIM agrees to pay DISTRIBUTOR a commission on standard products shipped to house accounts listed hereafter beginning January 1, 1998. To qualify for commissions on those accounts, the MAXIM FAE or DISTRIBUTOR will validate his involvement in the design win. In the event the FAE and RSM are unable to provide such validation, no commission will be earned."

Presumably, RSM stands for "Regional Sales Manager."

134.    These two paragraphs presumably must be read together in order to determine what the parties intended with respect to the payment of commissions. This is particularly difficult because not only do the provisions of Section 1B and the first paragraph of Exhibit B contradict each other, it is unclear what is meant by the retroactive provision that MC earns these provisions as of January 1, 1998, and what to do if, as the Arbitrator has found, for all intents and purposes, as of February 1, 2001 there was no FAE responsible for Belgium.

135.    The most important contradictions between Section 1B and Exhibit B are that Section 1B provides that Maxim agrees (seemingly unconditionally) to pay a commission as specified in Exhibit B "*for each sale* by Maxim to those House Accounts" and again in its second paragraph "*for each sale* by any branch, subsidiary or other affiliated company of MAXIM to its own current and future customers within the territory and in particular to the House Accounts listed in Exhibit B hereto," whereas the first paragraph of Exhibit B

provides that Maxim agrees to pay a commission on "*standard* products shipped" to House Accounts. [*emphasis added*]

136.    The term "standard products" presumably refers to Exhibit A, but it is left blank and refers to Exhibit D (Price List) which is also left blank. It might also refer to commodity parts (manufactured by Maxim as well as competitors)[6], but it is unclear why these would be singled out as opposed to "sole source products" (*i.e.* a product manufactured exclusively by Maxim). In fact, Walter Sangali testified that the FAE's "purpose is to make design wins of sole source products, ... to make sure that we can get the highest possible market share." (Transcript Sangali, p. 21) On the other hand, Exhibit A's cross reference to the Price List, may indicate that it refers to *all* products that MC could distribute under the 1998 Agreement.

137.    In addition, while no reference to any conditions is made in Section 1B, in two sentences in the first paragraph of Exhibit B contradictory conditions are imposed for MC to qualify for commissions: the second sentence requires validation by the FAE *or* by the Distributor (MC), whereas the third sentence requires validation by the FAE *and* RSM. The third sentence makes no mention of the Distributor. So which is it, validation by the FAE or MC (2d sentence) or by the FAE and the RSM together (3d sentence)?

138.    A puzzling detail is that the payment of commissions was to be retroactive to January 1, 1998, even though the non-exclusivity of the relationship did not commence until October 1, 1998, the effective date of the 1998 Agreement. Does this mean that Maxim had already started to sell to the House Accounts by January 1, 1998 (or even prior to this date)? Maxim mentions that the intention was to cover the sale of Products to Alcatel in connection with the ADSL project. Either way, direct sales (at least in Belgium and Luxembourg) would constitute a breach of the 1987 Agreement, as during the period January 1, 1998 through October 1, 1998, the relationship was still exclusive, so that all direct sales made during this period would have had to be credited through MC as the seller of record to Alcatel, Philips and Option. Respondent's Exhibit B-1 reports almost US$400,000 in sales to

---

[6] In response to the question what are commodity parts, Sangali testified, "They are industry standard parts manufactured by several ... manufacturers." ((Transcript Sangali, p. 18)

Alcatel Belgium during the calendar year 1998. This detail was not focused on by the parties, and therefore the Arbitrator will not consider it further.

139.    Two further complicating factors present themselves: the words "design win" are not defined, and as mentioned previously, there was no FAE responsible for Belgium during a period of two years (from February 2001 until the end of the Termination Period on March 7, 2003). After February 2001, there was a "nominal" FAE, Mr. Quo Chang, who was responsible for France, but it is unclear whether he was even aware that he had a specific task in Belgium with respect to validation of design wins. At no time did any of the parties mention any individual acting as "RSM",[7] let alone that he did any of the validation together with the FAE, even though the third sentence of the first paragraph of Exhibit B purports to provide explicitly that "In the event the FAE and RSM are unable to provide such validation, no commission will be earned." For this reason alone, the Arbitrator has trouble taking this condition seriously, as obviously very little, if any, effort was made by Maxim to live up to the design win condition, and it was unclear which products the design wins were supposed to apply to, standard products only, sole source products only (as Walter Sangali testified), or both. As Article 1156 Civil Code provides, the Arbitrator must analyze what the intent of both contracting parties must have been rather than adhere strictly to the literal meaning of the words of the agreement.

140.    Many different definitions of what was meant with "design win" were offered by testimony on both sides, but none seemed to lead to any clear notion of what is common in the industry. Whereas Walter Sangali was able to identify only three design wins during his tenure as supervisor of the FAEs, Robert Pippel testified that he was quite upset about this conclusion, and felt it reflected poorly on the work he had done in the last 9 years that he had worked for Maxim. He also indicated that Heide Perry had told him that she had seen many more design wins, but that they were unable to trace them any more than they had. The following testimony by Pippel reflects probably most accurately what the process of obtaining a "design win" meant at Maxim, at least for the FAE. Pippel testified:

---

[7] The closest thing to an RSM was probably Walter Sangali, the managing director for European sales and field application engineers since January 1, 2000. He never testified to an awareness, however, that he needed to "validate" design wins in order for MC to qualify for commissions.

"The way it should work is that a sales person from Maxim or from a distributor finds a running or upcoming project at a customer, having the possibility of placing components made by Maxim in that project. What the salesman should do is report to an application engineer that there is a possibility to place Maxim parts in a project: this is the project, these are the parts, this is the volume and so on.

"Then the AE goes to the customer, starts working with the designers, with the management in some cases to find out what the possibilities are to get these Maxim parts in the project, find out if there are other parts to be placed in there, find out whether the factory has to do certain things to fine trim some parts that do not fit 100% to their requirements or make a complete[ly] new component for a future project. During that circus of constantly having contact with the designer, the progress is that either a part will be designed in in the project or it will be lost. The reason can be because a part from the competition was designed in or that we could not fulfill the slot or the requirements as they wanted. When it's won, the job for the FAE is finished. That's concerning the technical part of the AE in relation to the customer.

"The second part is the marketing part." (Transcript Pippel p. 4)

141.    Assuming for now that the first paragraph of Exhibit B constituted a valid condition precedent for MC to earn a commission, the Arbitrator holds that he needs to look for the general meaning attached to this term in the semiconductor industry. The logic for the concept of a design win is that once a customer's need for a specific product for a specific purpose has been generated (the "design-in"), the application of the design-in by the customer can be traced, so that the generator can be rewarded for this contribution to the manufacturer when future applications of the design-in occur at other establishments.

142.    In an August 2005 study, iSuppli Corporation of El Segundo, California, reported that chip suppliers acknowledge that their North American manufacturer's representatives and distributors are not always being properly compensated for their part in creating a new

sales opportunity. The reps' expected value for out-of-region sales for which they registered the design win was only 52 percent, compared to 100 percent for in-region sales. Similarly, design win distributors are compensated only 36 percent of the time when another distributor in a different region provides fulfillment. iSuppli observed that this is not only detrimental to a supplier's design win partners but there are adverse consequences as well for small and mid-tier OEMs which depend on reps and distributors for technical support that suppliers lack the resources to provide.

143. Thus, Escend Technologies' subsidiary, Escend Sales, developed design win management software, which is specifically designed to allow semiconductor and electronic component suppliers to track design wins globally. The software allows companies such as Maxim to see in real-time what its revenues per design win are on average, how many designs the company has actually won in any given month, and what the status of any past design wins are. It allows the manufacturer to set up systems that will reward the teams (both internal and external, such as distributors) that earned a design win, for worldwide sales attributable to the design win. If Maxim used this type of software, it would have been able to provide the Arbitrator with real data about MC's design wins, tracking them in all situations in which MC would be entitled to commissions in accordance with the provisions of Exhibit B of the 1998 Agreement.

144. There are simple definitions for what constitutes a design win. MC adduces several of these. The most persuasive one that MC points to is the definition developed by the Computing Technology Industry Association (CompTIA), an organization with more than 20,000 members in over 100 countries. Its website describes 'design win' as follows:

"From a broad perspective, a design win has been achieved whenever a customer, prospective customer or customer's agent (*such as a distributor*) notifies a supplier that its product has been selected for integration into the customer's product. At this broader level, there are usually financial incentives involved beyond the securing of the customer's business. More specifically, design win refers to a program whereby a supplier offers financial incentives in the form of bonuses, rebates, Ship-from-Stock and

debit authorizations and/or off book pricing when its product is designed into another company's product and agreed upon sales quotas or other conditions are met. If the supplier is working directly with the end-customer, the supplier's sales force achieves the 'design win' when the customer designs in the product; the customer gets financial awards in the form of rebates, debit authorizations and/or special pricing once conditions for incentives are met; *if a distributor is brokering the design work, the distributor achieves the "design win" when the distributor's customer designs in the supplier's product, and financial awards realized when the conditions for incentives are met*." [*emphasis added*]

145. The Arbitrator concludes that this definition fits the intention of the parties as expressed so confusingly in Exhibit B. In practice, it means that MC earned a commission whenever its customers designed in Maxim's product(s). The Arbitrator further holds that, in accordance with the general principles of Belgian contract law and the principles of reasonableness and fair dealing therein contained, the specific but contradictory conditions of the second and third sentences of the first paragraph of Exhibit B are as such unenforceable, and that any purported requirement of specific validations of design wins must be interpreted as validations by the FAE or by MC itself. *See* Articles 1156 *et seq.*, Belgian Civil Code. This means that, in theory, MC will be entitled to commissions on all products sold to, and designed in by, Alcatel before March 7, 2003.

146. The next issue is what, if any, limitations are put on MC's right to earn commissions when the design win extends to Alcatel outside Belgium, or even to companies that produce product for Alcatel. Exhibit B provides in this respect as follows:

- 5% commission will be paid on the first US$500,000 dollars shipped to a specified account in each MAXIM fiscal year.

- 3% commission will be paid on any amount over US$500,000 dollars shipped to specified account during that MAXIM fiscal year.

- 59 -

- In the event that manufacturing or purchasing of house accounts listed hereunder is transferred out of the assigned territory, 50% of the above stated commission will be credited to DISTRIBUTOR for each sale of any branch, subsidiary or otherwise affiliated company of MAXIM.

- In the event that there is a price reduction, the above commission schedule will be adjusted to reflect any price erosion.

### House Accounts

- ALCATEL TELECOM and all their branches and subsidiaries in Belgium
- PHILIPS and all their branches and subsidiaries in Belgium
- OPTION and all their branches and subsidiaries in Belgium

New OEMs can be added to this list by mutual agreement of both parties or on specific request of the OEM customer. Any specific requests of an OEM customer shall be contingent upon Maxim's approval.

147.    Unfortunately, the specific provision in the above quoted portion of Exhibit B that deals with the right to earn commissions for sales abroad is quite unclear. The provision appears to have two parts: one dealing with the purchasing side, the other with the selling side.

148.    The "purchasing side" is quite broadly worded (in the first part of the sentence contained in the above-quoted third bullet point in ¶146), and does not appear to put *any* limitation on the purchasing entity: "In the event that manufacturing or purchasing of house accounts … is transferred out of [Belgium]", would appear to include *all* situations in which the purchasing or manufacturing [on behalf] of a house account such as Alcatel is "transferred" abroad. This presumes only that it first occurred in Belgium, and was later transferred abroad, whether to another Alcatel entity or a third party contractor. In all those instances, MC is entitled to a commission at 50% of the domestic rate. Maxim argues that

- 60 -

subcontracting by a House Account to a third party was simply not foreseen when the parties entered into the 1998 Agreement, and that therefore it ought to be excluded. The above-quoted language, however, is not restrictive and simply does not specify what type of entity would qualify or disqualify MC's earning a commission.

149.    The "selling side" (set forth in the second part of the sentence contained in the above-quoted third bullet point in ¶146) is less clear: Assuming that the parties intended to say "sale by" rather than "sale of", this portion of the sentence provides that MC will earn a commission "for each sale [by] any branch, subsidiary or otherwise affiliated company of Maxim." Maxim argues that this phrase needs to be interpreted narrowly and that the words "otherwise affiliated company" must be interpreted in accordance with the corporate definition of what is an affiliated company. By doing so, Maxim effectively argues that an indirect sale by Maxim through a distributor would be excluded. Economically, there is something to be said for this interpretation, because when Maxim sells the product to the distributor, and the latter turns around and sells the product on to the House Account's foreign purchasing entity, a large portion of the profits will ordinarily be retained by the distributor. On the other hand, from MC's perspective, it should not make any difference whether Maxim sells the product directly or indirectly to the Alcatel entity, especially as it has no control over how Maxim sells the product to the House Account. Additionally, it is often unclear what the role is of the intermediary (does it act for Maxim or Alcatel?), as such company may not be a mere distributor, but could be what is called a "kitter", in which event the intermediary company puts certain component parts together into a "kit" that it then sells on to Alcatel, thus making assembly of the final product easier and more economical for Alcatel's manufacturing entity. Should it make any difference if the "kitter" is a subsidiary of Maxim, an independent company or a subcontractor or subsidiary of Alcatel? Finally, under the usual broad interpretation of a design win, the industry practice appears to be that it follows wherever and however the product was sold. (See ¶142)

150.    It is also important to note that *in any event* the phrase cannot be interpreted literally, as a literal construction would imply that the parties would have intended to exclude

direct sales by Maxim itself to the House Account's foreign purchasing entities. There can be little doubt that the parties intended to include direct sales in the phrase.

151.    The principles of interpretation of contractual obligations under Belgian law as set forth in Articles 1156 *et seq.* of the Belgian Civil Code,[8] the overarching principles of good faith and fair dealing, and the apparent industry practice in this regard lead the Arbitrator to the conclusion that this phrase must be interpreted as including not only direct sales by Maxim itself, but also indirect sales through a distributor or other intermediary. In other words, in addition to sales by branches and subsidiaries, the Arbitrator interprets sales by "otherwise affiliated companies" so as to include distributors and other types of intermediary companies. Any other interpretation would compel irrational distinctions between the different types of sales, which would unreasonably deprive the distributor with the design win from the commission to which it is entitled.

152.    Having determined the extent of the situations in which MC is entitled to receive a commission, namely (i) on all direct and indirect sales relating to design wins (as this term is herein interpreted), and (ii) on domestic (at 5% and 3% respectively) as well as foreign sales (at 2.5% and 1.5% respectively) to Alcatel and/or Alcatel related manufacturing and purchasing entities, the Arbitrator needs to determine the amount of commissions that Maxim should have paid to MC from January 1, 1998 through March 7, 2003, such time periods to be measured by Maxim's fiscal year which consists of a 52-to-53-week period that ends on the last Saturday of June.

153.    It is obvious to the Arbitrator that Maxim has not been very forthcoming with the necessary information that would have enabled MC to make a well-founded claim. First, Maxim failed to issue regular and reliable FAE reports to MC during the time that the 1998 Agreement was in effect, and these reports came to a complete halt after 1999. In addition, the final sentence of Section 1B of the 1998 Agreement required that Maxim report to MC on

---

[8] See generally S. Stijns & J. Smits (ed.), INHOUD EN WERKING VAN DE OVEREENKOMST NAAR BELGISCH EN NEDERLANDS RECHT (Intersentia, 2005)

a monthly basis the booking and billing figures for the House Accounts.    Maxim's compliance with this obligation was at best spotty.

Maxim has long taken the position that MC had the burden of proving its damages, and that it was under no obligation to assist MC in that endeavor, thereby forgetting the principles of good faith and fair dealing that it needs to contribute such items of evidence that are typically within its scope of knowledge.    (See Expertise Willemart, p.18.)    Whatever data Maxim did provide appear to be somewhat subjected to its own interpretation of "design win".    At the ultimate hour, about 60 hours prior to the commencement of the evidentiary hearings in these proceedings, representatives of Maxim's German subsidiary delivered a large stack of papers to MC without any further cohesion or guidance. Johan Vandamme, the owner of MC, spent the better part of the weekend preceding the hearings as well as a portion of the hearing days themselves trying to make sense of these documents.    The Excel sheets submitted on December 15, 2006 appeared to provide more data, but again were "colored" by Maxim's own interpretation of what was commissionable and what was not commissionable, and as will be discussed later, also proved unreliable.    While it was itself either unable or unwilling to provide MC with the necessary information, Maxim even suggested that MC should have asked the Arbitrator to subpoena Alcatel for this information.

154.    Data regarding possible commissions due from sales to the House Accounts, Option and Philips, are not available, other than a statement from Ms. Heide Perry, an employee of Maxim Germany that sales to Option were not commissionable because she had "no record of any design wins at Option." (Transcript Perry I, p. 14).    The testimony regarding sales to Philips showed commissionable sales of US$2,000, translating into a commission of US$100.    Ms. Perry testified that she had no other records of design wins at Philips, and that therefore no commissions were due. (Transcript Perry, p. 14)    No evidence was adduced about sales to Philips Belgium or Option Belgium for which Ms. Perry concluded that no design win was due.

155.    Of course, evidence submitted by Maxim with respect to sales which it believes are commissionable is not very useful without knowing what other sales took place to the

House Accounts, for which Maxim believed (rightly or wrongly) it owed no commissions to MC. However, as there is no other evidence available with respect to Philips and Option, and no data with respect to them can be extrapolated, any claim MC makes with respect to underpayment of commissions on sales to Philips and Option must be denied.

156.    On the other hand, the disclosure made on December 15, 2006 by Maxim in furtherance of the November 7, 2006 disclosure agreement between the parties does give some more data, albeit that they again appear to be incomplete in the sense that (i) it does not include sales to intermediary companies that in turn sold products to Alcatel's manufacturing or purchasing entities, and (ii) it does not include sales to Alcatel subcontractors (such as Flextronics) and kitters, which sales would be commissionable to the extent they include parts for which MC had a design win as herein defined.

157.    In fact, Maxim may well have the complete information that the Arbitrator needs in order to make a correct determination of the commissions earned by MC during the relevant period (January 1, 1998 through March 7, 2003). This is evident from the testimony of Jean-François Bougerol, when he declared:

> "… we have accurate tracking records for sure of what we sell to Alcatel, part number by part number, including distribution, including subcontractors. […] Subcontractors such as Flextronics, because they order through Alcatel numbers. So it goes to our incentive. We receive an incentive on whatever we sold to Alcatel so I know perfectly that we have records of everything that is sold all over the world to Alcatel." (Transcript Bougerol, p. 8)

158.    Conversely, Mr. Bougerol also testified that according to Christophe Verboven, Alcatel's purchase manager for Belgium, Alcatel would *not* have this type of information readily available. Bougerol declared, relating Verboven's words to him in a telephone conversation:

"... it is now part of the Alcatel history, it's in our archives and it's quite impossible to investigate and to know which part was designed in what. We have so many boards in applications. Each board has had different revisions. So how do you want me to know which socket, according to time and location and application, was designed by who or where. It is quite impossible. It would be a nightmare to try and understand the complete history. ..." (Transcript Bougerol, p.2)

159.    As the Arbitrator does not dispose of the necessary information, he is compelled to work with what is before him. Given Maxim's failure to have provided useable evidence, with respect to Alcatel, the Arbitrator holds that under these circumstances it is entirely proper for MC to come to a "best estimate" of the commissions owed to it by extrapolating publicly available data with respect to Alcatel's production records. Maxim objects to the extrapolation methodology, as there are too many uncertainties involved. Extrapolating from publicly available production data is indeed not very accurate, especially if the data are unavailable for all relevant years. In addition, one has to make assumptions as to how many Maxim products are included in each Alcatel product. However, this is information that should have been supplied by Maxim itself, which, at least according to Mr. Bougerol, has detailed data with regard to its direct and indirect sales to Alcatel and its subcontractors. Not having produced those data, Maxim is estopped from making these objections.

160.    Under the circumstances, the best available method of calculating MC's damages relative to the underpayment of commissions, consists of (i) analyzing Maxim's commission statements covering January 1998 through June 2000 (Resp. Exh. B-1), July 2000 through June 2001 (Resp. Exh. B-2) and July 2001 through June 2002. (No similar data were submitted for the period July 2002 until March 7, 2003.) In addition, (ii) these data need to be compared with the information submitted by Maxim on December 15, 2006. Finally, (iii) to the extent any portion of this data is useable, this information needs to be adjusted on the basis of extrapolation data from Alcatel's public production records.

- 65 -

161.    Looking at Respondent's Exhibit B-1, which calculated the commission for MC from January 1998 through June 2000, analysis is made more difficult, because the data failed to indicate which products Maxim considered to be commissionable. As a result, MC was unable to verify whether it received the proper commissions for everything that had to do with Alcatel. According to this report, sales to the United States did not kick in until the 4th Quarter of FY 1999 (April through June 1999), leaving five quarters (January 1998 through March 31, 1999) with zero commissionable sales reported. A comparison of this data with the Excel Sheet of December 15, 2006 (herein the "Excel Sheet") for the same time period, reveals that according to the Excel Sheet during the five quarters in question sales amounting to US$2,542,675 were made to the US Alcatel facilities (of which US$2,021,736 to the Nogales facility), while the Excel Sheet reported zero sales to Belgium during this period. Of these US sales of US$2,542,675, a staggering amount of US$2,331,350 is declared as "Commission Paid, part not won," which would translate to at least US$34,970.25. If these commissions were paid, *none* of them was reported as such on Exhibit B-1.

The discrepancies between the two sets of documents become even more astounding as one proceeds into 1999 and 2000. For example, *no* US sales are reported for the first and second fiscal quarters of 2000 (the 3rd and 4th calendar quarters of 1999) by the Excel Sheet, whereas commissionable US sales are reported in Exhibit B-1, respectively for US$727,520 and US$268,800. Similarly, the Excel Sheet reports sales to Geel, Belgium, in the fourth fiscal quarter of 1999 and the first and second fiscal quarters of 2000 (respectively, the 2nd, 3rd and 4th quarters of 1999) for US$822,442, US$4,293,912 and US$1,067,715, most of which either indicate "Commission Paid", or Commission Paid, part not won.". However, when one compares these numbers against sales and commissions paid according to Exhibit B-1, the total corresponding numbers for these three quarters' sales to Geel add up to a number that is about equal to what the Excel Sheet reports just for the fourth fiscal quarter of 1999.

162.    The only conclusion the Arbitrator can make from studying these documents in detail is that the data contained in both the Excel Sheet and Exhibits B-1, B-2 and B-3 are grossly in error and entirely unreliable.

The Arbitrator has taken an average of US$6.25 in sales to Alcatel relating to parts commissionable to MC.  This is based on the following table:

TABLE 1

| Component | Unit price in US$ |
|---|---|
| MAX 708 CSA | 0.30 |
| MAX 708 RESA | 0.30 |
| MAX(1)651(E)SA | 1.23 |
| DG409DY | 0.46 |
| MAX774 | 1.68 |
| MAX(3)232 | 0.68 |
| MAX705 | 0.30 |
| MAX232CSE | 0.60 |
| MAX232AEWE | 0.70 |
| Total | 6.25 |

In addition, through extrapolation of the publicly available data (1999: 1.6 mln, 2000: 6 mln, 2001, 8 mln units) submitted by Claimant, the Arbitrator has estimated the production volumes of Alcatel's ADSL units during the relevant calendar quarters, as well as calculated the total commissions payable as follows:

TABLE 2

| Calendar Quarter | Total Sales reported by Maxim in B1-2-3 and in Excel Sheet | | | Alcatel est. ADSL units produced | Total commissions owed |
|---|---|---|---|---|---|
| | Belgium | Nogales | Shanghai | | |
| Q1 1998 | 1,658 | 211,200 | 0 | 100000 | 15,667 |
| Q2 1998 | 76,514 | 419,365 | 0 | 150000 | 23,243 |
| Q3 1998 | 185,233 | 402,751 | 0 | 250000 | 30,800 |
| Q4 1998 | 136,380 | 312,800 | 0 | 300000 | 30,171 |
| Q1 1999 | 37,802 | 675,620 | 975 | 350000 | 33,380 |
| Q2 1999 | 822,442 | 300,639 | 0 | 400000 | 49,837 |
| Q3 1999 | 4,293,912 | 727,520 | 0 | 400000 | 111,909 |

- 67 -

| | | | | |
|---|---|---|---|---|
| Q4 1999 | 1,067,715 | 268,800 | 0 | 450000 | 58,203 |
| Q1 2000 | 755,883 | 145,280 | 0 | 1250000 | 128,526 |
| Q2 2000 | 646,974 | 804,945 | 9,250 | 1500000 | 150,330 |
| Q3 2000 | 1,562,025 | 721,309 | 291,629 | 1500000 | 174,055 |
| Q4 2000 | 2,902,095 | 832,390 | 31,318 | 1750000 | 207,594 |
| Q1 2001 | 2,294,394 | 438,890 | 200,365 | 2000000 | 221,916 |
| Q2 2001 | 656,734 | 249,750 | 6,888 | 2000000 | 197,351 |
| Q3 2001 | 291,780 | 0 | 0 | 2000000 | 197,712 |
| Q4 2001 | 261,003 | 0 | 0 | 2000000 | 195,579 |
| Q1 2002 | 107,211 | 0 | 0 | 1750000 | 165,671 |
| Q2 2002 | 76,265 | 0 | 0 | 1500000 | 141,769 |
| Q3 2002 | 6,750 | 0 | 0 | 1250000 | 117,424 |
| Q4 2002 | 0 | 0 | 12 | 1000000 | 93,750 |
| Q1 2003 - 7/3/03) | 0 | 0 | 7,925 | 750000 | 70,392 |
| TOTAL | | | | | 2,415,279 |

163.    In the absence of more concrete and reliable data submitted by Maxim, the
Arbitrator is satisfied that the above reflected calculations constitute the best available
estimate and comes as close to the real amount due as possible.  This is especially so in view
of the fact that data for all other Maxim Products sold by MC to Alcatel prior to the 1998
Agreement included a list of 72 products[9] (including the 9 products used in the ADSL
modem), 63 of which are completely ignored for purposes of this calculation.

_____

[9] Claimant's Exh. A-62 lists the following products:
DG407, DG409, DG412, DG417, ICL7642, MAX1626, MAX1651, MAX186, MAX190, MAX202, MAX208,
MAX213, MAX232, MAX233, MAX235, MAX241, MAX250, MAX251, MAX3218, MAX3232, MAX3241,
MAX3243, MAX3488, MAX3675, MAX3680, MAX3681, MAX3690, MAX3691, MAX3762, MAX4141,
MAX4147, MAX4743, MAX490, MAX492, MAX512, MAX528, MAX603, MAX630, MAX637, MAX649,
MAX651, MAX662, MAX691, MAX695, MAX697, MAX700, MAX703, MAX705, MAX707, MAX708,
MAX734, MAX738, MAX739, MAX743, MAX747, MAX765, MAX767, MAX770, MAX771, MAX772,

- 68 -

Respondent claims (according to Resp. Exh. B-1, B-2 and B-3) to have paid an aggregate amount of US$416,241. Claimant on the other hand contends that it has received no more than US$334.236. An analysis of the various exhibits submitted in support of this contention leads the Arbitrator to conclude that, more likely than not, Claimant received only the sum of US$334,236.49 over the period of the 1998 Agreement (*1998-2000:* US$196,103.85; *2001:* US$125,446.94; *2002:* US$6,018.35, and *2003 (January through March 7):* US$6,667.35.)

Thus, the Arbitrator concludes that during the relevant period of the 1998 Agreement, Respondent failed to pay to Claimant a net amount of US$2,081,043:

TABLE 3

| Total commissions owed | minus commissions paid | Total amount of commissions payable |
|---|---|---|
| US$2,415,279 | (US$334,236) | US$2,081,043 |

The net amounts of the commissions owed to MC shall be subject to interest, each time calculated from the last day of the relevant calendar quarter, at the statutory annual rate of 7% through December 31, 2006, and at the statutory annual rate of 6% thereafter until paid in full. Thus, applying the data set forth in Table 2 above, the starting date of interest due on the first net amount of US$98,903 in commissions owed shall be September 30, 1999 (the previous amounts having been offset by the commissions received during that period). The amounts in commissions owed relative to the quarters ending on December 31, 1999 and the four calendar quarters of 2000 shall be as stated in the above Table 2, and interest thereon shall be calculated as aforesaid from the last day of each such calendar quarter. The commissions received during the year 2001 shall be deducted from the amount owed for the first quarter of that year (netting US$96,469), and interest thereon shall be calculated as aforesaid from March 31, 2001. The amounts in commissions owed relative to the remaining quarters in 2001 shall be as stated in the above Table 2, and interest thereon shall be calculated as aforesaid from the last day of each such calendar quarter. Similarly, the commissions received during the year 2002 shall be deducted from the amount owed for the first quarter of that year (netting US$165,070), and interest thereon shall be calculated as

---

MAX774, MAX775, MAX776, MAX792, MAX797, MAX809, MAX811, MAX856, MAX903, MAX907, MAX934, MX7574.

aforesaid from March 31, 2002. The amounts in commissions owed relative to the remaining quarters in 2002 shall be as stated in the above Table 2, and interest thereon shall be calculated as aforesaid from the last day of each such calendar quarter. Finally, as to commissions owed for the period from January 1, 2003 through March 7, 2003 the commissions received for that period shall be deducted therefrom (netting US$63,725), and interest thereon shall be calculated as aforesaid from March 31, 2003.

## XIII.   CLAIM FOR DAMAGES CAUSED BY IMPROPER CONDUCT

164.    MC alleges that Maxim's conduct during these arbitration proceedings constituted improper behavior that gives rise to an actionable claim for the increased expenses incurred by MC, estimated *ex aequo et bono* at €100,000. The Arbitrator sees no valid ground for awarding such a claim. Maxim's conduct of these proceedings was indeed adversarial, but no strategic actions undertaken by Maxim amount to actionable misconduct. Besides, the Arbitrator sees no additional damages suffered by MC. Maxim's insufficient disclosure does not translate into additional damages for MC, as the Arbitrator has made a best estimate of such damages. The claim is denied.

## XIV.   COUNTERCLAIM ADVANCED BY MAXIM

165.    Maxim alleges that during the period from January 1, 1998 until March 7, 2003, MC received commission payments on certain sales that were not commissionable under the Agreement. Specifically, MC received commission payments on all sales by Maxim to Alcatel in Belgium, even on sales concerning products for which the design win had not been done as per the Agreement, and which hence were not commissionable. Maxim identified such allegedly unduly made commission payments for the first time in detail in its post-hearing brief dated May 31, 2007,[10] and demands that they be refunded to Maxim by MC. Maxim indicates a maximum and a minimum amount of the commissions it overpaid,

---

[10] Previously, in Maxim's second memorial (dated October 10, 2006), Maxim alleged that it overpaid an amount of US$136,431.12 on four products for which MC would not have earned a design win (MAX708, MAX 1651, MAX3232, and DG409).

aggregating to a total minimum of US$109,379.89 and a total maximum of US$182,301.02, and suggests that the exact amounts should be determined by the expert appointed by the Arbitrator, Mr Carlo Van Der Herten.

166.    Despite several prior opportunities to do so, Maxim first submitted evidence in support of its counterclaim in its post-hearing brief. This alone could compel the Arbitrator to dismiss the counterclaim, as, *inter alia*, this does not afford MC an adequate opportunity to exercise its proper right of defense.

167.    In any event, however, the Arbitrator finds that the counterclaim lacks foundation. The basis for the counterclaim is that Maxim made commission payments to MC for sales to Alcatel that were not commissionable as there was no design win. The Arbitrator has held, however, that there is a design win whenever MC achieved that the House Account designed one or more Maxim parts into its products. See ¶145. Therefore, in principle, all sales to Alcatel were commissionable. Hence, the counterclaim is denied.

## XV.    INTEREST

168.    MC claims interest on the amounts awarded to it, counting from the date of the Notice of Termination (September 7, 2001) at a statutory Belgian interest rate of 7% per annum. Maxim opposes the imposition of interest on the ground that MC's choice of first bringing this case before the Belgian courts, and tying up the parties for more than five years, constitutes abuse of process. Accordingly, adding interest for the period 2001-2005 would violate the principle of equity under Belgian law. In addition, Maxim claims that the statutory interest has been lowered to 6%.

169.    The Arbitrator finds that the question as to whether a claim based on Articles 2 and 3 of the 1961 Act is arbitrable has been the subject of much discussion. Various aspects of this question have been litigated up to the Belgian Supreme Court. Courts and scholars alike have differentiated between domestic and foreign arbitration, whether the arbitral award

would be executed in the foreign country or in Belgium, and whether the contract provided for Belgian law or a foreign law to apply. Although the argument could be made that when Belgian law is declared to apply to the agreement in question, there is no doubt that the dispute is properly arbitrable, a further distinction could be made as the arbitration *in casu* takes place in San Jose, California, and as such is subject to the procedural laws of California to the extent that they come into play. *See* most recently, Supreme Court, 16 November 2006, *Van Hopplynus Instruments S.A. v. Coherent Inc.*, www.cass.be, Justel No. F-20061116-7. *See generally*, Pascal Hollander, *L'Arbitrabilité des Litiges Relatifs aux Contrats de Distribution Commerciale en Droit Belge*, in L'ARBITRAGE ET LA DISTRIBUTION COMMERCIALE (Actes du Colloque du CEPANI du 17 novembre. 2005). Thus, the arbitrability of this dispute was by no means a straightforward issue.

170.    In support of its contention, Maxim refers to the note by K. Vanderschot under the decision of June 17, 2002 by the Court of Appeal in Liège, 2003 T.B.R.R. 446, 448. Vanderschot recalls the factors that courts take into consideration (including the decision in question), which include acting with the exclusive goal of damaging the other party, exercising one's right without any (lawful) interest, choosing among different ways to exercise one's right with the same usefulness the way which is (most) harmful for the other party, and refusal to limit damages suffered by the other party. The Arbitrator finds that none of these factors applies to the actions of MC in bringing the litigation before the Belgian courts.

171.    Based on the foregoing, the Arbitrator concludes that MC's litigation before the Belgian courts did not rise to the level of abuse of process that would violate equitable principles under Belgian Law.

172.    Maxim also argues that the statutory interest rate has been reduced to 6% per annum by implementation of the new Section 1, para. 1 of the Act of 15 May 1865, as amended (published in the Belgian Official Gazette of January 17, 2007). The Arbitrator finds that the statutory interest rate in Belgium has indeed been reduced to 6% per annum

- 72 -

effective January 1, 2007. As the Arbitrator finds that Belgian judges almost always award interest at the statutory interest rate, the statutory rate will prevail in this procedure.

173. Therefore, each of the claims awarded herein and in the Final Award shall be subject to an annual percentage rate of 7% through December 31, 2006, and of 6% from and after January 1, 2007 until payment in full has been received by MC. With reswpect to the issue as to the date on which interest starts to be due with respect to the claims awarded herein, the Arbitrator holds that no general rule exists that all such amounts awarded earn interest as of the date of the Notice of Termination. The Arbitrator has indicated the starting date relative to each claim awarded herein in the final paragraph dealing with such claim (See ¶¶82, 104, 107, 131 and 163).


## XVI.   FEES AND COSTS

174. It is within the discretion of the Arbitrator to award attorneys' fees and costs to the prevailing party, in an amount that he deems to be reasonable. Such decision is hereby deferred to a further Award.

## XVII. SUMMARY AND PARTIAL AWARD

175.   For the above reasons the Arbitrator awards as follows:

1.   With respect to Claimant's claim pursuant to Section 2 of the 1961 Act:

- An equitable and reasonable Termination Period would have been 30 months instead of the 18 months unilaterally determined by Respondent;

- the Claimant's claim for a compensatory payment succeeds insofar as it relates to the additional 12-month period hereby awarded. The amount to be awarded to Claimant hereunder (including interest thereon) is deferred to the Final Award following the findings and calculations by the expert, Mr. Carlo Van Der Herten.

2.   Claimant's claim pursuant to Section 21 of the 1995 Act fails and is dismissed.

3.   With respect to Claimant's claim that Respondent undermined MC's benefits during the Termination Period:

- Claimant's claim with respect to undue payment of publicity expenses succeeds with respect to the period from September 8, 2002 through March 7, 2003. The amount to be awarded to Claimant hereunder (including interest thereon) is deferred to the Final Award following the findings and calculations by the expert, Mr. Carlo Van Der Herten.

- Claimant's claim with respect to reimbursement of MC's contribution to the FAE's salary succeeds in the sum of US$43,861, plus interest thereon at the statutory rate prevailing in Belgium.

- Claimant's claim with respect to damages suffered during the Termination Period as a result of Respondent's pricing and publicity campaign fails and is dismissed.

4. Claimant's claim pursuant to Section 3 of the 1961 Act succeeds. The amount to be awarded to Claimant hereunder (including interest thereon) is deferred to the Final Award following the findings and calculations by the expert, Mr. Carlo Van Der Herten, on the basis of the monthly average gross margin on the sale of Maxim Products, calculated on the basis of the total gross margins on such sales obtained during the 36-month period comprised of the second semester of 1998, the calendar years 1999 and 2000 and the first semester of 2001, increased by a sum of US$970,786, representing the total gross receipts in additional commissions MC should have received during this same 36-month period. The monthly average thus obtained shall be multiplied by twelve.

5. Claimant's claim for relief in respect of underpayment of commissions on the House Account succeeds in the sum of US$2,081,043, plus interest thereon at the statutory rate prevailing in Belgium.

- 75 -

**THE ARBITRATOR AWARDS AND ORDERS AS AND FOR THIS PARTIAL AWARD THAT:**

The Respondent shall pay to the Claimant the total sum of US$2,124,904, together with interest on the respective amounts from such respective starting dates as set forth in ¶¶107 and 163, at the statutory interest rates of 7% per annum through December 31, 2006 and of 6% per annum thereafter until fully paid.

All other decisions are deferred to a further Award.

Place of Arbitration: San José, Santa Clara County, California

Dated this 9th day of November 2007

Eric van Ginkel
Sole Arbitrator

- 76 -