Tod L. Gamlen, State Bar No. 83458
Jerry Salcido, State Bar No. 233282
**BAKER & McKENZIE LLP**
660 Hansen Way
Palo Alto, CA  94304-1044
Telephone: +1 650 856 2400
Facsimile:  +1 650 856 9299
tod.l.gamlen@bakernet.com
jerry.m.salcido@bakernet.com

Attorneys for Petitioner
MAXIM INTEGRATED PRODUCTS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAXIM INTEGRATED PRODUCTS, INC., | **CIVIL ACTION** |
| Petitioner, | **Case No.  08 00721–JW** |
| v. | **DECLARATION OF JERRY SALCIDO IN SUPPORT OF MAXIM INTEGRATED PRODUCTS, INC.'S MOTIONS (1) TO STRIKE RESPONDENT'S SUPPLEMENTAL CROSS-PETITION TO CONFIRM JULY 12, 2008 ARBITRATION AWARD; (2) FOR LEAVE TO FILE SUPPLEMENTAL PETITION TO VACATE JULY 12, 2008 ARBITRATION AWARD; AND (3) TO VACATE JULY 12, 2008 ARBITRATION AWARD MEMORANDUM OF POINTS AND AUTHORITIES** |
| MASTER CHIPS BVBA, | |
| Respondent. | |
| | **Date:    September 15, 2008**<br>**Time:    9:00 a.m.**<br>**Dept.:   Courtroom 8, 4th Floor**<br>**Judge:   The Honorable James Ware** |

Baker & McKenzie LLP
660 Hansen Way
Palo Alto, CA  94304
+1 650 856 2400

Case No. 08 00721–JW
DECL. IN SUPP. OF MTNS. TO STRIKE SUPP. CROSS-PET.; FOR LEAVE TO FILE SUPP. PET. TO VACATE; AND TO VAC. ARB. AWARD
PALDMS/373546.1

I, Jerry Salcido, hereby make the following declaration under penalty of perjury under the laws of the State of California and the United States. I declare that the facts stated herein are true, correct and within my own personal knowledge. If called as a witness and sworn I could competently testify to these facts.

1. I am an attorney at law duly admitted to practice before the Courts of the State of California and before this Court. I am an associate with the law firm of Baker & McKenzie LLP, 660 Hansen Way, Palo Alto, California, attorneys of record for Petitioner Maxim Integrated Products, Inc. ("Maxim"). I am involved in handling this case on behalf of said Petitioner and, as such, I have personal knowledge of the matters set forth in this declaration.

2. On January 31, 2008, Maxim filed its Petition to Vacate Arbitration Award. Maxim's Petition alleged that the "Partial Award" entered by arbitrator Eric Van Ginkel in favor of Master Chips should be vacated on several grounds of arbitrator misconduct, all of which deprived Maxim of a fair hearing. Those grounds included the arbitrator's refusing to continue the arbitration proceedings after allowing Master Chips to increase its damages claim from $2 million to $10 million on the eve of the arbitration hearing; disobeying his own procedural order by allowing Master Chips' expert witness Marc Willemart to testify in French, a language in which Maxim's counsel who was responsible for examining Willemart is not fluent; and, disregarding a November 2007 discovery stipulation that set forth each party's disclosure obligations—which lead to the arbitrator's considering irrelevant evidence to the detriment of Maxim.

3. Master Chips filed an Opposition and Cross-Petition to Confirm Arbitration Award on April 28, 2008. In its Opposition Master Chips argued that the Federal Arbitration Act ("FAA") does not apply to the Partial Award.

4. On May 19, 2008 Maxim filed its Reply, which, among other things, countered Master Chips' position on the FAA.

5. The Court heard Maxim's Petition to Vacate on June 2, 2008. At that hearing the Court indicated that it would be interested in knowing when the arbitrator issued his Final Award.

6. The arbitrator issued his Final Award on July 12, 2008. A true and correct copy of the Final Award is attached hereto as **EXH. 57**.

1

Baker & McKenzie LLP
660 Hansen Way
Palo Alto, CA 94304
+1 650 856 2400

Case No. 08 00721-JW
DECL. IN SUPP. OF MTNS. TO STRIKE SUPP. CROSS-PET.; FOR LEAVE TO FILE SUPP. PET. TO VACATE; AND TO VAC. ARB. AWARD
PALDMS/373546.1

7.   Two weeks later, on July 24, 2008, respondent Master Chips filed a Supplemental Cross-Petition to Confirm Arbitration Award, but did not request from the Court at that time, or any time before or since, for leave to file the Supplemental Cross-Petition.

8.   On July 29, 2008, I sent Master Chips' counsel an email (a true and correct copy of which is attached hereto as **EXH. 58**) notifying them that Master Chips' Supplemental Cross-Petition was procedurally improper and subject to a motion to strike.  In hopes of avoiding having to waste resources on filing a motion to strike I proposed the following stipulation::

   a.   Master Chips withdraws its Supplemental Cross-Petition;

   b.   A Court order granting Maxim's Petition to Vacate will apply to vacate both the Partial Award and the Final Award; and

   c.   A Court order denying Maxim's Petition to Vacate and/or confirming the Partial Award will apply to confirm both the Partial Award and the Final Award.

9.   Master Chips' counsel, Seth Appel, sent me an email on August 4, 2008 notifying me that Master Chips will not agree to Maxim's proposed stipulation.  A true and correct copy of Mr. Appel's email to me is attached hereto as **EXH. 59**)

10. In spite of being on notice that its Supplemental Cross-Petition to vacate was subject to a motion to strike, Master Chips still failed to seek leave of court to file its Supplemental Cross-Petition.  Instead, on August 7, 2008 it filed a Notice of Hearing Re the Supplemental Cross-Petition and a Memorandum of Points and Authorities in support of the Supplemental Cross-Petition, and scheduled a hearing date for September 15, 2008.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed on August 11, 2008, at Palo Alto, California.

/s/ Jerry Salcido
Jerry Salcido

Baker & McKenzie LLP
660 Hansen Way
Palo Alto, CA  94304
+1 650 856 2400

2

Case No. 08 00721-JW
DECL. IN SUPP. OF MTNS. TO STRIKE SUPP. CROSS-PET.; FOR LEAVE TO FILE SUPP. PET. TO VACATE; AND TO VAC. ARB. AWARD
PALDMS/373546.1

# EXHIBIT 57



**International Chamber of Commerce**
*The world business organization*

**International Court of Arbitration • Cour internationale d'arbitrage**

# AWARD

**ICC International Court of Arbitration • Cour internationale d'arbitrage de la CCI**

38, Cours Albert 1er, 75008 Paris, France
Tel. +33 1 49 53 28 28   Fax +33 1 49 53 29 33
Web site www.iccarbitration.org    E-mail arb@iccwbo.org

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 14123/RCH/JHN

### MASTER CHIPS BVBA

(Belgium)

**vs/**

MAXIM INTEGRATED PRODUCTS INC.

(U.S.A.)

This document is an original of the Final Award rendered in conformity with the Rules of the ICC International Court of Arbitration.

INTERNATIONAL CHAMBER OF COMMERCE
## INTERNATIONAL COURT OF ARBITRATION

ICC CASE NO. 14 123/RCH/JHN
In the Matter of the Arbitration between:

MASTER CHIPS BVBA

Claimant

and

MAXIM INTEGRATED PRODUCTS INC.

Respondent

# FINAL AWARD
# SENTENCE FINALE

# FINAL AWARD
## TABLE OF CONTENTS

I.      INTRODUCTION...................................................................................................1

II.     THE PARTIES AND THEIR LEGAL REPRESENTATION ...................................1

III.    PROCEDURAL HISTORY; APPOINTMENT AND JURISDICTION OF
ARBITRATOR ......................................................................................................2

IV.     PROCEDURAL HISTORY SUBESEQUENT TO THE PARTIAL AWARD ......................4

IV.     THE ISSUES RAISED IN CLAIMANT'S MEMORIALS OF DECEMBER 12 AND
21, 2007; THRESHOLD ISSUE UNDER ARTICLE 19 OF THE RULES..........................6

V.      CLAIMANT'S CLAIM THAT COMPENSATORY DAMAGES UNDER SECTION 2
OF THE 1961 ACT MUST INCLUDE COMMISSIONS PAYABLE DURING THE
ADDITIONAL 12-MONTH PERIOD.......................................................................10

VI.     CLAIMANT'S CLAIM RELATING TO CONVERSION INTO EURO'S OF THE
QUARTERLY AMOUNTS OF UNPAID COMMISSIONS. ...............................................13

VII.    CLAIMANT'S CLAIMS RELATING TO CAPITALIZATION OF INTERESTS. .............19

VIII.   QUANTIFICATION ISSUES LEFT BY THE PARTIAL AWARD FOR FINDINGS
AND CALCULATIONS BY THE EXPERT. ...............................................................27

IX.     QUANTIFICATION OF THE COMPENSATORY DAMAGES PURSUANT TO
SECTION 2 OF THE 1961 ACT. ...........................................................................29

X.      QUANTIFICATION OF CLAIMANT'S CLAIM RESPECTING UNDUE PAYMENT
OF PUBLICITY EXPENSES. ................................................................................31

XI.     QUANTIFICATION OF THE EQUITABLE COMPENSATION PURSUANT TO
SECTION 3 OF THE 1961 ACT. ...........................................................................33

XII.    COSTS RELATED TO THIS ARBITRATION ............................................................35

XIII.   AWARD............................................................................................................37

INTERNATIONAL CHAMBER OF COMMERCE
## INTERNATIONAL COURT OF ARBITRATION

ICC CASE NO. 14 123/RCH/JHN
In the Matter of the Arbitration between:

### MASTER CHIPS BVBA

Claimant

and

### MAXIM INTEGRATED PRODUCTS INC.

Respondent

# FINAL AWARD

## I.    INTRODUCTION

1.    This dispute concerns the termination of a distribution agreement between the Respondent, Maxim Integrated Products Inc. (herein "Respondent"), a manufacturer of analog devices, and Claimant, Master Chips bvba (herein "Claimant"), the Belgian distributor of Respondent's products until March 2003.

## II.    THE PARTIES AND THEIR LEGAL REPRESENTATION

2.    The Claimant is Master Chips bvba, a limited liability company organized and existing under the laws of the Kingdom of Belgium (Company No. 0425352027), with its principal place of business at Jan Persijnstraat 2, B-8500 Kortrijk. Claimant is engaged in the distribution of electronic components, such as semi-conductors, power supplies, capacitors and fuses.

3.    Claimant is represented by Novalex Advocaten (by Leo Goovaerts, Sabine Thielemans and Philip Peerens), located at Kerselarenlaan 118, B-1200 Brussels.

4.    The Respondent, Maxim Integrated Products, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 120 San Gabriel Drive, Sunnyvale, California 94086. Respondent designs, develops and manufactures linear and mixed-signal integrated circuits, commonly referred to as analog circuits. Its shares are traded on NASDAQ under the symbol "MXIM".

5.    Respondent is represented by Lafili, Van Crombrugghe & Partners (by Jan Swinnen and Bieke Noels of the Antwerp office, and Ingrid Meeussen of the Brussels office), with an address at Desguinlei 214, B-2018 Antwerpen.

## III.    PROCEDURAL HISTORY; APPOINTMENT AND JURISDICTION OF ARBITRATOR

6.    The parties originally entered into an exclusive distribution agreement on October 1, 1987 (the "1987 Agreement"). After a period of negotiations, the parties entered into a new, modified distribution agreement that pursuant to Section 11A thereof became effective as of October 1, 1998 (herein the "1998 Agreement"). Pursuant to Section 16F, the "Agreement and the performance thereof shall be governed by and construed in accordance with the laws of **Belgium**." [*emphasis in original*]

The 1998 Agreement includes an arbitration clause that applies to this arbitration. It is set forth in Section 16G and reads as follows:

"G.    The parties agree that any disputes which may arise hereunder or in any way arising out of the interpretation or application of this Agreement shall be submitted to the international Commercial Arbitration Committee of the International Chamber of Commerce for arbitration in accordance with its rules and that the decision on such arbitration shall be final. The place of arbitration

shall be the State of California, Santa Clara County unless another place be designated by mutual agreement between the parties."

At its session of February 2, 2006, the International Court of Arbitration (the "Court"), being *prima facie* satisfied that an arbitration agreement under the ICC Rules of Arbitration in force as from January 1, 1998 (herein the "Rules") may exist, decided that this arbitration should proceed in accordance with Article 6(2) of the Rules, and determined that the place of arbitration is San José, Santa Clara County, California. In addition, the Court decided that the matter would be submitted to a Sole Arbitrator.

7.     The Court at its session of 24 February 2006, in accordance with Article 9(3) of the Rules, appointed Eric van Ginkel as Sole Arbitrator (herein the "Arbitrator"), upon the proposal of the Dutch National Committee. The Arbitrator's address is 11693 San Vicente Boulevard #908, Los Angeles, California 90049.

8.     The Court's decision that the arbitration should proceed in accordance with Article 6(2) of the Rules was administrative in nature.    The parties, however, subsequently waived any objections to the jurisdiction of the Sole Arbitrator to hear the case. (Terms of Reference ¶12). The parties are in agreement about the Arbitrator's jurisdiction and have agreed not to challenge the same (*Ibid.*).

9.     The Arbitrator determined by Procedural Order No. 1 dated May 7, 2006, that pursuant to Article 16 of the Rules English is the language of this arbitration, with the proviso that written and oral submissions of any kind, including pleadings, evidence, texts of statutory laws and case law/jurisprudence could be submitted either in *English* or *Dutch* without the necessity of a translation. The Arbitrator drew up, and the parties agreed to, Terms of Reference in accordance with Article 18 of the Rules, dated as of June 23, 2006.

10.    The parties and the Arbitrator agreed that the IBA Rules on the Taking of Evidence in International Commercial Arbitration would apply to this arbitration.

- 3 -

11.     In accordance with Article 20(4) of the Rules, the Arbitrator, upon the suggestion of and after having consulted the parties, appointed (from among the candidates proposed by the parties) an expert by Procedural Order No. 5 dated October 31, 2006 in order to assist the Arbitrator in making certain determinations of a financial nature.  The Arbitrator thus appointed

Mr. Carlo Van der Herten

FINACC & Partners bvba

Josef van Elewyckstraat 103

B-1853 Strombeek-Bever, Belgium

12.     The Arbitrator rendered a Partial Award dated November 9, 2007 (herein the "Partial Award"), which was duly received by the parties on November 14, 2007.

13.     For further details with respect to the Agreement between the parties and the procedural history of this arbitration up to the Partial Award, the Arbitrator refers to the Partial Award.

## IV.    PROCEDURAL HISTORY SUBESEQUENT TO THE PARTIAL AWARD

14.     On December 12, 2007, Claimant filed two Memorials which raised allegations in accordance with Article 29 "and/or" Article 19 of the Rules.  Claimant submitted a third Memorial on December 21, 2007.  In accordance with the Arbitrator's request for comments, Respondent submitted Memorials in response to the issues raised by Claimant on January 15, 2008 and January 21, 2008 respectively.

15.     On December 19, 2007, the Arbitrator held a telephone conference with the Expert, Mr. Carlo Van Der Herten (herein the "Expert") and counsel for both parties, who were assembled at the Expert's offices.  The purpose of the conference call was to hear the parties and the Expert with respect to any comments or suggestions they had regarding the draft terms of reference for the Expert.

16.     The Arbitrator finalized the Terms of Reference for the Expert on December 19, 2007. The Expert signed them on December 30, 2007.

17.     On March 12, 2008, the Expert rendered his final report to the Arbitrator. Except as otherwise noted herein, the Expert's findings form the basis for the decisions regarding the issues that (in and pursuant to the Partial Award) the Arbitrator had deferred to this Final Award.

18.     (a)     The Arbitrator rendered an Addendum to the Partial Award dated March 29, 2008 (herein the "Addendum") which was approved by the Court at its session of March 28, 2008. In the Addendum, the Arbitrator granted Claimant's request for a correction of the Partial Award and dismissed the other allegations under Article 29 of the Rules. He ruled, however, that in due course, he would decide whether to admit these allegations as new claims under Article 19 of the Rules, together with Claimant's claim for capitalization of interest under Article 1154 of the Civil Code, which is the subject of Claimant's Memorial dated December 21, 2007. The Addendum was duly received by the parties on April 2, 2008.

        (b)     On May 22, 2008, the Arbitrator requested the parties to waive the 30-day limitation on the Arbitrator's authority to correct an error he had discovered in the Partial Award. One of the parties declined to waive such limitation. Consequently, no such correction was made.

19.     On April 3, 2008, the Arbitrator issued Procedural Order No. 8, in which he requested supplemental memorials dealing with the interpretation of Article 1154 of the Civil Code, which the parties submitted on April 14, 2008.

20.     (a)     On June 27, 2008, the Arbitrator declared the proceedings closed in accordance with Article 22(1) of the Rules.

- 5 -

(b)    The Court has continuously extended the time limit for rendering the Final Award in accordance with Article 24(2) of the Rules, and has done so most recently at its session of June 6, 2008, when it extended the time limit until September 30, 2008.

IV.    **THE ISSUES RAISED IN CLAIMANT'S MEMORIALS OF DECEMBER 12 AND 21, 2007; THRESHOLD ISSUE UNDER ARTICLE 19 OF THE RULES**

21.    The Arbitrator held that one issue constituted an application of Article 29(2) of the Rules for correction of a computational error. The error was corrected in the Addendum. The three remaining issues raised by Claimant in the three memorials referred to in ¶14 hereinabove can be summarized as follows:

(i)    Claimant's first allegation deals with Section 2 of the "*Wet van 27 juli 1961 betreffende de eenzijdige beëindiging van de voor onbepaalde tijd verleende concessies van alleenverkoop*" ("Act of 27 July 1961 regarding the unilateral termination of exclusive distribution agreements entered into for an unlimited term", herein referred to as "the 1961 Act"). Claimant alleges that for the proper computation of the equitable compensation of Section 2 of the 1961 Act, the Arbitrator needs to include the gross commissions that Claimant should have received during the additional 12-month Termination Period the Arbitrator awarded in ¶175(1) of the Partial Award. Claimant had argued as much in its Post-Hearing Memorial dated May 31, 2007, under ¶1.4.1.6, pp. 49-50. Claimant's Memorial dated December 12, 2007 "regarding the computation of the damages awarded by Partial Award dated November 9, 2007", ¶3.

(ii)    Claimant's second allegation relates to the award of underpaid commissions in connection with Respondent's sales to the House Accounts. The Arbitrator awarded US$2,081,043 for this claim in the Partial Award (See ¶163 and item 5 of the dispositive paragraph on page 75). Claimant alleges that the Arbitrator needs to express the damages suffered by Claimant in Euros rather than United States Dollars, and that the quarterly dollar amounts computed by the Arbitrator need to be converted into Euros at the end of each such quarter when they were due and payable.

- 6 -

Claimant's Memorial dated December 12, 2007 "regarding the computation of the damages awarded by Partial Award dated November 9, 2007", ¶2; Claimant's Memorial dated December 12, 2007 "regarding compensation for currency devaluation".

(iii)    Finally, Claimant alleges that pursuant to Article 1154 of the Civil Code it is entitled to capitalization of the interest awarded pursuant to ¶¶107 and 163, as well as the dispositive paragraph, of the Partial Award, - so that such interest will itself yield interest from January 1, 2008. Claimant's Memorial dated December 21, 2007 "concerning claim and demand for payment regarding capitalization of interest".

22.    Respondent, in its Memorials dated January 15 and 21, 2008, respectively, in addition to substantive law defenses that will be discussed in more detail hereinbelow, advances certain defenses of a procedural character: Respondent argues that (i) the claim must be dismissed, as it is submitted late and after the Arbitrator has closed the proceedings under Article 22 of the Rules, and (ii) because it constitutes an appeal from the Partial Award in violation of Article 28(6) of the Rules.

23.    Thus, a threshold question arises whether and to what extent Claimant can raise issues that have not been fully addressed by the Partial Award, and that do not constitute applications for the correction of a clerical, computational or typographical error or any error of a similar nature contained in the Partial Award, as referred to in Article 29 of the Rules.

24.    New claims are governed by Article 19 of the Rules, which provides as follows:
    "After the Terms of Reference have been signed or approved by the Court, no party shall make new claims or counterclaims which fall outside the limits of the Terms of Reference *unless it has been authorized to do so by the Arbitral Tribunal*, which shall consider the nature of such new claims or counterclaims, the stage of the arbitration and other relevant circumstances." *[emphasis added]*

- 7 -

25.    The Terms of Reference provide, in ¶¶11.4 and 13.2, that both parties reserved the right, respectively, to "increase/expand" Claimant's demand, and "to advance additional defenses" of Respondent. The Terms of Reference, in ¶17, quote Article 19 of the Rules and conclude that "Accordingly, within the confines of Article 19, the Sole Arbitrator may consider new or altered claims in due course."

26.    In ¶8 of the Partial Award, the Arbitrator wrote that "[a]t the conclusion of the hearing on May 8, 2007, the Arbitrator declared the proceedings closed in accordance with Article 22 of the Rules." This applied to the issues covered by the Partial Award. The Arbitrator declared the proceedings closed with respect to the Final Award only on June 27, 2008.

27.    Based on the foregoing, the Arbitrator holds that Article 19 of the Rules gives him the explicit discretionary authority at this stage of the proceedings to allow a party to make new claims (or counterclaims) that go beyond the explicit subjects covered by the Terms of Reference, and to make additional submissions or arguments. Pursuant to Article 19, the Arbitrator needs to take into consideration the nature of such new claims, the stage of the arbitration and other relevant circumstances.

28.    Here, the nature of the new claims advanced by Claimant flows directly from the decisions made by the Arbitrator in his Partial Award:

(i)    as the Arbitrator found in the Partial Award that Claimant was entitled to a longer Termination Period than Respondent had allowed, the question arises whether or not unpaid commissions ought to be included in the determination of compensatory damages in lieu of the additional 12-month Termination Period; this question did not arise earlier as Claimant demanded an equitable compensation pursuant to Section 2 of the 1961 Act equal to the actual value of the entire business of MC during the year of termination (2001), alleged to be in the amount of €6,968,089.55.

- 8 -

(ii) as the Arbitrator determined in the Partial Award the amount of the commissions Respondent should have paid to Claimant during the time that the 1998 Agreement was in effect, and expressed those amounts in United States Dollars, the question arises whether those dollar amounts should be converted into Euros at the time that Respondent should have paid the quarterly amounts rather than at the time of the Partial Award or the actual payment; and

(iii) as the Arbitrator decided in the Partial Award that the Respondent must pay certain amounts with interest thereon, the question arises whether such (unpaid) interest can be capitalized, so that interest on interest is payable.

29. It appears to the Arbitrator that Claimant raised these issues at a logical stage in the arbitration, i.e. after the Partial Award was received by the parties and prior to the Final Award. In fact, it is hard to see how Claimant could have raised any of these claims any earlier:

(a) The claim under (i) was not raised before, as Claimant demanded an equitable compensation pursuant to Section 2 of the 1961 Act equal to the actual value of the entire business of MC during the year of termination (2001) (alleged to be in the amount of €6,968,089.55). The issue in connection with determining an equitable compensation in lieu of the additional 12-month Termination Period only arose because the Arbitrator awarded this additional 12-month Termination Period instead of the actual value of Claimant's business. See Partial Award ¶79.

(b) The claim under (ii) is correctly raised at this stage, as Claimant had stated its claim in Euros and the Arbitrator computed the amount in United States Dollars. Had the Arbitrator computed the amount in Euros (or had he asked the Expert to conduct these calculations), this issue would not have arisen. Furthermore, as the analysis below (¶¶42-56) indicates, under Belgian law, compensation for losses from currency fluctuations may be considered a separate and distinct source of damages that, if awarded, does not constitute a *correction* of the amount awarded in the foreign currency, but rather a *separate* amount of damages, expressed in the currency of the

- 9 -

home country. Thus, a claim for compensation for currency losses constitutes a new claim which may be the subject of a subsequent award.

30.    By definition, the Partial Award decides only those issues that are covered by the Partial Award. Consequently, all matters not definitively decided by the Partial Award may be the subject of one or more further arbitral awards.

31.    Having given due consideration to the above described circumstances, the Arbitrator hereby accepts and authorizes Claimant's above-referenced claims under Article 19 of the Rules. Respondent had the opportunity to, and in fact did, comment on Claimant's claims which are now submitted according to Article 19 of the Rules. See Respondent's three Memorials respectively dated January 15, 2008 (2) and January 21, 2008 (1).

## V.    CLAIMANT'S CLAIM THAT COMPENSATORY DAMAGES UNDER SECTION 2 OF THE 1961 ACT MUST INCLUDE COMMISSIONS PAYABLE DURING THE ADDITIONAL 12-MONTH PERIOD.

32.    As stated in ¶21(i) above, Claimant alleges that the Arbitrator needs to add to the computation of the equitable compensation pursuant to Section 2 of the 1961 Act, the gross commissions Claimant should have received during the additional 12-month Termination Period which the Arbitrator awarded in ¶175(1) of the Partial Award, as Claimant had argued in its Post-Hearing memorial dated May 31, 2007, under ¶1.4.1.6, pp. 49-50. Claimant's Memorial dated December 12, 2007 "regarding the computation of the damages awarded by Partial Award dated November 9, 2007", ¶3.

33.    Claimant's argument set forth in ¶1.4.1.6 of its Post-Hearing Memorial posits that Claimant's activities as distributor and its activities as agent are intertwined and foreseen in the same agreement. In addition, Claimant invokes Section 16 of the 1998 Agreement which provided that "this Agreement shall bring no prejudice whatsoever to the existing rights of Maxim and distributor based on their anterior contractual relationship."

- 10 -

34.     Respondent refers to its own Post-Hearing Memorial dated May 31, 2007 (at p.49). It argues that the damages need to be restricted to Claimant's role as distributor, thus excluding the commissions earned on the House Accounts, as the commissions do not relate to that role. Respondent emphasizes that the intention of the compensation awarded to a distributor under Section 2 is clear from Section 1(2) of the 1961 Act, that defines the role of the distributor as acting in his own name and for his own account in relation to the sale of goods he buys from a manufacturer.

35.     In ¶79 of the Partial Award, the Arbitrator observed that he needed to determine the compensatory payment under Section 2 in such a manner that it is equivalent to the (net) benefits the distributor would have enjoyed from implementing the distributorship agreement during the additional portion of the Termination Period, i.e. the additional 12-month period.

36.     The Arbitrator finds that there is no precedent for including into those benefits aspects of the distributorship agreement that do not relate to the distribution activity proper, and Claimant has not cited any authority or court decision in support of that contention.

37.     The Arbitrator also notes that the nature of the compensation awarded under Section 2 differs fundamentally from the compensation awarded under Section 3 of the 1961 Act. As he observed in ¶115 of the Partial Award, the additional compensation provided for in Section 3 seeks to compensate the distributor for the loss of clientele, whereas Section 2 seeks to compensate the distributor for loss of the semi-gross profits he would have earned during the Termination Period to which he was entitled but which he did not enjoy, - in order to enable the distributor to either find one or more new distributorships or to change the nature of his business, so as to return to the prior level of profitability. The Arbitrator found in the Partial Award that the compensation under Section 3 should include a compensation for the lost House Accounts, as that formed a substantial portion of the lost clientele. The compensation under Section 2, however,

- 11 -

focuses on the distributorship itself, which under the 1998 Agreement no longer included the House Accounts.

38.     Claimant's argument that the distributorship and an agency relationship regarding the House Accounts were intertwined cannot succeed, as the Arbitrator found that no such agency relationship existed. See Partial Award ¶¶86 and 97.

39.     Claimant's reliance on Section 16 of the 1998 Agreement (which provided that "this Agreement shall bring no prejudice whatsoever to the existing rights of Maxim and distributor based on their anterior contractual relationship") must fail as well, as Section 16 cannot be interpreted to mean that Claimant's rights as a distributor were not changed by the 1998 Agreement: Claimant's territory was made smaller (from Belgium and Luxembourg to just Belgium), its exclusive distributorship was changed into a non-exclusive distributorship, and distribution activities were reduced by exclusion of the House Accounts. Section 16 cannot be interpreted as affecting those basic changes. Compensation under Section 2 of the 1961 Act relates strictly to the distributorship and must therefore be based on Claimant's rights as they relate to the distributorship created by the 1998 Agreement. In contradistinction, the damages under Section 3 of the 1961 Act relate to the clientele, and for the determination of those damages, it is logical (both from the perspective of reasonableness and by dint of Section 16 of the 1998 Agreement) to include the House Accounts. The House Accounts were the most important part of the clientele that Claimant had created for Respondent, and Claimant was still being compensated for these House Accounts under the 1998 Agreement. No such logic exists for compensation under Section 2 of the 1961 Act.

40.     Finally, the Arbitrator observes that for his determination of what the total length of the Termination Period should have been, he looked at *all* relevant factors, but he did *not* consider payment of commissions on the House Accounts for purposes of that calculation. The determination of the additional 12-month period was not in part based on the receipt of commissions for Respondent's sales to the House Accounts. Therefore,

- 12 -

the equitable compensation in lieu of that additional 12-month period should not be based on it either.

41.     The Arbitrator holds that compensation under Section 2 of the 1961 Act must exclude the commission payments Claimant would have received during the additional 12-month period. Claimant's claim under this heading is therefore dismissed.

## VI.    CLAIMANT'S CLAIM RELATING TO CONVERSION INTO EURO'S OF THE QUARTERLY AMOUNTS OF UNPAID COMMISSIONS.

42.     As stated in ¶21(ii) above, Claimant's second claim deals with the damages suffered by Claimant that relate to the commissions Respondent should have paid to Claimant with respect to products sold to the House Accounts. Claimant alleges that the Arbitrator should have expressed those damages in Euros rather than United States Dollars, and that the award of US$2,081,043 in ¶175(5) of the Partial Award gives rise to a new claim for compensatory interest in the amount of €821,916. Claimant argues that pursuant to applicable Belgian law the quarterly dollar amounts computed by the Arbitrator need to be converted into Euros at the end of each such quarter when they were due and payable. Claimant's Memorial dated December 12, 2007 "regarding the computation of the damages awarded by Partial Award dated November 9, 2007", ¶2; Claimant's Memorial dated December 12, 2007 "regarding compensation for currency devaluation".

43.     Claimant correctly argues that the Terms of Reference and, amongst others, its Post Hearing Memorial of May 31, 2007 stated its total claim of unpaid commissions on the House Accounts in Euros and not in United States Dollars. It is true that certain of Claimant's arguments in its various memorials that preceded the Partial Award discuss its claims in United States Dollars, but those arguments focused more on known components of its total damages, or the sale of components for which it argued to have earned design wins. See, e.g. Claimant's Post-Hearing Memorial pp. 71-73. Importantly, however, in Paragraph III.3.7 of its Post Hearing Memorial, Claimant alleged that Respondent held

back commission payments in an amount of *at least* €1,749,953.21. This claim is also reflected in ¶35(E) of the Partial Award.

44.    Claimant further observes that the Partial Award ordered Respondent to pay to Claimant an amount of US$2,081,043 for unpaid commissions relating to the 1999-2003 period, and that the Arbitrator based this amount on historical dollar amounts of the respective transactions. Partial Award ¶¶153-163. In the meantime, however, the United States Dollar has suffered a strong devaluation vis-à-vis the Euro.

45.    The issue raised by Claimant, therefore, is whether it can claim the damages it suffered as a result of the fact that the awarded compensation is in "historical dollar amounts", which, if converted into Euros at the current exchange rate, are far below the aggregate amounts Claimant would have received had it been able to convert payments in dollars at the respective Euro exchange rates prevailing at the time such payments should have been made. Claimant alleges that under Belgian law it is entitled to compensatory interest ("*vergoedende intresten*" or "*intérêts compensatoires*") in an amount estimated at €821,916, which will compensate Claimant for the difference between the (nominal) US Dollar amount awarded in the Partial Award and the damages actually suffered by Claimant as of the date of the Partial Award. Finally, Claimant claims that interest ("*verwijlsintresten*") is payable on these "compensatory interest".

46.    Respondent argues that the Arbitrator correctly decided the damages payable to Claimant for unpaid commissions in United States Dollars, since the obligation under the 1998 Agreement was expressed in US Dollars, the parties always conducted all their transactions in US Dollars, and Claimant lacks any legal basis for a conversion of the US Dollar award into Euros. Respondent's arguments are unfounded, as under Belgian law this is not an issue determined by the currency used in the contract, but rather by the nature of the debt and the currency risk associated with that type of debt. Finally, Respondent argues that the currency that applies at the place of arbitration, California, is also the United States Dollar. This argument also lacks merit, as the 1998 Agreement explicitly provides that Belgian law, not California law, applies. See ¶6 above.

- 14 -

47.     The parties agree that the issue raised by Claimant is controlled by Belgian law. The Arbitrator agrees with this conclusion. Having reviewed the literature as well as the case law submitted by the parties, the Arbitrator concludes that, reduced to its most basic elements, the question under Belgian law that needs to be resolved is whether the damages fixed by the Arbitrator in his Partial Award respecting the unpaid commissions on sales to the House Accounts relate to a "debt of a certain amount" ("*numerieke schuld*" or "*geldschuld*" – "*créance de somme*") or a "debt of value" ("*waardeschuld*" – "*créance de valeur*"). Both parties have submitted extensive literature and case law to support their respective positions with respect to this question, Claimant supporting the theory that this is a debt of value, Respondent supporting the conclusion that this concerns a debt of a certain amount.

48.     The Arbitrator finds that the most useful definition of a "debt of a certain amount" was offered by Professor R.O. Dalq, in "*Solutions judiciaires et législatives aux conséquences de l'inflation sur le droit de la responsabilité des contrats et de l'enrichissement sans cause*", in RAPPORTS BELGES AU XIE CONGRÈS DE L'ACADÉMIE INTERNATIONAL DE DROIT COMPARÉ 241, 250-251 (Kluwer Anvers & Bruylant Bruxelles, 1982). According to Professor Dalq, a debt of a certain amount ("*créance de somme*") "is not an amount 'to be determined' but an amount fixed in advance for which all the elements needed for its determination are certain." [*translation by Arbitrator*] Dalq, at 250.

49.     On the other hand, a "debt of damages and interest that may result from the failure to carry out the contract or from its bad implementation is a debt of value and not a debt of a certain amount, in this sense that the amount of damages and interest remains undetermined until the day on which they will be fixed by a judicial decision, or by agreement between the parties." [*translation by Arbitrator*] Dalq, at 251.

50.     Here, the claim in question involves "a claim for damages and interest that results from the failure to carry out a contract or from its bad implementation." Its quantum

- 15 -

remained undetermined until the Arbitrator fixed the amount in the Partial Award. Based on the foregoing, the Arbitrator holds that the claim for damages suffered by Claimant that relate to the commissions Respondent should have paid to Claimant with respect to products sold to the House Accounts constitutes a claim of value and not a claim for a certain amount. See also Supreme Court, 26 February 1930, 1930-I *Pas.* 276, and Supreme Court, 26 February 1931, 1931-I *Pas.* 94.

51.     The distinction between these two concepts of debt has important consequences, as it is determinative of whether or not the principles enunciated in Articles 1153 and 1895 of the Civil Code apply. Article 1153 provides that in the case of a delay in the payment of a certain money amount, only statutory interest is owed. Article 1895 provides that a loan obligation remains payable in the currency expressed in the contract, without regard to the fluctuation of the currency. In other words, the principle underlying Article 1895 puts the currency risk with the lender, even if the borrower repays the loan too late.

52.     This principle not only applies to loans (which are, of course, claims for a certain amount), but has been extended to apply to other debts of a certain amount, such as the obligation to pay a purchase price. The distinction between the two types of debts is not always clear. For example, in a recent decision of November 10, 2005, *Justel* No. N-20051110-11, the Supreme Court reversed the lower court's decision to grant "compensatory interest" to the donor of a gift who had demanded its return from an ungrateful donee in accordance with Article 958(2) Civil Code, holding that it was a debt of a certain amount so that the donor and not the donee ran the currency risk.

53.     The Supreme Court has made clear, however, that neither Article 1153 nor 1895 of the Civil Code applies to debts of value. See, e.g., Supreme Court, 4 September 1975, 1975-1976 *RW* 1561, with Note by Hans van Houtte; and Supreme Court, 28 September 1995, 1995-1996 *RW* 924.

54. In the event of non-payment of a "debt of value", the court will have to establish the amount of compensatory interest by estimating the debt owed in money, on the basis of Articles 1149 through 1151 of the Civil Code, and by applying the principle of complete restoration of the damages suffered by the plaintiff. Supreme Court, 26 February 1931, 1931-I *Pas.* 94. As a result, for a debt of value in a different currency, the currency risk rests with the debtor rather than the creditor. As the Arbitrator holds that the claim in question is a "debt of value" (see ¶50 above), Claimant is entitled to compensatory interest, and the Arbitrator needs to establish the amount thereof.

55. Under Belgian law, so-called "compensatory interest" compensates the Claimant for the difference between the amount of damages awarded on the basis of historical data, and the amount of damages actually suffered. Here, the amount of the damages determined on the respective due dates of the debt, when converted into Euros against the *currently* prevailing exchange rate, is substantially less than the damages actually suffered when expressed in Euros at the exchange rates that prevailed on those respective due dates of the debt (on which Respondent should have made these payments). Accordingly, Claimant is entitled to compensatory interest to make up for the difference.

56. The Arbitrator holds that the amount of these damages needs to be computed on the basis of the difference in the exchange rates applicable on the respective due dates of the debt and the date of the Partial Award. See Supreme Court, 4 September 1975, 1975-1976 *RW* 1561, Note Hans van Houtte (upholding the lower court's decision that the delay of the debtor in fulfilling his contractual obligations to pay an amount in foreign currency caused damages to the plaintiff). In that case, the Supreme Court affirmed the lower court's award of compensatory interest taking into consideration the economic loss of value of that currency on the exchange market from the due date of the debt until the date of the actual payment of the debt. 26 *RW* at 1563. Like here, that case involved an obligation expressed in a foreign currency to which the court found that Belgian law applied.

57.    Claimant has submitted a detailed computation of the differences in value of the quarterly damages expressed in United States Dollars and in Euros at the then prevailing exchange rate. Respondent has not questioned the accuracy of this aspect of Claimant's claim.    Therefore, the Arbitrator adopts in principle the calculations presented by Claimant, subject however to certain corrections of the net commissions in US Dollars and the applicable exchange rates.    Claimant's proposed exchange rates go to the date *prior* to the end of the quarter when the latter falls on a Saturday, Sunday or holiday, whereas it is customary to use the first business day *following* the last day of the quarter. Table I compares the amounts of commissions used by the Claimant with the amounts set forth in Table 2 of the Partial Award.    In addition, Table I compares the exchange rates proposed by Claimant versus the exchange rate for the first business day following the end of the quarter:

**TABLE I**

| Date [day, mo, yr] | Claimant's Net Commissions According to Claimant (in US $) | Corrected Amounts of the Claimant's Net Commissions (in US $) | Exchange Rate US $ / EUR | Corrected Exchange Rate US $ / EUR | Relevant Date [day, mo, yr] |
|---|---|---|---|---|---|
| 30/09/1999 | 98.903 | *111,909* | 1,0665 | 1.0665 | |
| 31/12/1999 | 58.203 | 58,203 | 1,0046 | *1.0090* | 03/01/2000 |
| 31/03/2000 | 128.526 | 128,526 | 0,9553 | 0.9553 | |
| 30/06/2000 | 150.330 | 150,330 | 0,9556 | 0.9556 | |
| 30/09/2000 | 174.055 | 174,055 | 0,8765 | *0.8802* | 02/10/2000 |
| 31/12/2000 | 207.594 | 207,594 | 0,9305 | *0.9423* | 02/01/2001 |
| 31/03/2001 | 96.469 | *221,916* | 0,8832 | *0.8772* | 02/04/2001 |
| 30/06/2001 | 197.351 | 197,351 | 0,8480 | *0.8455* | 02/07/2001 |
| 30/09/2001 | 197.712 | 197,712 | 0,9131 | *0.9125* | 01/10/2001 |
| 31/12/2001 | 195.579 | 195,579 | 0,8813 | *0.9038* | 02/01/2002 |
| 31/03/2002 | 165.070 | *165,671* | 0,8724 | *0.8786* | 02/04/2002 |
| 30/06/2002 | 141.769 | 141,769 | 0,9975 | *0.9913* | 01/07/2002 |
| 30/09/2002 | 117.424 | 117,424 | 0,9860 | 0.9860 | |
| 31/12/2002 | 93.750 | 93,750 | 1,0487 | 1.0487 | |
| 07/03/2003 | 63.725 | *70,392* | 1,1039 | 1.1039 | |
| 31/03/2003 | | | 1,0895 | 1.0895 | |
| 09/11/2007 | | | 1,4683 | 1.4683 | |

- 18 -

58.     The corrected numbers are incorporated into the Table set forth below and, to the extent necessary, recalculated to arrive at the correct result:

### TABLE II

| Due Date Commissions | Net Commissions US $ | Exchange Rate[1] US $ / EUR | Commissions in EUR according to exchange rate on due date | Commissions in EUR according to exchange rate on November 9, 2007 | Difference = amount of compensatory interest |
|---|---|---|---|---|---|
| 30/09/1999 | 111,909 | 1.0665 | 104,931 | 76,218 | 28,713 |
| 31/12/1999 | 58,203 | 1.0090 | 57,684 | 39,640 | 18,044 |
| 31/03/2000 | 128,526 | 0.9553 | 134,540 | 87,534 | 47,006 |
| 30/06/2000 | 150,330 | 0.9556 | 157,315 | 102,384 | 54,931 |
| 30/09/2000 | 174,055 | 0.8802 | 197,745 | 118,542 | 79,203 |
| 31/12/2000 | 207,594 | 0.9423 | 220,306 | 141,384 | 78,922 |
| 31/03/2001 | 221,916 | 0.8772 | 252,982 | 151,138 | 101,844 |
| 30/06/2001 | 197,351 | 0.8455 | 233,413 | 134,408 | 99,005 |
| 30/09/2001 | 197,712 | 0.9125 | 216,671 | 134,654 | 82,017 |
| 31/12/2001 | 195,579 | 0.9038 | 216,396 | 133,201 | 83,195 |
| 31/03/2002 | 165,671 | 0.8786 | 188,562 | 112,832 | 75,730 |
| 30/06/2002 | 141,769 | 0.9913 | 143,013 | 96,553 | 46,460 |
| 30/09/2002 | 117,424 | 0.9860 | 119,091 | 79,973 | 39,118 |
| 31/12/2002 | 93,750 | 1.0487 | 89,396 | 63,849 | 25,547 |
| 31/03/2003 | 70,392 | 1.1039 | 63,767 | 47,941 | 15,826 |
| Total | US$2,232,181 | | € 2,395,812 | € 1,520,251 | € 875,561 |

59.     The compensatory interest thus computed amounts to €875,561. Claimant, however, has submitted a claim for €821,916, and the Arbitrator cannot award more to Claimant than it has asked for.  Accordingly, the Arbitrator awards Claimant compensatory interest in the amount of €821,916, plus interest due at the Belgian statutory rate prevailing from time to time from the respective due dates set forth in Table II above until fully paid.

## VII.    CLAIMANT'S CLAIMS RELATING TO CAPITALIZATION OF INTERESTS.

60.     In its Memorial dated December 21, 2007, Claimant alleged that pursuant to Article 1154 of the Civil Code it is entitled to capitalization of the interest awarded in ¶¶107, 163 and the dispositive paragraph of the Partial Award, so that such interest will itself yield interest from January 1, 2008. Claimant's Memorial dated December 21,

---

[1] Source: European Central Bank, Statistical Data Warehouse, http://sdw.ecb.europa.eu/quickview.do?SERIES_KEY=120.EXR.D.USD.EUR.SP00.A

2007 "concerning claim and demand for payment regarding capitalization of interest". In its Supplemental Memorial dated April 14, 2008, Claimant modified and extended its claim for capitalization of interest as follows:

(1) *Concerning unpaid commissions awarded by the Partial Award:*

    (a) capitalization of interest so that interest accrued from 1999 through 2003 (¶163 Partial Award) through November 9, 2007 (the date of the Partial Award) shall be added to principal on January 1, 2008, causing interest to accrue on those amounts of interest from that date;

    (b) to decree that interest accruing from November 10, 2007 in the future will be capable of being further capitalized annually by complying with the conditions of Article 1154 Civil Code pursuant to service of judicial notice in accordance with the *Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters* (concluded November 15, 1965).

(2) *Concerning the restitution of FAE related expenses awarded by the Partial Award:*

    (a) capitalization of interest so that interest accrued from March 7, 2003 (¶107 Partial Award) through November 9, 2007 (the date of the Partial Award) on the principal amount of US$43,861 shall be added to principal on January 1, 2008, causing interest to accrue on that amount of interest from that date;

    (b) to decree that interest accruing from November 10, 2007 in the future will be capable of being further capitalized annually by complying with the conditions of Article 1154 Civil Code pursuant to service of judicial notice in accordance with the *Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters* (concluded November 15, 1965).

(3) *Concerning capitalization of the interest on the sums to be awarded by the Final Award (restitution publicity expenses, additional termination compensation, compensation for clientele, compensatory payment for exchange rate related losses, attorneys' fees and costs of the arbitration):*

(a) capitalization of interest so that the interest accrued from the respective dates on which the sums are to be awarded respectively were owed until December 31, 2007 shall be added to principal on January 1, 2008, causing interest to accrue on those amounts of interest from that date;

Additionally, capitalization of such interest so that the interest accrued from January 1, 2008 through the date of the Final Award shall be added to principal on the date of the Final Award, causing interest to accrue on those amounts of interest from that date;

(b) to decree that interest accruing from the date of the Final Award in the future will be capable of being further capitalized annually by complying with the conditions of Article 1154 Civil Code pursuant to service of judicial notice in accordance with the *Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters* (concluded November 15, 1965).

61.     Article 1154 of the Belgian Civil Code provides that "interest on capital that has become due may accrue interest, either as a result of a judicial notice or as a result of a special agreement, provided that the notice or the agreement relates to interest that is owed for at least an entire year." *(unofficial translation by Arbitrator)* The principle enunciated in Article 1154 is called *"anatocisme"* in both Dutch and French, best translated as "compound interest" or "capitalization of interest."

Whenever Article 1154 applies, however, it subjects the possibility of capitalization of interest to two conditions[2]:

(i)     the creditor must notify the debtor by serving a judicial notice on it, or a "special agreement" must exist between the parties; and

---

[2] Roodhooft recognizes a third condition, namely that the judicial notice must specify the amount of the interest to be capitalized. II.4 BESTENDIG HANDBOEK VERBINTENISSENRECHT 198h (J. Roodhooft, Ed.; Kluwer Mechelen, 2007). This view is based on lower court decisions (Bergen, 2 December 1996, 1997 *J.T.* 272; Antwerpen, 9 November 1999, 2000-01 *A.J.T.* 571) that have since been overruled by the Supreme Court's decision of 25 April 2001 (C9900004Fv), *Justel* N-20010426-6, when the Supreme Court ruled explicitly that "Article 1154 of the Civil Code does not require that the amount of the accrued interest is mentioned in the complaint." See *infra*, ¶73.

(ii)    such notice or agreement must relate to interest which is owed for at least an entire year.

62.    A preliminary question arises whether the Arbitrator has jurisdiction over an issue involving Article 1154 of the Civil Code. Respondent argues that the Arbitrator has no jurisdiction as Article 1154 conditions its application on service of a judicial notice by a bailiff or the existence of a special agreement. The word "judicial" relates to a proceeding before a regular Belgian court, and therefore, Respondent argues, excludes any form of extrajudicial dispute resolution such as arbitration. Case law has made clear that a judicial notice must be made either (i) by filing a complaint through a bailiff or (ii) a brief or memorial filed with the clerk of the court. Besides, Respondent does not know of any case in which a domestic or international arbitrator has considered or awarded a claim pursuant to Article 1154.

63.    Claimant argues that the Arbitrator has jurisdiction as (i) neither the substantive nor the procedural law of Belgium provide for, or have, a principle that excludes the application of Article 1154 in case of arbitration, and (ii) the requirement of a judicial notice only regards the manner by which capitalization can be triggered, and does not in any way limit the jurisdiction of either court or arbitrator. In any event, the jurisdiction of an arbitral tribunal is generally held to be identical to that of a court. G. KEUTGEN & G.-A. DAL, *L'arbitrage en droit belge et international* 278, No. 328 (Bruylant, 2006).

64.    Claimant further argues that excluding the applicability of Article 1154 Civil Code from an arbitral proceeding would go against the *ratio legis* of Article 1154, as it is designed to protect the *debtor* to some degree from the effect of capitalization of the interest accruing on the principal amount owed by him, such effect being a rapid increase in the amount of such interest. H. DE PAGE, 3 *Traité élémentaire de droit civil belge* No. 149 (Bruylant, 1952-1975). Finally, Claimant argues that if Article 1154 were not to apply, then the court or arbitrator can apply capitalization of interest without any conditions, - based on the principle of complete compensation of damages.

65.     Applying the principle that the jurisdiction of an arbitral tribunal is identical to that of a court (of course, subject to any jurisdictional limits imposed by the arbitration clause contained in the parties' agreement), and considering that Article 1154 is designed to protect the debtor rather than favor the creditor, the Arbitrator holds that he has jurisdiction over the issues raised by, and the possible application of, Article 1154 of the Civil Code.

66.     A further preliminary issue arises as to whether Claimant has complied with the conditions set forth in Article 1154: specifically, whether (i) delivery of the memorial dated December 21, 2007 to Respondent, the Arbitrator and the ICC Secretariat rises to the level of a valid judicial notice, and (ii) the requirement of passage of an entire year has been complied with.

67.     The first issue has become moot, as Claimant has instructed its bailiff to serve the judicial notice on Respondent in compliance with the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters (hereinafter the "Hague Convention"). As Respondent has not indicated that it was *not* so served, Claimant's statement to this effect can be accepted as true. Hence, the Arbitrator assumes that valid judicial notice to Respondent in compliance with the Hague Convention has taken place. The Arbitrator therefore need not consider Claimant's contention that the memorial dated 21 December 2007 constituted adequate judicial notice in the sense of Article 1154, and/or that the parties' agreement to submit their arbitration to the ICC Rules and/or the Terms of Reference constitute the "special agreement" referred to in Article 1154.

68.     The Supreme Court, in its decision of 21 December 2006 (C050210N, *Justel* N-20061222-3) held, in Paragraph 13 of its opinion, as follows:

    "Article 1154 of the Civil Code, which subjects the capitalization of interest regarding interest on capital to certain conditions, relates to money debts. This provision does not apply to compensatory interest on debts of value, such as the obligation to pay

damages resulting from breach of contract, when the amount of the compensation is totally left to the court.

In relation to debts of value, the court may award interest on compensatory interest without being bound by the conditions of Article 1154 of the Civil Code, if it concludes that this is required for a full compensation of the damages." [*translation by Arbitrator*]

69.    It is clear from the above-quoted decision of the Supreme Court that Article 1154 of the Civil Code does not apply to interest on debts of value. See also Supreme Court, 27 October 1988, *A.C.* 1988-89, 238; *R.W.* 1989-90, 163; Supreme Court, 7 November 1986, *A.C.* 1986-87, 329; Supreme Court, 29 October 1956, I *Pas.* 202 (1957). Excepting the award of the claim for restitution of the one-third portion of the salary of Respondent's Field Application Engineer in the amount of US$43,861 (which is discussed in more detail in ¶73 below), the Arbitrator holds that the amounts determined in the Partial Award, as well as *all* amounts determined in this Final Award, constitute debts of value. The Arbitrator finds that, except for the US$43,861, Article 1154 does not apply to the interest accrued from the respective due dates (in the 1999-2003 timeframe) of Respondent's debt obligations recognized and quantified in the Partial Award and in this Final Award.

70.    A debt of value transforms into a debt of a certain amount by the determination of the amount of damages by the court (or arbitrator) on the date of its judgment (or arbitral award). See Supreme Court, 21 December 2006 (C050210N, *Justel* N-20061222-3), Para. 14; C. Biquet-Mathieu & C. Delforge, *Le régime juridique des intérêts – Essai de synthèse*, CHRONIQUE DE DROIT À L'USAGE DES JUGES DE PAIX ET DE POLICE 239, 259 No. 30 (2008). Thus, Respondent's above-described debt obligations that are characterized as debts of value, convert into debts of a certain amount on the dates of the Partial Award and this Final Award, respectively. Article 1154 will apply to these debts to the extent they remain unpaid, but only after the second condition of Article 1154 has been fulfilled, namely that at least an entire year has elapsed. Clearly, this will not occur until November 9, 2008 for the obligations quantified in the Partial Award, and not until 365

- 24 -

days from the date of receipt of this Final Award for the obligations quantified in this Final Award.

71.    Claimant seeks capitalization of the compensatory interest awarded in the Partial Award, as well as any compensatory interest the Arbitrator awards in this Final Award. From the above-quoted decision of the Supreme Court of 21 December 2006 ((C050210N, *Justel* N-20061222-3), it is clear as to debts of value that (i) the court (or arbitrator) is not bound by the conditions of Article 1154 of the Civil Code, and (ii) the court (or arbitrator) has *discretionary* authority whether or not to award interest on compensatory interest. Indeed, the Supreme Court authorizes the court (or arbitrator) to award it "if it concludes that this is required for a full compensation of the damages." (Paragraph 13 quoted in ¶68 above, *in fine*)

72.    The Arbitrator, in the exercise of this discretionary authority, concludes that interest on interest is not required in order to fully compensate Claimant's damages. The Arbitrator holds that Claimant is fully compensated by the sum of the principal amounts awarded in the Partial Award, the regular interest accruing thereon through November 9, 2007 and (where applicable) the additional compensatory amount herein awarded to account for exchange rate related losses. Similarly, the Arbitrator holds that the sums awarded in this Final Award constitute full compensation of Claimant's damages and need not be further augmented by awarding interest on interest. See Supreme Court, 13 March 2008, C060657.F/1, *Justel* F-20080314-3). Accordingly, Claimant's claims set forth in ¶60(1)(a) and (3)(a) above are dismissed.

73.    Following the analysis set forth in ¶¶47-56 above, the Arbitrator holds, however, that the amount of US$43,861 in restitution of Claimant's contribution to the salary of Respondent's Field Application Engineer (which is the subject of Claimant's claim set forth in ¶60(2)(a) above), must be considered a "debt of a certain amount", as it is a specific claim asserted in US Dollars by Claimant, uncontested by Respondent as to the accuracy of the amount, and so awarded by the Arbitrator. Professor Dalq (as quoted in ¶48 above) defined it as follows: "a debt of a certain amount (*"créance de somme"*) is not

an amount 'to be determined' but an amount fixed in advance for which all the elements needed for its determination are certain." [*translation by Arbitrator*] Dalq, at 250. Here, the amount of US$43,861 is one that was "fixed in advance for which all the elements needed for its determination are certain." Pursuant to Article 1154 of the Civil Code, the interest on this amount may be capitalized from a date that is at least one entire year from the date the restitution was due (which is assumed to be on March 7, 2003, the final day of the Termination Period (as that term is defined in ¶23 of the Partial Award)). Thus, Claimant's demand set forth in ¶60(2)(a) above for capitalization from January 1, 2008 of the accrued interest on this amount succeeds. As previously discussed, as a debt of a certain amount, it remains a dollar obligation, which may be paid either in US dollars or in Euros, converted at the exchange rate applicable on the date of payment. Similarly, the interest accruing on this amount and the interest thereon, remain US dollar obligations, but are calculated at the Belgian statutory rate prevailing from time to time.

74.    Claimant's claims set forth in ¶60(1)(b), (2)(b) and (3)(b) above relate to the application of Article 1154 of the Civil Code to *future* capitalization of the interest that will have accrued on or after November 9, 2008 on the amounts quantified in the Partial Award, and on or after the date that is 365 days from the date of receipt of this Final Award on the amounts quantified in this Final Award. In this regard, it is important to note that the judicial notice referred to in Article 1154 does *not* require that the amounts of interest on the relative principal amounts be specified in the judicial notice. Supreme Court, 26 April 2001, A.C. 2001, No. 235. The present claims are therefore not invalidated by a failure to indicate a specific amount. It is sufficient that Claimant serve a judicial notice on the Respondent that specifically demands capitalization of interest.

75    If this matter were being litigated in a Belgian court, a demand for *future* capitalization would likely be unnecessary. Ordinarily, such demand would not be brought until the conditions set forth in Article 1154 had been fulfilled. A demand made in advance of the fulfillment of these conditions is justified, however, in an international arbitration, since the jurisdiction of the arbitral tribunal must ordinarily end on the date

- 26 -

the tribunal renders its final award.[3]  Consequently, a demand for capitalization cannot be made at a later date before the very tribunal that is most familiar with the matter, and whose decision (in comparison to the judgment of a court) can be enforced more easily in a foreign country pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958 (the "New York Convention")[4], or, as here, is enforceable pursuant to 9 U.S.C. §202 *et seq.*, in the country where the arbitration is held but as to which a complicated foreign statute applies that the court in that country may find difficult to implement.

76.    Accordingly, the Arbitrator hereby decrees that the interest accruing from the date of the Partial Award, as well as the interest that will accrue from the date of this Final Award, in the future will be capable of being capitalized annually by complying with the conditions of Article 1154 Civil Code, (i) by service of judicial notice in accordance with the Hague Convention, and (ii) by the fact that such interest(s) shall have remained unpaid for at least an entire year.

## VIII.  QUANTIFICATION ISSUES LEFT BY THE PARTIAL AWARD FOR FINDINGS AND CALCULATIONS BY THE EXPERT.

77.    On November 9, 2007, the Arbitrator rendered a Partial Award, by which the Arbitrator, in ¶175, ruled as follows:

(i)    With respect to Claimant's claim pursuant to Section 2 of the 1961 Act:

- An equitable and reasonable Termination Period would have been 30 months instead of the 18 months unilaterally determined by Respondent;

- the Claimant's claim for a compensatory payment succeeds insofar as it relates to the additional 12-month period hereby awarded. *The amount to be awarded to Claimant*

---

[3] In the spirit of the Rules, the jurisdiction of the tribunal ends on the date of the Final Award, or, as the case may be, on the date of an Addendum thereto at the latest.
[4] http://www.uncitral.org/pdf/english/texts/arbitration/NY-conv/XXII_1_e.pdf.

*hereunder (including interest thereon) is deferred to the Final Award following the findings and calculations by the expert, Mr. Carlo Van Der Herten.* [emphasis added]

(ii)    Claimant's claim pursuant to Section 21 of the 1995 Act fails and is dismissed.

(iii)    With respect to Claimant's claim that Respondent undermined MC's benefits during the Termination Period:

- Claimant's claim with respect to undue payment of publicity expenses succeeds with respect to the period from September 8, 2002 through March 7, 2003. *The amount to be awarded to Claimant hereunder (including interest thereon) is deferred to the Final Award following the findings and calculations by the expert, Mr. Carlo Van Der Herten.* [emphasis added]

- Claimant's claim with respect to reimbursement of MC's contribution to the FAE's salary succeeds in the sum of US$43,861, plus interest thereon at the statutory rate prevailing in Belgium.

- Claimant's claim with respect to damages suffered during the Termination Period as a result of Respondent's pricing and publicity campaign fails and is dismissed.

(iv)    Claimant's claim pursuant to Section 3 of the 1961 Act succeeds. The amount to be awarded to Claimant hereunder (including interest thereon) is deferred to the Final Award *following the findings and calculations by the expert, Mr. Carlo Van Der Herten,* on the basis of the monthly average gross margin on the sale of Maxim Products, calculated on the basis of the total gross margins on such sales obtained during the 36-month period comprised of the second semester of 1998, the calendar years 1999 and 2000 and the first semester of 2001, increased by a sum of US$1,072,521.21, representing the total gross receipts in additional commissions MC should have received during this same 36-month period.[5] The monthly average thus obtained shall be multiplied by twelve. [emphasis added]

---

[5] As amended by the Addendum to Partial Award dated March 29, 2008.

- 28 -

(v)    Claimant's claim for relief in respect of underpayment of commissions on the House Account succeeds in the sum of US$2,081,043, plus interest thereon at the statutory rate prevailing in Belgium.

78.    Mr. Carlo Van Der Herten rendered his final report to the Arbitrator on March 12, 2008 (herein the "Report"). The Report was able to quantify each of the three areas for which the Arbitrator requested the Expert's input.  The Report's findings will be discussed in more detail with respect to each of those three areas.

## IX.    QUANTIFICATION OF THE COMPENSATORY DAMAGES PURSUANT TO SECTION 2 OF THE 1961 ACT.

79.    The Arbitrator determined in the Partial Award that an equitable and reasonable Termination Period under Section 2 of the 1961 Act would have been 30 months instead of the 18 months unilaterally determined by Respondent, and that Claimant's claim for compensatory payment pursuant to Section 2 succeeds insofar as it relates to the additional 12-month period so awarded.

80.    The Arbitrator directed the Expert to compute the compensatory payment on the basis of the average (annual) semi-gross profits achieved by the distributor as of the date of the notice of termination. For purposes of the foregoing, the Arbitrator held that the average semi-gross profits shall mean Claimant's net profits plus the general "non-compressible" expenses ("*niet-samendrukbare kosten*"), insofar as they relate to the exploitation of the distributorship that had been terminated.  Such non-compressible expenses are deemed to exclude the publicity expenses referred to above in ¶77(iii), first bullet point.  In order to arrive at the average annual semi-gross profits as of the date of termination, the Expert was instructed to examine such profits over the second semester of 1998, the calendar years 1999 and 2000 and the first semester of 2001, the sum of which was to be divided by three.

81.    The Arbitrator reserved for later determination the issue as to (a) whether or not these numbers needed to be increased by the additional gross receipts in commissions

- 29 -

that Claimant should have received during the 36-month period referred to above (to be divided by three), and (b) whether, and if yes, when and at what exchange rate, the US Dollar amounts of such commissions had to be converted into Euros. It should be noted that the issue(s) under (b) do not arise if the first issue is answered in the negative.

82.     The question as to whether these numbers must be increased by the additional gross receipts in commissions has already been discussed extensively in ¶¶32-41 above, and in ¶41 the Arbitrator concluded that compensation under Section 2 of the 1961 Act must exclude the commission payments Claimant would have received during the additional 12-month period. The same reasoning to exclude applies to the commissions Claimant actually received during the 36-month period that is used to calculate the "average" semi-gross profits which determine the compensatory payment in lieu of the additional 12-month period.

83.     Accordingly, the calculations prepared by the Expert that included commissions, are adjusted as follows:

**TABLE III**

|  | Period July 1, 1998 – Dec.31, 1998 | Year 1999 | Year 2000 | Jan. 1, 2001 – June 31, 2001 |
|---|---|---|---|---|
|  | Bfr. | Bfr. | Bfr. | Eur |
| **Gross Profits**[6] | 4,448,395 | 8,409,915 | 11,547,999 | 326,430 |
| *minus* variable costs[7] *ratio* (part Maxim)[8] | 1,947,568 (36.44% of 5,344,588) | 3,916,969 (43.31% of 9,044,029) | 5,827,935 (57.67% of 10,105,662) | 117,072 (62.50% of 187,315) |
| **Semi-Gross Profits** | 2,500,827 or €61,994[9] | 4,492,946 or €111,377 | 6,720,064 or €141,802 | €209,358 |

---

[6] See the Expert's Final Report, p. 18, "gross margin sales" (first line in table entitled "Summary: Gross margin → net result after corrections").

[7] Ibid., "variable costs" (4th line in table entitled "Summary: Gross margin → net result after corrections").

[8] See the Expert's Final Report, p. 11, "%" (6th line in table entitled "Turnover Maxim-products and other products").

[9] The official conversion rate of Belgian Francs to Euros is 40.3399, so that €1.00 = Bfr. 40.3399. See, e.g., http://fisconet.fgov.be/nl/?bron.dll&root=V:/sites/FisconetNldAdo.2/&versie=04&file=bronnen/cir&zoek=0000000 00&name=19.12.01/1&.

- 30 -

The sum of the semi-gross profits as set forth in the above table for the 36-month period is €524,531 (€61,994 + 111,377 + 141,802 + 209,358). The average semi-gross profits for the 12-month period constituting the compensatory payment pursuant to Section 2 of the 1961 Act is therefore €174,844 (€524,531 divided by three). Accordingly, the Arbitrator awards Claimant a compensatory payment for the period during which Claimant did not enjoy the benefit of the Termination Period, in the amount of €174,844.

As the Arbitrator observed in ¶82 of the Partial Award, this amount shall be payable together with interest thereon at the Belgian statutory rate prevailing from time to time, from the date on which the additional 12-month period would have ended, i.e. March 7, 2004[10] until fully paid.

## X.   QUANTIFICATION OF CLAIMANT'S CLAIM RESPECTING UNDUE PAYMENT OF PUBLICITY EXPENSES.

84.     The second item that the Expert was asked to compute concerned the publicity expenses incurred by Claimant during the six-month period form September 8, 2002 through March 7, 2003.

85.     The Expert reported that Claimant produced three invoices that qualify for the above. The invoices are reproduced in Appendix 3 to the Report. The Arbitrator finds that the first such invoice, as reproduced in Appendix 3, indicates that it concerns the period of July 2002 through September 2002. As the relevant six-month period commenced on September 7, 2002, no more than a 23/92 portion of the first invoice can be taken into consideration. The amount to be included from this invoice therefore is 23/92 of US$9,135.00 = US$2,283.75 (rounded: US$2,284).

---

[10] Computing interest from this date is a logical consequence of the fact that the obligation to make such a compensatory payment is not an "autonomous contractual obligation, but takes the place of the breached obligation to observe a reasonable Termination Period." Supreme Court, 4 December 2003, 2005-2006 *RW* 257-258.

86.     The Arbitrator accepts the Expert's findings with respect to the other two invoices. Therefore, the total amount of publicity expenses incurred by Claimant during the relevant six-month period is as follows:

**TABLE IV**

|  | *Date document* | *Specification* | *Amount in US$* |
|---|---|---|---|
| **1) invoice M5070 (allocated portion 23/92)** | Nov.1, 2002 | Merchandising Sep.8–30, 2002 | 2,284 |
| **2) invoice M5130** | Feb.13, 2003 | Merchandising Oct.–Dec. 2002 | 10,801 |
| **3) invoice M5153** | Mar.4, 2003 | Merchandising Jan.-Mar. 2003 | 5,595 |
| **Total** |  |  | 18,680 |

87.     The Arbitrator holds that this amount of US$18,680 is also a debt of value, as the applicable time period had not been determined until the Partial Award, and the amount of publicity expenses incurred during that time period had not been determined until this Final Award. As a consequence, Claimant is entitled to a payment of this amount in Euros (see ¶¶49-54 above). Claimant sought a combined amount of €92,182.35 for the restitution of FAE-elated expenses (US$43,861.49) and the publicity expenses (US$77,303) using an exchange rate of 1.3144. As the analysis of the law governing debts of value shows, however, the amount of US$18,680 must be converted as of the day(s) the payments to Respondent were actually made. As these days are not known, the Arbitrator hereby establishes March 31, 2003 as a fair and reasonable estimate of the date for conversion. The exchange rate for that date as published by the European Central Bank[11] was 1.0895. The principal amount in Euros is therefore €17,145.

88.     Consequently, the Arbitrator awards Claimant an amount of €17,145, which shall be payable together with the Belgian statutory interest prevailing from time to time from March 31, 2003 until fully paid.

---

[11] See http://sdw.ecb.europa.eu/quickview.do?SERIES_KEY=120.EXR.D.USD.EUR.SP00.A.

- 32 -

## XI.    QUANTIFICATION OF THE EQUITABLE COMPENSATION PURSUANT TO SECTION 3 OF THE 1961 ACT.

89.    With respect to the quantification of the equitable compensation pursuant to Section 3 of the 1961 Act, the Arbitrator ruled in his Partial Award, as modified by the Addendum, that "the amount to be awarded to Claimant hereunder (including interest thereon) is deferred to the Final Award following the findings and calculations by the expert, Mr. Carlo Van Der Herten, on the basis of the monthly average gross margin on the sale of Maxim Products, calculated on the basis of the total gross margins on such sales obtained during the 36-month period comprised of the second semester of 1998, the calendar years 1999 and 2000 and the first semester of 2001, increased by a sum of US$1,072,521.21, representing the total gross receipts in additional commissions MC should have received during this same 36-month period.  The monthly average thus obtained shall be multiplied by twelve."

90.    The Expert performed the calculation largely in accordance with the Arbitrator's instructions on pages 21 and 22 of his Report.  However, the Expert expressed concern about the conversion rates.  Indeed, it appears that the Expert did not convert all commission amounts into Euros.  For the periods after January 1, 2001, the Expert correctly converted the US dollar amounts into Euros as of the dates they should have been received.  Accordingly, the Arbitrator must re-calculate in part the amounts in such a manner that they conform to his holding in Part VI of this Final Award.

91.    Using the official exchange rates at the end of each quarter (or the next business day if the end of the quarter fell on a weekend or a holiday) as published by the European Central Bank,[12] the Arbitrator comes to the following table:

---

[12] See http://sdw.ecb.europa.eu/quickview.do?SERIES_KEY=120.EXR.D.USD.EUR.SP00.A.

- 33 -

TABLE V

| Period | Gross margin Sales (rounded) | Commissions Received (rounded) | Additional Commissions Claimant should have received | Total |
|---|---|---|---|---|
| 1/7/98 – 31/12/98 | US$110,790 €93,977 | US$44,545 €37,785 | US$60,971 €51,719 | US$216,306 €183,481 |
| 1/1/99 – 31/12/99 | US$208,801 €174,692 | US$39,491 €33,040 | | US$501,621 €449,675 |
| Q1 – 1999 | | | US$33,380 €31,074 | |
| Q2 – 1999 | | | US$49,837 €48,254 | |
| Q3 – 1999 | | | US$111,909 €104,931 | |
| Q4 – 1999 | | | US$58,203 €57,684 | |
| 1/1/00 – 31/12/00 | US$267,368 €286,461 | US$202,850 €217,335 | | US$1,130,723 €1,213,702 |
| Q1 – 2000 | | | US$128,526 €134,540 | |
| Q2 – 2000 | | | US$150,330 €157,315 | |
| Q3 – 2000 | | | US$174,055 €197,745 | |
| Q4 – 2000 | | | US$207,594 €220,306 | |
| 1/1/01 – 30/06/01 | US$304,556 €353,580 | US$98,863 €114,777 | | US$822,686 €954,752 |
| Q1 – 2001 | | | US$221,916 €252,982 | |
| Q2 – 2001 | | | US$197,351 €233,413 | |
| Total 36 month period (gross) | US$891,515 €908,710 | US$385,749 €402,937 | US$1,394,072 €1,489,963 | US$2,671,336 €2,801,610 |
| Minus comm. already paid | | | | (US$385,749) (€402,937) |
| Total 36 month period (net) | | | | US$2,285,587 €2,398,673 |
| Total divided by 36 | | | | US$63,488.53 €66,629.81 |
| Multiplied by 12 | | | | US$761,862 €799,558 |

- 34 -

92.     Thus, the Arbitrator awards Claimant as and for additional equitable compensation pursuant to Section 3 of the 1961 Act an amount of €799,558,[13] plus interest thereon at the Belgian statutory rate, payable from September 7, 2001, until fully paid.

## XII.    COSTS RELATED TO THIS ARBITRATION

93.     By e-mail dated March 11, 2008, the Arbitrator invited the parties to submit details of their attorneys' fees and disbursements related to this arbitration, to be dealt with as part of the Final Award. Accordingly, Lafili, Van Crombrugghe & Partners on March 13, 2008 submitted their billed fees and disbursements on behalf of Respondent between March 28, 2007 and February 27, 2008 amounting to an aggregate amount of €540,786.03. On March 14, 2008, Novalex submitted a list of Claimant's invoiced fees and disbursements in the total amount of €2,250,762.89. Additional disbursements included sums paid to the ICC, namely US$186,000 on behalf of Claimant and US$46,000 on behalf of Respondent, as well as the advances paid to the ICC for the Expert, consisting of €15,918 on behalf of Claimant and €15,918 on behalf of Respondent.

94.     The parties subsequently exchanged correspondence in which Lafili, Van Crombrugghe & Partners contended that attorneys' fees and certain other costs claimed

---

[13] The following exchange rates were used herein:
*Quarterly Exchange Rates 1 Euro = -- US Dollar*
Source: European Central Bank

| | | |
|---|---|---|
| 04 Jan 1999 | 1.1789 A | Exchange Rate for 1998 |
| 31 Mar 1999 | 1.0742 A | |
| 30 Jun 1999 | 1.0328 A | |
| 30 Sep 1999 | 1.0665 A | |
| 03 Jan 2000 | 1.0090 A | Average for 4 quarters 1999: 1.19525 |
| 31 Mar 2000 | 0.9553 A | |
| 30 Jun 2000 | 0.9556 A | |
| 02 Oct 2000 | 0.8802 A | |
| 02 Jan 2001 | 0.9423 A | Average for 4 quarters 2000: 0.93335 |
| 02 Apr 2001 | 0.8772 A | |
| 02 Jul 2001 | 0.8455 A | Average for first 2 quarters 2001: 0.86135 |

by Claimant were not properly recoverable because an award of costs is not customary under Belgian law and the parties did not include a specific clause concerning costs in the 1998 Agreement.

95.     Respondent overlooks, however, that in their 1998 Agreement the parties agreed to ICC arbitration, and by doing so they incorporated the ICC Rules into their arbitration agreement.   In addition, Claimant already asserted a claim for an award of costs in Section 11.2 of the Terms of Reference, which was signed by or on behalf of Respondent and not previously objected to by Respondent other than by demanding payment of its own attorneys' fees and costs in its Post-Hearing Memorial (p. 140).

96.     Respondent further argues that the legal costs incurred by Claimant were substantially higher than those incurred by Respondent and were excessive and disproportionate to the matter at hand.

97.     Under Article 31 of the Rules, the Arbitrator is given broad discretion in relation to the award of costs.   In the exercise of this discretion, the Arbitrator takes into consideration in the award of costs the outcome of the proceedings.   In this matter, Respondent's relatively modest counterclaim was dismissed in its entirety, and while Claimant succeeds with respect to several of its claims, the amounts awarded are substantially less than the total amount of Claimant's claims.

98.     As a general principle, a party should be awarded only those costs that are both reasonably incurred and reasonable in amount.   Therefore, in addition to the outcome of the proceedings, the Arbitrator gives due consideration to the proportionality between the costs expended and the sums claimed and recovered.   Claimant claims to have incurred costs totaling more than €2,250,000.   Little would be gained by a detailed discussion of the arguments and considerations that could be put forward to justify different figures for the award of costs in the present circumstances.   Any such exercise would create an impression of precision that would be misplaced.   For the determination of an award of costs, the Arbitrator exercises his discretionary authority to arrive at what he considers to

be the correct solution after having taken a number of factors into consideration. Some of these factors may plead for awarding a higher amount in costs; some may convince the Arbitrator that a lower amount is more justified.

99.    Taking into account all the issues and all the decisions reached in both the Partial Award and this Final Award, the Arbitrator comes to the conclusion that Respondent shall bear the whole financial burden of its own costs, and that Claimant shall recover from Respondent the sum of €1,250,000 in respect of its legal costs including disbursements and expenses. Claimant shall bear the remainder of its own legal costs itself.

100.    The Arbitrator further determines that Respondent shall bear the costs of the arbitration. Claimant has paid to the ICC Secretariat US$186,000 as its separate advance on costs, whereas Respondent has paid US$46,000 as its advance on costs. In addition, the total cost of the Expert was €31,835.92, of which each party paid 50%. Accordingly, Respondent shall reimburse to Claimant the sum of US$186,000, as well as the sum of €15,917.96 paid to the ICC on account of fees and costs in connection with the services performed by the Expert.

## XIII.  AWARD

For the above reasons the Arbitrator awards as follows:

### THE ARBITRATOR AWARDS AND ADJUDGES THAT:

1.    Claimant's claim for further remuneration, as equitable compensation pursuant to Section 2 of the 1961 Act, of the gross commissions Claimant would have received during the additional 12-month Termination Period which the Arbitrator awarded pursuant to ¶175(1) of the Partial Award, fails and is dismissed.

- 37 -

2.  In addition to the amount of US$2,081,043 that the Arbitrator already awarded in ¶175, paragraph 5, of the Partial Award, Claimant's claim for compensatory interest in relation to the unpaid commissions on the House Accounts succeeds in the amount of €821,916, plus interest due at the Belgian statutory rate prevailing from time to time, from the respective Dollar-to-Euro conversion dates set forth in Table II in ¶58 hereof, until fully paid.

3.  Claimant's claims for capitalization of the interest awarded pursuant to the Partial Award and this Final Award fail insofar as such interest relates to debts of value.

4.  Claimant's claim for capitalization, in accordance with Article 1154 of the Civil Code, of interest accrued on the sum of US$43,861 (an amount that the Arbitrator already awarded in ¶175, paragraph 3, second bullet point, of the Partial Award) in restitution of the Claimant's share of the Field Application Engineer's salary succeeds; such capitalization to be effective from January 1, 2008, and annually thereafter, subject to Claimant's judicial notice to Respondent in accordance with the Hague Convention.

5.  Claimant's claim for the right to capitalization of interest accrued from November 10, 2007 relative to amounts awarded to Claimant in the Partial Award (other than the US$43,861 referred to in subparagraph 4 above), and from the date of this Final Award relative to amounts awarded to Claimant in this Final Award, succeeds; such capitalization to be effective from November 9, 2008 and the date that is 365 days from the date of receipt of this Final Award, respectively, and annually thereafter, subject to Claimant's judicial notice to Respondent in accordance with the Hague Convention.

6.  Claimant's claim for a compensatory payment for the 12-month period during which Claimant did not enjoy the benefit of the Termination Period pursuant to Section 2 of the 1961 Act, awarded in ¶175, paragraph 1, of the Partial Award, subject to computations performed by the Expert, succeeds in the amount of

- 38 -

€174,844, together with interest thereon payable at the Belgian statutory rate prevailing from time to time, from March 7, 2004 until fully paid.

7.    Claimant's claim for reimbursement of the publicity expenses awarded in principle in the Partial Award for the six-month period form September 8, 2002 through March 7, 2003, as determined with the assistance of the Expert, succeeds in the amount of €17,145, together with interest thereon payable at the Belgian statutory rate prevailing from time to time, from March 7, 2003 until fully paid.

8.    Claimant's claim for equitable compensation pursuant to Section 3 of the 1961 Act, awarded in ¶175, paragraph 4, of the Partial Award, subject to computations performed by the Expert, succeeds in the amount of €799,558, together with interest thereon payable at the Belgian statutory rate prevailing from time to time, from September 7, 2001 until fully paid.

9.    Respondent shall pay to Claimant the sum of €1,250,000 as a contribution to Claimant's legal costs and expenses.

10.    Respondent shall bear the cost of the arbitration, including the fees and expenses of the Arbitrator, together with the expenses of the ICC, aggregating US$226,000. Accordingly, Respondent shall reimburse to Claimant the sum of US$186,000 being the total advance paid by Claimant to the ICC on account of such costs. In addition, Respondent shall reimburse to Claimant the sum of €15,917.96 paid by Claimant to the ICC on account of fees and costs incurred in connection with the services performed by the Expert. Claimant has to bear the remainder of its costs itself and Respondent has to bear all of its costs.

11.   All other requests are rejected.


Place of Arbitration: San José, Santa Clara County, California

Dated this 12th day of July, 2008


Eric van Ginkel
Sole Arbitrator

- 40 -

# EXHIBIT 58

## Salcido, Jerry M

**From:**   Salcido, Jerry M
**Sent:**   Tuesday, July 29, 2008 9:29 AM
**To:**   Lawrence J. Siskind
**Cc:**   Seth I. Appel; Gamlen, Tod L
**Subject:** Maxim v. Master Chips: Proposed Stipulation

Dear Mr. Siskind:

We have received Master Chips' "Supplemental Cross-Petition to Confirm Arbitration Award" and supporting papers which was filed on July 24, 2008 and which Master Chips seeks confirmation of the Final Arbitration Award. Although we recognize Master Chips' right to move to confirm the Final Arbitration Award, we believe that the Supplemental Cross-Petition is procedurally improper. In hopes of avoiding the expense of litigating procedural matters, would Master Chips be interested in entering into a stipulation along the following lines:

- Master Chips withdraws its July 24 Cross Petition.
- If the Court grants Maxim Integrated Products, Inc.'s Petition to Vacate Arbitration Award, the parties agree that the Court's order will apply to both the Partial Award and the Final Award; that is, both awards will be vacated.
- If the Court denies Maxim Integrated Products, Inc.'s Petition to Vacate Arbitration Award and/or confirms the Partial Award, the Court's order will apply to both the Partial Award and the Final Award.

We believe that this should streamline the litigation by allowing the Court's order to bring finality to both the Partial and Final Award. Please let us know if you are in agreement. In the event that you do not agree we anticipate filing a motion to strike the Supplemental Cross Petition and also filing a Petition to Vacate the Final Award.

Sincerely,

Jerry

Jerry Salcido
Attorney at Law*
Baker & McKenzie LLP
660 Hansen Way
Palo Alto, California 94304-1044, USA
Tel: +1 650 856 5551
Fax: +1 650 856 9299
jerry.m.salcido@bakernet.com

*Admitted in California and Utah

Baker & McKenzie LLP is a member of Baker & McKenzie International, a Swiss Verein

8/7/2008

# EHHIBIT 59

## Salcido, Jerry M

**From:** Seth I. Appel [SAppel@harveysiskind.com]

**Sent:** Sunday, August 03, 2008 3:40 PM

**To:** Salcido, Jerry M; Lawrence J. Siskind

**Cc:** Gamlen, Tod L

**Subject:** RE: Maxim v. Master Chips: Proposed Stipulation

Jerry,

Master Chips does not agree to your proposed stipulation.

Regards,

Seth I. Appel

Harvey Siskind LLP

4 Embarcadero Center, 39th Floor

San Francisco, CA 94111

Telephone:  (415) 354-0100

Facsimile:  (415) 391-7124

The contents of this e-mail message and any attachments are confidential and are intended solely for the addressee. The information may be privileged by law. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you are not the intended recipient and/or have received this transmission in error, any use, reproduction or dissemination of this transmission or its contents is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or at 415.354.0100 and delete this message and its attachments, if any.

**From:** Salcido, Jerry M [mailto:Jerry.M.Salcido@BAKERNET.com]
**Sent:** Tue 7/29/2008 9:29 AM
**To:** Lawrence J. Siskind
**Cc:** Seth I. Appel; Gamlen, Tod L
**Subject:** Maxim v. Master Chips: Proposed Stipulation

Dear Mr. Siskind:

We have received Master Chips' "Supplemental Cross-Petition to Confirm Arbitration Award" and supporting papers which was filed on July 24, 2008 and which Master Chips seeks confirmation of the Final Arbitration Award.  Although we recognize Master Chips' right to move to confirm the Final Arbitration Award, we believe that the Supplemental Cross-Petition is procedurally improper.  In hopes of avoiding the expense of litigating procedural matters, would Master Chips be interested in entering into a stipulation along the following lines:

- Master Chips withdraws its July 24 Cross Petition.
- If the Court grants Maxim Integrated Products, Inc.'s Petition to Vacate Arbitration Award, the parties agree that the Court's order will apply to both the Partial Award and the Final

Award; that is, both awards will be vacated.
- If the Court denies Maxim Integrated Products, Inc.'s Petition to Vacate Arbitration Award and/or confirms the Partial Award, the Court's order will apply to both the Partial Award and the Final Award.

We believe that this should streamline the litigation by allowing the Court's order to bring finality to both the Partial and Final Award.  Please let us know if you are in agreement.  In the event that you do not agree we anticipate filing a motion to strike the Supplemental Cross Petition and also filing a Petition to Vacate the Final Award.

Sincerely,

Jerry

Jerry Salcido
Attorney at Law*
Baker & McKenzie LLP
660 Hansen Way
Palo Alto, California 94304-1044, USA
Tel: +1 650 856 5551
Fax: +1 650 856 9299
jerry.m.salcido@bakernet.com

*Admitted in California and Utah

Baker & McKenzie LLP is a member of Baker & McKenzie International, a Swiss Verein

Pursuant to requirements related to practice before the Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purposes of (i) avoiding penalties imposed under the United States Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message. Please visit www.bakernet.com/disclaimer_bm for other important information concerning this message.

8/7/2008